No. 25-7523

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

MGA ENTERTAINMENT INC., a California corporation,

*Plaintiff-Petitioner,*

v.

CLIFFORD "T.I." HARRIS, an individual; TAMEKA "TINY" HARRIS, an individual; OMG GIRLZ LLC, a Delaware Limited Liability Company; and DOES 1-10, inclusive,

*Defendants-Respondents,*

GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC, and OMG GIRL LLC

*Counter-Claimants-Respondents,*

MGA ENTERTAINMENT INC., ISSAC LARIAN, and DOES 1-10, inclusive,

*Counter-Defendants-Petitioners,*

_____

On Appeal from the United States District Court
for the Central District of California
No. 2:20-cv-11548, Hon. Judge James V. Selna

## RESPONSE TO PETITION FOR PERMISSION TO APPEAL PURSUANT TO 28 U.S.C. § 1292(b)

John R. Keville
Robert L. Green
Chante B. Westmoreland
SHEPPARD, MULLIN, RICHTER &
HAMPTON, LLC
845 Texas Avenue, 25th Floor
Houston, TX 77002
(713) 431-7100
jkeville@sheppardmullin.com
rgreen@sheppardmullin.com
cwestmoreland@sheppardmullin.com

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................6

II.  FACTS ......................................................................................................8

    A.   The OMG Girlz ...............................................................................8

    B.   The Lawsuit and Trials ....................................................................9

    C.   Post-Trial .......................................................................................14

III. LEGAL STANDARD ...............................................................................15

IV.  ARGUMENT.............................................................................................16

    A.   The Question of Whether the Amount of Punitive Damages
        Should Be Decided By A Judge or Jury Does Not Satisfy the
        Jurisdictional Requirements ...........................................................16

        1.   The Proposed Question Is Not Controlling.............................16

        2.   There Are Not Substantial Grounds for a Difference of
            Opinion...................................................................................17

        3.   An Interlocutory Appeal Will Not Materially Advance the
            Ultimate Termination of the Litigation ..................................20

    B.   The Question of Whether Punitive Damages Are Available
        Similarly Does Not Satisfy the Jurisdictional Requirements..............23

        1.   MGA Has Failed to Show Any Substantial Ground for
            Difference of Opinion On This Issue.....................................23

        2.   An Interlocutory Appeal Will Not Materially Advance the
            Ultimate Termination of the Litigation ..................................27

V.   CONCLUSION..........................................................................................28

1

TABLE OF AUTHORITIES

Page(s)

Cases

*Batterton v. Dutra Group*
No. CV 14-7667-PJW, 2015 WL 13752889 (C.D. Cal. Feb. 6, 2015) ..............15

*Beijing Tong Ren Tang (USA), Corp. v. TRT USA Corp.*
No. C-09-00882 RMW, 2011 WL 13143358, at *6 (N.D. Cal. Nov. 23,
2011) ......................................................................................................26, 28

*Bereda v. Pickering Creek Indus. Park, Inc.*
865 F.2d 49 (3d Cir. 1989) ...........................................................................21, 22

*Brewer v. Second Baptist Church of Los Angeles*
32 Cal. 2d 791 (1948) ...................................................................................23, 24

*California v. Altus Fin. S.A.*
540 F.3d 992 (9th Cir. 2008) ........................................................................26, 27

*Caterpillar Inc. v. Lewis*
519 U.S. 61 (1996).........................................................................................15

*In re Cement Antitrust Litig.*
673 F.2d 1020 (9th Cir. 1981) ......................................................................16

*Cheung v. Daley*
35 Cal. App. 4th 1673 (1995) .......................................................................25, 27

*Clark v. McClurg*
215 Cal. 279, 9 P.2d 505 (1932), 81 A.L.R. 908........................................23, 27

*Couch v. Telescope Inc.*
611 F.3d 629 (9th Cir. 2010) ........................................................................15

*Crevier v. Sullinger*
57 Fed. Appx. 319 (9th Cir. 2003)................................................................24

*Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*
946 F.3d 1367 (Fed. Cir. 2020) ....................................................................18

*Fuller v. City of Oakland, Cal.*
47 F.3d 1522 (9th Cir. 1995), *as amended* (Apr. 24, 1995) ...............................21

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*
579 U.S. 93 (2016)...................................................................................19

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*
28 F.4th 35 (9th Cir. 2022) ...................................................................22

*Haydel v. Morton*
8 Cal.App.2d 730, 48 P.2d 709 (1935)................................................23

*Horn v. Guar. Chevrolet Motors*
270 Cal. App. 2d 477 (Ct. App. 1969)..................................................26

*Jack Daniel's Props., Inc. v. VIP Prods. LLC*
599 U.S. 140 (2023)................................................................................12

*Jackson v. Johnson*
5 Cal. App. 4th 1350 (1992) ..................................................................27

*In re Javahery*
2017 WL 971780 (B.A.P. 9th Cir. Mar. 14, 2017).............................24

*Kizer v. County of San Mateo*
53 Cal.3d 139 (1991) .........................................................................24, 25

*Kuehner v. Dickinson & Co.*
84 F.3d 316 (9th Cir. 1996) ..................................................................16

*Liu v. SEC*
93 F.4th 1058 (9th Cir. 2024) ...............................................................20

*Markman v. Westview Instruments, Inc.*
517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996) .................18

*MJT Sec., LLC v. Toronto-Dominion Bank*
2006 WL 1236661 (9th Cir. May 9, 2006).........................................24

*Mother Cobb's Chicken Turnovers v. Fox*
10 Cal. 2d 203 (1937)............................................................................27

*In re Oracle Corp. Securities Litigation*
  627 F.3d 376, 386 (9th Cir. 2010) ..........................................................16

*Proofpoint, Inc. v. Vade Secure, Inc.*
  No. 19-CV-04238-MMC, 2023 WL 5723670
  (N.D. Cal. Sept. 5, 2023) .................................................16, 19, 20, 22

*Proofpoint, Inc. v. Vade USA, Inc.*
  2024 WL 4003096 (9th Cir. Aug. 30, 2024) .......................................19

*Quicksilver, Inc. v. Kymsta Corp.*
  No. CV 02-5497-VBF(MCX), 2007 WL 9712164
  (C.D. Cal. Dec. 5, 2007) ....................................................................17

*Riley v. Volkswagen Grp. of Am., Inc.*
  51 F.4th 896 (9th Cir. 2022) ..............................................................19

*Rogers v. Grimaldi*
  875 F.2d 994 (2d Cir. 1989) .........................................................12, 13

*Taylor v. Wright*
  69 Cal. App. 2d 371 (1945) ...............................................................19

*Topanga Corp. v. Gentile*
  249 Cal. App. 2d 681 (Ct. App. 1967)................................................24

*In re Tsay JBR LLC*
  136 F.4th 1176 (9th Cir. 2025) ..........................................................17

*Union County v. Piper Jaffray & Co.*
  525 F.3d 643 (8th Cir. 2008) .............................................................15

*WBIP, LLC v. Kohler Co.*
  829 F.3d 1317 (Fed. Cir. 2016) .........................................................16

*Weiss v. Blumencranc*
  61 Cal. App. 3d 536 (Ct. App. 1976)..................................................26

*Werschkull v. United Calif. Bank*
  85 Cal. App. 3d 981 (1978) ...............................................................26

*Yates v. Nimeh*
  486 F. Supp. 2d 1084 (N.D. Cal. 2007)..............................................24

<u>Statutes</u>

28 U.S.C. § 1292(b) ...............................................................................15

35 U.S.C. § 284 ......................................................................................19

Cal. Civ. Code § 3294 ............................................... 17, 19, 20, 23, 24, 25

Cal. Civ. Code § 3294(a) ........................................................................18

Defend Trade Secret Act...................................................................19, 20

Patent Act ........................................................................................18, 19, 20

Uniform Trade Secret Act.......................................................................19

<u>Other Authorities</u>

First Amendment....................................................................................12

Seventh Amendment .......................................................................7, 8, 16

Fed. R. Civ. P. 39 ...................................................................................21

Fed. R. Civ. P. 50 ...................................................................................28

## I.  **<u>INTRODUCTION</u>**

In 2020, the Harrises noticed a striking similarity between their popular music group, the OMG Girlz, and MGA's OMG Dolls.  They sent MGA a cease and desist letter. Without responding, MGA filed a declaratory judgment action leading to five years of litigation, multiple summary judgment rulings, a mistrial, two concluded trials, and an Order for a new trial limited to punitive damages. At the appropriate time, there will be appellate issues raised by both sides related to that history and that will be the time for MGA's current issue to be addressed. Now is not the time. MGA's issue does not merit interlocutory appeal for the reasons explained below.

In the most recent trial last fall, a jury found that MGA willfully infringed the OMG Girlz' trade dress, and maliciously and oppressively misappropriated their likeness in creating the seven accused dolls:



The jury awarded $17,872,253 in disgorgement damages for each claim, and another $53,616,759 in punitive damages for the misappropriation claim. At MGA's request, the jury also returned a verdict on other dolls, finding another 8 had used the OMG Girlz' trade dress and/or likeness, but because these were only in MGA's declaratory judgment case, MGA was assessed no disgorgement damages or punitive damages related to those dolls.

This Court should decline to take up the Seventh Amendment question because the factors needed for interlocutory appeal are not met. First, there is no substantial ground for difference of opinion. MGA does not dispute that the "longstanding two-step framework" is the appropriate test nor does it explain how the district court erred in applying that analysis. And second, even if MGA could overcome that hurdle, any advancement of the case would be marginal, not material, because there would still be a fourth jury trial to decide whether MGA acted with fraud, oppression or malice subjecting it to an award of punitive damages, followed by (1) if OMG is correct, that same jury determining the amount of punitive damages, or (2) if MGA is correct, the court determining the amount of punitive damages. In other words, a jury must be empaneled either way, regardless of whether the district court must act as the fact finder to ultimately decide any punitive damages amount.

This case has been litigated for five years. It was set for final judgment and an appeal of all issues. There is no material benefit to be gained from piecemeal deciding the Seventh Amendment question now. MGA's secondary question can only be taken up if an interlocutory appeal is granted on the first issue, thus it too should be denied.

## II.   FACTS

### A.   The OMG Girlz

The OMG Girlz is a music group that started in 2009 and continue to perform today. The group consists of Zonnique Pullins (the daughter of famous musicians Clifford "T.I." and Tameka "Tiny" Harris), Breaunna Womack, and Bahja Rodriguez. The OMG Girlz are known to "paint your city pink purple and blue" using the distinctive elements of their brand: the name "OMG GIRLZ" coupled with combinations of vibrant hair color in non-monochromatic and contrasting hues—primarily in bright pink, vivid purple, and shades of blue—contrasting wavy and straight hair styling, and experimental, fun, urban, and edgy wardrobes and makeup; and layered clothing, voluminous skirts (i.e., tutus and other poofy skirts), and bold, over the top clothing and accessories. *Id.* Their distinctive look has transformed into a source identifier for the OMG Girlz' music and entertainment services. Dkt. 1050 at 42:12-16.

Together with her husband, famous rapper T.I., Tiny leveraged her business and entertainment acumen to help the OMG Girlz amass a dedicated fanbase throughout the country, with particular popularity among young, millennial girls in the Black community. Dkt. 1049 at 82:23-83:4; Dkt. 1031 at 86:14-21. The OMG Girlz appeared on Tiny and T.I.'s hit reality television shows on BET and VH1, giving them an audience of millions. *See* Dkt. 1031 at 84:18-25; Dkt.1072 at 7. Their songs have tens of millions of plays on YouTube, they have millions of followers on Facebook, and they have been recognized by some of the biggest names in their entertainment area, including Drake, Xscape, Beyoncé, Lady Gaga, Flo Milli, Sean Bankhead, and Michael Mauldin. Dkt. 1026 at 72:12-21; 133:2-16; Dkt. 1028 at 100:1-8; Dkt. 1031 at 94:21-95:1.

**B.     The Lawsuit and Trials**

In late 2020, Tiny learned that the multi-billion-dollar toy giant MGA had created a line of dolls using the OMG Girlz name and brand, and her then-counsel sent a cease and desist letter with pictures and comparisons.

Instead of investigating the matter, MGA and Issac Larian deemed it "extortion," and indicated that any proposed licensing or other resolution would be "over his dead body." Dkt.1072 at 13. Despite the OMG Girlz' claims, MGA continued to release new OMG Dolls throughout the lawsuit, including three dolls—Miss Divine, Miss Prism, and Runway Diva—which match one of the

9

OMG Girlz most publicized early photos, one that appeared prominently in the letter. Most importantly, MGA's actual consumers were confused about an affiliation between the OMG Girlz and OMG Dolls. Dkt.1072 at 21.

MGA is well-known in the artistic community for "referencing" pop culture, and with no clear internal policy outlining the appropriate or legal limits, these "references" often rise to the level of ripping off creatives without attribution. Dkt.1072 at 5, 8. Although MGA's employees waffle about how MGA incorporates pop culture and celebrities into its doll designs MGA's documents (and the appearance of the dolls themselves) make clear that the company routinely bases its dolls on celebrities. *See id.*

The infringing OMG Dolls appear to be animated or "toy" versions of the OMG Girlz. Dkt.1072 at 7. The packaging and online and print marketing materials for the dolls prominently feature both the "OMG" and "girls" elements of the trade dress. The dolls are sold or marketed in groups featuring vibrant non-monochromatic hair colors, specifically in combinations of pink, purple, and blue, and are dressed and marketed in fun, urban, edgy wardrobes, including replicas of OMG Girlz' tour outfits. MGA did not obtain permission to use the OMG Girlz' brand, trade dress, and likeness. Dkt. 1009.

MGA had knowledge of the OMG Girlz and the overlap in the brands' target markets and consumer-base before creating the OMG Doll line. Dkt. 1009;

Dkt.1072 at 7. Accordingly, in December 2020, when the OMG Girlz' representatives sent the letter notifying them of the potential IP infringement, MGA swiftly filed a declaratory judgment action without so much as a phone call. Dkt.1072 at 8. MGA did no investigation to determine whether its designers had used the OMG Girlz' brand when developing the dolls. Dkt.1072 at 8. The company has no official policy on copying, put no legal document hold in place (even after receiving notice of the infringement and filing the district court action), and did nothing to otherwise try to differentiate between the two brands. Dkt. 1072 at 6, 8; Dkt. 1067 at 8.

Tellingly, MGA's internal emails demonstrate confusion between the OMG Dolls and the OMG Girlz in 2019, when employees incorrectly believed a reference to "OMG Girl" and Bahja Rodriguez in a song was actually about the OMG Dolls. Dkt.1072 at 8. This same confusion caused by MGA's use of "OMG" and "girls" in its advertising and packaging is exhibited in declarations of confusion by MGA's customers. Dkt.1072 at 21.

In a racially-charged first trial, MGA counsel repeatedly and gratuitously used the full "n-word" during cross examination of the OMG Girlz, questioned rap lyrics, and stated that the Harrises could not be "an all American Family" (for some *un*stated reason). Following that, designated testimony from a third party witness who expressed displeasure with companies taking advantage of Black creatives

11

was played without objection by MGA. MGA had not objected to the offending testimony during the designation exchange as violating a motion in limine, and made the strategic decision not to object to the testimony until the video concluded, then moved for a mistrial. *See* Dkt. 560. The district court granted MGA's request for a mistrial, concluding that that testimony was the final straw given the "mire of salacious activities" that had previously occurred before that jury. *See, e.g.*, Dkt. 681.

In the first retrial, a verdict came swiftly (i.e., in barely an hour) in MGA's favor due to the erroneous inclusion of a First Amendment defense that was rejected by the Supreme Court just days later in an analogous case. In the second retrial, a verdict came in favor of the OMG Girlz, by a jury that meticulously went through the evidence and verdict form during a several-hours long deliberation. The May 2023 jury rendered a verdict finding MGA not liable for any IP infringement. Importantly, the crux of MGA's 2023 defense relied on a pre-*Jack Daniels* understanding of the First Amendment protection afforded to works that make expressive, but non-source-identifying, use of trademarks, as outlined in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). *Compare Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140 (2023). MGA spent more than 7 hours in direct examination building out this defense with its corporate representative. And over the OMG Girlz' objection, the jury instructions included this defense. Two

12

weeks after this take-nothing verdict, the Supreme Court issued its opinion clarifying that the so-called *Rogers* test "applie[s] only to cases involving 'non-trademark uses' [where] 'the defendant has used the mark' at issue in a 'non-source-identifying way.'" *Id.* at 1588. The court found that MGA had admittedly used the brand in a source identifying way, and granted the OMG Girlz' motion for a new trial in light of this. Dkt. 860. The *Rogers* test provided such a clear hurdle and permeated so much of MGA's trial presentation, that the court also granted a new trial on the right of publicity cause of action as well. *See id.* In September 2024, the parties tried the case to a new jury. This time, the OMG Girlz reduced the number of dolls for which it requested damages in an effort to streamline its case. At MGA's request, the jury was required to make a decision on whether more than 30 dolls infringed. After several hours of deliberation, the jury returned a verdict that MGA infringed the OMG Girlz' trade dress with respect to the seven dolls at issue, that it did so willfully, and that MGA also misappropriated the OMG Girlz' name, likeness, and identity with malice, fraud, or oppression. As to MGA's declaratory judgment claim, the jury found seven additional dolls infringed the OMG Girlz' trade dress, and eight dolls (six overlapping) infringed the OMG Girlz' likeness.

## C.    Post-Trial

The district court entered judgment in favor of the OMG Girlz following the verdict. Subsequently, MGA moved for judgment as a matter of law and/or a new trial on three grounds (Dkt.1121), and on July 8 (Dkt. 1133) the district court granted MGA's request for a new trial on only one ground: the issue of punitive damages. Repeatedly substituting its judgment for the jury's, the district court found that its own inferences were preferable to the jury's because there was no smoking gun, and reasoned that the "evidence falls short of showing willfulness, intent, or conscious disregard with respect to MGA's conduct." Dkt. 1133 at 9-13.

Notwithstanding this, the court simultaneously offered the OMG Girlz one dollar as punitive damages in exchange for foregoing another trial. *Id.* at 1. In other words, the district court concluded that at least *some* punitive damages were proven at trial. Indeed, in a later Order the district court stated:

> disgorgement alone is not a deterrent to MGA; disgorgement simply requires MGA to return what was wrongfully obtained. Thus, punitive damages are necessary for deterrence and are appropriate in this case.

Dkt. 1172 at 10.

The parties briefed the structure of a new trial with MGA arguing that the new trial should be tried to the bench, and the OMG Girlz arguing that they should be allowed to present their punitive damages case to a jury. Although the parties agreed from the outset that any disgorgement amount in the verdict would be

14

advisory, MGA never objected to a jury deciding the liability or amount of punitive damages until after receiving a $53 million punitive damages verdict against them.

## III.  <u>LEGAL STANDARD</u>

An appellate court may review a nonfinal order for interlocutory appeal where the order (1) involves a controlling question of law, (2) as to which there is substantial ground for a difference of opinion, and (3) an immediate appeal might materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b). "Generally speaking, § 1292(b) certification is reserved for exceptional cases." *Batterton v. Dutra Group*, No. CV 14-7667-PJW, 2015 WL 13752889, at *1 (C.D. Cal. Feb. 6, 2015) (citing *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 74 (1996) ("Routine resort to § 1292(b) requests would hardly comport with Congress' design to reserve interlocutory review for 'exceptional' cases while generally retaining for the federal courts a firm final judgment rule."). Because "[t]he requirements of § 1292(b) are jurisdictional," if an appeal "does not present circumstances satisfying the statutory prerequisites," the Ninth Circuit will not allow the appeal. *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010) (quoting *Union County v. Piper Jaffray & Co.*, 525 F.3d 643, 645–46 (8th Cir. 2008) (per curiam)).

## IV.   **ARGUMENT**

### A.   **The Question of Whether the Amount of Punitive Damages Should Be Decided By A Judge or Jury Does Not Satisfy the Jurisdictional Requirements**

#### 1.   *The Proposed Question Is Not Controlling*

While the applicability of the Seventh Amendment may be a legal question, it is not controlling here because it would not "materially affect the outcome of litigation in the district court" such as by avoiding "needless expense and delay." *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1981); *Kuehner v. Dickinson & Co.*, 84 F.3d 316, 319 (9th Cir. 1996). MGA agrees that avoiding "needless expense and delay" is an issue in both the first and third factors of deciding whether to grant a request for interlocutory appeal.  Pet. at 11. Despite that, MGA's issue will *add* expense and delay because a jury trial will still be necessary even if the amount of punitive damages is left to the district court. As MGA's petition makes clear, its theory is borrowed from the DTSA and patent law, where courts decide enhancement. Pet. at 17. But a jury still decides the predicate liability question in those cases. *Proofpoint, Inc. v. Vade Secure, Inc.*, No. 19-CV-04238-MMC, 2023 WL 5723670, at *1 (N.D. Cal. Sept. 5, 2023) (discussing the district court's ability to award exemplary damages upon a jury finding of willful and malicious appropriation); *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 n.13 (Fed. Cir. 2016) ("This leaves in place our prior precedent that there is a right to a

16

jury trial on the willfulness question. . . . Whether the conduct is sufficiently egregious as to warrant enhancement and the amount of the enhancement that is appropriate are committed to the sound discretion of the district court."). Moreover, if there were any question as to having a jury decide liability for punitive damages, MGA stipulated to a jury trying liability issues—which necessarily would include whether MGA is liable for punitive damages, as both involve issues of intent.

     *2.     There Are Not Substantial Grounds for a Difference of Opinion*

There is no substantial ground for difference of opinion because MGA cannot explain how the district court erred in applying the agreed standard. MGA agrees that the "longstanding two-step framework" is the appropriate standard: first, determine whether the claims "replicate common law" causes of action and, second, determine whether the remedy is legal is nature. Pet. at 9 (recognizing the two-step inquiry, repeated in *In re Tsay JBR LLC*, 136 F.4th 1176 (9th Cir. 2025) is the controlling test). Nor does it meaningfully challenge the district court's application of that test. MGA does not dispute that misappropriation of likeness replicates the common law. And as this Court explained, "a penalty that advances punitive and deterrent purposes" is a legal remedy. *In re Tsay*, 136 F.4th at 1179-80. That is why the only court to directly address punitive damages under Cal. Civ. Code § 3294 determined punitive damages should be tried to a jury. *Quicksilver,*

*Inc. v. Kymsta Corp.*, No. CV 02-5497-VBF(MCX), 2007 WL 9712164, at *2 (C.D. Cal. Dec. 5, 2007) (finding that the defendant did "not establish that there is no remaining right to a jury [as to plaintiff's] claims for exemplary damages pursuant to California Civil Code Section 3294(a)" even when the only other relief sought (an injunction) was equitable).

Unable to criticize the district court's reasoning, MGA instead proposes a new rule: punitive damages adopt the status of the underlying damages. Pet. at 15. It is this new rule, not the OMG Girlz' position, that would "would invalidate centuries of tradition." Pet. at 17. As MGA notes and analogizes to this case, the district courts determine enhancement under the Patent Act. *Id.* (citing *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020)). But that is true regardless of the underlying damages and "there is no dispute that [patent] infringement cases today must be tried to a jury, as their predecessors were more than two centuries ago." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). But under MGA's new rule, enhancement of any legal damages remedy would then be a legal remedy requiring a jury trial and vice versa for equitable remedies. This cannot be squared with the Patent Act.[1]

---

[1] While this Court need not resolve the issue, the commitment of enhanced damages to the district court can be reconciled under the two-step framework because they are a specific remedy with their own unique history, having developed from automatic treble damages. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 97-100 (2016).

Given its logical inconsistency and poor fit with the controlling test, it is not surprising there is a dearth of case law supporting MGA's position. Other than the district court's rescinded tentative opinion, MGA's argument rests entirely on the unpublished decision in *Proofpoint, Inc. v. Vade USA, Inc.*, 2024 WL 4003096 (9th Cir. Aug. 30, 2024). But that case was interpreting the Defend Trade Secret Act, which specifically commits the decision whether to treble damages to the court's discretion. The similarity to the Patent Act is not a coincidence. The DTSA was modeled in part on the Uniform Trade Secret Act, which took its enhancement provision from patent law. *See* UTSA Section 3 Comments ("This provision follows federal patent law in leaving discretionary trebling to the judge even though there may be a jury, *compare* 35 U.S.C. Section 284 (1976).").

California's punitive damages under Section 3294 are a different creature; they are not "tethered" to a multiple of a specific damages number, nor capped other than through constitutional concerns. *See Riley v. Volkswagen Grp. of Am., Inc.*, 51 F.4th 896, 902 (9th Cir. 2022). Unlike enhanced damages, they are historically "in the discretion of the jury." *See Taylor v. Wright*, 69 Cal. App. 2d 371, 385 (1945) (referring to §3294). Thus, to the extent the unpublished *Proofpoint* is "authority," it is of no moment in this context.

MGA's attempts to bolster *Proofpoint* fail. MGA wrongly claims that *Liu v. SEC* supports the proposition that the character of the damages for the underlying

19

tort (here, disgorgement), somehow "infects" the character of the punitive damages. Pet. at 15 (citing 591 U.S. 71). But *Liu* says no such thing. The language quoted by MGA was in the reference to the various names given to disgorgement of profits. *Liu*, 591 U.S. at 79 ("Equity courts have routinely deprived wrongdoers of their net profits from unlawful activity, even though that remedy may have gone by different names."). The Court determined that, much like a rose by any other name, a "profit-based measure of unjust enrichment" is a matter of equity. *Id.* Nowhere does *Liu* conclude punitive damages are the same. Instead it draws a sharp distinction between the two, explaining that disgorgement is capped at profits "to avoid transforming an equitable remedy into a punitive sanction." *Id.* But punitive damages under Section 3294 are not capped, or "tethered," to profits like they are in the DTSA and Patent Act, which limit the enhancement to treble damages. Thus, the discussion in *Liu*, and any reliance on it in *Proofpoint*, are inapplicable to this case.

### 3. *An Interlocutory Appeal Will Not Materially Advance the Ultimate Termination of the Litigation*

Interlocutory appeal will not materially advance the ultimate termination of the case because there will be a jury trial regardless, whether it is a jury trial on punitive damages liability and a bench trial on the amount, or both tried to a jury. Ultimately, little to nothing would be saved, especially in comparison to adding a piecemeal appeal.

20

Furthermore, a positive outcome for MGA on interlocutory appeal would only spawn more district court briefing. The district court found MGA had at least impliedly consented to a jury trial on punitive damages under Rule 39(c). Dkt. 1118 at 3. MGA's position is that having secured a new trial it can now withdraw that consent. Not so. The general rule is that "when a trial is held with a nonadvisory jury pursuant to Rule 39(c) and a second trial becomes necessary due to problems with the first trial (that are unrelated to the validity of trying the case before a nonadvisory jury), Rule 39(c) does not permit the district court to withdraw its prior consent to the litigants' request for a nonadvisory jury." *Bereda v. Pickering Creek Indus. Park, Inc.*, 865 F.2d 49, 55 (3d Cir. 1989). Any other outcome would be like "allowing a gambler to switch his bet as the horses reach the home stretch." *Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1532 (9th Cir. 1995), *as amended* (Apr. 24, 1995) (analyzing Fed. R. Civ. P. 39 in the context of jury waiver, reasoning that "[a] party cannot fairly be permitted to gain two chances at victory by waiting until after it is advised of the judge's decision to decide whether to waive its right to a jury"). The district court has not addressed whether MGA can withdraw its consent to a jury trial except for as to the amount of punitive damages, as evidenced by its proposed one-dollar remittitur to get a final appealable judgment by its later statement that punitive damages are appropriate in this case. Dkt. 1133 at 13. Thus if this Court were to find the

21

unpublished decision in *Proofpoint* applied here*,* there would be additional briefing at the district court, and if the outcome was not satisfactory to MGA, likely another request for interlocutory appeal.

Lastly, MGA's reliance on *Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, 28 F.4th 35, 41 (9th Cir. 2022) is misplaced. The Court there did not set forth a new general rule, it simply distinguished *Bereda* on the facts. Critically, the Court emphasized that the plaintiffs seeking a jury trial had flipped positions, having previously "argued against giving binding effect to the jury's verdict below and affirmatively request[ing] a de novo determination of the issue by the district court." *Id.* This flip-flop was one reason the plaintiffs were not "placed in a worse position on remand." *Id.* Nothing like that happened here. The OMG Girlz have always requested a jury (and MGA did not disagree until *after* it received an adverse verdict). Furthermore, the verdict in *Harbor Breeze* was set aside as entirely as "fundamentally flawed" due to an incorrect jury instruction, hence why the Ninth Circuit found "no valid portion of that prior jury verdict would be disrespected, implicitly or explicitly." *Id.* at 39. But here, the jury's verdict on liability, stands. A bench trial on punitive damages—wherein MGA agrees some evidence overlaps with the prior liability findings (Dkt. 1139 at 11-12)—necessarily "disrespect[s]" the prior jury's verdict.

22

Accordingly, regardless of the answer to MGA's question in a vacuum, a limited additional jury trial is required in this case. Because it will not ultimately advance the litigation, interlocutory appeal should be denied.

**B.      The Question of Whether Punitive Damages Are Available Similarly Does Not Satisfy the Jurisdictional Requirements**

At the outset, MGA's second question was not certified by the district court and thus should not be considered if the certified question is rejected. However, this question also fails the jurisdictional requirements regardless.

*1.      MGA Has Failed to Show Any Substantial Ground for Difference of Opinion On This Issue*

There is no substantial ground for difference of opinion on the availability of punitive damages. While not relied on by the district court, the California Supreme Court has explained "[t]he rule that exemplary damages cannot be imposed unless the plaintiff has suffered actual damages . . . is based on the principle that the defendant must have committed a tortious act before exemplary damages can be assessed." *Brewer v. Second Baptist Church of Los Angeles*, 32 Cal. 2d 791, 801–02 (1948) (citations omitted). For that reason, California courts have found that Section 3294 only requires "that a tortious act be proven if punitive damages are to be assessed." *Topanga Corp. v. Gentile*, 249 Cal. App. 2d 681, 691 (Ct. App. 1967).

23

MGA argued to the district court that this was overruled by *Kizer v. County of San Mateo*, 53 Cal.3d 139, 147 (1991), but *Kizer* did not overrule *Brewer* or *Topanga*. MGA's position is also contradicted by the decisions of this Court and lower courts in the circuit, which have recognized the *Topanga* rule in post-*Kizer* decisions. *Crevier v. Sullinger*, 57 Fed. Appx. 319, 321 (9th Cir. 2003) ("[I]t is not crucial to the award of punitive damages that compensatory damages actually be awarded. So long as there has been an actual injury, the plaintiff need not be awarded compensatory damages in order to sustain a punitive damages award."); *MJT Sec., LLC v. Toronto-Dominion Bank*, 2006 WL 1236661, at *3 (9th Cir. May 9, 2006) (finding that an allegation of a tortious act was sufficient to state a claim for punitive damages, because "because the requirement of actual damages 'imposed by section 3294 is simply the requirement that a *tortious act be proven if punitive damages are to be assessed.*'"); *In re Javahery*, 2017 WL 971780, at *8 (B.A.P. 9th Cir. Mar. 14, 2017), *aff'd*, 742 F. App'x 307 (9th Cir. 2018) ("Carefully parsed, California decisional law does not require that there be an express award of actual damages to support an award of punitive damages, but rather that the plaintiff has suffered injuries from a tortious act, even if compensatory damages were not awarded."); *Yates v. Nimeh,* 486 F. Supp. 2d 1084, 1086 (N.D. Cal. 2007) (allowing the punitive damages claim noting that "[t]he requirement of 'actual

24

damages' imposed by section 3294 is simply the requirement that a tortious act be proven if punitive damages are to be assessed").

However, whether MGA has identified a discrepancy in California state law is ultimately moot as to whether to grant interlocutory appeal, because MGA's own authority makes clear that punitive damages are available here. Below, MGA argued that *Cheung v. Daley* repudiated the "tortious act" rule and interpreted *Kizer* to require actual damages. Dkt. 1150-1 (citing 35 Cal. App. 4th 1673, 1675-77 (1995)). Yet here, MGA does not address *Cheung*, likely because it is dispositive. As the district court recognized, *Cheung* makes clear that an equivalent to actual damages, such as restitution, is sufficient predicate for punitive damages. Dkt. 1172 at 9 (citing 35 Cal. App. 4th at 1677 n.8). The OMG Girlz had no issue proving a tortious act and damages. The jury unanimously found that MGA committed two tortious acts (and did one willfully and the other maliciously), and awarded disgorgement damages, which were repeatedly noted as a "stand in" for an award of actual damages. Dkt. 502 at 8; *see also* Dkt. 1013 at 29 (instructing the jury that "the OMG Girlz must prove the amount of their damages" and that MGA's profits were "damages claimed by the OMG Girlz" for misappropriation).

The *Topanga* rule recognized by the district court is consistent with other California decisions. *See Weiss v. Blumencranc*, 61 Cal. App. 3d 536, 542 (Ct. App. 1976) (finding punitive damages award proper based on equitable order of

25

dissolution and accounting, but no compensatory damages); *Horn v. Guar.*

*Chevrolet Motors*, 270 Cal. App. 2d 477, 484 (Ct. App. 1969) (affirming award of

punitive damages where plaintiff sought equitable recission, and had to return

money to defendant, but where the jury found defendant acted with oppression,

fraud, or malice). It is also consistent with nominal damages, which are available

even absent harm, being sufficient to support punitive damages. *See, e.g.*, *Beijing*

*Tong Ren Tang (USA), Corp. v. TRT USA Corp.*, No. C-09-00882 RMW, 2011 WL

13143358, at *6 (N.D. Cal. Nov. 23, 2011 ("Nominal damages alone can support

an award of punitive damages.") (citing *Werschkull v. United Calif. Bank*, 85 Cal.

App. 3d 981 (1978) (affirming award of $1.00 for actual damages and $550,000 in

punitive damages against Bank which had diverted pension funds but there was no

way of knowing to what extent beneficiaries were injured)).

MGA's position cannot be reconciled with the above, and its cited cases

actually support the OMG Girlz' position. In MGA's cases, the bar to punitive

damages was not the category of the underlying financial compensation awarded,

but that the jury had explicitly awarded *no damages*. For example, *California v.*

*Altus Fin. S.A.*, 540 F.3d 992, 1001 (9th Cir. 2008), the court observed "here the

jury here explicitly found *"$0"* of compensatory damages," and collects other

cases with similar results. *See id.* (citing *Jackson v. Johnson*, 5 Cal. App. 4th 1350,

1357–58 (1992) (emphasis added) (finding that plaintiffs failed to show an element

of its claim for legal malpractice, "actual loss," causing the jury to "assess damages in the sum of 0 dollars," and invalidating punitive damages as a result); *Mother Cobb's Chicken Turnovers v. Fox,* 10 Cal. 2d 203, 205 (1937) ("It is not true that by reason of the acts aforesaid the plaintiff had suffered actual damages, *This is an express finding that plaintiff has not suffered* any actual damages. In view of this finding, the court was without right to award exemplary damages.") (emphasis added)). MGA suggests distinguishing the present case from case law with zero dollar awards "makes no sense" (Pet. at 24), but as *Cheung* recognizes, *Clark v. McClurg* made exactly that distinction. *Cheung*, 35 Cal. App. 4th at 1677 n.7 ("The [*McClurg*] court went on to indicate that such a policy of liberally construing the verdict was to be distinguished from situations where "the jury, by its verdict, expressly found and determined that the ... plaintiffs had not suffered any actual damages." (citing 215 Cal. 279)). MGA has not presented any substantial basis to disagree with the district court's determination that punitive damages are available.

### 2. An Interlocutory Appeal Will Not Materially Advance the Ultimate Termination of the Litigation

Even if MGA had support for its position, its argument suffers a fatal flaw: MGA waived any challenge to the availability of punitive damages below. As MGA concedes in its petition, the first time it argued that "California law d[oes] not permit punitive damages because there were no actual damages" was in post-trial briefing. Pet. at 7. Before that, MGA has only objected to the punitive

27

damages question on the ground that common law misappropriation did not allow for punitive damages.[2] This is dispositive because, as discussed above, nominal damages *can* support a punitive damages award. *See, e.g.*, *Beijing Tong Ren Tang (USA), Corp.*, 2011 WL 13143358, at \*6. If MGA had properly objected to the verdict form on this ground, the OMG Girlz could have sought nominal damages to address the purported deficiency. Having not done so, MGA cannot now complain that the damages verdict does not allow for recovery of punitive damages.[3] *See In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 386 (9th Cir. 2010).

## V. <u>CONCLUSION</u>

Based on the foregoing, MGA's petition should be denied.

---

[2] The district court rejected MGA's argument and MGA has not reraised it here.

[3] In the proceedings below, MGA argued that the district court had considered this issue and rejected it in granting a new trial. That was not true. The argument the district court considered related to waiver of Rule 50 arguments as opposed to granting a new trial. Dkt. 1133 at 6. The waiver at issue here is MGA's failure to object to the jury verdict, which is not something that can be cured with a new trial request, as the opportunity to seek nominal damages has now passed.

Dated: December 10, 2025       Respectfully submitted,

/s/ John R. Keville

John R. Keville
Robert L. Green
Chante B. Westmoreland
SHEPPARD, MULLIN, RICHTER &
HAMPTON, LLC
845 Texas Avenue, 25th Floor
Houston, TX 77002
(713) 431-7100
jkeville@sheppardmullin.com
rgreen@sheppardmullin.com
cwestmoreland@sheppardmullin.com

*Attorneys for Defendants and Counterclaimants and Respondents CLIFFORD "T.I." HARRIS, TAMEKA "TINY" HARRIS, OMG GIRLZ LLC, and Counter-Claimants GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC and OMG GIRLZ LLC*

29

## STATEMENT OF RELATED CASES

On May 28, 2025, Petitioners filed a Notice of Appeal in *MGA Entertainment Inc. v. Harris, et al.*, No. 25-3448. On June 3, 2025, the Ninth Circuit stayed all proceedings other than mediation pending the district court's resolution of the Rule 50 and 59 motions.

December 10, 2025

/s/ John R. Keville
John R. Keville

# CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limitation of Cir. R. 5-2(b) and Cir. R. 32-3(2) because it contains 5,466 words.

This response complies with the type face and type-style requirements of the Fed. R. App. P. 32(a)(5) and (a)(6) because this response has been prepared in a proportionately spaced and Times New Roman 14-point font.

December 10, 2025

/s/ John R. Keville
John R. Keville

31

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2025, I electronically filed the foregoing response on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Case Management System (ACMS).

December 10, 2025
/s/ John R. Keville
John R. Keville

32

**APPENDIX**

## TABLE OF CONTENTS

Dkt. 502,  Order Regarding Motions *In Limine*
(Jan. 13, 2023)...............................................................................A001–018

Dkt. 560, Amended Deposition Ruling
(Jan. 23, 2023)…………...............................................................A019–068

Dkt. 681, Minute Order re Order to Show Cause
(May 8, 2023)................................................................................A069–071

Dkt. 860, Order Regarding Motion for Attorneys' Fees and Motion for New Trial
(Sept. 15, 2023)…………................................................................A072–080

Dkt. 1009, Verdict Form
(Sept. 23, 2024)…………................................................................A081–094

Dkt. 1013, Jury Instructions
(Sept. 20, 2024)…………............... ...............................................A095–131

Dkt. 1026, Trial Transcript at 72:12-21, 133:2-16
(Sept. 4, 2024)…………................................................................A132–136

Dkt. 1028, Trial Transcript at 100:1-8
(Sept. 6, 2024)………… ...............................................................A137–140

Dkt. 1031, Trial Transcript at 84:18-25, 86:14-21, 94:21-95:1
(Sept. 12, 2024)…………..............................................................A141–147

Dkt. 1049, Trial Transcript at 82:23-83
(Sept. 5, 2024)…………................................................................A148–153

Dkt. 1050, Trial Transcript at 42:12-16
(Sept. 6, 2024)…………................................................................A154–157

Dkt. 1067, Defendants'/Counterclaimants' Motion for Enhanced Damages
(Dec. 13, 2024)...........................................................................A158–178

Dkt. 1072, Defendants'/Counterclaimants' Proposed Findings of Fact and
Conclusions of Law
(Dec. 20, 2024),........................................................................A179–202

Dkt. 1121, Plaintiff and Counter-Defendants' Notice of Motion and Motion for
Judgment as a Matter of Law or, in the Alternative, Motion for New Trial or
Remittitur
(May 27, 2025),........................................................................A203–207

Dkt. 1133, Order Regarding Motion and Renewed Motion for Judgment as a
Matter of Law or, in the Alternative, for New Trial or Remittitur
(July 8, 2025)...........................................................................A208–240

Dkt. 1139, Plaintiff and Counter-Defendants' Opening Brief Regarding Structure
of New Trial on Punitive Damages
(Aug. 11, 2025).......................................................................A241–254

Dkt. 1172, Order Regarding Motion for Certification of Interlocutory Appeal
(Nov. 20, 2025)........................................................................A255–265

Dkt. 1118, Final Judgment
(Apr. 29, 2025).........................................................................A266-270

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MGA Entertainment Inc. <br><br> PLAINTIFF(S) <br><br> v. <br><br> Clifford T.I. Harris, et al <br><br> DEFENDANT(S) | CASE NUMBER <br><br> CV 20-11548-JVS (AGRx) <br><br> **NOTICE OF CLERICAL ERROR** |

You are hereby notified that due to a clerical error ☐ documents associated with the filing of the new action ☐ the following scanned document  ☒ docket entry   have/has been corrected as indicated below.

Title of scanned document:  MINUTES [IN CHAMBERS] Order re Motions in Limine

Filed date:  January 11, 2023   Document Number(s):  501

☐ Incorrect case number _____ was assigned to this ☐ action  ☐ document

☐ Case number has been corrected.  The correct case number is _____

☐ Incorrect judge's initials were indicated on this ☐ action ☐ document . The correct judge's initials are: _____

☐ Incorrect magistrate judge's initials were indicated on this ☐ action ☐ document . The correct magistrate judge's initials are: _____ .

☐ Case has been reassigned from  ☐ Judge ☐ Magistrate Judge _____ to ☐ Judge ☐ Magistrate Judge _____ . The initials of the new judge(s) are: _____

☐ Case was assigned to  ☐ Western ☐ Southern ☐ Eastern  division.  Pursuant to General Order 19-03, the case has been reassigned to the ☐ Western ☐ Southern ☐ Eastern  division. The former case number _____ has been reassigned to new case number _____ .

☐ Case title is corrected from _____ to _____

☐ Document has been re-numbered as document number _____

☐ Incorrect ☐ Filed Date ☐ Date of Document ☐ Date ENTERED on CM/ECF   was stamped on the document. The correct date is _____ .

☐ Document is missing page number(s): _____

☐ To ensure proper routing of documents, all documents filed with the court must reflect the following case number and judge's initials: _____

☒ Other:  Due to clerical error the incorrect document was attached to docket entry [501]. The correct document is attached to this entry.  SEE ATTACHMENT

CLERK, U.S. DISTRICT COURT

Date: _____January 13, 2023_____        By:  /s/  E. Synagogue _____

Deputy Clerk

G-11 (03/19)                    NOTICE OF CLERICAL ERROR

**A001**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | | |
|---|---|---|---|---|
| Case No. | CV 20-11548-JVS(AGRx) | | Date | January 11, 2023 |
| Title | MGA Entertainment Inc. v. Clifford T.I. Harris, et al | | | |

Present: The Honorable    **James V. Selna, U.S. District Court Judge**

| Elsa Vargas | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**    **[IN CHAMBERS]** Order re Motions in Limine

MGA Entertainment Inc. v. Clifford T.I. Harris et al., AND RELATED COUNTERCLAIMS, 2:20-cv-11548-JVS (AGRx)

Tentative Minute Order re Motions *in Limine*

MGA Entertainment, Inc. *et al.* (collectively "MGA") and Clifford "T.I." Harris, *et al.* (collectively "Harris Parties") move the Court for relief by way of Motions *in Limine*. The Court now enters its rulings.

I.      MGA's Motions *in Limine.*

A.   Motion *in Limine* No. 1: Exclusion of Financial Evidence.

As Counter-Defendant, MGA seeks an order to exclude late produced financial documents. (Docket No. 208.) The Harris Parties have filed an opposition (Docket No. 229), and MGA has replied (Docket No. 248).

One problem at the outset in considering this motion is MGA's failure to identify a single document for exclusion.

1.   Legal Standards.

Where a party fails to obey a discovery order, such as an order to produce documents, the Court may impose sanctions:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 20-11548-JVS(AGRx)                              Date   January 11, 2023

Title      MGA Entertainment Inc. v. Clifford T.I. Harris, et al

---

If a party or a party's officer, director, or managing agent--or a witness designated under Rule 30(b)(6) or 31(a)(4)--fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence

(Fed. R. Civ. P. 37(b)(2)(ii).)

2.  Discussion.

The civil minutes for the parties' April 6, 2022 discovery conference with the Magistrate Judge reflect the following:

Defendants agreed to complete production of OMG Girlz financial information by Friday, April 8, 2022, with the possible exception of information in the possession of a previous tour manager, Mr. Maudlin, who is addressed separately in paragraph 6 below. As to Mr. Maudlin, Defendants will make best reasonable efforts to obtain OMG Girlz financial information from him.

(Docket No. 112, pp. 1-2.)

Subsequent correspondence between the parties followed, but the Harris Parties made no further production.  (See Docket No. 333-17, Ex. P.)

While Harris Parties claim that the minute order merely reflects counsels' agreement regarding production, the Court finds that the memorialization by the Magistrate Judge in a minute order, based on the parties' representations, is sufficient to invoke Rule 37(b).

Nevertheless, in the absence of specifics, the Court denies the motion without prejudice.  Any objection made a trial shall be made with specificity as to when

---

CV-90 (06/04)                    **CIVIL MINUTES - GENERAL**                    Page 2 of 17
**A003**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    CV 20-11548-JVS(AGRx)                              Date    January 11, 2023

Title    MGA Entertainment Inc. v. Clifford T.I. Harris, et al

and if a document to which MGA objects has been produced.

B. Motion *in Limine* No. 2: Other Acts.

As Counter-Defendant, MGA seeks an order to exclude other acts of infringement or misappropriation. (Docket No. 209.) The Harris Parties have filed an opposition (Docket No. 243), and MGA has replied (Docket No. 249).

The issue here is whether such evidence is admissible as other bad acts under Federal Rule of Evidence 404(b).

1. Legal Standards.

Rule 404(b)(1) bars "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, the same evidence may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." (Fed. R. Evid. 404(b)(2).) There is further gloss to the exception: "(1) the other act evidence must tend to prove a material point; (2) the other act must not be too remote in time; (3) the evidence must be sufficient to support a finding that the defendant committed the other act; and (4) in some cases, the other act must be similar to the offense charged." United States v. Bibo-Rodriguez, 922 F.2d 1398, 1400 (9th Cir. 1991).

Evidence which meets the 404(b) standard is nevertheless subject to exclusion under Federal Rule of Evidence 403. United State v. Cherer, 513 F.3d 1150, 1157 (9th Cir. 2008).

Federal Rule of Evidence 406 provides a basis for "[e]vidence of a persons habit or an organization's routine practice . . . to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice." (Fed. R. Evid. 406.)

2. Discussion.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    CV 20-11548-JVS(AGRx)                                    Date    January 11, 2023

Title    MGA Entertainment Inc. v. Clifford T.I. Harris, et al

The evidence which MGA seeks to exclude falls into two broad categories: allegations and habit or practice.

*Allegations.* The Harris Parties marshal a series of allegations[1] asserted by various parties that MGA has infringed the intellectual property rights of that particular company. The Court finds that mere allegations of *other* infringements or misappropriation do no support a material point with regard to alleged misconduct in this case. In dealing with the scope of Rule 30(b)(6) depositions, the Magistrate Judge refused to compel production of an MGA representative to address cease and desist letters and law suits alleging other instances of misappropriation. (Docket No. 101.) She held: "The court agrees that Topics 23-24 would be irrelevant or at best tangential to the seventh *Sleekcraft[2]* factor, and denies the Grand Parties' motion to compel." (Id., p. 2.) As is apparent, the Magistrate Judge's decision was not based solely on burden. (See Opposition, p. 8.) Moreover, venturing into proof to support allegations would present a classic series of cases within cases. (Fed. R. Evid. 403.) The recognized basis for admission, knowledge, is not supplied by allegations in another case.

There is no case law to support the proposition that evidence of knowledge, the seventh Sleekcraft, in another case is sufficient to support an inference of knowledge in a different case. United States v. Bailey, 696 F.3d 794, 799 (9th Cir. 2012). "Admitting prior conduct charged but settled with no admission of liability is not probative of whether the defendant committed the prior conduct, much less whether he committed the conduct in question. There is no logical relevancy to admitting this type of evidence." (Id. at 800.) Such evidence reduces to inadmissible character evidence. (Fed. R. Evid. 404(a).)

Moreover, copying and infringement under the Lanham Act are not the same. Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 36-37 (2003). This injects a further ground for jury confusion. (Fed. R. Evid. 403.)

---

[1]Opposition, pp. 3-5.

[2]AMF Inc. v. Sleekcraft Boats, 559 F.2d 341, 348-49 (9th Cir. 1979).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | |
|---|---|---|
| Case No. | CV 20-11548-JVS(AGRx) | Date  January 11, 2023 |
| Title | MGA Entertainment Inc. v. Clifford T.I. Harris, et al | |

The Harris Parties offer two instances of judicial resolutions that go beyond allegations, but the results do not assist the Harris Parties. In Art Attacks Ink, the jury found in favor of MGA on one claim, and hung on another. The District Court granted judgment as a matter of law on the remaining claim, and the Ninth Circuit affirmed the trial court's rulings. Art Attacks Ink, LLC v. MGA Entertainment Inc., 581 F.3d 1138, 1141 (9th Cir. 1138, 1141 (9th Cir. 2009). The Louis Vuitton case in the Central District did not produce a substantive result.

MGA's claims with regard to the source of inspiration for its dolls does not open the door to allegations. Obviously, if the Harris Parties have evidence of a source for the MGA dolls, such evidence is admissible. And, if fact, the Harris Parties outline such evidence in their opposition. (Opposition, pp. 7-8.)

*Habit or Practice.* While the Harris Parties' offer of multiple alleged instances of copying, the contention misses the essence of Rule 406. The Court looks to "(1) the degree to which the conduct is reflexive or semi-automatic as opposed to volitional; (2) the specificity or particularity of the conduct; and (3) the regularity or numerosity of the examples of the conduct." United States v. Angwin, 271 F.3d 786, 799 (9th Cir. 2001). The requisite degree of frequency requires "more than a mere tendency to act in a given manner, but rather, conduct that is semi-automatic in more than a mere tendency to act in a given manner, rather, conduct that is semi-automatic in nature." Simplex, Inc. v. Diversified Energy Systems, Inc., 847 F.2d 1290, 1293 (7th Cir.1988) (internal quotation marks deleted). The evidence here is insufficient to support admissibility under Rule 406

The Harris Parties spend a portion of their opposition focusing on the fact that MGA has no policy to prevent copying. (Opposition, pp. 6-7.) That is not the focus on MGA's motion, and such evidence may be relevant, but it does not make a habit.

C. Motion *in Limine* No. 3: Cultural Appropriation/Racism.

As Counter-Defendant, MGA seeks an order to exclude the evidence of alleged cultural appropriation and racism. (Docket No. 210.) The Harris Parties have filed an opposition (Docket No. 244), and MGA has replied (Docket No. 261).

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 20-11548-JVS(AGRx) | Date | January 11, 2023 |
| Title | MGA Entertainment Inc. v. Clifford T.I. Harris, et al | | |

In ruling on MGA's motion to strike portions of the First Amended Counterclaim, the Court struck allegations of cultural appropriation: "the FACC's statements regarding cultural appropriation have no bearing on any of the counterclaims, and . . . they are accordingly immaterial and impertinent." (Docket No 53, p. 16.) The Court's basis for exclusion extends to evidence which would support those allegations.

The detailed list of impermissible allegations puts the Harris Parties on specific notice. (Reply, pp. 3-4.) These matters will be excluded.

Nothing prevents the Harris Parties from pursuing the racial diversity, age, or gender of OMG Girlz fans. (See Opposition, pp. 2-3) Nothing prevents the Harris Parties from offering evidence of MGA's diversity goals and philosophy. (See id., pp. 5-6.)

The Harris Parties distinguish misappropriation from cultural appropriation. (See id., p. 7.) Consistent with the Court's ruling on Motion *in Limine* No. 2, third-party misappropriation is excluded. Given that inspiration is different from misappropriation, inspiration inquiries are proper.

While the Court excludes evidence that expressly goes to cultural appropriation or racism, the Harris Parties raise concerns about what might "imply or suggest" suggest racism. (Opposition, p. 3.) In addition to the Court's general admonition in bold below, counsel shall advise each witness of this portion of the Order specifically. Veiled, calculating remarks are no less objectionable than the attribution of outright racist statements. If there is any doubt that specific inquiries will run afoul of the Court's rulings, counsel shall raise the issue in advance outside the presence of the jury.

The Motion is granted.

D. <u>Motion *in Limine* No. 4: Abandoned/Undisclosed Theories.</u>

As Counter-Defendant, MGA seeks an order to exclude the evidence of abandoned or undisclosed theories. (Docket No. 332.) The Harris Parties have filed an opposition (Docket No. 356), and MGA has replied (Docket No. 377).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 20-11548-JVS(AGRx)                    Date   January 11, 2023

Title   MGA Entertainment Inc. v. Clifford T.I. Harris, et al

      As part of a party's initial disclosures under Rule 26 of the Federal Rules of Civil Procedure, a party must provide "a computation of each category of damages claimed by the disclosing party--who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered." (Fed. R. Civ. P. 26(a)(1)(A)(iii) (emphasis supplied). As a practical matter, this requirement is most frequently met through a damage expert's report and supporting materials.[3]  The basic point is that the opposition is entitled to notice of the damages theory, a calculation, and supporting materials.  If these basics are provided during discovery, a failure to make a formal Rule 26 disclosure is harmless, and the self-executing exclusionary sanctions do not come into play.  (See Fed. R..iv. P. 37(c).)

      Mere disclosure of a damage theory is no more than a placeholder which does not satisfy Rule 26's disclosure obligations.  (See Opposition, p. 3.) Counsel "contemplating lost opportunities for licensing and/or disgorgement" similarly does not meet the requirements of Rule 26.  (Docket No. 101, p. 2.)  In ruling on MGA's summary judgment motion, the Court bifurcated disgorgement, and then noted "to the extent that Counterclaimants seek profits as a surrogate measure of their own damages, they may present evidence of the profits at trial."[4]  (Docket No 323, pp. 32-33.)  However, and contrary to Harris Parties assumption (Opposition, p. 7), that was not a license to present direct evidence of lost profits.

      In their opposition, the Harris Parties state that they "do not seek to introduce specific additional calculations for this beyond what Mr. Tregillis [their damage expert],  timely disclosed . . ., has already or will update in accordance with the methods and calculations set forth in his previously produced report."  (Id., p. 8.)

      The expert report of Christian Tregillis ("Tregillis") presents only a claim for disgorgement (Docket No. 148-2), and the Harris Parties acknowledge as much. (Opposition, p. 11.)  The Harris Parties understand the metes and bounds of any

---

[3]The Harris Parties' initial disclosures signaled as much.  (Docket No. 332-2, p. 3.)

[4]At the Pretrial Conference, the Court concluded that there would be no bifurcation.  (See Pretrial Conference Order, p

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 20-11548-JVS(AGRx)                     Date   January 11, 2023

Title        MGA Entertainment Inc. v. Clifford T.I. Harris, et al

permissible damage theory, and the Court will hold them to that.  The Court  excludes all other damage theories, including loss opportunities and direct lost profits calculation or the Harris Parties's damages.[5]  It is too late in the day embark on other paths. (Opposition, p. 11.)  The prejudice is obvious.  (Fed. R. Civ. P.  37(c).)

As indicated, the Motion is granted

E.   Motion *in Limine* No.  5: Consumer Declarants Not Deposed.

As Counter-Defendant, MGA seeks an order to exclude consumer confusion declarants who have not been deposed.  (Docket No.  333.)  The Harris Parties have filed an opposition (Docket No. 357), and MGA has replied (Docket No.  378).

On MGA's motion to strike, the Court rejected for purposes of summary judgment the declarations of individuals offered on the issue of confusion who had not been deposed.  (Docket No. 322, p. 5.)  However, the Court "reopen[ed] discovery for the limited purpose of allowing Counter-Defendants to depose the Consumer Declarants." From the parties' papers, the last of which was filed on November 21, 2022, it appears that at least some the declarants have been deposed.

Any consumer confusion witness who has not been deposed as of this date is excluded.  (See Docket No. 322.)

F.   Motion *in Limine* No.  6: References to Spoliation.

As Counter-Defendant, MGA seeks an order to exclude references to spoliation and similar conduct.  (Docket No. 334.)  The Harris Parties have filed an opposition (Docket No. 363-1), and MGA has replied (Docket No. 404-1).

The Court agrees that evidence of Court's spoliation rulings and similar actions by the Court should be excluded.  Such evidence is not relevant. (Fed. R. Evid. 402.)

---

[5]The is particulary so with respect to any showing of lost profits given that all the evidence to support such a theory has always been within the Harris Parties' possession.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 20-11548-JVS(AGRx)                                    Date   January 11, 2023

Title      MGA Entertainment Inc. v. Clifford T.I. Harris, et al

However, the present Motion seeks much more.  As evidenced by the first lines of MGA's supporting memorandum, this is not a motion *in limine* except in name:

> Having failed to unearth any evidence of willful infringement despite fulsome discovery, Harris Parties and their counsel have resorted to repeated baseless assertion that MGA improperly withheld or destroy evidence.  As MGA has consistently demonstrated, however, Harris Parties contentions are wholly unsupported by the record.

(Motion, p. 3; emphasis supplied.)[6]  Rather, it is a stealth summary judgment asking the Court to address the existence and sufficiency of the evidence to support a list of supposed examples of misconduct.  At the outset, the Court advised the parties that motions *in limine* could not be so used.  (Docket No. 18, p. 4.)  While is it permissible to seek specific Rule 56(g) findings on a summary judgment motion, such fact-based rulings are not available on a motion *in limine*.

Except as noted, this portion of the Motion is denied.

F.   Motion *in Limine* No.  7 : Exclusion of Tregillis.

As Counter-Defendant, MGA seeks an order to exclude Harris Parties' expert Tregillis.  (Docket No. 444.)  The Harris Parties have filed an opposition (Docket No. 468), and MGA has replied (Docket No. 470).

As discussed more fully below in Section II.E, infra, the Court's summary judgment ruling paring back the number of dolls at issue affected the damages calculations previously may be both parties' experts.  Tregillis' Supplemental Report is in response to Russell Mangum's ("Mangum") supplemental report which under the facts of this case the Court has declined to strike on timeliness or other grounds.

The parties should be treated with parity.  The Court declines to strike Tregillis' supplemental report largely for the grounds advanced in resolving the Mangum motion.  Just as with Mangum, MGA may take a deposition of on no more than three

---

[6]Other evidence is replete in the Motion.   (E.g., Motion, pp. 7:3-4; 8:20-21; 9:4-7.)

A010

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    CV 20-11548-JVS(AGRx)                                    Date    January 11, 2023

Title    MGA Entertainment Inc. v. Clifford T.I. Harris, et al

hour on The supplement.

The Motion is denied.

II.    The <u>Hall</u> Parties's Motions *in Limine.*

_____The parties have dealt with the Harris Parties' Motions *in Limine* Nos. 1 and 2 in consolidated filings: Harris Parties' Motions (Docket No. 187), MGA's Opposition (Docket No. 217), and Harris Parties' Reply (Docket No. 255).

A.    Motion *in Limine* No. 1: Witness Disclosures After Close of Discovery.

The Harris Parties seek an order to exclude witnesses disclosed by MGA after the close of discovery.  No Rule 26 disclosure was made, and the Harris Parties seek the automatic exclusion provided under Rule 37(c).

At the Pretrial Conference hearing, the Harris Parties pointed out that the Court had previously ruled on the issue, and excluded Allen Haljevac, Irene Garcia, and Danna Darma.  (Docket No. 326, p.6 n.6; Docket No. 331, pp. 6-7.) Indeed, on the motion for reconsideration for the summary judgment ruling, the Court denied this Motion as moot.

B.    Motion *in Limine* No. 2: Evidence re "Tot Dolls,"

The Harris Parties seek to exclude evidence of "Tot Dolls" prior to 2018 as inspiration.[7]  Harris Parties rely on representations that inspiration evidence prior to 2018 would not be offered.  (Ranahan Decl., Ex. A, pp. 9-12.)  Counsel for MGA affirmatively stated that the "design for inception did not occur in 2016 and 2018."  (<u>Id.</u>, pp. 9-10.)

The Court takes the Motion under submission subject to further briefing discussed at the Pretrial Conference.

_____

[7]The Harris Parties' compliance with Local Rule 7-3 was imperfect, but not sufficient on that basis to decline ruling on the Motion.  (Reply, pp. 4-5.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    CV 20-11548-JVS(AGRx)                                      Date    January 11, 2023

Title       MGA Entertainment Inc. v. Clifford T.I. Harris, et al

C.  Motion *in Limine* No.  3: Criminal Allegations.

The Harris Parties seek an order to exclude evidence of criminal allegations or convictions.  (Docket No. 337.)  MGA has filed an opposition (Docket No. 370-1), and the Harris Parties have replied (Docket No. 383-1).

At the outset, the Court expresses its frustration at the lack of detail and resort to vague generalities found in the meager 3/4 of a page of argument offered in support of the Motion.  (Motion, p.  6.)  Gleaning the facts as best it can from the opposition and reply, the orders:

• Allegations of criminal conduct are excluded as irrelevant.  The Court rejects the contention that the Harris Parties have opened the door to such evidence. (Opposition, p.  2.)  To the extent that MGA offers such evidence to support the contention that it would be improbable that MGA would want to trade on the creations of such dubious owners, the Court finds the theory dubious and  more prejudicial than probative.  (Fed. R. Evid. 403.)   The prejudice of women in California and Georgia coming forward with allegations of drugging, kidnaping, and sexual misconduct is prejudicial with no offsetting benefit with regard to the claims here.  (See Opposition, pp. 8-9.)

• None of the criminal acts which MGA cites would qualify and Rule 404(b) evidence for numerous reasons, not the least of which is lack of similarity to the conduct here in issue.  (See discussion of Rule 404(b), supra.)  Moreover, much of the conduct is stale.

• Clifford Harris' felony conviction for being a felon in possession of a firearm and his violations of supervised release are potentially admissible under Federal Rule of Evidence 609.  If MGA wishes to pursue this or other crimes, it shall file a further application addressing the nature of the crime, its staleness, and any dishonesty inherent in the crime.  (Fed. R. Evid. 609(a), (b).)

•At oral argument, MGA addressed the issue of photos of Zonnique Pullins. The Court will consider the use of the photos without reference to Pullins' conviction. MGA shall make its proposal outside the presence of the jury before offering the photos.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    CV 20-11548-JVS(AGRx)                              Date    January 11, 2023

Title    MGA Entertainment Inc. v. Clifford T.I. Harris, et al

Except to the extent the Court will allow a further application with regard to Rule 609, the Motion is granted.

    D.    Motion *in Limine* No. 4: Spoliation.

The Harris Parties seek an order to exclude "inspiration" documents and certain other documents in light MGA's lack of a document retention policy and certain failures to produce. (Docket No. 337, pp. 7-8.) MGA has filed an opposition (Docket No. 355), and the Harris Parties have replied (Docket No. 383-2).

The Motion is largely a repackaging of the Harris Parties' earlier spoliation motion. (See Docket No. 190; under submission.) The Motion is denied for the same reasons. (See Docket No. __.) To the extent the Motion seeks individual factual determinations, the Court denies the Motion for the same reasons set forth in response to MGA's parallel motion. (See Section I.F, supra.)

    E.    Motion *in Limine* No. 5: Changes in Mangum's Methodology.

The Harris Parties seek an order to exclude of changes in Mangum's damages methodology first presented in his Supplemental Report. (Docket No. 340-1). MGA has filed an opposition (Docket No. 351), and the Harris Parties have replied (Docket No. 387).

Supplemental expert reports are permitted and at times even required. (Fed. R. Civ. P. 26(e).) The question here is whether the supplement exceeds the permissible scope. Generally, "a supplemental expert report that states additional opinions or seeks to strengthen' or deepen' opinions expressed in the original expert report is beyond the scope of proper supplementation and subject to exclusion under Rule 37(c)." Plumley v. Mocket, 836 F. Supp. 2d 1053, 1062 (C.D. Cal. 2010) (internal quotation marks deleted). However, there is an explanation.

On summary judgment the Court excluded large number of dolls, and only 31 or 32 remain in dispute. (Docket No. 326, pp. 23, 30.) In his initial report, issued

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | | |
|---|---|---|---|---|
| Case No. | CV 20-11548-JVS(AGRx) | | Date | January 11, 2023 |
| Title | MGA Entertainment Inc. v. Clifford T.I. Harris, et al | | | |

prior to the Court's summary judgement, Mangum had calculated the total revenue for all the dolls, and then deducted costs to arrive at net profit. Through no fault of his, Mangum's original analysis no longer fits the facts of the case that will be tried. Accordingly, he calculated the revenue for each of the remaining dolls individually; there is no contention that he used a different method of calculating revenues per doll than he had for the aggregate. He then applied an average profit for the doll line, and used this to arrive at net profits for the remaining doll's.

To be sure the approach is new. However, this is not a "re-do" triggered by a court's criticism or finding of error.

The Court finds that the calculation of revenue per doll is simply a finer parsing of Mangum's aggregate calculation at least as to the new revenue calculations. These are "updated numbers . . . into a previously-disclosed and unchanged formula. (See Motion, p. 4.) The use of average profits for the line is new, but it goes to the weight of his opinion. The Court finds that Mangum's profit calculations meet all the same requirement for an initial report. (Fed. R. Civ. P. 26(a)(2)(B)(i-ii).) Indeed, one of the purposes of an expert report is to see if a deposition is even necessary. (Id., Notes of Advisory Committee on Rules–1993 Amendment.)

Given that the Harris Parties' expert also calculated damages on a product line rather than individual basis, it is not surprising that Mangum, as a rebuttal witness, also did initially. (Docket No. 340-2, ¶ 38.)

The Court finds that there is substantial justification. (Fed. R. Civ. P. 37(c).) If MGA indicates it desires to do so, the Court will order a further deposition no later than five days before Mangum takes the stand. As indicated above, the scope of any necessary examination is narrow.

Except as indicated, the Motion is denied.

F. Motion *in Limine* No. 6: Exclusion of Expert Isaacson.

The Harris Parties seek an order to exclude the testimony of MGA expert Bruce Isaacson ("Isaacson"). (Docket No. 282.) MGA has filed an opposition (Docket

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 20-11548-JVS(AGRx)                              Date   January 11, 2023

Title      MGA Entertainment Inc. v. Clifford T.I. Harris, et al

No. 219-5), and the Harris Parties have replied (Docket No. 267).

  1. <u>Legal</u> <u>Standard.</u>

  Federal Rule of Evidence 702 permits expert testimony from "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education," if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

(Fed. R. Evid. 702.)

  On this challenge, the Court is called to exercise its "gatekeeper" function to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." <u>Daubert</u> v. <u>Merrell</u> <u>Dow</u> <u>Pharmaceuticals, Inc.</u>, 509 U.S. 579, 597 (1993). A trial court's "gatekeeping" obligation to admit only expert testimony that is both reliable and relevant is especially important "considering the aura of authority experts often exude." <u>Mukhtar</u> v. <u>Cal. State</u> <u>Univ.</u>, 299 F.3d 1053, 1063-64 (9th Cir. 2002). Nevertheless, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." <u>Primiano</u> v. <u>Cook</u>, 598 F.3d 558, 564 (9th Cir. 2010). Importantly, the Court's gatekeeper role under <u>Daubert</u> is "not intended to supplant the adversary system or the role of the [trier of fact]." <u>Quiet</u> <u>Tech.</u> <u>DC-8, Inc.</u> v. <u>Hurel-Dubois</u> <u>UK Ltd.</u>, 326 F.3d 1333, 1341 (11th Cir. 2003) (internal quotation marks and citation omitted). In other words, at this stage, the Court is not supposed "to make ultimate conclusions as to the persuasiveness of the proffered evidence." (<u>Id.</u>) As the Ninth Circuit summed up in <u>Alaska</u> <u>Rent-A-Car, Inc.</u> v. <u>Avis</u>, 738 F.3d 960, 969-70 (9th Cir. 2013):

> Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable. The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    CV 20-11548-JVS(AGRx)                     Date    January 11, 2023

Title    MGA Entertainment Inc. v. Clifford T.I. Harris, et al

The requirement that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue" goes primarily to relevance. Primiano, 598 F.3d at 564.

The Rule 702(c) and (d) reliability indicators are subject to a more flexible analysis. According to the Ninth Circuit,

> [i]n Daubert, the Supreme Court gave a non-exhaustive list of factors for determining whether scientific testimony is sufficiently reliable to be admitted into evidence, including: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific community.

Domingo ex rel. Domingo v. T.K., 289 F.3d 600, 605 (9th Cir. 2002).

The trial court has "broad latitude" in deciding how to determine the reliability of an expert's testimony and whether the testimony is in fact reliable. Mukhtar, 299 F.3d at 1064; see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). The "test of reliability is 'flexible,' and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." Kumho Tire, 526 U.S. at 141.

2. Discussion.

The Harris Parties mount several attacks on Isaacson's work.

First, they claim the so-called "Eveready" approach is flawed and inapplicable here. (Motion, pp. 9-15.) While the Harris Parties' rebuttal expert Dr. Susan McDonald acknowledges the Eveready method as the "gold standard" (Docket No

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 20-11548-JVS(AGRx) | Date | January 11, 2023 |

| | |
|---|---|
| Title | MGA Entertainment Inc. v. Clifford T.I. Harris, et al |

186-1, p. 6), the Harris Parties contend that it should be limited to cases where the senior mark is "well-known." However, they assert in their pleadings that "the OMG Girlz have achieved nationwide fame and popularity." (E.g., Docket No. 63, p. 11, 14.) The statement is binding on the Harris Parties, and Isaacson was entitled to rely. American Title Ins. Co. v. Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1931988). Moreover, the Harris Parties' 30(b)(6) witness testified to the same effect. (Finkelstein Decl., Ex. B, p. 77.)

The leading treatise recognizes that the senior mark need not be "top of the line" in order to employ the Eveready approach. 1 McCarthy on Trademarks and Unfair Competition, § 32:174.

With regard to surveys in general, the parties present an academic debate as to whether the Squirt format or the Eveready format is appropriate. The jury entitled to weigh the completing theories and decide for itself.

The Harris Parties assert that Isaacson's ultimate conclusion is self-contradictory and unreliable. Isaacson concludes that his results would occur "either if the L.O.L. Surprise! O.M.G. Dolls are not confusingly similar to the OMG Girlz, or if the OMG Girlz are not well-known, or if both conditions are true." (Isaacson Report, Dkt. No. 144-2, ¶ 121). The Court does not agree. Moreover, the Court cannot say that the survey results are invalid if OMG Girlz are not detected as well known.

The Court finds that Isaacson sampled the correct potential buyers of the junior mark as required in a forward confusion case. Any criticism as to the target audience for the survey did not sufficiently reflect that part of the market goes to weight. Stonefire Grill, Inc. v. FGF Brands, Inc., 987 F. Supp. 2d 1023, 1038 (C.D. Cal. 2013).

Technical criticisms, such as the wording of survey questions, go to the weight of the survey work, not its admissibility. Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc., 618 F.3d 1025, 1036 (9th Cir. 2010). For example, "permission" questions are not improper. Fifty-Six Hope Road Music, Ltd. v. A.V.E.LA, Inc., 778 F.3d 1059, 1070 (9th Cir. 2015).

In conclusion, the Court finds that in accordance with Ninth Circuit

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 20-11548-JVS(AGRx)                                    Date    January 11, 2023

Title      MGA Entertainment Inc. v. Clifford T.I. Harris, et al

standards, Isaacson has used accepted principles and his conclusions are relevant.  Wendt v. Host International, Inc., 125 F.3d 806, 814 (9th Cir 1997).

     The Motion is denied.

* * * * * * * * * * * * *

**Counsel are ordered to advise the parties and all witnesses of the Court's rulings so that there are no inadvertent violations of this Order.**

                                                                          :          0

                                            Initials of Preparer     lmb

2022-11-05            Campbell, Moniece          Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

> **FILED**
> CLERK, U.S. DISTRICT COURT
> 1/23/22
> CENTRAL DISTRICT OF CALIFORNIA
> BY: _____ eva _____ DEPUTY

MGA ENTERTAINMENT, INC., a ) California corporation; )

) Plaintiffs, )

) Case No. vs. ) 2:20-cv-11548-JVS-AGR

) CLIFFORD Â"T.I.Â" HARRIS, an )

individual; TAMEKA Â"TINYÂ" ) HARRIS, an individual; OMG )

GIRLZ LLC, a Delaware limited ) liability company; and DOES 1 )

- 10 inclusive; ) )

Defendants. ) _____ )

) GRAND HUSTLE, LLC, PRETTY )

HUSTLE, LLC and OMG GIRLZ LLC; ) )

Counter-Claimants, ) )

vs. ) )

MGA ENTERTAINMENT, INC., ISAAC ) LARIAN and DOES 1 - 10, )

inclusive; ) )

Counter-Defendants. ) _____ )

VIDEOTAPED REMOTE DEPOSITION OF MONIECE IRMONI CAMPBELL

Pittsburgh, Pennsylvania

Saturday, November 5, 2022

Reported by:

Lynda L. Fenn, CSR, RPR CSR No. 12566

JOB No. 5544640

*Reviewed 1.13.23*

*O/R. overruled*

*S: sustained*

*After p. 92 all objection overruled unless of otherwise enough.*

*JVS*

A019

| 2022-11-05 | Campbell, Moniece | Page 2 |
| --- | --- | --- |

VIDEOTAPED REMOTE DEPOSITION of MONIECE IRMONI CAMPBELL,

taken on behalf of Plaintiff and Counter-Defendant, Pittsburgh, Pennsylvania, at 1:07 p.m. and ending at 4:54 p.m., Saturday, November 5, 2022, reported by Lynda L. Fenn, CSR No. 12566, Certified Shorthand Reporter within and for the State of California, pursuant to notice.

APPEARANCES (Appearing via Zoom Videoconference):

For the Plaintiff and Counter-Defendant MGA Entertainment, Inc., and Counter-Defendant Isaac Larian:

   MGA ENTERTAINMENT, INC.
   BY: ELIZABETH LACHMAN, ESQ.
   9220 Winnetka Avenue
   Chatsworth, California 91311
   (818) 894-2525
   elachman@mgae.com

| 2022-11-05 | Campbell, Moniece | Page 4 |
| --- | --- | --- |

                    I N D E X

EXAMINATION BY:                      PAGE
MS. LACHMAN                          7, 182
MS. RANAHAN                          176

         E X H I B I T S
NUMBER         DESCRIPTION         PAGE
Exhibit 1   A seven-page document entitled   125 Amended
Notice of Deposition of
            Monise Campbell
Exhibit 2   A 13-page document entitled   126 Amended Notice
of Subpoena
            Duces Tecum to Monise Campbell
Exhibit 3   A three-page document entitled   133 Declaration of
Monise Campbell
            in Support of Defendants', Cross-Complainants', Motion for
            Summary Judgment
PREVIOUSLY MARKED EXHIBITS
NUMBER         DESCRIPTION         PAGE
Exhibit 13   A 71-page document depicting   158
            images of dolls

         INFORMATION REQUESTED
            (None)
INSTRUCTION NOT TO ANSWER
            PAGE     LINE
            111     14 112

| 2022-11-05 | Campbell, Moniece | Page 3 |
| --- | --- | --- |

APPEARANCES (Appearing via Zoom Videoconference):

For the Defendants and Counter-Claimants:

   WINSTON & STRAWN LLP
   BY: ERIN R. RANAHAN, ESQ.
   333 South Grand Avenue
   Los Angeles, California 90071-1543
   (213) 615-1700
   eranahan@winston.com

Also Connected:

   Joselyn Luna, Videographer

| 2022-11-05 | Campbell, Moniece | Page 5 |
| --- | --- | --- |

         Pittsburgh, Pennsylvania
         Saturday, November 5, 2022
         1:07 p.m. - 4:54 p.m.

THE VIDEOGRAPHER: Good morning. We're going on the record at 1:07 p.m. on November fifth, 2022.

Please note that this deposition is being conducted virtually.

The quality of recording depends on the quality of camera and Internet connection of participants.

What is seen from witness and heard on screen is what will be recorded.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video-recorded deposition of Moniece Campbell taken by counsel for plaintiff and cross -- sorry -- and counter-defendant in the matter of MGA Entertainment, Inc., a California corporation versus Clifford "T.I." Harris, an individual, et al., and all related

Our Designations      Their Designations                    3 / 51

| 2022-11-05 | Campbell, Moniece | Page 6 |
| --- | --- | --- |

cross-actions, filed in the United States District Court Central District of California, Case No. 2:20-CV-11548-JVS-AGR.

This deposition is being conducted remotely using virtual technology.

My name is Jocelyn Luna representing Veritext and I'm the videographer. The court reporter is Lynda Fenn from the firm Veritext.

I'm not related to any parties in this action nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearance and affiliation for the record, beginning with the noticing attorney.

MS. LACHMAN: Good morning, my name is Elizabeth Lachman, I represent MGA Entertainment and related parties.

MS. RANAHAN: Good morning, I am Erin Ranahan. I represent OMG Girlz LLC, all the defendants and counter-claimants in this case, including "T.I.," Tameka "Tiny" Harris and also Pretty Hustle and Grand Hustle.

| 2022-11-05 | Campbell, Moniece | Page 7 |
| --- | --- | --- |

THE VIDEOGRAPHER: Will the reporter please swear in the witness and counsel may proceed.

THE COURT REPORTER: Ms. Campbell, please raise your right hand.

MONIECE IRMONI CAMPBELL,
produced as a witness on behalf of the Plaintiff, and having been first duly sworn, was examined and testified as follows:

THE COURT REPORTER: Go ahead, Counsel.

EXAMINATION

BY MS. LACHMAN:

Q. Ms. Campbell, could you spell your first, middle and last name for the record?

A. Yes, first name is [REDACTED], middle name is [REDACTED], and last name is Campbell, C-a-m-p-b-e-l-l.

Q. Thank you.

And, Ms. Campbell, what's your birth date?

A. December third, 1996.

Q. So you're about to turn -- I can't do math.

A. Twenty-six.

Q. Twenty-six. Okay.

| 2022-11-05 | Campbell, Moniece | Page 8 |
| --- | --- | --- |

Q. Ms. Campbell, have you ever had your deposition taken before?

A. No.

Q. Have you ever been a party to a lawsuit?

A. No.

Q. You've never been sued; is that correct?

A. Correct.

Q. And you've never sued anyone else?

A. No.

Q. Have you ever been convicted of a crime?

A. No.

Q. Ms. Campbell, do you -- do you know what MGA Entertainment is?

I introduced myself a little bit earlier as representing MGA Entertainment and that's who I represent in this case.

Do you know what that entity is?

A. Yes.

[REDACTED]

| 2022-11-05 | Campbell, Moniece | Page 9 |
| --- | --- | --- |

[REDACTED]

Q. Okay.

A. Go ahead.

MS. RANAHAN: Let me just object to the extent this is not a memory test.

You didn't give her any instructions and she's never been deposed, but she's not required to try to remember, you know, her childhood first moment of remembering MGA. That's not a realistic question.

I don't even know how anyone would remember the moment they first -- whatever.

Just so you know, Ms. Lachman knows you've never had a deposition and normally she would give you some instructions. You know, this is not a memory test, give your best recollection.

But to the extent you have no specific recollection, you are not required to try to answer that question.

So I would object on that basis.

MS. LACHMAN: Okay. And I'm going to ask Ms. Ranahan, just state her objection as succinctly as possible.

| 2022-11-05 | Campbell, Moniece | Page 10 |
|---|---|---|

BY MS. LACHMAN:

Q. It is true, I will sometimes give a long speech at the beginning of a deposition sort of explaining how everything works. I know that it's 1:00 where you are, so I wanted to dispense with admonitions because I'm assuming that Ms. Ranahan explained to you what we're going to be doing today. If you would like, I can absolutely give you a primer on what today's going to be like, if you would like.

A. No, I'm okay. I can -- you can just proceed.

Q. Okay. Well, the most important thing is, I will say, is that today you are required to tell the truth and that everything that you say is under penalty of perjury. You understood that; right?

A. Yes.

Q. Okay. And your testimony today, even though it is being given virtually, and in this sort of informal, Zoom world that we all live in, it is as if -- it should be and it is -- it should be and it is as if it's the same testimony that you would give in a court of law in front of a judge and a jury.

| 2022-11-05 | Campbell, Moniece | Page 11 |
|---|---|---|

Do you understand that?

A. Yes, I understand.

Q. Okay. And, in fact, your deposition may be played in front of a judge or a jury. Do you understand that?

A. I understand.

Q. Okay. Great. If at any point I ask a question that you don't understand because I use a word that you think maybe I'm using in a way differently than you might understand it or if there's anything confusing about my question, please feel free to just stop me and ask me to clarify any part of my question or to restate it differently.

A. Okay.

Q. If you go ahead and answer, I'm going to assume that you understood exactly my question the way I meant it. Fair?

A. Yes, understood.

Q. Okay. Great. So you testified that when you were a child you received gifts of MGA toys. Do you remember that?

A. Yes.

| 2022-11-05 | Campbell, Moniece | Page 12 |
|---|---|---|

[redacted] Dolls and card games is probably the best I can remember.

Q. Okay. And in terms of dolls, do you have any recollection of anything about the dolls, even if you don't remember the name?

A. They were just pretty basic dolls like not -- not Barbie but like -- I don't know. Just regular dolls.

Q. And you said not like Barbie, do you mean like fashion dolls?

A. Yeah, they weren't fashion dolls at all.

Q. They were not fashion dolls?

A. No.

Q. Okay. Do you know if they were the Bratz dolls?

A. Oh, I guess so, yeah, Bratz. I guess Bratz. Now I remember that Bratz is made by that company. Yeah, but they -- yeah. They were Bratz

| 2022-11-05 | Campbell, Moniece | Page 13 |
|---|---|---|

dolls. But they were just Bratz, you know, nothing else like -- I don't know -- that would stand out from Bratz, I felt like Bratz was their own thing. So just Bratz dolls, yes.

Q. Okay. Just to make sure that I understood it.

[redacted]

MS. RANAHAN: I think, Liz, she had just said that she just remembered that that was MGA. Your original question was, right, like, what do you remember from a child getting. She's just now learning that that was associated with this.

BY MS. LACHMAN:

Q. So, Ms. Ranahan, is going to have a chance to ask any clarifying questions after I'm done.

A. Okay.

| 2022-11-05 | Campbell, Moniece | Page 14 |
| --- | --- | --- |

Q. If at any point you remember something and you're like, Oh, I would like to go back and explain, you know, something, just let me know. We don't have to -- you know, you can absolutely take a pause and ask to clarify something if you suddenly remember something.

A. Okay.

Q. Okay. Great.

Other than the MGA Bratz dolls that were gifted to you as a child, do you recall any other toys made by MGA that you had as a child?

A. As I stated before, I believe like card games maybe -- maybe Uno, I think. But like something in that, like maybe Crazy Eights. Some type of card game.

[redacted]

Q. Okay. More than fifteen?

A. No.

| 2022-11-05 | Campbell, Moniece | Page 15 |
| --- | --- | --- |

Q. Okay. Do you still have your Bratz dolls?

A. No.

Q. Do you remember what you did with them?

A. My mom probably threw them away. Yes, I remember she threw them away. I was too old for dolls, so she threw them away.

Q. Okay. Do you remember how old you were when your mom threw away the Bratz dolls?

MS. RANAHAN: I object. This calls for speculation about when her mom did something. I mean this is just getting really -- when her mom might have disposed of her dolls is really far afield.

So if you don't remember, Moniece, I mean you don't remember. I don't know how anyone would remember when someone else threw away a toy.

MS. LACHMAN: Ms. Ranahan, if you could just state your objection. If the witness doesn't remember or doesn't understand my question, she can let me know.

BY MS. LACHMAN:

Q. Do you have my question in mind, Ms. Campbell?

A. Yes, I don't remember.

Q. Okay. Do you -- do you understand -- do

| 2022-11-05 | Campbell, Moniece | Page 16 |
| --- | --- | --- |

you have a general understanding of what -- of what this lawsuit is about?

A. Yes.

Q. Okay. What's that understanding?

A. The understanding is that MGA produced a doll LOL -- OMG LOL Surprise and "T.I." and "Tiny" have a group named OMG Dolls or OMG Girlz -- I'm sorry, OMG Girlz and that MGA stole their likeness to produce their doll, so that's my understanding.

Q. Okay.

And at some point in this lawsuit you submitted a declaration; is that right?

A. Correct.

Q. Okay.

I want to talk -- I want to talk a little bit about the -- it's my understanding that you purchased LOL Surprise OMG dolls at some point; is that right?

A. Yes.

Q. Okay. That's what I want to talk about, so let's talk about that.

[redacted]

| 2022-11-05 | Campbell, Moniece | Page 17 |
| --- | --- | --- |

[redacted]

| 2022-11-05 | Campbell, Moniece | Page 18 |
|---|---|---|

A. [illegible redacted text]

Q. Okay. And have you done anything to sort of go back and try to figure out how many exactly you purchased?

A. I have, but I don't have a record.

Q. Okay.
And what have you done to go back and try to figure out how many you purchased?

A. Called my sister and called my neighbors and cousins, like how many dolls do you have? We have a lot, a lot of accessories.
It wasn't just the dolls. It was the accessories and all the things that -- so yes.

| 2022-11-05 | Campbell, Moniece | Page 19 |
|---|---|---|

[illegible redacted text]

Q. Okay. Nieces, cousins and neighbors.
And I'm going to break each one of those down.

A. Okay.

Q. Your nieces, how many nieces do you have?

A. Six.

| 2022-11-05 | Campbell, Moniece | Page 20 |
|---|---|---|

Q. And the nieces are your sister's daughters?

A. Correct.

Q. Okay. So all six nieces that you purchased LOL surprise -- I'm sorry.
When you purchased LOL Surprise dolls for your nieces, were they for all six of your sister's children -- daughters?

A. Yes.

Q. Okay.

MS. RANAHAN: Object. That time you didn't call them -- you've been calling them LOL OMG. You usually stipulate to OMG. That time you did not say OMG, so I don't know.

MS. LACHMAN: Okay. Thank you, Erin.

BY MS. LACHMAN:

Q. Ms. Campbell, I've been saying LOL Surprise OMG dolls, which is a lot of words.
If I say, "OMG dolls," will understand that I'm referring to the LOL Surprise OMG dolls?

A. Yes.

Q. Okay. So I'm just going to call them "OMG dolls" from now on.

A. Okay.

Q. If -- if for some reason you want me to clarify, please feel free to ask me to.

| 2022-11-05 | Campbell, Moniece | Page 21 |
|---|---|---|

A. All right. No problem.

Q. [illegible redacted text]

A. [illegible redacted text]

OK

Q. Okay. And what are their age ranges?

A. Ten -- no, 12 -- well now 12 to three.

Q. Twelve being the oldest.

A. There's two 12-year-olds, yes, being the oldest. They are twins.

Q. And then the youngest is three-years-old?

A. Yes.

Q. And these -- and your six nieces are all daughters of your sister?

A. Correct.

Q. Do you have more than one sister?

A. Yes.

Q. Okay. What is -- what is your sister's name who has the six nieces? Who has your nieces?

A. Do I have to give her name?

Q. It's just so that I don't -- we can -- I mean, just her first name. It's just so that I don't confuse her with anyone else in your family.

A. Oh, okay. Got it.
Her name is Kai, K-a-i.

Q. Okay.

OK

Case: 25-7523  12/10/2025  DktEntry: 5.1  Page 61 of 306
Case 2:20-cv-11548-JVS-AGR   Document 560   Filed 01/23/23   Page 7 of 50   Page ID #:30830
Case 2:20-cv-11548-JVS-AGR   Document 540-1   Filed 01/23/23   Page 9 of 52   Page ID #:29153

**Page 22** — 2022-11-05 — Campbell, Moniece

MS. RANAHAN: Just to assure you, she's not at any risk of being pulled into this lawsuit for any reason, so don't worry about that.

If I -- we don't even have the time to do it if I wanted to do it, or if Liz wanted to do it because of the timing of this case, so don't worry about that.

THE WITNESS: All right.

MS. LACHMAN: Okay. So that's helpful to me.

BY MS. LACHMAN:

Q. So Kai is your sister. She has six daughters for whom you purchased OMG dolls?

A. Sorry, yes.

[lines 15–22 redacted]

Q. And how are you -- how old are they?

A. Nine and six.

Q. So today they are nine and six?

---

**Page 23** — 2022-11-05 — Campbell, Moniece

A. Yes.

Q. Other than your six nieces and your two cousins, age nine and six currently, did you buy LOL OMG dolls for anyone else in your family?

A. Not my family no.

Q. Okay. So now we're going to go to -- I think you said the neighbors; right?

A. Correct.

Q. Okay. So you purchased LOL Surprise OMG dolls for your neighbors -- neighbor's children?

A. Neighbor's children, yes.

Q. And how many children are we talking?

A. She has two children.

Q. Okay.

MS. RANAHAN: I mean the neighbor's children are still her neighbors just for the record, so you can just call them the neighbors.

BY MS. LACHMAN:

Q. And how old are the two children?

A. One is eight and I believe the other one -- she's probably -- she's probably 13 now. Yeah, she's 13.

Q. And they're both girls?

A. Yes.

Q. Okay. So the neighbor's who you bought LOL

---

**Page 24** — 2022-11-05 — Campbell, Moniece

Surprise OMG dolls for are currently eight-years-old and 13-years-old?

A. Correct.

Q. Okay. Have we talked -- have you -- have you identified for me all of the different people that you bought OMG dolls for?

A. Yes.

Q. Okay. I know that you've told me about some of the ages that these kids are today. But, obviously, you didn't give them all the gifts today, so I want to sort of understand the period of time that you've been purchasing the dolls. So that's what I want to talk about next.

A. Okay.

[lines 15–25 redacted]

---

**Page 25** — 2022-11-05 — Campbell, Moniece

[lines 1–25 redacted]

A025



2022-11-05 — Campbell, Moniece — Page 28

Q. So you bought two of the -- you described her as a curly, mohawk hairstyle?

A. Correct.

2022-11-05 — Campbell, Moniece — Page 27

Q. Okay.

So I'm going to call this the Wal-Mart purchase, the first Wal-Mart purchase so that we can talk about it and not forget what we're talking about.

2022-11-05 — Campbell, Moniece — Page 29

Q. Okay.

Do you remember if you purchased them, even if it wasn't like near Christmastime or the holidays, do you remember if you purchased them and sort of held on to them until Christmas or did you gift them right away?

**Our Designations**    **Their Designations**

| 2022-11-05 | Campbell, Moniece | Page 30 |
|---|---|---|

A. I gifted them right away.

Q. Okay.

Your nieces, you have two 12-year-old, twin nieces and the youngest is three-years-old. What about the other three nieces that sort of fall in the middle.

How old are they today?

A. Okay. So the twins are 12. One, she's nine. So that would be -- it's literally 12, nine, eight and six. Twelve, nine, eight, six. Twelve, nine -- yeah, eight and six.

Q. And then three?

A. Yeah, three. Yes.

That's a lot to keep up with, so I just have to make sure it's right, but yes.

Q. Do you remember when you bought the --

okay.

So 2019, that's about three years ago. So your -- do you remember if your 12-year-old, twin nieces were nine at the time.

Does that sound right?

MS. RANAHAN: Let me just say, I mean this is -- the exact age on the date you gave them, it's really kind of a memory test that you are asking her.

You can give your best estimate about the

| 2022-11-05 | Campbell, Moniece | Page 31 |
|---|---|---|

age and I think you are doing a great job and have done that.

But to the extent you're not being asked like, you know, when they are not even associated with a Christmas or a birthday or anything, like what age were they when you handed it to them, when birthdays are constantly happening, I just think it's -- you know, do your best, but you don't have to precisely remember these things.

THE WITNESS: Okay.

MS. RANAHAN: This is an extreme memory test that she is putting you under right now, so do your best.

MS. LACHMAN: Yeah, Ms. Campbell, you can always say, "I don't remember," or you can give me your best guess.

And, Ms. Ranahan, if you want to state that the objection calls -- you know, if you want to state an objection succinctly instead of making a long speech.

MS. RANAHAN: Yeah, I would love to. Sure.

Let me make it again.

I'm objecting that you've already asked the ages of these kids. You've asked them repeatedly.

She's given you a great timeframe, She's identified

| 2022-11-05 | Campbell, Moniece | Page 32 |
|---|---|---|

their ages and now you are just like trying narrow in on an age at which a certain doll was handed.

It's just so far afield, so I'm going to just object that it's inappropriate, it's harassing, it's badgering the witness.

And I think she's answered the question how old they are. So we should just move on from asking how old these nieces and neighbors are. I think we've got a sense.

MS. LACHMAN: Ms. Campbell, I'm entitled to your best recollection. Ms. Ranahan is right. It's not a memory test and I'm not trying to get, you know, a photographic memory and nor are you required to have one.

But to the extent that are you able to answer my questions, I'm entitled to your best testimony today and I have only one chance to take your testimony and that's today, so I'm just trying to get through this.

If you don't remember, let me know. If there's something that you could look at that might help you remember something, also let me know.

THE WITNESS: Okay. Three years ago, they are 12 now, so yes, they were nine three years ago. And the last child wasn't born yet. And whoever

| 2022-11-05 | Campbell, Moniece | Page 33 |
|---|---|---|

else, the other children, however they all are old now, three years ago if that's how old they were, so yes.

MS. LACHMAN: Okay.

BY MS. LACHMAN:

Q. So we've talked about the first time you purchased LOL Surprise OMG dolls. And that was at Wal-Mart, you believe to be in 2019.

A. Yes.

Q. Correct so far?

A. Yes.

Q. Great.

[redacted]

| 2022-11-05 | Campbell, Moniece | Page 34 |
| --- | --- | --- |

Q. Okay. I'm not trying to -- I got that, so I'm going to ask some clarifying questions.

Do you remember -- okay. So if I understood your testimony correctly -- and please correct me if I got it wrong.

Q. Okay. Okay. What do you mean by that? You meant like the same sort of -- you know, so that the MGA -- so that OMG dolls are like, you know, 11, 12 inches approximately, you know, they're fashion dolls.

Would you call them a fashion doll?

A. Yes.

Q. All right.

| 2022-11-05 | Campbell, Moniece | Page 36 |
| --- | --- | --- |

Q. Okay. And all of the in-store purchases of the OMG dolls that you made occurred at Wal-Mart?

A. Yes.

Q. Do you remember when you saw the other LOL Surprise products that did not say OMG? Do you remember what it was that you saw, what product specifically?

A. They were just different dolls. They

| 2022-11-05 | Campbell, Moniece | Page 35 |
| --- | --- | --- |

| 2022-11-05 | Campbell, Moniece | Page 37 |
| --- | --- | --- |

didn't look like the ones that I purchased. They -- they were just different dolls. I don't think they were as tall and I think they had some little baby ones -- baby dolls LOL Surprise. But they weren't OMG LOL Surprise. They were just LOL Surprise.

Q. Okay.

A. So they just had different types of dolls.

Q. And could you see -- were the dolls in a box or were they the dolls that were in a ball, do you remember?

A. Yeah, they were in a ball. They were in a box. Some of them were in the multi packs. They had all different types of -- what threw me off is that they had all different types of products now. They had, like, big boxes of multiple dolls. And little ones in a ball. They were just LOL surprise, yeah.

Q. This time that you were in Wal-Mart in 2021 and saw LOL Surprise products that were -- did not say OMG, this 2021 visit to Wal-Mart, had you ever seen any of those LOL Surprise products before that time?

A. No.

Q. Okay. Have you ever purchased an LOL Surprise ball?



2022-11-05 — Campbell, Moniece — Page 38

A. No.

*(remaining testimony on this page redacted)*

2022-11-05 — Campbell, Moniece — Page 40

*(lines 1–7 redacted)*

Q. Does your sister live in Atlanta?

A. No. Not currently, no.

Q. In the time that you have been buying dolls for your sister's daughters, has she lived in Pittsburgh?

A. No, she lives in New York.

Q. And in the time that you've been giving your nieces the OMG dolls, have they always lived in New York during that time?

A. I mean, yes, like permanent living situation, yes, because they would just go visit Atlanta so...

Q. Okay. Did you ask your sister to send you pictures of the dolls?

A. No, I didn't. She was busy, but she just knows they're a lot. I didn't ask for pictures because I didn't know if I should get her involved. I didn't know what the situation was. We

2022-11-05 — Campbell, Moniece — Page 39

*(testimony on this page redacted)*

2022-11-05 — Campbell, Moniece — Page 41

had a conversation.

Q. And other than the duplicate doll that you mentioned with the curly mohawk that your sister was able to say, "Yes, I see those, those are here," was she able to identify for you any other dolls that you had purchased?

A. Like the -- no, no. She wasn't able to identify, because like I said, she said there was a lot.

Q. Okay.

A. She couldn't. I didn't ask for specifics. I just asked her, "Do you have all of those dolls that I've been buying?" And she was like, "Yeah." And specifically the ones with the mohawk.

*(lines 15–21 redacted)*

Q. How many conversations did you have with your sister about trying to figure out which dolls you had purchased -- which OMG dolls you had purchased for them?

A029

**2022-11-05  Campbell, Moniece  Page 42**

A. Just one conversation.

Q. Okay.

At one point did you call your cousins to try to figure out which dolls you had purchased for them?

A. You said at what point, like specifically when or --

Q. At some point, did you?

A. Oh, yes, at some point, yes.

Q. Okay.

A. The same thing with the neighbors -- the cousins and the neighbors, same thing.

Q. I'm sorry, let's talk -- I'm sorry, let's talk about the call with your cousins.

A. Okay.

Q. You called your cousins' mom?

A. Yes.

Q. Okay. And what was that conversation -- what were you able to learn from that conversation?

A. That they still had all the dolls that I had bought them.

Q. Were you able to learn anything about which dolls specifically you had purchased for them?

A. No.

Q. What about the number of dolls that you had

**2022-11-05  Campbell, Moniece  Page 43**

purchased from -- for them?

A. She said it was probably like twenty dolls. She said same thing, you know, she was explaining to me that the girls tore up the dolls, had everything everywhere.

So, it was about twenty dolls.

Q. About twenty dolls. Okay.

So the conversation was with your cousin, she was able to tell you that, yes, your two -- your two cousins still have their dolls -- the dolls that you purchased for them?

A. Uh-huh.

Q. That they are about twenty of them. Am I right?

A. Yes.

Q. But you were not -- she was not able to identify for you which particular dolls; correct?

A. Yeah, because I didn't ask. And the reason that I didn't ask is because I just knew they were all OMG dolls -- OMG LOL Surprise dolls. There was really no specifics that I could recall, like, oh, okay, only from the first two dolls that I told you that I bought that were duplicate.

Q. Okay.

Have you told me everything that you can

**2022-11-05  Campbell, Moniece  Page 44**

remember about the conversation with your cousin?

A. Yes.

Q. Okay. Let's talk about at some point did you call your neighbor?

A. Yes.

Q. Okay.

And you called your neighbor to ask about the OMG dolls that you had gifted her two daughters.

A. Yes.

Q. And tell me what you -- tell me about what you discussed with her during that conversation?

A. Pretty much the same thing. She didn't give me a specific amount. She just told me there were a lot of dolls just like my cousins, my nieces they tore them up.

You know, little girls take things apart. One of them cut the hair on the doll. She didn't say what color the hair was, she didn't give me specifics. She just said there were a lot.

Q. Okay. Did she give you a number?

A. No, she didn't. And I feel like I bought more of the dolls for my nieces because there are six nieces, so I bought a lot of the dolls for them. But most of them, I would say, they all got a lot but most of then went to my nieces.

**2022-11-05  Campbell, Moniece  Page 45**

Q. Was your -- were you able to identify any of the dolls that you bought for your two neighbors during this conversation?

A. No, it was a phone call. It wasn't a Face Time call, so no.

And like I said, I didn't know if I could share specifics with the case or anything, so I didn't go into detail.

Just asked them, "Hey, do you still have those dolls that I bought your daughters," that was it.

[redacted]

**2022-11-05 — Campbell, Moniece — Page 46**

[redacted text]

Q. Okay. You mentioned that the call with your neighbor when you -- the call that you had with your neighbor when you called to inquire about whether they still had the OMG dolls that you had given to them, you said it was not a FaceTime call?

A. Right.

Q. What about the call -- the similar call that you had with your cousin and your sister Kai, were those on FaceTime?

A. Only with my cousin. My sister, no. Only with my cousin.

Q. Okay.

A. She wasn't even home.

Q. I'm sorry?

A. She wasn't even home. She was just telling me it was a lot of dolls. She wasn't home when I called her on FaceTime.

**2022-11-05 — Campbell, Moniece — Page 47**

Q. Are we talking about your cousin or your sister?

A. My cousin. My sister, I called her on the phone, as well as my neighbor. My cousin, I called her on FaceTime, but she wasn't home.

Q. Okay. So you were not able to visually see any of the dolls when you called your cousin on FaceTime; am I correct?

A. Correct.

Q. Other than the -- other than the doll -- so far today the only doll that I remember you identifying as having purchased is you described her as having a brown curly mohawk?

A. Yes.

Q. Okay. And I'm going to try to find a picture of that doll, so that you and I can make sure that we're talking about the same doll. But I'm going to call her brown curly mohawk doll for now.

A. Okay.

Q. Other than that doll, which you believe you purchased two of, can you remember any other LOL surprise OMG doll that you purchased?

MS. RANAHAN: Let me just -- you just --

**2022-11-05 — Campbell, Moniece — Page 48**

hold on, just for the record, there's two mohawk ones and so I don't -- the way you just described it, you think you've identified which one. Maybe she's purchased both of the mohawk ones but -- and you can show her the photos. But I don't want you to just -- your record just -- there's two mohawk ones, one from 2019 and one from 2020 which you can show her. Maybe she's bought them both, but I don't think we can try to guess which ones without showing her the images.

MS. LACHMAN: Okay.

MS. RANAHAN: Do you have images to show her? I don't think that's fair to determine that.

MS. LACHMAN: Counsel, there is nothing unfair about my question and the witness seems to be understanding exactly what my question was. I'm going to repeat it again so that Ms. Campbell can remember.

MS. RANAHAN: I'm talking about your last question where you said the one with the mohawk. There's multiple ones.

MS. LACHMAN: I didn't say the one with the mohawk. I said -- okay.

MS. RANAHAN: Well, you identified it as a brown curly one and I'd say there's two with a mohawk

**2022-11-05 — Campbell, Moniece — Page 49**

with slightly different colors, so I just want her to see the photos so she can -- and maybe she's purchased them both, we don't know. But I think you should show her because I don't think we can --

MS. LACHMAN: I understand.

MS. RANAHAN: You are trying to now say it's the brown hair, as opposed to the blonde hair and I don't think that's -- I want her to look at them to see if she's purchased both of them.

MS. LACHMAN: Okay. That's fair.

BY MS. LACHMAN:

Q. Let me do it this way, I'm going to -- I'm going to use the description that you gave me.

[redacted text]

A031

---

**2022-11-05 — Campbell, Moniece — Page 50**

[redacted]

MS. RANAHAN: Why don't you show her the photos? Wait, go ahead, you can remember any that you can remember off the top of your head, but it would be easier if you show her the photo. And I can do that at the end, Liz, if you are not going to do it, so that's fine.

[redacted]

MS. LACHMAN: Okay. We've been going for about an hour.

---

**2022-11-05 — Campbell, Moniece — Page 51**

Would you -- oh, and another thing, of course, anytime that you have to use the restroom break or something, just let me know and we can absolutely take a break. I usually like to take a break about every hour to give the witness and the court reporter a break.

THE WITNESS: Okay.

MS. RANAHAN: How long do you think you plan to go, Liz?

MS. LACHMAN: I don't know. So would you like to take a --

MS. RANAHAN: You have no estimate? I mean, that's not --

MS. LACHMAN: No, I have no estimate.

MS. RANAHAN: How could you have no estimate?

MS. LACHMAN: So, would you like to take a five-minute break right now, Ms. Campbell, or do you want me to keep going?

THE WITNESS: You can take a five-minute break.

MS. LACHMAN: Okay. So let's take a five-minute break. I have 11:01 a.m. here for me, so let's be back here in approximately five minutes.

---

**2022-11-05 — Campbell, Moniece — Page 52**

Is that okay with the videographer and the court reporter?

THE VIDEOGRAPHER: That's okay with me.

THE COURT REPORTER: Thank you very much. That's fine.

THE VIDEOGRAPHER: This marks the end of Media No. 1. The time is 2:01 p.m. We're off the record.

(Brief interruption in proceedings.)

THE VIDEOGRAPHER: This marks the beginning of Media No. 2. The time is 2:09 p.m. We're on the record.

BY MS. LACHMAN:

Q. Ms. Campbell, you testified earlier that when you bought the LOL Surprise -- your first LOL Surprise -- the first time that you bought an LOL Surprise OMG doll, you had already known about the OMG Girlz; is that right?

A. Yes.

[redacted]

---

**2022-11-05 — Campbell, Moniece — Page 53**

[redacted]

---



Page 57

Q. Yeah, it's one thing, like I wanted to make sure, like I mean, like, pressing follow so that you are, you know, updated regularly on sort of posts that they make versus being curious and just doing like your own research.

A. Right.

Q. So which one were you referring to?

A. I was referring to -- I was referring to both. But if you mean follow, yes, I was following them on social media platforms and subscribed to their YouTube page, to be specific.

Q. Okay. And do you think that you followed and subscribed or have you verified that you did, in fact, subscribe and follow?

A. No, I verified. I'm sure of that.

Q. Did you verify that recently or --

A. I mean --

MS. RANAHAN: Which one are you talking about, Liz, because now she said she follows. But



2022-11-05 — Campbell, Moniece — Page 58

then you added subscribed in there, so I don't know
which one you are talking about.
MS. LACHMAN: I guess I'll just ask -- I'll
ask Ms. Campbell.
BY MS. LACHMAN:

MS. RANAHAN: Everybody does it.
THE WITNESS: Yeah.

2022-11-05 — Campbell, Moniece — Page 59

BY MS. LACHMAN:

Q. What were your feelings at the time?
A. I don't know. I wouldn't say sad. I was
just surprised. I was surprised that they broke up
because, you know, the unity they had as a group.
They all grew up together, so I just was surprised.

2022-11-05 — Campbell, Moniece — Page 60

2022-11-05 — Campbell, Moniece — Page 61

Q. They -- they did not know about the OMG
Girlz before you told them about them?
A. Correct.
MS. RANAHAN: I'll just -- let me just
object that are you speculating. But she said she
taught them. But I don't know how she would know
necessarily what any of them knew before.
MS. LACHMAN: That's a good point. Let me
ask you a question -- let me ask this question.
THE WITNESS: Okay.
BY MS. LACHMAN:

| 2022-11-05 | Campbell, Moniece | Page 62 |
|---|---|---|

OR

OR

| 2022-11-05 | Campbell, Moniece | Page 64 |
|---|---|---|

Pullins?

A. No.

Q. Okay.

So you think that you may have commented on social media posts by "Tiny" if they had something to do with her youngest daughter who also sings.

A. Yeah, I am.

Q. Okay.

A. I am.

Q. What about "T.I." Harris, have you ever commented on a social media post that "T.I." Harris has made?

A. No.

Q. What about the OMG Girlz when they were together.

Do you remember ever commenting on a social media post?

A. Yeah. Definitely when they were together, yes.

Q. So you would interact with their social media posts?

A. Yeah. Like, like it and share and comment, yes.

Q. What about the -- what about the individual members after the group disbanded.

| 2022-11-05 | Campbell, Moniece | Page 63 |
|---|---|---|

Q. At one point -- at one point you commented on the social media post and that's why we're talking here today.

But my question is have you ever commented on any social media posts by "Tiny" Harris before that.

A. I believe so, yes.

Q. Okay. What about --

A. I'm sorry, go ahead.

Q. No, you have the floor.

A. I was just going to say probably about -- mostly about her children, like her daughters. Her daughter she sings, so I know I always comment and say something because she -- her younger daughter can sing.

If I can remember specifically, so yes.

Q. "Tiny's" younger daughter or youngest daughter?

A. Youngest. Youngest.

Q. Okay.

But you are not talking about Zonnique

| 2022-11-05 | Campbell, Moniece | Page 65 |
|---|---|---|

Did you ever comment on social media posts by Zonnique Pullins?

A. Yeah.

MS. RANAHAN: Let me just object to the "disbanded" part just for the record because they have been still continuing to do things together and they still have a Facebook page together, so go ahead.

THE WITNESS: Okay.

BY MS. LACHMAN:

Q. Did you understand what I mean when I said the group disbanded?

A. Are you talking to me?

Q. Yes.

A. Oh, yes, I understand.

Q. Okay.

A. But yes, I commented under Zonnique's post. I was more so invested in Zonnique because she just had a baby, like, around the same time I had my daughter.

So, yeah, probably said congratulations or something like that.

Yeah.

Q. You didn't -- you never bought any LOL Surprise OMG dolls for your own children; is that

A035

| 2022-11-05 | Campbell, Moniece | Page 66 |
| --- | --- | --- |

correct?

A. No, because my daughter is about to be one, so I was not invested after I learned that they made other dolls, which was in 2021 when I found out -- when my daughter was born. I said summer of 2021 I found out. My daughter was born in December of 2020. I didn't buy her any dolls.

Q. Have you ever spoken to "Tiny" Harris?

A. Like personally, no.

Q. In any way?

A. Like -- no.

Q. I'm sorry, I said have you ever spoken to "Tiny" Harris and you said, "personally, no." So I was confused and just wondering have you ever spoken or communicated with her in any way?

A. Oh, no.

Q. Okay. The same question for Mr. "T.I." Harris, have you ever communicated with him in any way?

A. No.

Q. Any individual -- any member of the OMG Girlz, group, have you ever communicated with any of them in any way?

A. No.

| 2022-11-05 | Campbell, Moniece | Page 67 |
| --- | --- | --- |

| 2022-11-05 | Campbell, Moniece | Page 68 |
| --- | --- | --- |

Q. And a more specific question I had, which is: Do you think that the OMG dolls physically look like the individual members of the OMG Girlz?

A. Yes, I think so.

Q. And you know that there are three members of the OMG Girlz; correct?

A. Yes.

Q. When you purchased the curly mohawk with the guitar doll that you and I were speaking about earlier, did you think that that doll looked like any particular OMG Girlz member?

A. Yes, as I stated earlier, I thought that doll specifically looked like Zonnique.

Q. Okay. And do you remember if you saw -- if you saw a doll that looked like any of the -- the other two members?

A. No. Like feature-wise, no. But like hairstyles and clothing, yes.

Q. Okay. So you -- did you think -- did you think that there was a -- I'm trying to think of how to refer to the other OMG Girlz members because you don't remember their names. So my understanding is that you have Zonnique Pullins. And then another member, her name

| 2022-11-05 | Campbell, Moniece | Page 69 |
| --- | --- | --- |

was Bahja Rodriguez. Does that name sound familiar?

A. Not her full name, no.

Q. And then Breaunna Womack, does that name sound familiar?

A. The Breaunna part, yes.

Q. Okay.

A. Not her last name, but yes.

Q. Okay.

MS. RANAHAN: Do you want to tell her their stage numbers and then maybe she'll remember those better?

BY MS. LACHMAN:

Q. Do you remember any of the stage names of the OMG?

MS. RANAHAN: You asked her that, but do you want to tell her -- you just told her the full names. I don't know if it would be helpful to tell her.

BY MS. LACHMAN:

Q. Okay.

MS. RANAHAN: You asked her that already,



| 2022-11-05 | Campbell, Moniece | Page 70 |
| --- | --- | --- |

Liz. I'm asking if you want to give her those so that she can distinguish.

[redacted]

MS. LACHMAN: Okay.

BY MS. LACHMAN:

[redacted]

Q. Okay. Okay.

[redacted]

| 2022-11-05 | Campbell, Moniece | Page 72 |
| --- | --- | --- |

Q. Okay.

MS. RANAHAN: She already testified originally the OMG name, I just want to -- that's part of your question, too, right, Liz, or are you beyond that?

She testified that that was the original draw, the OMG name everywhere.

So I just want to make sure that if what you -- if you are intending to refer to that too, that's part of this.

MS. LACHMAN: Thank you. Sorry, I lost my train of thought.

BY MS. LACHMAN:

Q. Okay.

You said the hairstyles and the clothes?

A. Yes.

Q. And Ms. Ranahan mentioned that you had also said OMG?

A. Yes, the name.

Q. Okay.

So just to place ourselves back and recenter our conversation, I had asked what was it about the products that you purchased at that Wal-Mart that made you think you were buying dolls of the OMG Girlz and you said hairstyle.

| 2022-11-05 | Campbell, Moniece | Page 71 |
| --- | --- | --- |

[redacted]

| 2022-11-05 | Campbell, Moniece | Page 73 |
| --- | --- | --- |

Clothing; is that right?

A. Yes, and you kind of asked me that earlier too and I said clothing.

Q. Yeah.

[redacted]



2022-11-05     Campbell, Moniece     Page 74

Q. And earlier I asked whether you knew what

2022-11-05     Campbell, Moniece     Page 75

the "OMG" in "OMG Girlz" stands for and you testified that you thought it just stood for "Oh, my gosh"?

A. Right.

2022-11-05     Campbell, Moniece     Page 76

2022-11-05     Campbell, Moniece     Page 77

OR

OR

Q. Do you know if you bought any fashion dolls that are not LOL Surprise OMG dolls?

A. No.

Q. No, you have not or, no, you don't know?

A. No, I have not bought any dolls.

Q. So you haven't purchased, like, Barbie dolls, for example?

A. No.

Q. What about there's some fashion dolls out there called "Rainbow High." Have you purchased any Rainbow High dolls?

A. No.

Q. Do you know what I'm talking about when I say, "Rainbow High"?

A. Yes, I do. I don't have it.

Q. You've seen it on the shelves?

A. Uh-huh. Yes.

Q. Was there anything about the hairstyles, the LOL Surprise OMG doll hairstyles that made you think the dolls you were buying were OMG Girlz dolls?

A. Specifically, about the hairstyles you mean



2022-11-05 — Campbell, Moniece — Page 78

like -- okay.

Q. Just focusing on the hairstyles.

A. Oh, yeah.

MS. RANAHAN: Let me just object you've already -- to the extent she's already answered this with the mohawk, the purple, the blue, the pink. She mentioned the pink.

MS. LACHMAN: Counsel? Counsel?

MS. RANAHAN: But she's mentioned this all and now you are just going around and around and asking the same questions.

MS. LACHMAN: I'm going to move on to clothing next. I just want to make sure that I got everything about -- what was it about the hairstyles and so --

THE WITNESS: I can answer that.

BY MS. LACHMAN:

Q. So my question is: Anything else that we haven't talked about the hairstyles?

A. No.

Q. No, there's not?

A. No, there's not. Just what I've already stated.

Q. Okay.

And this is -- I'm going to move on, so

2022-11-05 — Campbell, Moniece — Page 79

this is my last chance to ask you about it which is why I sometimes summarize what I understand you have said. And then I'll ask you is there anything else before we move on.

So I want to make sure that you have a chance to tell me everything that made you think that the hairstyle -- something -- anything about the hairstyle that made you think the OMG dolls were dolls of the OMG Girlz?

A. Nothing else. Just like I said, the colorful, the different hairstyles. The braids. The buns. Like what we call space buns. The mohawk. The glitter.

I don't know. There was a lot so...

Q. Okay.

A. Specifically --

Q. Specifically, the space buns, have you -- is that something that the OMG Girlz wore a lot, space buns?

A. Yeah, space buns, not a lot I would say. But I've seen them with the space buns.

Q. Okay. And I feel like I know what you mean by space buns, but if you could explain it to me so that I make sure I know what you are talking about?

A. Yeah, just like two buns in the hair with a

2022-11-05 — Campbell, Moniece — Page 80

part down the middle, maybe a bang. Two hair -- like buns in your hair.

Q. Do you know why they are called space buns or why you call them space buns?

A. I mean that's just like the -- I don't know -- the popular name for them. That's just like -- I don't know -- that's what I've always called them.

Q. Okay.

A. I don't feel -- that's what every -- I feel like they are called space buns now too because people put glitter in their hair now, so that's why people call them space buns. But if I could just not use a name, I would just say two buns with a bang.

2022-11-05 — Campbell, Moniece — Page 81

Q. I'm going to move on to the clothing next. Is there anything else about hairstyles that you haven't told me about?

A. No.

Q. Okay.

So you mentioned that the clothing was also a reason why you believed that the OMG dolls were dolls of the OMG Girlz?

A. Yes.

Q. What was it about the clothing? And be as specific as you can.

A. Okay. You said I can -- I think I have a picture referring to that, the like -- I would have to look at it.

I can, like, go toggle through my app.

A039

Case: 25-7523, 12/10/2025, DktEntry: 5.1, Page 76 of 306
Case 2:20-cv-11548-JVS-AGR   Document 560   Filed 01/23/23   Page 22 of 50   Page ID #:30845
Case 2:20-cv-11548-JVS-AGR   Document 540-1   Filed 01/23/23   Page 24 of 52   Page ID #:29168





2022-11-05     Campbell, Moniece     Page 86

red shirt and blue pants with -- I don't know -- an orange belt, something like that.

I don't mean just colors and stripes. So different colored clothing.

MS. LACHMAN: Right.

BY MS. LACHMAN:

Q. And I guess my question is -- or if you have my question in mind, but I can re-ask it. Whether there are any other fashion dolls that are similar styles to what you just described?

A. I'm sorry, could you restate the question?

Q. Sure.

2022-11-05     Campbell, Moniece     Page 88

Q. I'm trying to understand it which is why -- which is why I'm asking the questions that I'm asking.

A. Okay.

2022-11-05     Campbell, Moniece     Page 87

2022-11-05     Campbell, Moniece     Page 89

Q. What about purple hair, blue hair, pink hair, have you ever seen those hair colors on dolls that are not the OMG dolls?

A. You said blue and pink?

Q. Blue, pink, purple.

A. Oh.

Q. Any of those colors or any of them at the same time?

A. At that time, like, no, I haven't because -- I mean if it was somebody with blue and pink hair, no, no. Not at the time, specifically, no.

Like there were no other groups out or people out with that style that were for my age range that I was listening to, so no.

Q. And this is in 2000 and -- you are referring to when the OMG Girlz was together and



| 2022-11-05 | Campbell, Moniece | Page 90 |

doing their thing --

A. Correct.

Q. -- before they -- okay.

A. So I wasn't listening to things out of my age range, specifically, at that time that I would see --

Q. Okay. But you bought the dolls in 2019. You started buying the dolls in 2019?

A. Right.

[text redacted]

| 2022-11-05 | Campbell, Moniece | Page 91 |

[text redacted]

MS. RANAHAN: Liz, you've asked that question already.

BY MS. LACHMAN:

Q. Am I right?

A. Would I be able to answer the question if you already asked it, I mean?

MS. RANAHAN: Yeah, you can answer it again. It's just -- this is just --

[text redacted]

MS. LACHMAN: I guess I'm trying to understand.

//

| 2022-11-05 | Campbell, Moniece | Page 92 |

BY MS. LACHMAN:

[text redacted]

Q. Okay.

[text redacted]

| 2022-11-05 | Campbell, Moniece | Page 93 |

[text redacted]

Q. And did you ever see any advertisements or any marketing to confirm your association?

A. Like, oh, no, I never saw that because I just wasn't vested in, like, stuff around that time, like social media. I was working a lot, so I really wasn't invested in all of that.

Q. So you never saw, for example, "Tiny" Harris post about the OMG dolls being a business venture of hers?

A. I wouldn't know because I wasn't on social media around the time. I really wasn't. I was invested in working. I wouldn't pay attention to that if it was there.

Case: 25-7523, 12/10/2025, DktEntry: 5.1, Page 79 of 306
Case 2:20-cv-11548-JVS-AGR  Document 560  Filed 01/23/23  Page 25 of 50  Page ID #:30848
Case 2:20-cv-11548-JVS-AGR  Document 540-1  Filed 01/23/23  Page 27 of 52  Page ID #:29171

| 2022-11-05 | Campbell, Moniece | Page 94 |
|---|---|---|

I mean, I'm pretty sure I saw -- like, you know, I had social media. It's still there, but I wasn't on it actively.

Does that make sense?

Q. You were not on it actively between 2019 and 2021?

A. Correct.

Q. You were not on social media actively in 2019, '20 or '21?

A. Right.

Q. So, is it your testimony that you were not sort of checking in on the social media posts of Zonnique Pullins, the OMG Girlz or "Tiny" Harris during this time?

A. Yeah, probably, like I said, at the end of -- at the end of 2021 -- I don't know when Zonnique had her daughter.

So probably around that time when she had her daughter and I heard the news is when I got back invested into social media.

So, I don't know when she had her child, but that is when.

But never did I say, oh, let me look and see if these dolls are associated with these girls because I had already thought that.

| 2022-11-05 | Campbell, Moniece | Page 95 |
|---|---|---|

So it was no reason -- I wasn't that invested to dig in that deep.

Q. But earlier you testified that you didn't think all of the dolls -- all of the OMG dolls looked like the OMG Girlz?

A. No. Not all of them, no. Like features? No.

Clothing, hair and makeup and likeness, yes.

Q. What -- what do you mean by features versus likeness?

A. Well, features, you had asked me if any of the dolls, specifically, looked like any of the girls. You asked me, like, face-wise and I said, yes, only the one doll.

What's her name? I don't know. The one that Ms. Ranahan had mentioned.

Q. The one that had the mohawk -- curly mohawk with the guitar?

A. Yes. I specifically said that one looked like Zonnique because of the skin complexion and the hairstyle and the outfit, that looked like something Zonnique would wear, how she would have her hair and the makeup, everything, the features.

| 2022-11-05 | Campbell, Moniece | Page 96 |
|---|---|---|

| 2022-11-05 | Campbell, Moniece | Page 97 |
|---|---|---|

| 2022-11-05 | Campbell, Moniece | Page 98 |

Q. Did you purchase any white dolls?

A. No.

MS. LACHMAN: All right. We've been going about another hour. We can take a five-minute break or -- let me just ask the court reporter, because I know I've got to give her hands a break.

How are we doing, Court Reporter?

THE COURT REPORTER: It's your call really, but I appreciate you asking me.

MS. LACHMAN: Okay. So, Ms. Campbell, we can do a five-minute break or a ten minute break. Do you have a preference?

THE WITNESS: Ten minutes would be fine for everybody, just -- yeah.

MS. RANAHAN: How much longer, Liz, do you estimate?

MS. LACHMAN: I don't know. And then

| 2022-11-05 | Campbell, Moniece | Page 99 |

depending on what you ask, Erin, I'll definitely have more so...

MS. RANAHAN: Well, I'm only going to have, like, you know, five minutes of questioning, so I -- I mean, this is just -- I'm asking for a -- this is pretty customary to provide an estimate. This is a third-party witness who bought dolls from your client.

The idea that you can't give us an estimate for everyone on a Saturday is pretty -- you know, you called me rude. I don't know how you can suggest this isn't rude.

Everyone needs to try to plan their day, Liz, so what is the estimate? She has a baby. She has a new baby. She has, you know, obligations, so we need to know how much longer you are going to drag this out.

So what's your estimate?

MS. LACHMAN: So I would say at least four hours more.

THE WITNESS: What? Four hours?

MS. RANAHAN: That's ridiculous. We're not -- at some point we are going to be -- that's insane. You are doing this for the --

MS. LACHMAN: I mean you are forcing me to

| 2022-11-05 | Campbell, Moniece | Page 100 |

give you an outer limit as to --

MS. RANAHAN: Four hours? This should have been -- we had three hours with Rachel Moshea. There is no way this should be going seven hours, Liz. You are being totally unreasonable. So we're not going to be going four more hours. If you are going to be asking the same questions over and over, we're going to be ending the deposition.

So why don't you focus on some new questions, finish this up, this is crazy. You are not going to go four more hours with this witness. That is completely harassing.

MS. LACHMAN: I probably -- I probably won't.

MS. RANAHAN: Well, then what is your actual prediction, not just an outer limit of your, you know, depo range if you had a real party witness? This is a third party who bought dolls from your client and was confused and mislead by your client's advertising. She already testified to it.

Now here we are on a Saturday, she's already sat for two hours.

How much lodger are you planning to go, honestly?

MS. LACHMAN: Ms. Campbell, we'll come back

| 2022-11-05 | Campbell, Moniece | Page 101 |

in ten minutes, if that's okay with you or we can come back in five minutes.

MS. RANAHAN: No, I think everyone deserves to have a realistic estimate, Liz, not four more hours.

MS. LACHMAN: I gave you my estimate and I'm not going to change my answer.

MS. RANAHAN: Well, we're not going to be sitting here for four more hours. It's not happening.

MS. LACHMAN: Then you can decide to conclude the deposition whenever you wish and you do so at your peril.

MS. RANAHAN: Well, I'm going to be asking her a couple of questions, so we'll give you one more hour, Liz.

MS. LACHMAN: No.

MS. RANAHAN: You asked everything there is.

MS. LACHMAN: No, there is not --

MS. RANAHAN: Yes, we're going to go one more hour and then I'll ask my questions and we'll call it a day.

MS. LACHMAN: No.

MS. RANAHAN: You can ask some follow-up

Our Designations    Their Designations                    27 / 51

| 2022-11-05 | Campbell, Moniece | Page 102 |
|---|---|---|

and we'll call it a day. We're not going four more hours, we're not.

MS. LACHMAN: No, you cannot conclude this in one hour.

MS. RANAHAN: Excuse me?

MS. LACHMAN: You cannot conclude this deposition in one hour. If you do --

MS. RANAHAN: Well, we had Rachel Moshea go for three hours and she was actually a MGA witness on a Saturday.

And now you are going to badger this witness to say four more hours, it's not happening.

MS. LACHMAN: Ms. Ranahan --

MS. RANAHAN: So ask your questions. We are going to call this at -- we're going to call your things at 1:30 p.m., you are going to be done with yours --

MS. LACHMAN: I still have a lot more for --

MS. RANAHAN: -- and we'll do 30 minutes and we'll be done.

MS. LACHMAN: I still have a lot more questions.

MS. RANAHAN: We are not going to go four more hours, we will not.

| 2022-11-05 | Campbell, Moniece | Page 103 |
|---|---|---|

You can tell the judge that you wanted to go seven hours with this witness. You wanted to keep her on a Saturday all day over buying dolls.

MS. LACHMAN: No, I don't think -- Ms. Ranahan?

MS. RANAHAN: You can tell the judge that.

MS. LACHMAN: If you would stop interrupting me, I would appreciate it.

I do not intend to go all seven hours. So far you have made long speaking objection. I'm trying to get through this examination.

MS. RANAHAN: Up to you. Up to you.

MS. LACHMAN: I am trying to get through this examination and if you prematurely terminate this deposition -- we are entitled to seven hours under the rule. I do not intend to take seven hours.

MS. RANAHAN: You are unbelievable, Liz. Okay. We'll be back in five minutes --

MS. LACHMAN: Stop interrupting me.

MS. RANAHAN: -- and we're not -- figure out your questions. We're not going four more hours, not a chance. There's not a chance.

MS. LACHMAN: If you will stop interrupting me. It is rude. I will not interrupt you if you do not interrupt me.

| 2022-11-05 | Campbell, Moniece | Page 104 |
|---|---|---|

I understand Ms. Campbell is a third-party witness. I'm trying to get through this as quickly as possible.

We're going to take a ten-minute break and I still have more to my examination and I only have one chance to speak with her.

MS. RANAHAN: How could you have more questions? How could you possibly have more questions for this witness, honestly? You should be done by now.

So we'll be done with your questions at 1:15 and then we will -- I'll ask her my two questions or, you know, 30 minutes and then we will be done.

MS. LACHMAN: No, we will not be done in one hour. We will come back in ten minutes. Thank you.

Ms. Campbell, if you could come back in ten minutes, that would be great.

THE VIDEOGRAPHER: This marks the end of Media No. 2. The time is 3:10 p.m. We're off the record.

(Brief interruption in proceedings.)

THE VIDEOGRAPHER: This marks the beginning of Media No. 3. The time is 3:25 p.m. We're on the

| 2022-11-05 | Campbell, Moniece | Page 105 |
|---|---|---|

record.

BY MS. LACHMAN:

[REDACTED]

Q. Okay. Who did you get an email from?

A. I don't remember specifically. I don't -- unless I can go on my email and look but --

Q. Well, I guess did you get a -- how did this person get your email address?

A. Through social media.

Q. Okay. So was the initial contact between you and this individual in the social media application?

A. Yes.

Q. Okay.

A. But I don't remember who specifically.



| 2022-11-05 | Campbell, Moniece | Page 110 |
| --- | --- | --- |

counter-claimants before you received the papers in the mail?

A. Before, no.

Q. Okay.

So, I want to make sure that chronologically I have it all down.

You made a social media post commenting.

You were then reached out to by somebody on social media who asked whether you would be willing to submit a statement. You said yes and gave that person your email address.

Next that person emailed you and you gave them your -- your telephone number in response and next you had a phone call with a lawyer for the counter-claimants.

Am I correct so far?

A. Yes.

[REDACTED]

I gave a statement and that was it. I received the email confirming that statement that I

| 2022-11-05 | Campbell, Moniece | Page 111 |
| --- | --- | --- |

made and that was months ago.

And then I received a call yesterday letting me know that I'll receive documents that I have to sign via email and now we're here today.

Q. Okay.

What documents did you receive yesterday that you have to sign?

MS. RANAHAN: Let me just say -- let me just say now, we are now representing, as you know, Ms. Campbell. So anything that happens between us now is privileged and that's including as of yesterday, so you don't have to answer these questions. I'll tell her not to answer.

I'm instructing her not to answer that question because that's something that we sent her after we represented her.

MS. LACHMAN: Okay.

BY MS. LACHMAN:

Q. So, Ms. Campbell, it's your understanding that Ms. Ranahan is here today as your attorney?

A. Yes.

Q. Okay. And it sounds like yesterday you signed something agreeing to that?

MS. RANAHAN: Under -- again, I'm going to just -- nothing that has happened between us since is

| 2022-11-05 | Campbell, Moniece | Page 112 |
| --- | --- | --- |

relevant to your questioning and it's privileged, so you don't have to answer that question.

I'm instructing you not to answer that question.

BY MS. LACHMAN:

Q. Are you going to follow Ms. Ranahan's instruction?

A. Yes.

MS. RANAHAN: This is not her declaration. This is about us representing her, Liz, so it's not relevant.

BY MS. LACHMAN:

[REDACTED]

Q. And she's not your lawyer for any other purpose?

A. No.

Q. Okay.

In this case we served a deposition subpoena.

Do you -- I can -- do you know if you've ever seen that? I can make it an exhibit, but I also know that you are going to go have to get an iPad and

| 2022-11-05 | Campbell, Moniece | Page 113 |
| --- | --- | --- |

I don't want to waste anymore time.

Did you ever see a subpoena in this case relating to the deposition?

A. I'm not sure that I remember. But if you showed me, I can -- I just went through the documents yesterday.

Q. Did anyone send you a copy of document requests that we served in this case? Basically a list of categories of documents that we would have liked you to have brought to your deposition.

Did anyone talk about documents?

A. I received, like, a link via email.

MS. RANAHAN: Liz, you are asking her -- she's aware of the doc request, but you are asking her for privileged communications.

Again, we represent her for this deposition, so everything that we discussed yesterday is privileged or in connection with the document request so...

MS. LACHMAN: Okay.

BY MS. LACHMAN:

Q. So, before yesterday --

MS. RANAHAN: Which we've objected to as inappropriate and untimely.

//

Our Designations        Their Designations                    30 / 51

| 2022-11-05 | Campbell, Moniece | Page 114 |
|---|---|---|

BY MS. LACHMAN:

Q. Did you look for any documents in connection with today's deposition?

A. No, because I didn't have any, so no.

Q. Okay.

And you didn't have any what? Any documents?

A. You mean like photos or anything?

Q. Well, we sent a list of documents and I can -- I'll just mark it as an exhibit and we can walk through it, although I really don't want to waste your time.

Do you have emails with -- that you received or that -- email communications with counter-claimants' lawyers in connection with your declaration?

A. Can you restate the question?

Q. Sure.

Did you get a copy -- so when you were -- you said you submitted a statement -- you gave a statement on a telephone call and you said that you got an email back from the lawyer that you spoke to confirming that statement.

A. Uh-huh.

Q. Do you have that email?

| 2022-11-05 | Campbell, Moniece | Page 116 |
|---|---|---|

Q. No, I'm asking you --

A. No.

Q. -- if you have that?

A. No, I don't.

Q. What do you mean you don't have that?

A. I don't have a screenshot of it in my phone, no.

Q. No, not a screenshot.

You have that communication?

A. No. Only -- the only communication I have is what I received via email that I was willing to give my statement here today. That's it.

Q. How were you contacted initially by counter-claimants' lawyers?

MS. RANAHAN: This is asked and answered.

Move on, Liz, this is how we're --

(Speaking simultaneously.)

MS. LACHMAN: I'm --

MS. RANAHAN: Is this how you want to go four more hours is repeating the same question ten times? Move on.

MS. LACHMAN: No, not moving on.

MS. RANAHAN: What does it matter? It's privileged. It's done. You've seen the statement. There's no --

| 2022-11-05 | Campbell, Moniece | Page 115 |
|---|---|---|

A. Yeah, I'm pretty sure I do. Yes.

Q. Okay.

Were you asked to produce that email or gather that email?

A. No.

Q. How many communications --

MS. RANAHAN: Your request asks for the drafts and there are no emails of drafts going back and forth. We said that in the response, Liz, and so our position on the responses is they are untimely and inappropriate. Nevertheless, we asked for a couple of things and beyond that, you can look at responses, we served them.

THE WITNESS: Yeah, I don't have any other communications, aside from my statement and just confirming my statement, that's it.

MS. LACHMAN: Okay.

BY MS. LACHMAN:

Q. So you have a screenshot -- do you have a -- you have a communication that someone, you don't remember who, reached out to you on behalf of the counter-claimants after you made the social media post.

So you have that communication; right?

A. No, I didn't say that. No.

| 2022-11-05 | Campbell, Moniece | Page 117 |
|---|---|---|

MS. LACHMAN: Ms. Ranahan --

MS. RANAHAN: Move on.

MS. LACHMAN: -- I'm talking about the communications that took place in April which are not privileged.

Why am I not allowed to ask about those?

MS. RANAHAN: She's already told you the substance of them and, like, the -- there's nothing there. She's given you the --

MS. LACHMAN: I -- Ms. Ranahan --

MS. RANAHAN: She's already answered it.

Move on. Asked and answered. Move on. Please move on.

You are torturing everybody, I'm sorry.

Move on.

BY MS. LACHMAN:

Case: 25-7523, 12/10/2025, DktEntry: 5.1, Page 85 of 306
Case 2:20-cv-11548-JVS-AGR   Document 560   Filed 01/23/23   Page 31 of 50   Page ID #:30854
Case 2:20-cv-11548-JVS-AGR   Document 540-1   Filed 01/23/23   Page 33 of 52   Page ID #:29177

| 2022-11-05 | Campbell, Moniece | Page 118 |
|---|---|---|



MS. RANAHAN: We're objecting --

BY MS. LACHMAN:

Q. But do you have --

MS. RANAHAN: Not only that we're objecting

---

| 2022-11-05 | Campbell, Moniece | Page 119 |
|---|---|---|

to that, so just move on to the next subject.

BY MS. LACHMAN:

Q. Do you --

MS. RANAHAN: She doesn't have that and we're not producing them anyway because you don't have -- your time for asking for documents is long gone.

BY MS. LACHMAN:

Q. Why not?

A. Because I received something via U.S. mail and I didn't need the emails. Don't we all delete mail? Like I don't have emails just piling up in my --

---

| 2022-11-05 | Campbell, Moniece | Page 120 |
|---|---|---|

BY MS. LACHMAN:

Q. Okay.

And how many of them were there?

A. One.

Q. Just one email?

A. Just one email.

Q. Okay.

And you don't remember who it was with?

A. No.

Q. Okay.

So other than --

MS. RANAHAN: Liz, this is really -- now you've just spent twenty minutes asking the same thing.

---

| 2022-11-05 | Campbell, Moniece | Page 121 |
|---|---|---|

Let's move on. Why don't you get to anything substantive that you have left so we can all get on with our day.

BY MS. LACHMAN:

Q. So other than the email communications with the lawyers who represent the counter-claimants, have you had any other written communications with them?

A. No.

Q. Well, you said that you got something by U.S. mail; is that right?

A. That was the same thing I got via email. The same documents that I got via email, was what I got U.S. mail, that's what I said. I deleted the email.

Q. Okay. And do you -- I'm sorry.

A. I deleted the email. I have the mail somewhere. It was irrelevant to me after I signed it and they told me they would reach out to me when it comes time to do this and they did. That's it.

Q. And what do you remember getting by U.S. mail?

A. My statement -- confirmation of my statement.

Q. Okay. And you read it?

A. Yes.

Our Designations    Their Designations    32 / 51

A049

| 2022-11-05 | Campbell, Moniece | Page 122 |
|---|---|---|

Q. It was a typed document?

A. Yes.

Q. Okay. And were there -- was there anything that you asked that be changed in that typed statement?

A. No, because everything that I stated was accurate.

Q. Everything in the statement was accurate; is that right?

A. Yes.

Q. Okay. So at no point did you make a change to the statement that was prepared by the counter-claimant's lawyers; is that right?

A. Yes. I don't -- I don't recall anything like that.

Q. How about -- you got a confirmation statement in an email that you said was later turned into the document you got by U.S. mail. My question was: Did you have any communications with counter-claimant's lawyers between the email and the document that you got by U.S. mail?

MS. RANAHAN: This has been answered now several times, Liz.

THE WITNESS: I don't understand what you

| 2022-11-05 | Campbell, Moniece | Page 123 |
|---|---|---|

are asking me.

BY MS. LACHMAN:

Q. Did you ever -- when you got -- when you got a confirmatory email from counter-claimant's lawyers, confirming the conversation that you had with them, did you state to them at any point, no, that needs to be changed or that's not what I said? Did you make any --

A. No.

MS. RANAHAN: She answered that. Liz, is this --

THE WITNESS: I didn't -- I didn't make any changes to it. I don't understand what you are getting at. There's nothing that says I made any changes. Do you see something there, because I don't understand what you are getting at?

MS. RANAHAN: No, and we also answered in a request that there was no drafts exchanged. There's not changes. You are clearly just trying to waste the witness' time. A witness who bought products from your client who is now being -- like drug out on this deposition as long as possible. That was a waste of twenty minutes. Please keep moving.

| 2022-11-05 | Campbell, Moniece | Page 124 |
|---|---|---|

BY MS. LACHMAN:

Q. Am I correct that -- so if you could please open up the software, the Exhibit Share software. I've marked some exhibits that I would like you to look at them.

A. Okay.

THE WITNESS: Do you have that, Ms. Ranahan? Are you going to pull that up on your end and, like, share it with me or do I have to go through my email?

MS. RANAHAN: So it's -- unfortunately it's another link --

THE WITNESS: Okay.

MS. RANAHAN: -- that you have to go into. I have to go into it separately too, so you may want to get your iPad for this. Okay?

THE WITNESS: Okay. One second, I'm going to go turn my camera off and go grab it. One second.

MS. RANAHAN: Okay.

THE VIDEOGRAPHER: Counsel, would you like to go off the record?

MS. LACHMAN: Yes.

THE VIDEOGRAPHER: This marks the end of Media No. 3. The time is 3:42 p.m. We're off the record.

| 2022-11-05 | Campbell, Moniece | Page 125 |
|---|---|---|

(Brief interruption in proceedings.)

THE VIDEOGRAPHER: This marks the beginning of Media No. 4. The time is 3:46 p.m. We're on record.

BY MS. LACHMAN:

Q. Ms. Campbell, I've gone ahead and marked two exhibits. I'm going to ask you about Exhibit No. 1, which is the Amended Notice of Deposition of Moniece Campbell.

(Plaintiff's Exhibit 1 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)

BY MS. LACHMAN:

Q. Do you see that document?

A. Yes.

Q. Have you ever seen this document before?

A. No, I don't recall.

Q. Is it, no, or, no, you don't recall?

A. No, let me -- hold on. Hold on. Let me see what I'm looking at here. Now I have to go back.

MS. RANAHAN: It might look like your declaration, but it's not, Moniece, so you may not -- this would have been something recent, like within the last --

A050

| 2022-11-05 | Campbell, Moniece | Page 126 |
| --- | --- | --- |

THE WITNESS: Oh, yeah, I don't -- I don't remember seeing this, because the only thing -- like you said, the declaration.

MS. RANAHAN: They look similar. It has a similar cover page and stuff which I know is probably what you are thinking of.

THE WITNESS: I mean -- yeah, and that would just be the same thing that I got in the mail, correct?

MS. RANAHAN: The other document right and it looks similar, yeah, it would have a similar cover page as this does.

THE WITNESS: Yeah, this is not the same thing.

MS. LACHMAN: Okay.

BY MS. LACHMAN:

Q. So you have not seen Exhibit No. 1 before; correct?

A. Right.

Q. Okay. We can go to Exhibit No. 2 now.

(Plaintiff's Exhibit 2 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)

THE WITNESS: Okay.

//

| 2022-11-05 | Campbell, Moniece | Page 127 |
| --- | --- | --- |

BY MS. LACHMAN:

Q. Take your time and -- take your time and scroll through this document. It's a subpoena for documents and I'll -- I'll read the caption page. It's an Amended Notice of Subpoena Duces Tecum to Moniece Campbell.

Have you ever seen this document before? Take your time to scroll through.

A. No.

Q. Okay.

A. From my understanding, I wasn't subpoenaed like I don't know if that means that I would have had to show up to court because I'm on the east coast, so I don't know how this --

Q. So you were subpoenaed. Ms. Ranahan accepted the subpoena on your behalf.

A. Okay.

Q. And we are able to do this deposition remotely because you are on the east coast, but you are under subpoena.

Did you understand that?

A. Yes, I understand that. But yeah, I have never seen this before.

Q. Okay. Other than the declaration that Ms. Ranahan's office sent to you that you signed and

| 2022-11-05 | Campbell, Moniece | Page 128 |
| --- | --- | --- |

the email communications that you and I have spoken about with -- that you had with counter-claimant's lawyers.

Have you had any other communications with counter-claimant's lawyers?

A. No.

Q. What about by text message?

A. No.

Q. You've never had any text communications with Ms. Ranahan --

A. Correct.

Q. -- is that your testimony?

A. I've never had any -- correct, never had any text messages with Ms. Ranahan, ever.

Q. Okay. What about any of Ms. Ranahan's co-workers?

A. Nobody. This is -- like I said, it's been dead air up until when I got confirmation that this is happening.

I got confirmation that this is happening via email for, like, the Zoom invite and stuff like that. That's it. It's been dead air.

Q. What about to prepare for your deposition today?

A. No.

| 2022-11-05 | Campbell, Moniece | Page 129 |
| --- | --- | --- |

Q. Did you have any communications with Ms. Ranahan?

A. No.

Q. Did you do anything to prepare for your deposition today?

A. Like with myself, yes but...

Q. What did you do?

A. Just made sure I went over my statement and was very clear on that so I can reiterate whatever I said in my statement.

Q. And that was -- and when you say your statement, you are referring to your written declaration; correct?

A

Q. Have you ever spoken to anyone else on Ms. Ranahan's legal team?

A. No.

Q. No other attorneys?

A. No.

Q. So is it fair to say that the only person you've communicated at all with about this case is Ms. Ranahan?

A. Correct.



2022-11-05    Campbell, Moniece    Page 130

Q. Okay.

MS. RANAHAN: And, Ms. Lachman, you're asking privileged stuff again. I told you, like, we represent her now and you continue to ask her about our discussions. So I just would ask you not to do that. I don't know why you continue to do it, but -- and I cannot believe you are still talking about the initial discussions but go on.

MS. LACHMAN: Wait. I'm sorry, is it -- are you saying I can't ask whether she was instructed to look for documents?

MS. RANAHAN: We've already told you that we've objected to that, we've given the responses and you are asking about our conversations. We represent her for this depo.

So, yes, you should not be asking her about our specific discussions. Yes, I think that's inappropriate, but I don't want to have a long-winded

2022-11-05    Campbell, Moniece    Page 131

argument. I want to just move forward, please.

MS. LACHMAN: I just want --

MS. RANAHAN: I'm asking you not ask her about our discussions anymore. I don't know how that's even controversial. You should just say, of course. Move on.

MS. LACHMAN: Well, it's not quite -- it's not quite clear to me when you started representing the witness.

MS. RANAHAN: In connection with this deposition.

MS. LACHMAN: So yesterday?

MS. RANAHAN: Yeah, yesterday.

MS. LACHMAN: Okay.

MS. RANAHAN: And that's when we talked about the documents so it's all privileged. So move on.

MS. LACHMAN: Thank you.

BY MS. LACHMAN:

Q. Ms. Campbell, you mentioned that after some time of purchasing the OMG dolls, you started to question whether they -- whether they were actually dolls of the OMG Girlz, but you kept buying them anyway?

A. No, that's not what I said. After -- you

2022-11-05    Campbell, Moniece    Page 132

said OMG Girlz.

See, it's been dragging so much, you are confusing me now.

Can you repeat the question?

Q. Sure.

Earlier today you said that at one point you realized or you started to question whether the OMG dolls were actually associated with the OMG Girlz?

A. No, I never stated that I was questioned that they were actually associated. I just -- I mean -- or not the OMG dolls.

Once they produced LOL Surprise dolls, I questioned whether OMG dolls LOL Surprise were associated with OMG Girlz. Not just OMG LOL Surprise, like, no.

The reason why I stop buying them is because they produced LOL Surprise dolls, so I don't know.

2022-11-05    Campbell, Moniece    Page 133

Q. Okay. I'm going to introduce another exhibit. Sorry, it takes a minute to do this.

MS. RANAHAN: You have to click in and out sometimes I think, right, like click back and go back to see it.

THE VIDEOGRAPHER: I think there's a refresh button.

THE WITNESS: Refresh. Okay.

MS. RANAHAN: Forward slash.

THE WITNESS: Okay. I'm looking at the document.

MS. LACHMAN: Okay.

Our Designations    Their Designations    35 / 51

A052



| 2022-11-05 | Campbell, Moniece | Page 134 |
|---|---|---|

| 2022-11-05 | Campbell, Moniece | Page 136 |
|---|---|---|

I mean, no, because it says I purchased over 40 LOL Surprise OMG dolls. Over 40 and I said 60 -- between 60 and a hundred. But at that time over 40 would still be the same thing.

So, no, nothing that I would want to change.

| 2022-11-05 | Campbell, Moniece | Page 135 |
|---|---|---|

Q. Have you had a chance to be read it since then?

A. I mean right now I just read it, yes.

Q. Okay. Well, did you read it yesterday? You said that you read it yesterday in preparation for today?

A. Oh, well, yeah, that too but...

Q. Okay. Was there anything that you saw that you would want to change?

A. Not really because I remember I did say --

| 2022-11-05 | Campbell, Moniece | Page 137 |
|---|---|---|

MS. RANAHAN: Objection; that's not what that says, so that's misleading.

THE WITNESS: No, that's not what I was talking about. I literally was questioning the OMG Girlz -- the OMG dolls, I mean.

MS. LACHMAN: Okay.

BY MS. LACHMAN:

Q. Can you -- can you --

A. It specifically says, "After some years of

Our Designations    Their Designations                                    36 / 51

A053

| 2022-11-05 | Campbell, Moniece | Page 138 |
|---|---|---|

purchasing LOL Surprise OMG dolls." I only questioned the OMG dolls. I've never questioned the LOL Surprise dolls. I've always just wanted to know if they were in connection in general.

Q. Okay.

And you said it -- and says, "I started to question whether or not they were related to the OMG dolls"; right?

A. Right.

Q. And why did you start to question? That's what you.

A. Because --

Q. Is that what you explain had to me earlier today?

A. Yeah, that's exactly what I explained to you earlier today. I started to question, but I continued to buy them because they were popular, the OMG dolls.

I never stated in this that I stopped buying them, like, until the LOL Surprise dolls came out individually like without the OMG, they dropped the OMG.

I never stated that here, but I just thought that made sense to what I said and what I'm stating today, so I don't understand what you are

| 2022-11-05 | Campbell, Moniece | Page 139 |
|---|---|---|

getting at.

Q. That's okay. I'm not sure I asked a question.

My question to you is: Why did you start to question, what was it that made you start to question whether the OMG dolls were related to the OMG Girlz?

A. Everything I told you about them. If you can see in paragraph four I said I thought the LOL Surprise OMG were OMG Girlz because of the similarities in their hairstyles, hair colors and nicknames.

Yeah, so the fact that they -- I guess I forgot to mention that, the fact that they nicknames really stood out to me too, because the girls had nicknames.

And I also added to my statements today that it is their clothing and everything else that I added, so yeah.

| 2022-11-05 | Campbell, Moniece | Page 140 |
|---|---|---|

Q. So going back to paragraph three, that same sentence that I read a couple of times, "I started to question whether or not they were related to the OMG Girlz."

Does that mean that after some years of purchasing the OMG dolls, you started to believe that they were associated with the OMG Girlz?

A. No.

Q. Or that you did not -- that you no longer believed that they were associated with the OMG Girlz?

A. I no longer --

MS. RANAHAN: Let's me just object. It says, "started to questions." So now you are asking for a definitive belief and it says, "started to question" which is different than --

THE WITNESS: I still continued to buy them, so I don't understand how it's relevant.

BY MS. LACHMAN:

Q. You still continued to buy them today; correct?

A. Not today, no, I didn't say today.

Q. Okay. I'm sorry, what do you mean you still continued to buy them?

A. After the fact when I started to question

| 2022-11-05 | Campbell, Moniece | Page 141 |
|---|---|---|

it, I still continued to buy them until I saw the LOL Surprise dolls individually.

It's not like I was in the store everyday seeing the change. But when I did see the change that's when I stopped buying them.

So when I meant until is until that moment.

Until that moment when I see the transition from the OMG just to straight LOL.

Q. Okay. So the moment that you stopped purchasing the LOL Surprise OMG dolls was when you saw the LOL Surprise Mystery Balls?

A. And don't they have dolls, I mentioned that earlier too the balls. They have other dolls --

Q. Okay.

A. -- that aren't OMG dolls.



**2022-11-05**  Campbell, Moniece  Page 142

Q. No, it's not, I'm sorry, and I feel like we're going in circles, but we're going to get there.

A. Okay. I'm explain it to you again.

Q. When you said you stopped buying the LOL Surprise LOL OMG dolls, you are talking about the -- the fashion dolls that come in the boxes that -- they are like nine-inches tall; right? Not -- not -- you've never bought anything in a mystery ball; is that right?

A. Right. But don't they have other stuff other than mystery balls?

Q. Who's "they"?

A. At MGA and the LOL Surprise. Don't -- isn't there other stuff? There's a whole -- when you go down that aisle, there's hundreds of things. So I focused on the dolls and there's some things that

**2022-11-05**  Campbell, Moniece  Page 143

don't say "OMG" on it. It just says, "LOL Surprise." So there's like baby dolls. There's balls. There's -- I don't know, like, dollhouses. There's all that kind of stuff, too. When I saw all that other stuff, I'm like, okay, well, this isn't anything to do with "Tiny," so it must be somebody else behind this.

Q. Why did you think -- why did you think this has nothing to do with "T.I." and "Tiny"?

A. Because of the OMG name and -- yeah, the OMG name. The OMG name was taken off.

Q. Okay.

A. I felt like it was something that was stolen at this point.

Q. The OMG name was taken off the OMG dolls, is that what you are saying?

A. No. The products. The products. The other products.

Q. Okay. The reason --

A. You work for the attorney, so you should know exactly what I'm talking about.

**2022-11-05**  Campbell, Moniece  Page 144

**2022-11-05**  Campbell, Moniece  Page 145

Q. Okay. That's what I want to talk about.

A. Okay.

Q. Why were you questioning -- what was it that was causing to you question whether there was actually any relationship between LOL Surprise OMG dolls and the OMG Girlz?

A. I already told you, the name. When I started to realize that there were other products with just LOL Surprise, then that's when I started to question it, like, okay, well, there you go but this didn't come. I didn't even know -- I probably bought, like, one doll after that, that's why I said I continued to buy because you said to be honest, that's what I did. I continued -- I probably bought one doll after that. After that I said, okay, well I'm not going to support this any longer. There you go. It probably was like maybe a couple weeks. A couple of

A055



**2022-11-05 — Campbell, Moniece — Page 146**

weeks, went back to Wal-Mart, like, oh, okay, I see they've got everything now. I'm not here for the dolls anymore and neither am I here for the other products, because I don't buy the other products anyway, so I'm just going to stop purchasing all together.

Does that make sense? Does that make it clear?

Okay. Well, I don't understand how to explain it to you, because now you are running me in circles and it's really starting to get me upset, because you -- you clearly don't understand what it's saying here and what I'm saying.

Q. Well, I guess what I'm saying --

A. I don't know what else --

Q. Let me make it more clear. Earlier today you said that when you realized that there were LOL Surprise non-OMG products you stopped buying LOL Surprise OMG dolls?

A. Right.

**2022-11-05 — Campbell, Moniece — Page 147**

So I don't know what else to tell you because that's exactly why I'm not going to answer any of the questions. If you are going to keep asking me the same question, I really don't want to do this because it's just annoying for me.

Q. So I'm entitled to your best testimony and I'm trying --

**2022-11-05 — Campbell, Moniece — Page 148**

A. And I've given it to you.

**2022-11-05 — Campbell, Moniece — Page 149**

Q. Okay. So, this says that you continued to purchase them because your siblings and nieces liked them.

So was it one more that you purchased or more than one?

A. No, one more. I mean them as in the dolls in general, like, one more that I purchased. I purchased one more and I specifically told you which one. The one with the half and half hair. She had yellow and black hair or it was green and black,

Case: 25-7523, 12/10/2025, DktEntry: 5.1, Page 93 of 306
Case 2:20-cv-11548-JVS-AGR   Document 560   Filed 01/23/23   Page 39 of 50   Page ID #:30862
Case 2:20-cv-11548-JVS-AGR   Document 540-1   Filed 01/23/23   Page 41 of 52   Page ID #:29185



| 2022-11-05 | Campbell, Moniece | Page 150 |
| --- | --- | --- |

something whole hair.

MS. RANAHAN: Liz, if you show her the photos -- I can show her some photos. That's what I'm going to do with my one question.

THE WITNESS: Yeah, because at this point it's --

MS. RANAHAN: It's your memory. You've bought dozens of dolls.

THE WITNESS: Yeah, I don't play with dolls. If I did, I would probably be able to show you like -- if you show me some pictures, I'll point them out right now.

MS. RANAHAN: I'm going to show you them when Liz is done. Hopefully very soon.

THE WITNESS: Okay.

MS. LACHMAN: Okay.

BY MS. LACHMAN:

Q. And who did you buy it for?

A. My -- one of -- no, it wasn't my niece. It wasn't my cousin. It was one of the neighbors

| 2022-11-05 | Campbell, Moniece | Page 151 |
| --- | --- | --- |

because -- the older one, she had a birthday. There you go. I bought it for her birthday.

Q. And is it your testimony that you would not have bought any of the OMG dolls if you had known from the beginning that --

A. Yeah.

Q. -- they had nothing to do with the OMG Girlz?

A. Right, I would have never bought them. I don't even buy Barbie dolls for my nieces because I don't feel like they represent us, so no, I wouldn't have bought them.

| 2022-11-05 | Campbell, Moniece | Page 152 |
| --- | --- | --- |

| 2022-11-05 | Campbell, Moniece | Page 153 |
| --- | --- | --- |

specific, like, culture -- like pop culture because they -- they asked African American people how to pop, want to take style, want to wear extensions, all of that, so I felt like it was inclusive, so I felt like it showed a different size. Other than, like, Barbie with her dog and her baby, yes.

Case: 25-7523, 12/10/2025, DktEntry: 5.1, Page 94 of 306
Case 2:20-cv-11548-JVS-AGR   Document 560   Filed 01/23/23   Page 40 of 50   Page ID #:30863
Case 2:20-cv-11548-JVS-AGR   Document 540-1   Filed 01/23/23   Page 42 of 52   Page ID #:29186



| 2022-11-05 | Campbell, Moniece | Page 154 |

[text redacted]

| 2022-11-05 | Campbell, Moniece | Page 155 |

[text redacted]

Q. And you don't think --

MS. RANAHAN: Liz, you are repeating the question. Move on.

MS. LACHMAN: My different question.

BY MS. LACHMAN:

[text redacted]

Q. Okay.

MS. LACHMAN: I'm going to -- if we could

| 2022-11-05 | Campbell, Moniece | Page 156 |

do a five-minute break.

A. No.

MS. RANAHAN: I think she's saying she's done. Moniece, I think she's saying she's done and then we'll do ours and then we'll be done. Is that what you are saying, Liz, I'm hoping?

MS. LACHMAN: I'm going to look over my examination, Erin, and I'm going to look at what documents I haven't shown the witness, and I'm going to try to ask whatever questions I have left. And if you ask questions, then as you know, I get to ask questions.

MS. RANAHAN: I'm just going to show her the photos and say which of these do you remember purchasing and that's it. And that's going to be my questions. I mean, it might be five minutes.

MS. LACHMAN: So let's come back --

MS. RANAHAN: I don't know why you would have to follow up on that. I mean, that is -- but if you need to, fine. So we're basically looking at we should be done by 2:00, 5:00 her time, hopefully.

THE WITNESS: This is my whole day. I have a baby. I'm leaving.

| 2022-11-05 | Campbell, Moniece | Page 157 |

MS. LACHMAN: Okay. So let's do this, let's not take a break.

THE WITNESS: Yeah.

MS. RANAHAN: Let's not. Okay.

THE WITNESS: Okay.

MS. RANAHAN: You need to -- and if you need to, like, nurse or pump or anything like that.

THE WITNESS: No, I already did that in preparation.

MS. RANAHAN: Okay.

THE WITNESS: Thank you.

MS. RANAHAN: Okay. Cool. Thank you. I know you are more patient than I am right now and I appreciate it. We're almost done now.

THE WITNESS: Okay. I understand. Thank you. I just have stuff to do.

MS. RANAHAN: I understand. We all do. Everybody does, especially you.

MS. LACHMAN: Ms. Campbell, if you go ahead and refresh that Exhibit Share you should have a fourth document.

THE WITNESS: All right. One -- one second.

BY MS. LACHMAN:

Q. This is an exhibit that was marked in a



| 2022-11-05 | Campbell, Moniece | Page 158 |
|---|---|---|

different deposition.

A. Is this the one with the dolls? Is that what you see?

Q. I'm showing you -- I'm sorry, was that question for me?

A. Yes, I'm sorry.

MS. RANAHAN: Yeah, the one with the doll. There's one doll.

BY MS. LACHMAN:

Q. So the document that I'm asking you about is -- in the lower left-hand corner there's a bright yellow sticker and it says Exhibit No. 13. Do you see that, on the very first page of the document?

MS. RANAHAN: It's a doll.

THE WITNESS: Oh, yes.

MS. RANAHAN: It's a doll.

THE WITNESS: Yes, sorry.

| 2022-11-05 | Campbell, Moniece | Page 160 |
|---|---|---|

Q. Okay.

A. So this page --

MS. RANAHAN: I only see one page -- one doll on all of these. What are you --

THE WITNESS: Some of them have a baby at the bottom.

MS. RANAHAN: Oh, I see.

MS. LACHMAN: Yeah, I'm only referring to the -- okay. So let me clarify that.

BY MS. LACHMAN:

| 2022-11-05 | Campbell, Moniece | Page 159 |
|---|---|---|

| 2022-11-05 | Campbell, Moniece | Page 161 |
|---|---|---|



2022-11-05 — Campbell, Moniece — Page 162

MS. LACHMAN: Okay.

BY MS. LACHMAN:

Q. So you did not purchase the one on page three?

MS. RANAHAN: Look on page fifteen.

THE WITNESS: One second.

MS. LACHMAN: Excuse me, wait, Ms. Ranahan, can you please just let her go in order, that way it will make sense?

MS. RANAHAN: Yeah, but it's -- she's going -- it's fine, you can go in order, but we're talking about -- she's looking for the mohawk one that she's looking for.

MS. LACHMAN: So when we get there. Yeah, I just -- I don't want to -- if you skip around, I'll assume that like you --

MS. RANAHAN: Okay.

MS. LACHMAN: That means she didn't purchase the ones on 14 or 13, so if you go in order.

THE WITNESS: Okay. The one on page seven

2022-11-05 — Campbell, Moniece — Page 163

I purchased.

MS. LACHMAN: Okay.

BY MS. LACHMAN:

MS. RANAHAN: And that was the one from 2019 that you -- and I'm doing this now so we don't have to do questions at the end. I don't think we need to now.

MS. LACHMAN: So I'll do it for you, Erin, since it's still my examination.

BY MS. LACHMAN:

2022-11-05 — Campbell, Moniece — Page 164

2022-11-05 — Campbell, Moniece — Page 165

Q. Okay.

Our Designations      Their Designations                                    43 / 51

A060



2022-11-05     Campbell, Moniece     Page 166

with the group so -- but yeah, because she wore a mohawk in the group too, and it just stood out to me specifically because of that.

Q. Okay.

Do you want to look at Exhibit No. 13 one

2022-11-05     Campbell, Moniece     Page 167

more time to see if there's anything else that you recognize? Or what I can do is I want to make sure that my list is correct, so I can read out the numbers and we can just confirm it.

I have that you bought --

MS. RANAHAN: Let me, for the record, say this is from her memory. She's trying to remember, you know, dozens of dolls she purchased over the last three years, so she's doing the best she can do.

But for you to say, like, I want to make sure my list is correct and that's for sure the ones she bought.

Also the packaging is different than looking at these dolls, the way that you presented them here, which is outside the packaging and certain, you know, styles, so I just want to, for the record, say she remembers purchasing certain dolls, to the extent some of them were to, you know, 2019, 2020, 2021, that is, I think, you know, tough to remember in this context and the way that you are presenting them in these photos, outside of the packaging.

BY MS. LACHMAN:

2022-11-05     Campbell, Moniece     Page 168

2022-11-05     Campbell, Moniece     Page 169

MS. RANAHAN: I think she said 21 and two;

right?

MS. LACHMAN: I don't -- I don't have 21 down.

MS. RANAHAN: Oh.

BY MS. LACHMAN:

Q. Do you have 21 down?

A. No, I didn't.

MS. RANAHAN: Sorry, I thought you said --

Our Designations     Their Designations     44 / 51

A061

| 2022-11-05 | Campbell, Moniece | Page 170 |
| --- | --- | --- |

go ahead.

MS. LACHMAN: Okay.

BY MS. LACHMAN:

[text redacted]

| 2022-11-05 | Campbell, Moniece | Page 171 |
| --- | --- | --- |

[text redacted]

Q. Okay. So you could have purchased other dolls. You just -- obviously, you didn't; right, because we haven't talked about 60 dolls so --

MS. RANAHAN: Well, no, let me just object because she said she bought duplicates, so she combined 60 dolls. It doesn't mean she bought 60 individual looks.

She could have bought, you know, duplicates of many of them, all of them or five or ten or whatever it is.

MS. LACHMAN: Okay. So let me ask it this way --

MS. RANAHAN: So buying 60 dolls doesn't mean 60 individual different dolls.

BY MS. LACHMAN:

Q. Okay. So let me ask it this way: The dolls that you did not call out, do you know that you didn't purchase them or you are not sure whether you purchased them?

A. I'm not sure.

Q. Okay. And I want to talk about number 18. This is -- this is one doll that you said it didn't require mind you of the OMG girl, but it reminded you

| 2022-11-05 | Campbell, Moniece | Page 172 |
| --- | --- | --- |

of "Tiny"; is that right?

A. Yes.

Q. Is this the only doll that sort of falls into that category?

A. That reminded me of "Tiny"?

Q. Yes.

A. Yes. This one specifically reminded me of "Tiny," yes.

Q. Okay.

And what was it about this doll that reminded you of "Tiny" Harris?

A. The hairstyle. The outfit. The complexion.

Q. What is her complexion?

A. I mean she's not -- she's not like white. I don't know. She's just light skinned.

Q. Okay. Light skinned.

And the hairstyle?

A. Yeah.

Q. This is the hairstyle that "Tiny" Harris wears or --

A. She's had it before when she gets her hair done, so she's had it before. And the outfit and the shoes, it's just like not specifically the outfit, but like something that she'd wear, like style.

| 2022-11-05 | Campbell, Moniece | Page 173 |
| --- | --- | --- |

She's very fashion forward, so yes.

Q. Okay. So the outfit you are not saying that it was something that "Tiny" did wear, but it's something that in your -- you would imagine her wearing?

A. Yes, because it's -- yes. My phone is dying. Great.

Okay. Let me put it on the charger. I'm sorry, I have to put off the camera for a second to get my charger.

MS. RANAHAN: How much more, Liz? I thought we were like wrapping up here.

MS. LACHMAN: So the only reason that I just -- I want to make sure. If you want, Erin, you can ask your questions. I just don't want to --

MS. RANAHAN: I'm going to show like a quick thing just to get an explanation on one sort of discrepancy that I just want cleared up -- or not cleared up but just to show why there's a discrepancy and then that's it.

I expect it to be like five minutes, so I don't want to break. I want her to be out of here as soon as possible. I'm just wondering -- I thought you were going to take five more minutes and take a look at your notes. And now you have gone over all

| 2022-11-05 | Campbell, Moniece | Page 174 |
| --- | --- | --- |

the dolls.

MS. LACHMAN: Yeah, I didn't -- I didn't take that break to look at my notes, so if you want we can take a quick break, three minutes, I can just look at my notes, make sure I don't have anything else. Or I can -- you know.

MS. RANAHAN: Well, do you -- do you think you are going to ask something after I -- do you want me to just do my doll questions --

MS. LACHMAN: Go ahead.

MS. RANAHAN: Before you look at that? Let me see if I can load this onto the thing. I just -- have just one.

She's gone over -- I wanted you on record looking at dolls that you purchased. I just have one discrepancy actually because I think -- you did go back and forth on that and I think it was the perfect explanation for it. I just want to make sure we have this one aspect on record which is the two mohawk dolls which you purchased both of.

So let me see if I can load. Can I load to the Exhibit Share, even though I'm not the one taking it? This is not for you, Moniece -- this is for -- we can go off -- I don't know if we want to go off the record or just keep it going.

| 2022-11-05 | Campbell, Moniece | Page 175 |
| --- | --- | --- |

How much time do you have left on your tape, Jocelyn?

THE VIDEOGRAPHER: I'm good until 30 more minutes.

MS. RANAHAN: Okay. So we should be done then. Okay. So my question is can I load an exhibit to this Exhibit Share.

THE COURT REPORTER: I don't believe so.

MS. RANAHAN: Okay. So let me try to just -- let's see, but you think I can do a share screen thing. Okay. Hold on.

THE VIDEOGRAPHER: This is the videographer. I'm not familiar with Exhibit Share. But the screen share you will be able to do.

MS. RANAHAN: I won't?

THE VIDEOGRAPHER: You will.

MS. RANAHAN: I will. Okay. Let me see if I can do it that way, if I have it on my screen, you are saying.

Okay. Let may try to screen share and see if that works.

Can you guys see what I'm looking at right now?

THE WITNESS: No.

THE VIDEOGRAPHER: No. There is a green

| 2022-11-05 | Campbell, Moniece | Page 176 |
| --- | --- | --- |

button at the bottom if you expand.

MS. RANAHAN: Oh, I see. I see it says share. Actually it's like lit up right now. Screen share. Okay. So let me see if I push this and then open up this document.

Okay. So now can you see my screen?

THE WITNESS: Yes.

MS. RANAHAN: Okay.

EXAMINATION

BY MS. RANAHAN:

Q. So let me just -- so this is -- these are dolls. I'm going to just show you because I think -- you know -- you recall purchasing both mohawk dolls thinking they looked like Zonnique; right?

A. Yes.

[text redacted]

| 2022-11-05 | Campbell, Moniece | Page 177 |
| --- | --- | --- |

[text redacted]

Q. Okay.

A. So I -- like I said, it's been a lot of dolls, it's been a long time. So that's the doll I purchased in 2019. But in 2020 I purchased the duplicates of the one with the mohawk and the guitar.

Q. Okay.

A. So that's the one --

Q. Okay.

A. -- I initially purchased.

Q. That makes sense.

A. Yeah.

Q. That makes sense to me. Okay. So then these are just dolls that are still in the case. I think Liz has gone over the ones and they are in a similar format.

Our Designations        Their Designations        46 / 51

Case: 25-7523, 12/10/2025, DktEntry: 5.1, Page 100 of 306
Case 2:20-cv-11548-JVS-AGR Document 560 Filed 01/23/23 Page 46 of 50 Page ID #:30869
Case 2:20-cv-11548-JVS-AGR Document 540-1 Filed 01/23/23 Page 48 of 52 Page ID #:29192

| 2022-11-05 | Campbell, Moniece | Page 178 |
|---|---|---|

So that was my question was -- I thought that's what you were -- were testifying to and I think we've -- all of these were within the scope unless you recognize any others. Let me just go slowly and see if there's any others that weren't for some reason in Liz's --

MS. LACHMAN: I'll object, Erin, mine had all the dolls.

MS. RANAHAN: Your what? Yours had all the dolls?

MS. LACHMAN: Every single doll, yeah.

MS. RANAHAN: Okay. I don't remember seeing a couple of them, but maybe I just missed it. It looks like -- yeah, because she went over all of these.

BY MS. RANAHAN:

Q. Okay. So maybe it was -- even these last, this one, these purple haired ones?

A. I don't remember seeing the purple haired ones.

Q. I don't either. Those are the two that I thought might not be in Liz's pack.

A. And the one with the pink hair under it, I don't -- I didn't see that one either.

Q. Right.

| 2022-11-05 | Campbell, Moniece | Page 179 |
|---|---|---|

[redacted]

Q. Okay. So this doll, I'm just going to say the name of it. Let's see, or the -- I'll give the SKU number. I don't even have the name, but it's 574217 and -- are you talking about this doll right here?

A. No, I'm sorry, the one under it.

Q. This one right here?

A. No, sorry, the one under that one.

Q. Under it. This one?

A. Yes.

Q. Okay. Was this one in your travel --

MS. LACHMAN: It's page 65 of Exhibit No. 13 that I showed her.

MS. RANAHAN: Okay.

THE WITNESS: Okay. Well, that's one that I missed. I definitely purchased that one.

BY MS. RANAHAN:

Q. This one?

A. Yeah.

Q. Okay. So let me just see if there's any others that -- any others that you don't think that you identified that you might have purchased.

| 2022-11-05 | Campbell, Moniece | Page 180 |
|---|---|---|

A. No.

Q. It looks like they're in here. Let's see. This one you purchased?

A. Right.

Q. Okay. I think that that's all for that. I just wanted to get that out there because I -- I actually -- these -- there were the two mohawk ones that both resemble Zonnique and were actually in that.

A. Yeah.

Q. Okay.

A. I purchased those two right there.

Q. Okay. Cool. And then here's another screen. This is just the way that they were released, so in case it jogs any other memory, but this was the fall 2018 Lady Diva, right here.

A. Right.

Q. And this is one that looks like her album cover a lot.

A. Right.

Q. Okay. That's all for me. Anything else, Liz?

MS. LACHMAN: Let me just quickly flip through the rest of my outline since I didn't get a chance to do it on the break.

| 2022-11-05 | Campbell, Moniece | Page 181 |
|---|---|---|

MS. RANAHAN: Okay.

BY MS. RANAHAN:

Q. Now, I'll just ask you, Moniece, just for the record, anything else you wanted to say about this or your experience or just, you know, why you feel frustrated about having been, you know, mislead into thinking this was a collaboration between the OMG Girlz and MGA?

A. Yeah, I mean, like I stated before, I'm just feeling like -- that the girls' likeness was -- it was stolen and, you know, "Tiny" and "T.I." and the girls, as a brand, they didn't get what they deserved. And that happens a lot with our community. We start things and people take them and profit off of them, so that's what made me really frustrated and -- yeah, initially I thought I was doing something by supporting them, but I was not because these dolls were not made by "Tiny" and "T.I." and the OMG Girlz.

[redacted]

A064

| 2022-11-05 | Campbell, Moniece | Page 182 |
|---|---|---|

Q. Thank you.

A. You're welcome.

MS. LACHMAN: I have a few follow-ups.

FURTHER EXAMINATION

BY MS. LACHMAN:

Q. You said you purchased over 40 dolls, probably between 60 and a hundred dolls. How much money do you think you spent on these dolls?

A. Those -- first of all, sorry, not to be rude, but those dolls are expensive. Yeah, they are expensive, so -- I don't know -- I can't -- how much does a doll average, if I could ask that, because I can't remember what I paid, like 40 -- 30, $40. So I don't know.

Q. So hundreds of dollars, maybe even a thousand dollars?

| 2022-11-05 | Campbell, Moniece | Page 183 |
|---|---|---|

A. Yeah.

Q. Is that a fair estimate, do you think?

A. You are asking me -- wait, let me calculate here, because -- hold on. To be fair, hold on. I would just say maybe thousands because -- definitely not in the hundreds. Yeah.

MS. RANAHAN: You did mention you bought other stuff besides the dolls. There was some accessory type of things.

THE WITNESS: Yeah.

BY MS. LACHMAN:

Q. Oh, did you -- did you mention that?

MS. RANAHAN: Yes, she did.

MS. LACHMAN: Okay.

BY MS. LACHMAN:

Q. I thought that you just purchased the dolls. What accessories do you remember purchasing?

A. Like their little clothing and stuff, that's about it.

Q. You separately purchased clothing?

A. Like, no -- don't they come, like, in packs and stuff like that, of clothing, like separate?

Q. So, the OMG dolls come with clothes in

| 2022-11-05 | Campbell, Moniece | Page 184 |
|---|---|---|

their box.

A. Oh, okay. Well, then I guess I just purchased the box with the clothing. Like some dolls are individual. Don't some dolls come individual and some dolls come with clothes in their box? Or do they all comes with clothes?

Q. They all have clothes in their box.

A. Well, okay, I guess -- hey, I don't play with dolls. I just bought what I bought, like, the ones with the clothes. You know, how some dolls come with their outfit and that's it. And some dolls come with their outfit and more clothes. I don't know.

Q. So you think you bought, like, separate clothes that did not have a doll with them. Is at that what you think?

A. Yeah, I think so, if they're the clothes that were fitting, you know, the dolls specifically. If they sell that then I definitely bought it, but if it wasn't here -- don't even worry about it, because I definitely bought some extra clothes and stuff.

Q. Okay. Well, I want to make sure. It's important because --

A. No, I get that.

| 2022-11-05 | Campbell, Moniece | Page 185 |
|---|---|---|

Q. Because if you are accusing someone of duping you, we want to make sure that what you think you were duped about is actually, you know, the thing that MGA sells.

A. Oh, okay. Well, for the most part I was duped with what came with the doll, so that's what -- I probably only bought like clothes and stuff for the dolls once or twice just thinking it came with the doll. That was something totally different if it wasn't -- if you guys don't sell that. It probably was, it probably wasn't. It was a long time ago. I don't remember. But for the most part I bought the dolls with the clothes in the boxes.

Q. Okay. The separate clothes that you bought, did it have anything on the box that would make you think it was LOL Surprise OMG outfit?

A. I don't remember. I just bought it because it was a doll. It wasn't Barbie, so yeah. LOL Surprises have it's own aisle. There's like multiple dolls in the aisle.

Q. Right.

A. So I don't know. The clothes, it doesn't matter because I only bought, like, two things. Two

Our Designations   Their Designations

48 / 51

A065

| 2022-11-05 | Campbell, Moniece | Page 186 |
| --- | --- | --- |

accessories, like two boxes of little clothing accessories.

Q. Okay. So other than the two boxes of clothing accessories, the only other thing that you bought thinking it was LOL Surprise OMG were the actual dolls themselves?

A. Right.

Q. Okay. So -- okay. So you spent thousands -- thousands of dollars on the LOL Surprise OMG dolls thinking that they were associated with the OMG Girlz?

A. Yes.

Q. You thought that you were supporting the OMG Girlz?

A. Correct.

Q. Even though the OMG Girlz had disbanded in 2015?

A. Yes, I still thought that they disbanded and made dolls.

Q. Even though you didn't see any social media posted by any of the OMG Girlz advertising, hey, these are our dolls?

A. I wasn't on social media.

Q. Okay.

Even though you didn't see anything on

| 2022-11-05 | Campbell, Moniece | Page 187 |
| --- | --- | --- |

television, advertising by the OMG Girlz or "T.I." and "Tiny" saying go to Target, go to Wal-Mart, these are our dolls?

A. Yeah, because I thought it was something that was maybe sold to a third-party company that had association with them, because if you sell something to a third party company, your face is not going to be a part of it.

You are just going to get the money behind the scenes, so that's what I was thinking.

Q. Okay. But you didn't understand that they were -- you didn't see any sort of advertising by "T.I.," "Tiny" or the OMG Girlz saying, Hey, we sold our likeness, go get these dolls because you will be supporting us? You didn't see any --

A. No, because people don't do that. Some people don't do that.

I don't -- I never heard -- I never heard that.

Q. Okay.

And you -- and when you were spending thousands of dollars, you didn't think to just double-check to make sure that the thousands of dollars were actually going to where you thought they were going?

| 2022-11-05 | Campbell, Moniece | Page 188 |
| --- | --- | --- |

A. They were going to where I thought they were going as in my nieces being -- and my nieces and my cousins and neighbors being happy they got a doll. That's it. That's all I was worried about.

Q. So it didn't matter whether you were supporting the OMG Girlz because really you just wanted to give gifts to your family?

A. No, no, no, no, no. It did matter. I wanted to represent -- I'm saying what mattered to me the most is that, one, I was supporting -- let me go over my answer because you are trying to twist it around.

No, that I was supporting because, like I told you before, I taught my nieces and cousins and neighbors about the OMG Girlz when I bought them the dolls. What was most important to me was that they were happy.

So yes, I was happy that I was supporting, but I was happy that they were happy.

Q. Okay. And you never went to go check to make sure --

MS. RANAHAN: Liz, okay, this is just repeating now the same question over and over and over. She's answered this. Let's go. I mean, let's be done with this, Liz.

| 2022-11-05 | Campbell, Moniece | Page 189 |
| --- | --- | --- |

MS. LACHMAN: It's just a yes or a no.

BY MS. LACHMAN:

Q. You didn't check to make sure?

MS. RANAHAN: But you are out of questions.

BY MS. LACHMAN:

Q. You didn't check to make sure?

A. No, I didn't check to make sure.

Q. Okay. Those are all my questions for today.

MS. RANAHAN: Thank you, Moniece, for all your time. I don't have any other questions for you. I appreciate your time and we'll be in touch.

THE WITNESS: All right. Do I just hang up?

THE VIDEOGRAPHER: One second, Moniece. Counsel --

MS. LACHMAN: Oh, wait, wait, wait, I'm sorry. I just have one -- I just have one more question related to the exhibit.

BY MS. LACHMAN:

Q. On your declaration your name is spelled M-o-n-i-s-e.

A. Yeah, the correct spelling, do you need that?

Q. That is not the correct spelling?

**Our Designations**   **Their Designations**

49 / 51

A066

| 2022-11-05 | Campbell, Moniece | Page 190 |
|---|---|---|

A. No.

Q. Have you ever gone by Monise, M-o-n-i-s-e?

A. Yes.

Q. You have?

A. Yes.

Q. Where have you gone by that name?

A. School. Work. It's just -- it's an error on my Social Security card and birth certificate that I'm in the process of getting fixed, but yes.

Q. Okay.

A. The legal spelling of my first name is -- I can spell it to you if you need it.

Q. No, you spelled it earlier. I just wanted to make sure that I had it right.

A. All right.

THE VIDEOGRAPHER: One second, Ms. Campbell.

Ms. Lachman, would you like your video ordered standard or expedited? Standard is ten business days.

MS. LACHMAN: Let me check with -- I think -- let me check with the person who actually knows what I need and then I will email you.

THE VIDEOGRAPHER: Okay. Please contact Veritext. Do you want me to put no video order at

| 2022-11-05 | Campbell, Moniece | Page 191 |
|---|---|---|

the moment?

MS. LACHMAN: Yeah, just put no video and then we'll let you know, because I know we're on the verge of trial, so maybe we may -- we may need it expedited, but I don't know, so I'll ask the person.

THE VIDEOGRAPHER: Okay.

MS. RANAHAN: Can we let the witness go?

THE VIDEOGRAPHER: Before that could I get your video order? Would you like one?

MS. RANAHAN: Yes, we would like one.

THE COURT REPORTER: Would you like that standard or expedited for video?

MS. RANAHAN: Just standard.

THE VIDEOGRAPHER: Standard. Would you like that synced with transcript?

MS. RANAHAN: Yes.

THE COURT REPORTER: Synced. Okay. Please stand by.

We're off the record at 4:54 p.m. and this concludes today's testimony given by Moniece Campbell.

The total number of media unit was four and will be retained by Volkswagen.

THE COURT REPORTER: Ms. Ranahan, I assume you want a transcript as well.

| 2022-11-05 | Campbell, Moniece | Page 192 |
|---|---|---|

MS. RANAHAN: Sure. Yes, please.

(Deposition ended at 4:54 p.m.)

///

///

///

| 2022-11-05 | Campbell, Moniece | Page 193 |
|---|---|---|

PENALTY OF PERJURY CERTIFICATE

I, MONIECE IRMONI CAMPBELL, do solemnly declare under penalty of perjury, under the laws of the State of California, that the foregoing is my deposition under oath; that these are the questions asked of me and my answers thereto; that I have read same and have made the necessary corrections, additions, or changes to my answers that I deem necessary.

EXECUTED this _____ day of _____, 2022, at _____, California.

_____

MONIECE IRMONI CAMPBELL

Our Designations     Their Designations          50 / 51

A067

| 2022-11-05 | Campbell, Moniece | Page 194 |
|---|---|---|

STATE OF CALIFORNIA )

) ss.

COUNTY OF LOS ANGELES )

I, Lynda L. Fenn, Certified Shorthand Reporter No. 12566 for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was duly sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced by me to typewritten form and that the same is a true, correct, and complete transcript of said proceedings.

Before completion of the deposition, review of the transcript [ X ] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not interested in the outcome of the action.

Witness my hand this 20th day of November, 2022.

<%20287,Signature%>

Lynda L. Fenn, CSR, RPR

| 2022-11-05 | Campbell, Moniece | Page 195 |
|---|---|---|

ERIN R. RANAHAN, ESQ.

eranahan@winston.com

November 20, 2022

RE: MGA ENTERTAINMENT, INC. VS. CLIFFORD Â"T.I.Â" HARRIS NOVEMBER 5, 2022, MONIECE IRMONI CAMPBELL, JOB NO. 5544640

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) Â– Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) Â– Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived Â– Reading & Signature was waived at the time of the deposition.

| 2022-11-05 | Campbell, Moniece | Page 196 |
|---|---|---|

_X_Federal R&S Requested (FRCP 30(e)(1)(B)) Â– Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

| 2022-11-05 | Campbell, Moniece | Page 197 |
|---|---|---|

RE: MGA ENTERTAINMENT, INC. VS. CLIFFORD Â"T.I.Â" HARRIS

MONIECE IRMONI CAMPBELL, JOB NO. 5544640

ERRATA SHEET

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____    _____

WITNESS                    Date

**Our Designations**    **Their Designations**    51 / 51

A068

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 20-11548-JVS(AGRx) | Date | May 8, 2023 |

| | |
|---|---|
| Title | MGA Entertainment, Inc. v. Clifford T.I. Harris, et al |

Present: The
Honorable        **James V. Selna, U.S. District Court Judge**

| | |
|---|---|
| Elsa Vargas | Not Present |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:**    **[IN CHAMBERS]** Order Re Order to Show Cause

MGA Entertainment Inc. v. Clifford T.I. Harris et al., AND RELATED
COUNTERCLAIMS, 2:20-cv-11548-JVS (AGRx)

Minute Order re Order to Show Cause

At the February 2, 2023, the Court ordered MGA Entertainment, Inc.
("MGA") to show cause with an offer of proof why it should be permitted to offer
evidence on certain topics.  (Tr. Feb.  2, 2023, pp. 8-9.)  In its response, MGA
summarizes the topics:

> (1) defendant Clifford "T.I." Harris' profane and misogynistic
> lyrics, (2) Zonnique Pullins' profane lyrics and social media posts, (3) Ms.
> Pullins' arrest for unlawful gun possession (4) Mr. Harris' criminal history,
> and (5) allegations of sexual misconduct against Mr. Harris and defendant
> Tameka "Tiny" Harris.

(Docket No. 600, Response of OSC and Offer of Proof, p. 1 ("Tendered Evidence").)
Clifford "T.I." Harris, *et al.*  ("OMG Parties") have filed an opposition (Docket No. 614),
and MGA filed a response (Docket No. 618-1 (sealed)).

At the February 2, 2023, the Court ordered MGA Entertainment, Inc.

Although presented under a number of different theories, at heart this is a
theft of intellectual property case, a trade dress case.  (Docket No. 16, First Amended
Complaint; Docket No. 63, Third Amended Counterclaims.)  MGA's rationale for the
Tendered Evidence is that it supports the theory that it would never have copied a group

A069

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 20-11548-JVS(AGRx)                            Date   May 8, 2023

Title   MGA Entertainment, Inc. v. Clifford T.I. Harris, et al

with such tawdry elements in its activities and associations.  That theory is supported by MGA designer Lora Stephens:

> Based on my awareness, I can unequivocally state that neither MGA nor I would design a doll that would be directly or indirectly affiliated or associated with T.I. or the OMG Girlz. That is because T.I.'s music uses profanity, embraces illegal hard drug use, and, most importantly, is disrespectful and demeaning to women. I also am aware of accusations against him and his wife, Tameka "Tiny" Harris for sexual assault and trafficking against women, including one of their employees. I was aware of these allegations when I and others at MGA designed LOL Surprise! OMG dolls, including the "Queens" segment which was released to the market in Spring 2022.

(Docket No.  600-11, Stephens Decl., ¶ 5.)  This is a viable theory, but only to the extent MGA was aware of this information at the time of the creation of OMG dolls.

The Court will allow Stephens to testify to the matters in her declaration. However, there are potential Rule 403 issues even within the scope of her testimony.  As a prophylactic measure, the Court will require MGA to present her direct to the Court out of the presence of the jury.  This will alleviate the need for objections during her examination and will allow the Court to consider the appropriate metes and bounds within the scope of Rule 403.

The Court bars all other evidence on the topics whether offered as corroboration of Stephens' testimony or otherwise.  The Tendered Evidence is prejudicial in the extreme, and most people would find it offensive and some of it despicable.   It sheds absolutely no light on whether the OMG parties' intellectual property has been unlawfully misappropriate.

A070

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No.    CV 20-11548-JVS(AGRx)                                      Date    May 8, 2023

Title    MGA Entertainment, Inc. v. Clifford T.I. Harris, et al


      The Court intends to keep the focus of this case on the intellectual property, and will not allow the case to descend into a mire of distracting salacious activities and conduct.  To this end, once having heard Stephens' direct, the Court will likely impose a time limit on her testimony.


                                                                                    :            0

                                     Initials of Preparer          eva

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 20-11548 JVS (AGRx) | Date | September 15, 2023 |

| | |
|---|---|
| Title | MGA Entertainment Inc. v. Clifford T.I. Harris et al. |

Present: The Honorable **James V. Selna, U.S. District Court Judge**

| Elsa Vargas | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**   **[IN CHAMBERS] Order Regarding Motion for Attorneys' Fees [803] and Motion for New Trial [813]**

Before the Court are two post-judgment motions.

First is a motion for attorneys' fees filed by Plaintiff and Counter-Defendant, MGA Entertainment, Inc. ("MGA Entertainment"), and Counter-Defendant, Isaac Larian ("Larian") (collectively, "MGA"). (Fees Mot., Dkt. No. 803-1.) The matter is fully briefed and the Court took it under submission. (Dkt. No. 853.)

Second is a motion for new trial by Defendants, Clifford "T.I." Harris, Tameka "Tiny" Harris, OMG Girlz LLC, and Counter-Claimants, Grand Hustle, LLC, Pretty Hustle, LLC, and OMG Girlz LLC (collectively, the "Harris Parties"). (Mot., Dkt. No. 814.).[1] MGA opposed. (Opp'n, Dkt. No. 854.) The Harris Parties replied. (Reply, Dkt. No. 857.)

The Court heard oral argument on September 11, 2023. (Dkt. No. 858.) For the following reasons, the Court **GRANTS** the motion for new trial and **DENIES** the motion for attorneys' fees without prejudice.

## I. BACKGROUND

---

[1] Following the filing of the motion for new trial, the Harris Parties filed a notice of appeal. (Dkt. No. 819.) The Court still retains jurisdiction to review these two motions. See Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 59–60 (1982) (noting a district court has "express authority to entertain a timely motion to alter or amend the judgment under Rule 59 [or motion for attorneys' fees], even after a notice of appeal had been filed"); see also Dkt. No. 856.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 20-11548 JVS (AGRx)                          Date   September 15, 2023

Title   MGA Entertainment Inc. v. Clifford T.I. Harris et al.

The facts of this case are well known to the Court and the parties.  The Court recites only the facts necessary to resolve the present motions.

MGA filed suit against T.I., Tameka, and OMG Girlz LLC for declaratory relief. (Compl., Dkt. No. 1.)  MGA produces L.O.L. Surprise! O.M.G. dolls and sought the Court's declaration as to the ownership of the dolls' trade dress rights.  The Harris Parties counterclaimed.  (Answer, Dkt. No. 13.)  Following discovery and motion practice, the case proceeded to trial.[2]

At trial, the Harris parties pursued a claim for trade dress infringement under the Lanham Act and common law misappropriation of likeness.  (Final Pretrial Conference Order, Dkt. No. 492, at 14.)  MGA proceeded on its claim for declaratory relief.  (Id. at 2.)  The jury returned a verdict in favor of MGA, finding the Harries Parties did not prevail on either of their claims with respect to any of the thirty-one L.O.L. Surprise! O.M.G. dolls at issue.  (Special Verdict, Dkt. No. 771.)  The Court entered final judgment in favor of MGA.  (Dkt. No. 777.)  MGA moved for attorneys' fees and the Harries Parties moved for a new trial.  The Court addresses both motions below.

## II. Legal Standard

### A.   Motion for New Trial

Pursuant to Federal Rule of Civil Procedure 59(a), in an action in which there has been a jury trial, a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]"  Courts may grant new trials, "even though the verdict is supported by substantial evidence, if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice."  United States v. 4.0 Acres of Land, 175 F.3d 1133, 1139 (9th Cir. 1999) (internal quotations omitted).  Authority to grant a new trial "is confided almost entirely to the exercise of discretion on the part of the trial court."  Allied Chem. Corp. v. Daiflon, 449 U.S. 33, 36 (1980) (per curiam).

---

[2] The first trial resulted in a mistrial.  (Dkt. No. 569.)  The case proceeded to a second trial on May 10, 2023.  (Dkt. No. 700.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    CV 20-11548 JVS (AGRx)                    Date    September 15, 2023

Title    MGA Entertainment Inc. v. Clifford T.I. Harris et al.

B.    *Motion for Attorneys' Fees*

Under § 35(a) of the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).  The Lanham Act does not define "exceptional cases."  "[D]istrict courts analyzing a request for fees under the Lanham Act should examine the "totality of the circumstances" to determine if the case was exceptional, Octane Fitness, 134 S.Ct. at 1756, exercising equitable discretion in light of the nonexclusive factors identified in Octane Fitness and Fogerty, and using a preponderance of the evidence standard."  SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd., 839 F.3d 1179, 1181 (9th Cir. 2016).  In an action for misappropriation for likeness, the prevailing party is entitled to attorneys' fees and costs.  See Cal. Civ. Code § 3344(a).

**III. DISCUSSION**

A.    *Motion for New Trial*

1.    Whether there is an intervening change in law

The Harris Parties argue they are entitled to a new trial based on a recent change in law.  See Jack Daniel's Props., Inc. v. VIP Prods. LLC, 143 S. Ct. 1578 (2023) ("Jack Daniel's").  The Supreme Court issued an opinion in Jack Daniel's on June 8, 2023, several weeks after the jury delivered its verdict in this case.  (See Special Verdict, Dkt. No. 771, May 26, 2023.)  Before taking up Jack Daniel's, a brief review of the Rogers test is necessary.  See Rogers v. Grimaldi, 875 F.2d 994 (2d Cir. 1989).

The Rogers test is used to determine whether a work should receive First Amendment protection.  See Jack Daniel's, 143 S. Ct. at 1586.  "The Rogers test requires the defendant to make a threshold legal showing that its allegedly infringing use is part of an expressive work protected by the First Amendment."  Gordon v. Drape Creative, Inc., 909 F.3d 257, 264 (9th Cir. 2018).  An expressive work is one that communicates ideas or expresses a point of view.  See Mattel, Inc. v. MCA Records, Inc., 296 F.33d 894, 900 (9th Cir. 2002).  And a work, such as a Barbie or Ken doll, can be an expressive work if it is sold commercially.  See id. at 906–07 (noting a commercially sold work is fully protected by the First Amendment so long as it is not "purely commercial").  Once this threshold showing is made then "the plaintiff must satisfy not only the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 20-11548 JVS (AGRx) | Date | September 15, 2023 |
| Title | MGA Entertainment Inc. v. Clifford T.I. Harris et al. | | |

likelihood-of-confusion test but also at least one of Rogers's two prongs." Gordon, 909 F.3d at 264. The two prongs are "that the mark is either not artistically relevant to the underlying work or explicitly misleading as to the source or content of the work." Id. at 265.

Jack Daniel's involved a dog toy made by VIP Products that looked similar to a bottle of Jack Daniel's. 143 S. Ct. at 1585. At summary judgment, on the relevant claim, VIP Products argued the dog toy was an expressive work that deserved First Amendment protection. Id. at 1586. The district court rejected VIP Products's argument because VIP Products used the Jack Daniel's mark for source identification. Id. at 1586. Thus, the Rogers test did not apply. The Ninth Circuit reversed, finding the dog toy was an expressive work and thus the Rogers test applied. Id. Upon remand, the district court held Jack Daniel's could not satisfy either prong of the Rogers test. The Ninth Circuit affirmed the decision, and the Supreme Court granted certiorari. Id. at 1587.

The Supreme Court held the Rogers test should not have been applied. Id. The Court clarified that Rogers "applie[s] only to cases involving 'non-trademark uses'—or otherwise said, cases in which 'the defendant has used the mark' at issue in a 'non-source-identifying way.'" Id. at 1588. "The test has not insulated from ordinary trademark scrutiny the use of trademarks as trademarks, 'to identify or brand [a defendant's] goods or services.'" Id. at 1588–59. When a use is for source identification and also to make an expressive comment, the infringement claim must me made "on the usual battleground of 'likelihood of confusion.'" Id. at 1589. The "Rogers [test] does not apply when the challenged use of a mark is as a mark." Id. at 1593.

The jury was instructed that the L.O.L. Surprise! O.M.G. dolls were an expressive work. (Jury Instr., Dkt. No. 764, at p. 23.) The jury was then instructed on the remainder of the Rogers test. The Harris Parties contend, based on Jack Daniel's, this instruction should not have been given at all. The first issue then, is whether the mark (i.e., trade dress) was used in a source identifying way. Source identification simply refers to whether the mark or trade dress is associated with a particular source. See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992); Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 843 (9th Cir. 1987).

In the First Amended Complaint ("FAC"), MGA claimed ownership "to unregistered rights, including trade dress rights, in the L.O.L. Surprise! Products." (FAC,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-11548 JVS (AGRx) | Date | September 15, 2023 |
|---|---|---|---|

| Title | MGA Entertainment Inc. v. Clifford T.I. Harris et al. |
|---|---|

Dkt. No. 16, ¶ 15.)  The Harris Parties, in their counterclaims, alleged MGA infringed on the OMG Girlz's trade dress "in physical toys and animated videos . . . ."  (Answer & TACC, Dkt. No. 61, ¶ 20.)  The core of the trial was always whether MGA, through the L.O.L. Surprise! O.M.G. dolls, copied the alleged trade dress of the OMG Girlz.  (See, e.g., Rep.'s Tr., Trial Day 2, Vol. 1, Dkt. No. 780, at 87:14–18 ("[The Harris Parties are] claiming that everything [MGA's] designers came up with no matter where they came from is based on them no matter what, whether it's blue jeans, whether it's tutus, whether it's skirts, whether it's -- no matter what.  It's all stolen.").)  Put another way, the jury was tasked with determining if MGA misappropriated the OMG Girlz's trade dress such that consumers believed the L.O.L. Surprise! O.M.G. dolls were associated with the OMG Girlz.  (See, e.g., Rep.'s Tr., Trial Day 11, Vol. 2, Dkt. No. 847, at 23:18–20 (arguing, regarding the First Amendment defense, "[c]an anybody in this room really believe after everything you've heard that these dolls were such a massive hit because of the OMG Girlz' fame?).)

MGA argues the boxes the dolls containing the dolls is the real mark at issue, not the dolls themselves.  (Opp'n 7.)  The entire theme of the Harris Parties' case was that the alleged trade dress was a combination of the name, vibrant hair, and unique wardrobe.  (Rep.'s Tr., Trial Day 2, Vol. 1, at 32:10–21.) MGA fought to keep photos of the boxes out of the jury instructions, but the crux of the jury's determination was whether MGA's dolls infringed the trade dress.  (See Rep.'s Tr., Jury Trial Day 11, Vol. 1, Dkt. No. 789, at 6:7–23.)  The dolls and boxes were never truly distinct items at trial; they came together.  The jury was ultimately tasked with deciding whether the dolls infringed on the alleged trade dress of the OMG Girlz, such that consumers would be misled as to the origin of the L.O.L. Surprise! O.M.G. dolls (i.e., the use of a mark as a mark).  The Supreme Court held, in such a case of source identification, the Rogers test does not apply.  Jack Daniel's, 143 S. Ct. at 1593.  There is no doubt that under Jack Daniel's, the

Case 2:20-cv-11548-JVS-AGR   Document 860   Filed 09/15/23   Page 6 of 9   Page ID #:44840

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 20-11548 JVS (AGRx)                    Date   September 15, 2023

Title   MGA Entertainment Inc. v. Clifford T.I. Harris et al.

Rogers test instruction should not have been given.[3]

Given the erroneous instruction, the Harris Parties argue a new trial is warranted. MGA disagrees. When an erroneous instruction is given, there is a presumption of prejudice. See Frost v. BNSF Ry. Co., 914 F.3d 1189, 1198 (9th Cir. 2019) (citing Galdamez v. Potter, 415 F.3d 1015 (9th Cir. 2005)). MGA must show it was more probable than not that the jury would have reached the same verdict without the Rogers test instruction. Id.

The trial record contains ample testimony that is directly relevant to the Rogers test instruction. This is true even though the First Amendment was not explicitly mentioned. For example, one of the consumer witnesses was asked whether T.I. or Tiny were present on any of the boxes of the dolls, and whether the dolls may have been influenced by the OMG Girlz. Such testimony goes towards whether the trade dress is explicitly misleading. (See generally Rep.'s Tr., Trial Day 4, Vol. II, Dkt. No. 840, at 77–80.) The testimony of the doll designers goes directly towards artistic relevance. (See generally Rep.'s Tr., Trial Day 6, Vol. II, Dkt. No. 851, at 4–43 (discussing inspiration behind the design of the dolls).) The Rogers test contained elements similar to that of other claims and defenses, and the testimony and evidence was relevant to multiple claims and defenses.

Importantly, the jury instructions provided several, independent pathways for the jury to render a verdict in favor of MGA. During closing argument, MGA's counsel told the jury: "So there are many roads to a verdict for MGA here. . . . [T]he case has many, many ways for you to find for MGA and that you should find for MGA." (Rep.'s Tr., Trial Day 11, Vol. 2, at 22:4–7.) The jury could have found that the OMG Girlz did not

---

[3] At oral argument, MGA focused on the "narrow" opinion in Jack Daniel's. The Supreme Court held, "Today's opinion is narrow. We do not decide whether the Rogers test is ever appropriate, or how far the 'noncommercial use' exclusion goes. On infringement, we hold only that Rogers does not apply when the challenged use of a mark is as a mark." 143 S. Ct. at 163. In Jack Daniel's, the Supreme Court did not narrow when the Rogers test applied in situations of source identification. The focus on narrowness in this case is not relevant, the issue is whether the trade dress at issue was used as a mark. Indeed, the Supreme Court's statement as to the "narrow" holding appears to relate to Justice Gorsuch's concurring opinion questioning the future validity of the Rogers test. See id. at 165 ("For another thing, it is not obvious that Rogers is correct in all its particulars . . . [a]ll this remains for resolution another day and lower courts should be attuned to that fact." (internal citation omitted)) (Gorsuch, J., concurring).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 20-11548 JVS (AGRx) | Date | September 15, 2023 |
| Title | MGA Entertainment Inc. v. Clifford T.I. Harris et al. | | |

possess a trade dress; the OMG Girlz' trade dress, if any, did not acquire secondary meaning; the alleged trade dress was non-functional; there was no likelihood of confusion; or the alleged trade dress was abandoned.  MGA's counsel went through all of the ways the jury could have found for MGA on the Lanham Act claim, including the First Amendment defense.  (See id. at 29:4–31:23.)  But the Rogers instruction was more than just one path for the jury to find for MGA.  It was also a hurdle that the Harris Parties were required to overcome in order to prevail on their trade dress infringement claim.  (Jury Instr. at p. 23 ("Therefore, you may find for the OMG Girlz on their trade dress infringement claim *only if* . . . .") (emphasis added).)  There is no way to know what path the jury took in rendering its verdict.  The First Amendment defense could have "provided a shortcut that the jury may well have taken[.]"  Frost, 914 F.3d at 1198.

At oral argument, both sides posited hypothetical scenarios to explain the short time it took the jury to reach its verdict and significance of the jury's note regarding attorneys' fees.  One can imagine a great number of plausible situations to explain why the jury took the amount of time it did to render its verdict.  But none gives sufficient clarity as to the jury's rationale in finding for MGA.

MGA argues the Harris Parties invited error by insisting on a general verdict form. (Opp'n 13–14.)  If a party "both invited the error, and relinquished a known right, then the error is waived and therefore unreviewable."  United States v. Perez, 116 F.3d 840, 845 (9th Cir. 1997).  In theory, had Jack Daniel's been decided prior to the finalizing of the jury instructions, an argument could be made the Harris Parties invited error by advocating for a general verdict form.  But neither the Court nor the parties had any idea there would be a subsequent change in law.  The Harris Parties cannot be faulted for their inability to predict the future.  In any event, the Court's regular practice in jury trials is to use a general verdict form as to each claim.  Moreover, there was no error in the Court's exercise of it discretion to use a general verdict per claim.  Thus, the invited error doctrine is inapplicable.

The Rogers test instruction pertained only to the trade dress infringement claim. (See Jury Instr. at p. 23.)  Indeed, the instruction was explicitly clear, stating: "[Y]ou may find for the OMG Girlz *on their trade dress infringement claim* only if the OMG Girlz prove by a preponderance of the evidence that: [the Rogers test is satisfied]."  (Id. (emphasis added).)  A separate First Amendment instruction, without the Rogers test, was given on the misappropriation claim.  (Jury Instr. at p. 26.)  The jury is presumed to have

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 20-11548 JVS (AGRx)                    Date   September 15, 2023

Title      MGA Entertainment Inc. v. Clifford T.I. Harris et al.

followed the Court's instructions.  See CSX Transp., Inc. v. Hensley, 556 U.S. 838, 841 (2009) ("Jurors routinely serve as impartial factfinders in cases that involve sensitive, even life-and-death matters.  In those cases, as in all cases, juries are presumed to follow the court's instructions.").  Thus, the Court presumes the jury followed the Rogers test instruction only as to the trade dress infringement claim.  There is simply no way to determine whether the jury found for MGA on both claims for the same reasons, or for different reasons.  The jury could have relied on any one or all of the elements of the misappropriation claim or First Amendment defense.

Additionally, when a change in law affects jury instructions, the Ninth Circuit routinely vacates the judgment and remands in light of the change.  See, e.g., Inland Empire Waterkeeper v. Corona Clay Co., 17 F.4th 825, 836–37 (9th Cir. 2021); c.f. Davis v. Blue Tongue Films, No. 22-55416, 2023 WL 3963838 (9th Cir. June 9, 2023).  The Court finds this further supports that a new trial is warranted.

At oral argument, MGA posited a somewhat tortured path to advance the argument that it was more probable than not that the jury's verdict was unaffected by the Rogers instruction.  The Court finds otherwise.

Based on the foregoing, the Court finds MGA failed to meet its burden in establishing, looking at the "proceedings as a whole," it was more probable than not that the jury would have rendered the same verdict if the Rogers instruction was omitted. Frost, 914 F.3d at 1198–99.

Erroneous jury instructions are a sufficient basis for a new trial.  See Murphy v. City of Long Beach, 914 F.2d 193, 187 (9th Cir. 1990).  Under Federal Rule of Civil Procedure 59(a), the Court has the discretion to grant a new trial on all or some of the issues.  Fed. R. Civ. P. 59(a)(1)(A).  A partial trial "may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." Gasoline Prods. Co. v. Champlin Refining Co., 283 U.S. 494, 500 (1931).  At oral argument, MGA argued that the trade dress claim and misappropriation claims were distinct enough to warrant a partial trial but similar enough to presume the jury found for MGA on both claims for similar reasons.  The Rogers instruction pertained only to the trade dress claim; however, the relevant evidence on both claims overlapped.  In the Ninth Circuit, a Lanham Act claim and misappropriation claim are distinguished on the basis of an additional element.

A079

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 20-11548 JVS (AGRx) | Date | September 15, 2023 |
| Title | MGA Entertainment Inc. v. Clifford T.I. Harris et al. | | |

See Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc., 778 F.3d 1059, 1072 (9th Cir. 2015). Given the similarity in elements and evidence, the Court declines to grant a trial on just the trade dress claim. In any event, the decision to limit issues in a new trial is within the Court's discretion. See Pumphrey v. K.W. Thompson Tool Co., 62 F.3d 1128, 1134 (9th Cir. 1995). The Court finds a trial on both claims is appropriate. The Court declines to grant the motion for new trial based on the remaining arguments brought forth by the Harris Parties. Nonetheless, the Court may revisit these issues before if raised as appropriate pretrial motions.

Following the close of evidence, the Harris Parties moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure Rule 50(a) on whether the dolls are an expressive work. (Rep.'s Tr., Trial Day 11, Vol. I, at 27:10–21.) The Harris Parties argued, based on MGA's testimony, the dolls are not an expressive work. The Court denied the motion. (Id. at 29:1–6.) The Harris Parties renewed the motion, pursuant to Federal Rule of Civil Procedure 50(b), in their motion for new trial. (Mot. 11–12.) Given the Rogers instruction is no longer a viable defense, the question of whether the dolls are expressive is now moot. Accordingly, the Court **DENIES** the renewed motion for judgment as a matter of law.

For the foregoing reasons, the Court **GRANTS** the motion for new trial.

*B.    Motion for Attorneys' Fees*

MGA seeks attorneys' fees. Given the new trial, the Court cannot yet determine whether the case is exceptional nor who the prevailing party is. Accordingly, the motion for attorneys' fees is **DENIED**.

**IV. CONCLUSION**

For the foregoing reasons, the Court **GRANTS** the motion for new trial and **DENIES** the motion for attorneys' fees without prejudice.

**IT IS SO ORDERED.**

FILED
CLERK, U.S. DISTRICT COURT

9/23/24

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ eva _____ DEPUTY

## ORIGINAL

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MGA ENTERTAINMENT, INC., a California corporation, <br><br> Plaintiff, <br><br> vs. <br><br> CLIFFORD "T.I." HARRIS, an individual; TAMEKA "TINY" HARRIS, an individual; OMG GIRLZ LLC, a Delaware limited liability company; and DOES 1-10, inclusive, <br><br> Defendants. | Case No.  2:20-cv-11548-JVS-AGR <br> ASSIGNED TO: Hon James V. Selna <br><br> **VERDICT FORM** |
| GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC, and OMG GIRLZ LLC, <br><br> Counter-Claimants, <br><br> vs. <br><br> MGA ENTERTAINMENT, INC., ISAAC LARIAN, and DOES 1 – 10, inclusive, <br><br> Counter-Defendants. | Complaint Filed:  December 20, 2020 <br> Trial Date:  September 3, 2024 |

1

A081

We the jury, being first duly empaneled and sworn in the above-entitled cause, do find as follows:

## Section I. OMG Girlz' Claims

**A.    Liability**

In the chart on the following pages, there is a list of the seven L.O.L. Surprise! O.M.G. dolls that the OMG Girlz allege infringe their trade dress and/or misappropriate their name, identity, or likeness.  Each row includes the name of the doll, a picture of the box(es) it is sold in, and the accompanying exhibit numbers.

1)    Do you find that the OMG Girlz have proven by a preponderance of the evidence that they have protectible trade dress?

YES ____✓____          NO_____

2)    If you answered "Yes" to Question 1 then, for each doll, please check "Yes" or "No" in the first column depending on whether you find that the OMG Girlz have proven by a preponderance of the evidence that the doll infringes the OMG Girlz' trade dress ("Yes") or does not infringe ("No").

3)    Regardless of your answer to Question 1, for each doll, please check "Yes" or "No" in the second column depending on whether you find that that the OMG Girlz have proven by a preponderance of the evidence that the doll misappropriates the OMG Girlz' name, likeness, or identity ("Yes") or does not misappropriate ("No").

2

| Product Name | Image | Question 2 Trade Dress Infringement | Question 3 Misappropriation of Name or Likeness or Identity |
|---|---|---|---|
| L.O.L. Surprise! O.M.G. Series 3 Fashion Doll with 20 Surprises "Chillax" | | ✓ Yes ____ No | ✓ Yes ____ No |
| L.O.L. Surprise! O.M.G. Series 2 Fashion Doll with 20 Surprises "Roller Chick" | | ✓ Yes ____ No | ✓ Yes ____ No |
| L.O.L. Surprise! O.M.G. Remix Super Surprise — 70+ Surprises, 4 Fashion Dolls & 4 Dolls "O.M.G. Remix Rock" "Bhad Gurl" | | ✓ Yes ____ No | ✓ Yes ____ No |

A083

| Product Name | Image | Question 2 Trade Dress Infringement | Question 3 Misappropriation of Name or Likeness or Identity |
|---|---|---|---|
| L.O.L. Surprise! O.M.G. Remix Super Surprise – 70+ Surprises, 4 Fashion Dolls & 4 Dolls "O.M.G. Remix Rock" "Metal Chick" | | ✔Yes ___No | ✔Yes ___No |
| L.O.L. Surprise! O.M.G. Queens Fashion Doll with 20 Surprises "Miss Divine" | | ✔Yes ___No | ✔Yes ___No |
| L.O.L. Surprise! O.M.G. Queens Fashion Doll with 20 Surprises "Runway Diva" | | ✔Yes ___No | ✔Yes ___No |
| L.O.L. Surprise! O.M.G. Queens Fashion Doll with 20 Surprises "Prism" | | ✔Yes ___No | ✔Yes ___No |

**B.** **First Amendment (Misappropriation)**

4) If, pursuant to Question 3, you found that at least one L.O.L. Surprise! O.M.G. doll misappropriates the OMG Girlz' name, likeness, or identity, do you find that MGA has proven, by a preponderance of the evidence, that its dolls are protected by the First Amendment?

YES _____ NO __✓___

**C.** **Monetary Recovery (Trade Dress)**

If you answered "Yes" to any doll for Question 2 (Trade Dress Infringement Column), please answer Questions 5 and 6. Otherwise, skip to Questions 7-8.

5) If you found that MGA infringed the OMG Girlz' trade dress, what amount should the OMG Girlz recover for MGA's trade dress infringement?

$ __17,872,253_____

6) Was MGA's trade dress infringement willful?

YES __✓___ NO _____

**D.**   **Monetary Recovery (Name, Likeness or Identity)**

If you answered "Yes" to any doll for Question 3 (Misappropriation of Name, Likeness, or Identity Column), and "No" to Question 4 (First Amendment) please answer Questions 7-8.  Otherwise skip to the next Section.

7)   What amount should the OMG Girlz recover for MGA's misappropriation of the OMG Girlz' name, likeness, or identity?

$ _____ 17,872,253 _____

8)   Do you find by clear and convincing evidence that MGA acted with oppression, fraud, or malice with regard to its misappropriation of the OMG Girlz' name, likeness, or identity?

YES ___✓___        NO _____

6
A086

## Section II. MGA's Claims

In the chart on the following pages, there is a list of the twenty-five L.O.L. Surprise! O.M.G. dolls that MGA alleges do not infringe the OMG Girlz trade dress and/or misappropriate their name, identity, or likeness. Each row includes the name of the doll, a picture of the box(es) it is sold in, and the accompanying exhibit numbers.

3)    For each doll, please check "Yes" or "No" in the first column depending on whether you find that MGA has proven by a preponderance of the evidence that the doll does not infringe the OMG Girlz' trade dress ("No") or does infringe ("Yes").

4)    For each doll, please check "Yes" or "No" in the second column depending on whether you find that MGA has proven by a preponderance of the evidence that the doll does not misappropriate the OMG Girlz' name, likeness, or identity ("No") or does misappropriate ("Yes").

| Product Name | Image | Question 3<br>Trade Dress Infringement | Question 4<br>Misappropriation of Name or Likeness or Identity |
|---|---|---|---|
| L.O.L. Surprise! O.M.G. Remix Super Surprise — 70+ Surprises, 4 Fashion Dolls & 4 Dolls "O.M.G. Remix Rock"<br><br>"Ferocious" | | ✓ No<br><br>_____ Yes | ✓ No<br><br>_____ Yes |

| Product Name | Image | Question 3 Trade Dress Infringement | Question 4 Misappropriation of Name or Likeness or Identity |
|---|---|---|---|
| L.O.L. Surprise! O.M.G. Remix Super Surprise — 70+ Surprises, 4 Fashion Dolls & 4 Dolls "O.M.G. Remix Rock" "Fame Queen" | | ✔ No ____ Yes | ✔ No ____ Yes |
| L.O.L. Surprise! O.M.G. Fashion Doll with 20 Surprises "Downtown B.B." | | ____ No ✔ Yes | ____ No ✔ Yes |
| L.O.L. Surprise! O.M.G. Fashion Doll with 20 Surprises "Uptown Girl" | | ✔ No ____ Yes | ✔ No ____ Yes |

| Product Name | Image | Question 3 Trade Dress Infringement | Question 4 Misappropriation of Name or Likeness or Identity |
|---|---|---|---|
| L.O.L. Surprise! O.M.G. Winter Disco Bigger Surprise with 5 Exclusive Dolls and 60+ Surprises<br><br>"Shadow" | | ____ No<br><br>✓ Yes | ✓ No<br><br>____ Yes |
| L.O.L. Surprise! O.M.G. Series 3 Fashion Doll with 20 Surprises<br><br>"Class Prez" | | ✓ No<br><br>____ Yes | ✓ No<br><br>____ Yes |
| L.O.L. Surprise! O.M.G. Remix 2 Pack -2 Fashion Dolls with Music<br><br>"Punk Grrrl" | | ____ No<br><br>✓ Yes | ____ No<br><br>✓ Yes |

| Product Name | Image | Question 3 Trade Dress Infringement | Question 4 Misappropriation of Name or Likeness or Identity |
|---|---|---|---|
| L.O.L. Surprise! O.M.G. Remix 2 Pack -2 Fashion Dolls with Music "Rocker Boi" | | ✔ No ____ Yes | ✔ No ____ Yes |
| L.O.L. Surprise! O.M.G. Fashion Doll "Lady Diva" | | ✔ No ____ Yes | ✔ No ____ Yes |
| L.O.L. Surprise! O.M.G. Fashion Doll Series 4 Doll with 20 Surprises "Sweets" | | ✔ No ____ Yes | ✔ No ____ Yes |

| Product Name | Image | Question 3 Trade Dress Infringement | Question 4 Misappropriation of Name or Likeness or Identity |
|---|---|---|---|
| L.O.L. Surprise! O.M.G. Fashion Doll - Series 4 Doll with 20 Surprises  "Spicy Babe" | | ✔ No  ____ Yes | ✔ No  ____ Yes |
| L.O.L. Surprise! O.M.G. Dance Dance Dance Fashion Doll with 15 Surprises  "Miss Royale" | | ✔ No  ____ Yes | ✔ No  ____ Yes |
| L.O.L. Surprise! O.M.G. Dance Dance Dance Fashion Doll with 15 Surprises  "B-Gurl" | | ✔ No  ____ Yes | ✔ No  ____ Yes |
| L.O.L. Surprise! O.M.G. Dance Dance Dance Fashion Doll with 15 Surprises  "Virtuelle" | | ____ No  ✔ Yes | ____ No  ✔ Yes |

| Product Name | Image | Question 3 Trade Dress Infringement | Question 4 Misappropriation of Name or Likeness or Identity |
|---|---|---|---|
| L.O.L. Surprise! O.M.G. Fashion Doll-Series 2 "Honeylicious" | | ____ No   ✓ Yes | ____ No   ✓ Yes |
| L.O.L. Surprise! O.M.G. Dance Dance Dance Fashion Doll with 15 Surprises "Major Lady" | | ✓ No   ____ Yes | ✓ No   ____ Yes |
| L.O.L. Surprise! O.M.G. Winter Disco Fashion Doll "Cosmic Nova" | | ✓ No   ____ Yes | ✓ No   ____ Yes |
| L.O.L. Surprise! O.M.G. Winter Disco Fashion Doll with 20 Surprises "24K D.J." | | ✓ No   ____ Yes | ✓ No   ____ Yes |

12

| Product Name | Image | Question 3 Trade Dress Infringement | Question 4 Misappropriation of Name or Likeness or Identity |
|---|---|---|---|
| L.O.L. Surprise! O.M.G. Winter Disco Fashion Doll<br><br>"Snowlicious" | | ✓ No<br><br>____ Yes | ✓ No<br><br>____ Yes |
| L.O.L. Surprise! O.M.G. Fashion Doll with 20 Surprises<br><br>"Miss Independent" | | ____ No<br><br>✓ Yes | ____ No<br><br>✓ Yes |
| L.O.L. Surprise! O.M.G. Fashion Doll- Series 2<br><br>"Candylicious" | | ✓ No<br><br>____ Yes | ✓ No<br><br>____ Yes |
| L.O.L. Surprise! O.M.G. Present Surprise Fashion Doll<br><br>"Miss Glam" | | ✓ No<br><br>____ Yes | ____ No<br><br>✓ Yes |

13

A093

| Product Name | Image | Question 3 Trade Dress Infringement | Question 4 Misappropriation of Name or Likeness or Identity |
|---|---|---|---|
| L.O.L. Surprise! O.M.G. Movie Fashion Doll with 25 Surprises "Gamma Babe" | | ✓ No ___ Yes | ✓ No ___ Yes |
| L.O.L. Surprise! O.M.G. World Travel Fashion Doll with 15 Surprises "City Babe" | | ___ No ✓ Yes | ___ No ✓ Yes |
| L.O.L. Surprise! O.M.G. Fashion Doll with 20 Surprises "Moonlight B.B." | | ✓ No ___ Yes | ✓ No ___ Yes |

The presiding juror should sign and date this verdict form.

Dated this ___23rd___ day of ___September___ 2024.

<br>

_____
Presiding Juror

14
A094



**F I L E D**
CLERK, U.S. DISTRICT COURT

9/20/24

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ eva _____ DEPUTY

**ORIGINAL**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MGA ENTERTAINMENT, INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CLIFFORD "T.I." HARRIS, an individual; TAMEKA "TINY" HARRIS, an individual; OMG GIRLZ LLC, a Delaware limited liability company; and DOES 1 - 10 inclusive,<br>Defendants, | Case No. 2:20-cv-11548-JVS-AGR<br><br>Assigned To: Hon James V. Selna<br><br>JURY INSTRUCTIONS |
| GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC, and OMG GIRLZ LLC,<br><br>Counter-Claimants,<br><br>vs.<br><br>MGA ENTERTAINMENT, INC., ISAAC LARIAN and DOES 1 - 10, inclusive,<br><br>Counter-Defendants. | |

SEPTEMBER 20, 2024

## Court's Instruction No. 1

Members of the Jury: Now that you have heard all of the evidence, it is my duty to instruct you on the law that applies to this case. Each of you has received a copy of these instructions that you may take with you to the jury room to consult during your deliberations.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

Perform these duties fairly and impartially.  You should not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.  Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases.  Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.  Like conscious bias, unconscious bias can affect how we evaluate information and make decisions.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

-1-

Please do not read into these instructions or anything that I may say or do or have said or done that I have an opinion regarding the evidence or what your verdict should be.

In these instructions, I will be refering to Clifford "T.I." Harris, Tameka "Tiny" Harris, OMG Girlz LLC, Grand Hustle, LLC, and Pretty Hustle, LLC collectively as "OMG Girlz." I will also be referring to MGA Entertainment and Isaac Larian collectively as "MGA."

<u>Court's Instruction No. 2</u>

When a party has the burden of proving any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

When a party has the burden of proving any claim or defense by clear and convincing evidence, it means that the party must present evidence that leaves you with a firm belief or conviction that it is highly probable that the factual contentions of the claim or defense are true. This is a higher standard of proof than proof by a preponderance of the evidence, but it does not require proof beyond a reasonable doubt.

You should base your decision on all of the evidence, regardless of which party presented it.

<u>Court's Instruction No. 3</u>

You should decide the case as to each party separately. Unless otherwise stated, the instructions apply to all parties.

<u>Court's Instruction No. 4</u>

The evidence you are to consider in deciding what the facts are consists of:

1.    the sworn testimony of any witness;

2.    the exhibits that are admitted into evidence;

3.    any facts to which the lawyers have agreed; and

4.    any facts that I have instructed you to accept as proved.

<u>Court's Instruction No. 5</u>

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you:

(1) Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2) Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(3) Testimony that is excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered.  In addition, some evidence was received only for a limited purpose; when I have instructed you to consider certain evidence only for a limited purpose, you must do so, and you may not consider that evidence for any other purpose.

(4) Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

.

A101  6

## Court's Instruction No. 6

Some evidence may be admitted only for a limited purpose.

When I instruct you that an item of evidence has been admitted only for a limited purpose, you must consider it only for that limited purpose and not for any other purpose.

<u>Court's Instruction No. 7</u>

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night. However, other evidence, such as a turned-on garden hose, may provide a different explanation for the presence of water on the sidewalk. Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense.

## Court's Instruction No. 8

There are rules of evidence that control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object. If I overrule the objection, the question may be answered or the exhibit received. If I sustain the objection, the question cannot be answered, and the exhibit cannot be received. Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore that evidence. That means when you are deciding the case, you must not consider the stricken evidence for any purpose.

Court's Instruction No. 9

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1)    the opportunity and ability of the witness to see or hear or know the things testified to;

(2)    the witness's memory;

(3)    the witness's manner while testifying;

(4)    the witness's interest in the outcome of the case, if any;

(5)    the witness's bias or prejudice, if any;

(6)    whether other evidence contradicted the witness's testimony;

(7)    the reasonableness of the witness's testimony in light of all the evidence; and

(8)    any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some

A105 10

things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.  What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

11

Court's Instruction No. 10

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers for each party may ask questions. The questions and answers are recorded.

Insofar as possible, you should consider deposition testimony, presented to you in court in lieu of live testimony, in the same way as if the witness had been present to testify.

Court's Instruction No. 11

You have heard testimony from experts about their opinions and the reasons for those opinions. This opinion testimony is allowed, because of the specialized knowledge, skill, experience, training, or education of this witness.

Such opinion testimony should be judged like any other testimony. You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's specialized knowledge, skill, experience, training, or education, the reasons given for the opinion, and all the other evidence in the case.

Court's Instruction No. 12

Trade dress is the nonfunctional physical detail and design of the product or its packaging which identifies the products source and distinguishes it from the products of others.

In this case, you have heard evidence about the manner in which the OMG Girlz identify their business and services they sell. This is the total image of their business, suggested by the general appearance of their business, such as their use of identifying colors, their business name, overall styling, including the accessories and dress of members, and other features reflecting on the total image of the business.

In this case, you have hearad evidence about the manner in which the OMG Girlz identify their business and the products and services they sell. This is the total image of their business, suggested by the general appearance of their business, such as their use of identifying colors, their business name, overall styling, including the accessories and dress of members, and other features reflecting on the total image of the business.

A person who uses the trade dress of another may be liable for damages.

14

<u>Court's Instruction No.  13</u>

Counter-Claimants, on behalf of the OMG Girlz, have brought a claim for trade dress infringement. On the OMG Girlz' claim for trade dress infringement, the OMG Girlz have the burden of proving by a preponderance of the evidence each of the following elements:

1.  The trade dress at issue, consisting of: the name "OMG GIRLZ" coupled with combinations of vibrant hair color in non-monochromatic and contrasting hues—primarily in bright pink, vivid purple, and shades of blue—contrasting wavy and straight hair styling, and experimental, fun, urban, and edgy wardrobes and makeup, layered clothing, voluminous skirts (i.e., tutus and other poofy skirts), and bold, over the top clothing and accessories has acquired secondary meaning;

2.  The OMG Girlz own the trade dress;

3.  The trade dress is nonfunctional; and

4.  The MGA Parties used trade dress similar to the OMG Girlz without their consent in a manner that is likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of the MGA Parties' goods.

Unregistered trade dress can be valid and provide the trade dress owner with the exclusive right to use that trade dress.

Literal copying may, but is not required, to establish a violation trade dress

rights.

If you find that each of the elements on which the OMG Girlz have the burden of proof has been proved, your verdict should be for the OMG Girlz. If, on the other hand, the OMG Girlz have failed to prove any of these elements, your verdict should be for MGA.

Court's Instruction No. 14

Trade dress acquires a secondary meaning when it has been used in such a way that its primary significance in the minds of the prospective consumers is not the product itself, but the identification of the product with a single source, regardless of whether consumers know who or what that source is. You must find that the preponderance of the evidence shows that a significant number of the consuming public associates the OMG Girlz' trade dress with a single source, in order to find that it has acquired secondary meaning.

When you are determining whether the OMG Girlz' trade dress has acquired a secondary meaning, consider the following factors:

1.    Consumer Perception.  Whether the people who purchase the product that bears the claimed trade dress associate the trade dress with the OMG Girlz;

2.    Advertisement.  To what degree and in what manner the OMG Girlz may have advertised under the claimed trade dress;

3.    Demonstrated Utility.  Whether the OMG Girlz successfully used this trade dress to increase the sales and number of consumers of the OMG Girlz' music and entertainment services, and establish their place in the market;

4.    Extent of Use.  The length of time and manner in which the OMG Girlz used the claimed trade dress;

5.    Exclusivity.  Whether the OMG Girlz' use of the claimed trade dress

A112 17

was exclusive;

6.    Copying.  Whether MGA intentionally copied the OMG Girlz' trade dress; and

7.    Actual Confusion.  Whether the MGA's use of the OMG Girlz trade dress has led to actual confusion among a significant number of consumers.

8.    Direct Consumer Testimony.  The amount of testimony from consumers that would indicate that, in the minds of the public, the primary significance of the OMG Girlz' claimed trade dress is to identify the source of the product rather than the product itself.

9.    Unsolicited Media. Whether the OMG Girlz received unsolicited media attention.

The presence or absence of any particular factor should not necessarily resolve whether the OMG Girlz' trade dress has acquired secondary meaning.

The OMG Girlz have the burden of proving that the OMG Girlz' trade dress has acquired a secondary meaning.

Court's Instruction No. 15

For a product's design to be protected under trade dress law, the design must be non-functional.

A claimed trade dress has aesthetic functionality if it serves an aesthetic purpose wholly independent of any source identifying function, such that the trade dress's protection under trade dress law would impose a significant non-reputation-related competitive disadvantage on its owner's competitors. The inquiry is whether, if one seller were given exclusive rights to use the claimed trade dress, other sellers would be forced to use alternative designs that make their products more costly to sell, or for which consumers' willingness to pay would be lower for reasons having nothing to do with the reputation of any source (e.g., the alternative designs would not have as much intrinsic aesthetic appeal).

The fact that that individual elements of the trade dress may be functional does not necessarily mean that the trade dress as a whole is functional; rather, functional elements that are separately unprotectable can be protected together as part of a trade dress.

OMG Girlz have the burden of proving non-functionality by a preponderance of the evidence in order to show that the trade dress is valid and protected from infringement.

<u>Court's Instruction No. 16</u>

If you find that MGA has used OMG Girlz' trade dress, you must determine whether such use is likely to cause confusion about the source of MGA's goods.

I will suggest some factors you should consider in deciding this. The presence or absence of any particular factor that I suggest should not necessarily resolve whether there was a likelihood of confusion, because you must consider all relevant evidence in determining this. As you consider the likelihood of confusion you should examine the following:

(1)    Strength or Weakness of the OMG Girlz trade dress. The more the consuming public of MGA's L.O.L. Surprise! O.M.G. dolls recognizes the OMG Girlz' trade dress as an indication of origin of the OMG Girlz, the more likely it is that consumers would be confused about the source of MGA's goods if MGA uses a similar trade dress.

(2)    MGA's Use of the Trade Dress. If the OMG Girlz and MGA use the trade dress in the same, related, or complementary ways there may be a greater likelihood of confusion about the source of the L.O.L. Surprise! O.M.G. dolls than otherwise.

(3)    Similarity. If the overall impression created by the OMG Girlz' trade dress in the marketplace is similar to that created by MGA's L.O.L. Surprise! dolls in appearance, there is a greater chance that consumers are likely to be confused by MGA's use of the trade dress. Similarities in appearance, sound or meaning weigh more heavily than differences in finding the trade dress is similar.

(4)    Actual Confusion. If use by MGA of the OMG Girlz' trade

**A115** 20

dress has led to instances of actual confusion, this strongly suggests a likelihood of confusion. However actual confusion is not required for a finding of likelihood of confusion. Even if actual confusion did not occur, MGA's use of the trade dress may still be likely to cause confusion. As you consider whether the trade dress used by MGA creates for consumers a likelihood of confusion with the OMG Girlz' trade dress, you should weigh any instances of actual confusion against the opportunities for such confusion. If the instances of actual confusion have been relatively frequent, you may find that there has been substantial actual confusion. If, by contrast, there is a very large volume of sales, but only a few isolated instances of actual confusion you may find that there has not been substantial actual confusion.

(5)   MGA's Intent. Knowing use by MGA of the OMG Girlz' trade dress to identify similar goods may strongly show an intent to derive benefit from the reputation of the OMG Girlz' trade dress, suggesting an intent to cause a likelihood of confusion. On the other hand, even in the absence of proof that the MGA acted knowingly, the use of the OMG Girlz' trade dress to identify similar goods may indicate a likelihood of confusion.

(6)   Marketing/Advertising Channels. If the parties' brands are likely to be seen in similar stores or marketplaces, or advertised in similar media, this may increase the likelihood of confusion.

(7)   Consumer's Degree of Care. The more sophisticated the potential buyers of the goods or the more costly the goods, the more careful and discriminating the reasonably prudent purchaser exercising ordinary caution may be. They may be less likely to be confused by similarities in the parties' trade dress.

(8)   Product Line Expansion. When the parties' products differ, you may consider how likely the OMG Girlz are to begin selling the products for which MGA is using the OMG Girlz' trade dress such as their own line of dolls or other characters based on the OMG Girlz in the metaverse. If there is a strong possibility of expanding into the other party's market, there is a greater likelihood of confusion.

(9)   Survey Evidence. Any survey evidence introduced by the parties regarding whether there is a likelihood of confusion.

22

<u>Court's Instruction No. 17</u>

The OMG Girlz cannot exclude others from using the alleged trade dress if it has been abandoned.

The MGA Parties contend that the trade dress has become unenforceable because the OMG Girlz abandoned it. The MGA Parties have the burden of proving abandonment by a clear and convincing evidence.

The owner of a trade dress abandons the right to exclusive use of the dress when the owner:

1.    discontinues its use in the ordinary course of trade, intending not to resume using it; or

2.    acts or fails to act so that the trade dress' principal significance to prospective consumers has become the entertainment product itself and not the producer of the entertainment.

Evidence of non-use of trade dress for three consecutive years is prima facie evidence of abandonment. When the MGA Parties prove the necessary consecutive years of non-use, the burden shifts to the OMG Girlz to go forward with evidence to prove that circumstances do not justify the inference of intent not to resume use. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not merely to reserve a right in the mark.

<u>Court's Instruction No. 18</u>

The OMG Girlz' claim that MGA misappropriated their name, likeness, or identity. To establish this claim, the OMG Girlz must prove all of the following:

1.   That MGA used the OMG Girlz' name, likeness, or identity;

2.   That the OMG Girlz did not consent to this use;

3.   That MGA gained a commercial benefit by using the OMG Girlz' name, likeness, or identity;

4.   That the OMG Girlz were harmed; and

5.   That MGA's conduct was a substantial factor in causing the OMG Girlz harm.

Court's Instruction No. 19

The MGA Parties claim that they have not violated the OMG Girlz' rights to their name, likeness, or identity, and that the L.O.L. Surprise! O.M.G. dolls are an expressive work that is protected by the First Amendment.

To succeed on this affirmative defense, the MGA Parties must prove either of the following:

1.     That the L.O.L. Surprise! O.M.G. dolls add something new to the OMG Girlz' likeness, giving it a new expression, meaning, or message; or

2.     That the value of the L.O.L. Surprise! O.M.G. dolls does not result primarily from the OMG Girlz' fame.

A120  25

Court's Instruction No. 20

It is the duty of the Court to instruct you about the measure of damages. By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

If you determine the OMG Girlz have proved that one or more of the L.O.L. Surprise! O.M.G. dolls infringe the OMG Girlz' trade dress, then the OMG Girlz are entitled to any profits earned by MGA that are attributable to the infringement by those dolls. OMG Girlz are not entitled to any profits earned by MGA from L.O.L. Surprise! O.M.G. dolls that the OMG Girlz have not proved infringe the OMG Girlz' trade dress.

Profit is determined by deducting all expenses from gross revenue.

Gross revenue is all of MGA's receipts from using the OMG Girlz' trade dress in the sale of any infringing L.O.L. Surprise! O.M.G. dolls. The OMG Girlz have the burden of proving MGA's gross revenue from any L.O.L. Surprise! O.M.G. doll that infringes the OMG Girlz' trade dress.

Expenses are all operating, overhead, and production costs incurred in producing the gross revenue. MGA has the burden of proving the expenses and the portion of its profit from any L.O.L. Surprise! O.M.G. doll that infringes the OMG Girlz' trade dress that is attributable to factors other than use of the OMG Girlz' trade dress.

Unless you find that a portion of the profit from the sale of the L.O.L.

26

A121

Surprise! O.M.G. dolls that the use of the OMG Girlz' trade dress is attributable to factors other than use of the OMG Girlz' trade dress, you should find that the total profit of any such dolls is attributable to the infringement.

Court's Instruction No. 21

This instruction relates to the Harris Parties' claim that MGA willfully violated their trade dress rights.

MGA committed willful trade dress infringement if the Harris Parties prove, by a preponderance of the evidence, that MGA knowingly and intentionally or acted with indifference, acted with reckless disregard for, or willful blindness in infringing the Harris Parties' trade dress.

You must also consider whether MGA reasonably believed it was not infringing the Harris Parties' trade dress. Then MGA's conduct was not willful. You may consider the effect of the Harris Parties' notification of their claim of infringegment. You must determine the reasonableness of MGA' conduct both before and after the notification.

Court's Instruction No. 22

This instruction relates to the Harris Parties' claim for violation of their of their name and likeness rights.

The OMG Girlz must prove the amount of their damages. The OMG Girlz do not have to prove the exact amount of damages that will provide reasonable compensation for the harm. However, you must not speculate or guess in awarding damages.

The following are the specific items of damages claimed by the OMG Girlz.

The OMG Girlz may recover any profits that MGA received from the use of the OMG Girlz' name or identity or likeness that have not already been taken into account with regard to the above damages. To establish the amount of these profits you must:

i.    Determine the gross, or total, revenue that MGA received from the use;

ii.   Determine the expenses that MGA had in obtaining the gross revenue; and

iii.  Deduct MGA's expenses from the gross revenue.

The OMG Girlz have the burden of proving the amount of gross revenue, and MGA has the burden of proving the amount of expenses.

A124  29

If you decide that MGA's conduct caused the Harris Parties harm by violating their name and likeness rights, you must decide whether that conduct justifies an award of punitive damages. The amount, if any, of punitive damages will be an issue decided later.

At this time, you must decide whether the Harris Parties proved that MGA engaged in that conduct with malice, oppression, or fraud. To do this, the Harris Parties must prove one of the following by clear and convincing evidence:

1. That the conduct constituting malice, oppression, or fraud was committed by one or more officers, directors, or managing agents of MGA who acted on behalf of MGA; or

2. That the conduct constituting malice, oppression, or fraud was authorized by one or more officers, directors, or managing agents of MGA.

"Malice" means that MGA acted with intent to cause injury or that MGA's conduct was despicable and was done with a willful and knowing disregard of the rights or safety of another. A defendant acts with knowing disregard when the defendant is aware of the probable dangerous consequences of the defendant's conduct and deliberately fails to avoid those consequences.

A125 30

"Oppression" means that MGA's conduct was despicable and subjected the Harris Parties to cruel and unjust hardship in knowing disregard of their rights.

"Despicable conduct" is conduct that is so vile, base, or contemptible that it would be looked down on and despised by reasonable people.

"Fraud" means that MGA intentionally misrepresented or concealed a material fact and did so intending to harm the Harris Parties.

An employee is a "managing agent" if the employee exercises substantial independent authority and judgment in corporate decision making such that the employee's decisions ultimately determine corporate policy.

If you decide that MGA's conduct caused the Harris Parties harm, you must decide whether that conduct justifies an award of punitive damages. The amount, if any, of punitive damages will be an issue decided later.

<u>Court's Instruction No.  23</u>

Before you begin your deliberations, elect one member of the jury as your presiding juror. The presiding juror will preside over the deliberations and serve as the spokesperson for the jury in court.

You shall diligently strive to reach agreement with all of the other jurors if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to their views.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not be unwilling to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right, or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

<u>Court's Instruction No. 24</u>

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves. Except for discussing the case with your fellow jurors during your deliberations.

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone, tablet, computer, or any other means, via email, via text messaging, or any internet chat room, blog, website or application, including but not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any other forms of social media. This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it, do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own. Do not visit or view any place discussed in this case, and do not use Internet programs or other devices to search for or view any place discussed during the trial. Also, do not do any research about this case, the law, or the people involved—including the parties, the witnesses or the

lawyers—until you have been excused as jurors. If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

These rules protect each party's right to have this case decided only on evidence that has been presented here in court. Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process. If you do any research or investigation outside the courtroom, or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete, or misleading information that has not been tested by the trial process. Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial. Remember, you have taken an oath to follow the rules, and it is very important that you follow these rules.

A juror who violates these restrictions jeopardizes the fairness of these proceedings. If any juror is exposed to any outside information, please notify the court immediately.

A129  34

Court's Instruction No. 25

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff, signed by your presiding juror or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court. If you send out a question, I will consult with the parties before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged. Do not disclose any vote count in any note to the court.

<u>Court's Instruction No. 26</u>

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign, and date it, and advise the bailiff that you are ready to return to the courtroom.

A131

36

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

MGA ENTERTAINMENT, INC.,          )CERTIFED TRANSCRIPT
            Plaintiff,            )
      vs.                         )
                                  )  CV-20-11548-JVS
CLIFFORD "T.I." HARRIS,           )
et al., )                         )
            Defendants.           )  TRIAL DAY 2, VOL. I
------------------------------)
GRAND HUSTLE, LLC, PRETTY         )
HUSTLE, LLC, and OMG GIRLZ,       )
LLC,                              )
            Counter-Claimants, )
      vs.                         )
MGA ENTERTAINMENT, INC.,          )
ISAAC LARIAN, and DOES 1-10,  )
inclusive,                        )
            Counter-Defendants.)
------------------------------)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

September 4, 2024


SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

2

APPEARANCES OF COUNSEL:

For the COUNTER-CLAIMANTS:

JOHN R. KEVILLE
ROBERT L. GREEN
CHANTE B. WESTMORELAND
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
700 Lousiana Street, Suite 2750
Houston, TX  77002
(713) 431-7100

For the COUNTER-DEFENDANTS:

PAUL J. LOH
BREEANNA N. BREWER
WILLENKEN, LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA  90017
(213) 955-9240

MARK A. FINKELSTEIN
UMBERG ZIPSER, LLP
1920 Main Street, Suite 750
Irvine, CA  92614
(949) 679-0052

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

A133

and had these big hats on.  It was a big thing because she wore it, and everybody was ranting and raving about how good she looked.  This is the same look of the Beyonce look that she had, the big curly blond hair that she had with the big brimmed hat.

Q    Would fans of Beyonce be likely to know the OMG Girlz as well?

A    Yes, they would.

MR. LOH:  Objection, foundation, hearsay.

THE COURT:  Foundation.

BY MR. KEVILLE:

Q    Mrs. Harris, in your experience in the music business and knowing the fans of the OMG Girlz having had interactions with Beyonce, would the fans of Beyonce be likely to know of the OMG Girlz as well?

MR. LOH:  Still no foundation.

THE COURT:  Overruled.

THE WITNESS:  I would say yes.  In the music industry -- I mean, the girls are into R&B music, so yes. They are a teen sensation that love the girls and love Beyonce as well.  Of course.

BY MR. KEVILLE:

Q    Now, you mentioned after talking to some people you contacted an attorney.  Did your attorney send a letter?

A    Yes, the attorney sent a letter.

as well.

Q    So did the girls write their own music?

A    Not at the time.

Q    You also hired for the girls a choreographer; is that right?

A    Yes.

Q    Sean Bankhead is his name?

A    Yes.

Q    And he's one of the best in the business, right?

A    Yes, he is.

Q    You helped to hire Michael Mauldin to manage the group, right?

A    Yes, I did.

Q    Now, I can't remember, but did Mr. Mauldin used to manage your group, Xscape?

A    Yes, he did.

Q    Did he also manage Destiny's Child?

A    No, I can't say that he did.

Q    But he was the founder of the Scream Tour that we were talking about earlier.

A    Yes.

Q    And so the girls got on the Scream Tour because of Mr. Mauldin's connection?

A    The girls got on the Scream Tour because of their relevancy in the industry.

139

CERTIFICATE


     I hereby certify that pursuant to Section 753,
Title 28, United States Code, the foregoing is a true and
correct transcript of the stenographically reported
proceedings held in the above-entitled matter and that the
transcript page format is in conformance with the
regulations of the Judicial Conference of the United States.


Date:  September 4, 2024


                         /s/   Sharon A. Seffens  9/4/24
                         _____
                         SHARON A. SEFFENS, U.S. COURT REPORTER

A136

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

```
MGA ENTERTAINMENT, INC.,     )CERTIFED TRANSCRIPT
              Plaintiff,     )
       vs.                   )
                             )  CV-20-11548-JVS
CLIFFORD "T.I." HARRIS,      )
et al., )                    )
              Defendants.    ) TRIAL DAY 4, VOL. I
----------------------------)
GRAND HUSTLE, LLC, PRETTY    )
HUSTLE, LLC, and OMG GIRLZ,  )
LLC,                         )
              Counter-Claimants, )
       vs.                   )
MGA ENTERTAINMENT, INC.,     )
ISAAC LARIAN, and DOES 1-10, )
inclusive,                   )
              Counter-Defendants.)
----------------------------)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

September 6, 2024

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

2

APPEARANCES OF COUNSEL:

For the Plaintiff and Counter-Defendants:

PAUL J. LOH
BREEANNA N. BREWER
WILLENKEN, LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA  90017
(213) 955-9240

MARK A. FINKELSTEIN
UMBERG ZIPSER, LLP
1920 Main Street, Suite 750
Irvine, CA  92614
(949) 679-0052


For the Defendants and Counter-Claimants:

JOHN R. KEVILLE
ROBERT L. GREEN
CHANTE B. WESTMORELAND
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
700 Lousiana Street, Suite 2750
Houston, TX  77002
(713) 431-7100

A138

Now, Ms. Womack, your group, the OMG Girlz, you guys use social media to promote yourself, correct?

A    Yes, that's one of the ways we promote ourselves.

Q    And you have a fairly strong social media presence?

A    Yes, we do.

Q    And you've continuously been engaging your fans in social media, correct?

A    Yes.  We love our fans a lot.

Q    Including after 2015?

A    Yes.

Q    Let me make sure I have the right ones.  Let's talk about social media.

The OMG Girlz, you have a Twitter handle called "TheRealOMGGirlz," correct?

A    Yes.

Q    You have an Instagram account handle called "omggirlz", right?

A    Yes, that's right.

Q    You have a YouTube channel for your official music videos called "OMGirlzVEVO," right?

A    Yes.

Q    And then the OMG Girlz also have their group Facebook page called "therealomggirlz," right?

A    Yes, those are our group pages, but we also have a strong presence amongst our individual pages, too, that they

132

CERTIFICATE


        I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date:  September 7, 2024


                    /s/   Sharon A. Seffens  9/7/24
                    _____
                    SHARON A. SEFFENS, U.S. COURT REPORTER

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

```
MGA ENTERTAINMENT, INC.,       )CERTIFED TRANSCRIPT
            Plaintiff,         )
      vs.                      )
                               )  CV-20-11548-JVS
CLIFFORD "T.I." HARRIS,        )
et al., )                      )
            Defendants.        ) TRIAL DAY 7, VOL. I
------------------------------)
GRAND HUSTLE, LLC, PRETTY      )
HUSTLE, LLC, and OMG GIRLZ,    )
LLC,                           )
            Counter-Claimants, )
      vs.                      )
MGA ENTERTAINMENT, INC.,       )
ISAAC LARIAN, and DOES 1-10,   )
inclusive,                     )
            Counter-Defendants.)
------------------------------)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

September 12, 2024

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

2

APPEARANCES OF COUNSEL:

For the Plaintiff and Counter-Defendants:

PAUL J. LOH
KENNETH MICHAEL TRUJILLO-JAMISON
BREEANNA N. BREWER
WILLENKEN, LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA  90017
(213) 955-9240

MARK A. FINKELSTEIN
UMBERG ZIPSER, LLP
1920 Main Street, Suite 750
Irvine, CA  92614
(949) 679-0052

For the Defendants and Counter-Claimants:

JOHN R. KEVILLE
ROBERT L. GREEN
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
700 Lousiana Street, Suite 2750
Houston, TX  77002
(713) 431-7100

A142

84

MR. KEVILLE:  Can you put that on the screen, Allen.

MS. BREWER:  Objection, Your Honor.

THE COURT:  Yes?

MS. BREWER:  Hearsay, lack of foundation, and we did not agree to this demonstrative.

THE COURT:  I can't hear you unless you're on the mic.

MS. BREWER:  We object to this demonstrative.  We did not agree to it.  Lack of foundation, hearsay, previously excluded.

MR. KEVILLE:  It's a demonstrative exhibit, Your Honor, just to narrow down all the data they all have.  It's all been part of other exhibits.  It's simply to show their presence on social media.

THE COURT:  Overruled.

BY MR. KEVILLE:

Q    All right, what does this show about your presence on social media, Ms. Pullins?

A    This shows all of our followers on all of our social media platforms.  At the top, the picture is our Facebook header where we have 3.1 million followers.  And then the header under is our YouTube, which we have 52 million combined views.  And on Twitter, we have 259,000 followers, and Instagram, we have 230,000 followers.

social media and, you know, seeing us on tours and things like that. And we've just always had a close bond with our fans.

Q    Okay. And does that continue to this day?

A    Yes, it does.

Q    From your experience interacting with your fans on social media, do you feel you have a pretty good sense of the demographics of your fans?

A    Yes.

MS. BREWER:  Objection, speculation.

THE COURT:  Overruled.

THE WITNESS:  Yes, I feel I do.

BY MR. KEVILLE:

Q    Can you describe the demographics of your fans?

A    I always say that our music -- I feel like even from the beginning being that we have, you know, greats doing our music and just behind us, period -- I feel like our music has always been ahead of its time and that, you know, we've been able to reach a wide range of people as far as our demographic. But I think primarily our demographic are black female millennials.

Q    Are you aware that there are tools that you and other artists can use to track their fan counts and followers and similar metrics for social media?

A    Yes, I'm aware.

94

A    Here is our recent press day that we had before coming here, and we also were filming a video in between doing a lot of things.  And sometimes, especially when it's the press in Atlanta, we will -- being that we live there, we'll just dress with what we have in our closets but still try to coordinate.  But it's -- I wouldn't say it's our trade dress.

Q    Okay.  Would it use your name, image, and likeness if somebody used photos like this?

A    Yes.

        MS. BREWER:  Objection, calls for a legal conclusion.

        THE COURT:  Overruled.

BY MR. KEVILLE:

Q    Sorry, what was your answer?

A    Yes, it would.

Q    Okay.  So lumped together, though, you wouldn't consider this the trade dress, but it does show your likeness?

A    Yes.

Q    Is the OMG Girlz' music still available today to stream?

A    Yes, it is.

Q    Where?

A    All streaming platforms:  iTunes, Apple Music, Spotify

SoundCloud, YouTube, wherever music is streaming.

Q    Have you released I think you said new music recently?

A    Yes.  We released a new single called "Motion" recently, and we released one of our fan favorite songs called "Lover Boy," which was a song that our fans used to see us perform on all of our tours, and we never put out the full version.  And throughout all the time, they always asked us about it and, you know, pretty much begged us to put it out, so we came together to put that song out first for our fans.

Q    And that was last year?

A    Yes.

Q    And how was that received by the fans?

A    Our fans were extremely excited to get it being that even in our solo endeavors, they all asked us about it, the song individually, and always stopped on a plane asking about -- before I can get on a plane when the song was coming out.  So we all felt like we -- it was something we had to do for our fans, and they were extremely excited about it.

Q    Do you plan to release more music?

A    Yes, we do.  We're working on putting out a project.

Q    Okay.  We saw earlier some fans showing up dressed as -- with OMG Girlz' colors or in OMG Girlz' merchandise.

Are there other ways the fans show that they're

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  September 12, 2024


/s/   Sharon A. Seffens  9/12/24
_____
SHARON A. SEFFENS, U.S. COURT REPORTER

1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

| | |
|---|---|
| MGA ENTERTAINMENT, INC., ) | |
| ) | |
| Plaintiff, ) | **Certified Transcript** |
| ) | |
| vs. ) | Case No. |
| ) | CV-20-11548-JVS |
| CLIFFORD T.I. HARRIS, et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |
| GRAND HUSTLE, LLC, PRETTY ) | |
| HUSTLE, LLC, and OMG GIRLZ LLC, ) | |
| ) | |
| Counter-Claimants, ) | |
| vs. ) | |
| ) | |
| MGA ENTERTAINMENT, INC., ISAAC ) | |
| LARIAN, and DOES 1 – 10, ) | **TRIAL DAY 3, VOL. II** |
| inclusive, ) | |
| ) | |
| Counter-Defendants. ) | |
| _____ ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
THURSDAY, SEPTEMBER 5, 2024
1:32 P.M.
SANTA ANA, CALIFORNIA

_____

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**
**A148**

2

**APPEARANCES OF COUNSEL:**


**FOR PLAINTIFF AND COUNTER-DEFENDANTS MGA ENTERTAINMENT, INC., a California Corporation:**

WILLENKEN LLP
BY:  PAUL J. LOH, ESQ.
707 Wilshire Boulevard
Suite 3850
Los Angeles, California 90017
213-955-9240
ploh@willenken.com

UMBERG ZIPSER LLP
BY:  MARK A. FINKELSTEIN, ESQ.
1920 Main Street
Suite 750
Irvine, California 92614
949-679-0052
mfinkelstein@umbergzipser.com

WILLENKEN LLP
BY:  BREEANNA NICOLE BREWER, ATTORNEY AT LAW
707 Wilshire Boulevard
Suite 3850
Los Angeles, California 90017
213-955-9240
bbrewer@willenken.com

**APPEARANCES OF COUNSEL**
**(Continued:)**

**FOR DEFENDANTS AND COUNTER-CLAIMANTS CLIFFORD "T.I." HARRIS, an Individual; TAMEKA "TINY" HARRIS, an individual; OMG GIRLZ LLC, a Delaware limited liability company; and DOES 1 - 10 inclusive; GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC and OMG GIRLZ LLC:**

          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
          BY:  JOHN R. KEVILLE, ESQ.
               Pro Hac Vice
          700 Louisiana Street
          Suite 2750
          Houston, Texas 77002-2791
          713-431-7113
          jkeville@sheppardmullin.com

          SHEPPARD MULLIN RICHERT & HAMPTON LLP
          BY:  ROBERT L. GREEN, ESQ.
               Pro Hac Vice
          700 Louisiana Street
          Suite 2750
          Houston, Texas 77002
          713-431-7100
          rgreen@sheppardmullin.com

          SHEPPARD MULLIN RICHTER & HAMPTON LLP
          BY:  CHANTE B. WESTMORELAND, ATTORNEY AT LAW
               Pro Hac Vice
          700 Louisiana Street, Suite 2750
          Houston, TX 77002
          713-431-7100
          Fax: 713-431-7101
          Email: Cwestmoreland@sheppardmullin.com

**ALSO PRESENT:**

          Ryan Knecht, defendant's IT technician
          Allen Eaton, plaintiffs' IT technician
          Jordan Fader, plaintiffs' IT technician

**UNITED STATES DISTRICT COURT**
**A150**

A       Oh, yeah, make their own YouTube videos, Instagram posts,

Tweets and also, like, TikToks, once that became a thing.  So,

yeah.

Q       Are you familiar with TikTok yourself?

A       Yes, I am.

Q       And do you know approximately when it was sort of

popularized here in the U.S.?

A       I think it was around 2016.

Q       So after you made the announcement?

A       Yes, after we made the announcements, they were still

posting about OMG Girlz, us, our story, like, our music.

Anything about us, they would talk about OMG.

Q       And are you familiar with a TikTok posted by

marvelousimani?

A       Yes, I am.

        MS. WESTMORELAND:  Your Honor, I'd like to admit

Exhibit 141, which is a short clip from a TikTok video.

        THE COURT:  Any objection?

        MR. LOH:  No, Your Honor.

        **(Exhibit Number 141 received.)**

        **(Videotape played, not reported.)**

BY MS. WESTMORELAND:

Q       So what was it like having fans put you on a platform

that didn't even exist sort of at the height of your touring?

A       Well, it just showed us how we were still relevant, like,

no matter what and how strong our brand was, and that stuck with people and still sticks with people, like, through their lives, because when we first came out, these fans were also around our age, if not younger, and so they grew up with us.

So even when they saw that announcement of us taking a pause, they would still talk about OMG, like, nonstop, like, as if we were still doing things, you know, every day together. But even with that happening, like, they would just show their love, and it just made us feel, you know, great to see the joy we brought to other people and the inspiration we've done for others.

Q    Besides this TikTok, have you seen other examples of fans sort of showing how you inspired them?

A    Yes.

Q    If you can turn in your binder to Exhibit 617.

I'm sorry, 717.  I misspoke.

A    Yes.

Okay.

Q    And are you familiar with the YouTube shorts?

A    Yes.

Q    Do you see an image of YouTube shorts there in the middle?

A    Yes, I do, at the bottom.

MR. LOH:  Your Honor, we object to -- we objected to 717.  There were comments.

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )

I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date:  September 6, 2024*

*/S/ DEBBIE HINO-SPAAN*

*Debbie Hino-Spaan, CSR No. 7953*
*Federal Official Court Reporter*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

### HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE

| | |
|---|---|
| MGA ENTERTAINMENT, INC., ) | |
| ) | |
| Plaintiff, ) | **Certified Transcript** |
| ) | |
| vs. ) | Case No. |
| ) | CV-20-11548-JVS |
| CLIFFORD T.I. HARRIS, et al., ) | |
| ) | |
| Defendants. ) | |
| _____) | |
| GRAND HUSTLE, LLC, PRETTY ) | |
| HUSTLE, LLC, and OMG GIRLZ LLC, ) | |
| ) | |
| Counter-Claimants, ) | |
| vs. ) | |
| ) | |
| MGA ENTERTAINMENT, INC., ISAAC ) | |
| LARIAN, and DOES 1 – 10, ) | **TRIAL DAY 4, VOL. II** |
| inclusive, ) | |
| ) | |
| Counter-Defendants. ) | |
| _____) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
FRIDAY, SEPTEMBER 6, 2024
1:32 P.M.
SANTA ANA, CALIFORNIA

_____

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**
**A154**

2

**APPEARANCES OF COUNSEL:**


**FOR PLAINTIFF AND COUNTER-DEFENDANTS MGA ENTERTAINMENT, INC., a California Corporation:**

WILLENKEN LLP
BY:  PAUL J. LOH, ESQ.
707 Wilshire Boulevard
Suite 3850
Los Angeles, California 90017
213-955-9240
ploh@willenken.com

UMBERG ZIPSER LLP
BY:  MARK A. FINKELSTEIN, ESQ.
1920 Main Street
Suite 750
Irvine, California 92614
949-679-0052
mfinkelstein@umbergzipser.com

WILLENKEN LLP
BY:  BREEANNA NICOLE BREWER, ATTORNEY AT LAW
707 Wilshire Boulevard
Suite 3850
Los Angeles, California 90017
213-955-9240
bbrewer@willenken.com

**UNITED STATES DISTRICT COURT**
**A155**

"BEAUTY, BABYDOLL, STAR," "blackgirlmagic" -- "#blackgirlmagic, #blackexcellence, #omggirlz."

Q    And that was in response to this photograph; correct?

A    Yes.

Q    So do your fans just automatically forget your trade dress looks if they see you dressed regularly?

A    No, not at all.  They actually recognize us the same.

MR. LOH:  Your Honor, object -- object.  Move to strike everything after "yes," because it's hearsay.

THE COURT:  It will be stricken.

BY MS. WESTMORELAND:

Q    To your knowledge, do your fans recognize your brand?

A    Yes, they do.

Q    Do they occasionally indicate that they recognize your brand by showing pink, purple, and blue hearts?

A    Yes.

Q    And finally, if we could look at what has been conditionally admitted, I guess, 1744.

Ms. Womack, you have no idea where this picture came from; is that true?

A    The source of it, no, I don't.

Q    Do you know when this photograph was taken?

A    No, I don't.

Q    Do you know who any of these people are?

A    No, I don't.

UNITED STATES DISTRICT COURT

A156

*CERTIFICATE OF OFFICIAL REPORTER*


COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


*Date:  September 7, 2024*



                              */S/ DEBBIE HINO-SPAAN*
                              _____

                              *Debbie Hino-Spaan, CSR No. 7953*
                              *Federal Official Court Reporter*

**UNITED STATES DISTRICT COURT**
**A157**

John R. Keville (*pro hac vice*)
jkeville@sheppardmullin.com
Robert L. Green (*pro hac vice*)
rgreen@sheppardmullin.com
Chante B. Westmoreland (*pro hac vice*)
cwestmoreland@sheppardmullin.com
SHEPPARD MULLIN RICHTER &
HAMPTON LLP
700 Louisiana Street, Suite 2750
Houston, TX 77002
Telephone: (713) 431-7100

Valerie E. Alter (SBN: 239905)
valter@sheppardmullin.com
SHEPPARD MULLIN RICHTER &
HAMPTON LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
Telephone: (310) 228-3700

Jiepu (Bobby) Li (SBN: 342224)
bli@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700

*Attorneys for Defendants*
*CLIFFORD "T.I." HARRIS, TAMEKA*
*"TINY" HARRIS, OMG GIRLZ LLC, and*
*Counter-Claimants GRAND HUSTLE, LLC,*
*PRETTY HUSTLE, LLC and OMG GIRLZ LLC*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MGA ENTERTAINMENT, INC., a California corporation, | **Case No. 2:20-cv-11548-JVS-AGR** |
| Plaintiff, | **REPLY IN SUPPORT OF DEFENDANTS' / COUNTERCLAIMANTS' MOTION FOR ENHANCED DAMAGES UNDER THE LANHAM ACT** |
| vs. | |
| CLIFFORD "T.I." HARRIS, an individual; TAMEKA "TINY" HARRIS, an individual; OMG GIRLZ LLC, a Delaware limited liability company; and DOES 1-10, inclusive, | Complaint Filed:  December 20, 2020<br>Trial Date:  September 9, 2024 |
| Defendants. | |
| GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC, and OMG GIRLZ LLC, | |
| Counter-Claimants, | |
| vs. | |
| MGA ENTERTAINMENT, INC., ISAAC LARIAN, and DOES 1 – 10, inclusive, | |
| Counter-Defendants. | |

SMRH:4924-0798-1573.8

-1-

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ...................................................................................................5

    A.   MGA's Profits Were Attributable to MGA's Infringement and Misappropriation ...............................................................................6

    B.   The Evidence Supported the Jury's Willful Infringement Finding and Its Finding of Malicious and Oppressive Misappropriation ...............8

    C.   MGA Wrongly Downplays and Disregards the Harm It Caused the OMG Girlz .........................................................................................10

    D.   MGA Failed to Prove Costs, And Now Offers an Unsupported and Too-Late Damages Theory .......................................................................13

    E.   The Lanham Act Gives This Court Discretion To Award Enhanced Damages, Whether Capped at "Trebled" Or Not......................................15

    F.   The Requested Enhancement Is Not Punitive...........................................17

III.   CONCLUSION ..................................................................................................19

TABLE OF AUTHORITIES

Page(s)

Cases

*Aoki v. Gilbert*
2020 WL 6741693 (E.D. Cal. Nov. 17, 2020) ................................................... 16

*Binder v. Disability Grp., Inc.*
772 F. Supp. 2d 1172 (C.D. Cal. 2011) .............................................................. 12

*Bowmar Instrument Corp. v. Continental Microsystems, Inc.*
497 F. Supp. 947 (S.D.N.Y. 1980) ..................................................................... 15

*Brighton Collectibles, Inc. v. Marc Chantal USA, Inc.*
2009 WL 10674076 (S.D. Cal. Aug. 12, 2009)................................................... 18

*Brighton Collectibles, LLC v. Believe Production, Inc.*
2018 WL 1381894 (C.D. Cal. Mar. 15, 2018) .................................................... 18

*Deering, Milliken & Co. v. Gilbert*
269 F.2d 191 (2d Cir. 1959) ............................................................................... 15

*Getty Petroleum Corp. v. Bartco Petroleum Corp.*
858 F.2d 103 (2d Cir. 1988) ............................................................................... 15

*Maier Brewing Co. v. Fleischmann Distilling Corp.*
390 F.2d 117 (9th Cir. 1968) ......................................................................... 11, 12

*Merck Eprova AG v. Gnosis S.p.A.*
760 F.3d 247 (2d Cir. 2014) ............................................................................... 10

*Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software*
880 F. Supp. 1005 (S.D.N.Y. 1994) ..................................................................... 9

*Nutting v. RAM Sw., Inc.*
69 F. App'x 454 (Fed. Cir. 2003) ....................................................................... 16

*OmniGen Research, LLC v. Yongqiang Wang*
2017 U.S. Dist. LEXIS 189543 (D. OR. 2017).................................................... 9

*Out of the Box Enterprises, LLC v. El Paseo Jewelry Exch., Inc.*
2012 WL 12893524 (C.D. Cal. June 27, 2012)....................................... 10, 11, 16

*Paige LLC v. Shop Paige LLC*
   2024 WL 3594450 (C.D. Cal. July 10, 2024) ...............................................17, 18

*Scott Collection, Inc. v. Trendily Furniture, Ltd. Liab. Co.*
   68 F.4th 1203 (9th Cir. 2023) ...........................................................................10

*Taylor Made Golf Co., Inc. v. Carsten Sports Ltd.*
   175 F.R.D. 658 (S.D. Cal. 1997) .......................................................................17

*Yuga Labs, Inc. v. Ripps*
   2023 WL 7089922 (C.D. Cal. Oct. 25, 2023) ....................................................16

Statutes

35 U.S.C. § 1117(a) ................................................................6, 14, 15, 16, 17

Other Authorities

4 McCarthy on Trademarks and Unfair Competition § 30:64 (5th ed.)...................12

## I.   INTRODUCTION

MGA's opposition completely discredits the jury's findings and ask this Court to do the same. Indeed, the majority of MGA's brief consists of MGA stating the evidence supports something that the jury rejected.

For example, MGA incorrectly argues that none of the profits from the OMG Dolls are attributable to its willful infringement of the OMG Girlz' trade dress or name, identity, and likeness. But the jury evaluated testimony from MGA's expert on the one hand, and four consumer witnesses on the other and decided that at least $17,872,253 in profits *were* attributable to the infringement. MGA also offers an alternative that maybe only 10-15% was attributable, but that was not a theory it chose to present at trial. It made the strategic choice to present Mangum's flawed "zero attributable profits" theory. It does not get a redo because the jury saw through that illogical argument.

MGA also incorrectly argues that there was no evidence to support a willfulness finding. Not so. The jury heard evidence of how MGA failed to perform any internal investigation or make any changes after receiving the cease and desist letter, despite being aware of the overlap in the target market.  The jury heard MGA sued the OMG Girlz almost immediately upon receiving the Harrises' letter, before any investigation and without any effort to retain documents, leading to obvious and proper inferences. And the jury heard MGA call the OMG Girlz and their families "extortionists" for asserting their rights, heard MGA's uncredible and inconsistent claims on what constituted "copying," and that during the litigation MGA made dolls even more similar to the OMG Girlz. This and more contributed to and supports the jury's willfulness finding.

MGA next incorrectly contends that there was no evidence of actual harm, and that any evidence of intangible harm was "excluded" by this Court (it wasn't). The OMG Girlz provided adequate evidence of harm. MGA's brief also makes clear it misunderstands remedies, because in addition to actual damages and diverted profits,

it is well-settled that disgorgement of profits may *also* be awarded under an unjust enrichment rationale. MGA largely rests its position on the distinction between damages and profits, but the jury was instructed that profits were the damages, and Ninth Circuit law eschews MGA's hyper-linguistic approach. MGA also ignores the jury's finding that the OMG Girlz were harmed by MGA's misappropriation, which is an element of that claim. (*See* Dkt. 1013, Jury Instruction No. 18).

MGA failed to prove deductions during trial and that cannot be remedied now. MGA's expert admitted that he did not provide the jury with any analysis regarding allocation of profits, and MGA provided no fact witnesses to prove any deductions. Thus, MGA's profit numbers were suspect and almost certainly underreport the company's profits on this successful line of OMG Dolls.

MGA argues that "trebling" disgorged profits is not allowed under the Lanham Act. But MGA acknowledges that there is no Ninth Circuit opinion prohibiting trebling of disgorged profits. Regardless, Section 1117(a) indisputably allows for disgorged profits to be increased, whether by a multiple or a set number and without a stated limit. Finally, MGA argues that enhancement cannot be punitive. The enhancement requested here is not punitive, but is instead based on deterrence, increasing a conservative award, and compensating intangible harms. Such enhancement is just and consistent with Ninth Circuit law and is warranted here.

## II. ARGUMENT

### A. MGA's Profits Were Attributable to MGA's Infringement and Misappropriation

MGA's consumers testified at trial and explained how the company's use of the OMG Girlz' likeness and trade dress influenced their decision to purchase the OMG Dolls. Further, the consumers testified that they purchased additional OMG Dolls (outside those found to be infringing) because the consumers mistakenly believed that the OMG Girlz sponsored or were somehow affiliated with the line of OMG Dolls.[1]

---

[1] Maxine Wagner TT at 94:12-23 ("To be honest with you, I thought that the whole line was created based on the girls. I didn't know that there was, you know, other

The jury heard this testimony from four consumers and believed that (conservatively) $17,872,253 in profits were attributable to MGA's infringement. Importantly, the issue of apportionment was *MGA's burden*. The only apportionment theory MGA put forward was a "zero attributable profits" theory. MGA's expert admitted this theory failed to account for the most popular dolls, and never explained why MGA would continue to use a trade dress worth *nothing*. The jury rightly did not accept MGA's nonsensical, self-serving theory. It therefore awarded the entire conservative profit amounts and was right to award at least that. Indeed, MGA admits that these dolls are marketed as "collectible," and the consumers testified that after buying what they believed to be the OMG Girlz' dolls "the way they are advertised [by MGA], I feel like you can't just buy one." Moneice Campbell TT at 17:22-18:07. Thus, MGA profited *more* off of its use of the OMG Girlz brand and goodwill than was accounted for in the profits calculation based on MGA's unproven expenses.

MGA's failure to meet its burden ends the analysis. But there was additional evidence rebutting MGA's "zero attributable profits" theory. For example, MGA's former marketing director, Rachel Brenner's testimony further supports this. The smaller L.O.L. Surprise! dolls were sold as "collectible" in opaque containers—certain dolls were more rare than others so because of the lower price point, consumers would purchase several in hopes of getting the "more rare" dolls—even if it meant getting a few repeats. (Day 8 (AM) at 20:6-9). Although these dolls also used celebrities' likenesses (e.g., Michael Jackson, Audrey Hepburn, Elton John), a

---

babies and other dolls and so on and so forth. But just like with Barbie, there's the whole -- you know, she has different friends and so on and so forth. I'm sure there is. But, no, the connection that we made with the dolls was because of the connection on television."); Windi Osborne TT at 236:8-14 ("to be in the store and to see that the packaging had the OMG and I'm looking at the doll with the skin tone and the hair and the outfit and assumed that LO – I'm sorry -- that OMG Girlz had partnered with the LOL Surprise! company and they're like a partnership and came out with dolls."); Moneice Campbell TT 24:18-25 ("[O]kay, the[OMG Girlz] have these dolls now and I am going to buy them because I support them"); Dominique Alexander TT Day 5, (AM) at 37:23-38:1 ("[The OMG Dolls] had 'OMG' on there, and then, like I said, it was like girls, the girl group, and then the girly rock star look is pretty much the same as depicted there with the dolls. . .").

consumer would not know that until he or she opened the opaque container and revealed the miniature celebrity-copy inside. (Day 8 (AM) at 19:11-19). Compare this to the packaging for the larger, more expensive OMG Dolls and it is clear that the OMG Girlz' trade dress is what attracted consumers. The marketing and packaging showed the consumer which doll it was purchasing (minimizing the "surprise" element). (*See, e.g.*, Tr. Exh. 1723 (Runway Diva Doll and box)). Thus, the name OMG, and the overall look and feel of the doll was apparent to the consumer, and as the consumer witnesses testified, these elements corroborated their mistaken belief that these dolls were sponsored by or affiliated with the OMG Girlz. Numerous consumers purchased these dolls because of the association, which is why these profits should be considered ill-gotten gains, as the jury found.

**B.  The Evidence Supported the Jury's Willful Infringement Finding and Its Finding of Malicious and Oppressive Misappropriation**

The jury found that MGA's conduct was willful, and enhanced damages are necessary to compensate the OMG Girlz, to make MGA's infringement unprofitable, and to deter repetition of MGA's conduct. As the OMG Girlz explained in its opening brief, MGA is a sophisticated company whose unofficial intellectual property policy is the vague statement on a sign, "don't copy." (Day 2 (PM) at 107:18-25). But MGA's designers claimed "don't copy" meant don't make an exact-in-every-detail replica, and none remember being trained on the topic. *See* (Day 8 (AM) at 65:24-66:11; 79:19-24); *see also* (Day 2 (PM) at 93:19-21). It was apparent the sign was a litigation-inspired prop. MGA has admitted it never made an effort to investigate the OMG Girlz' trade dress or misappropriation of name, identity, and likeness allegations in the cease and desist letter before rushing to sue the OMG Girlz three days before Christmas. For example, Mr. Larian claims he was unaware that his designers were aware of the OMG Girlz,[2] had circulated links to popular OMG Girlz

_____

[2] Despite being aware of the OMG Girlz, whether through personal applications or through the 2019 email between Ms. Consorti and Ms. Moshe/Brenner or after receiving the 2020 cease and desist letter, MGA also admitted it had never taken any

songs, or had images of the OMG Girlz on their Pinterest boards (Day 2 (PM) at 115:16-19; 111:15-17; 111:20-22). Similarly, the designers who testified for MGA said that no one spoke to them about this lawsuit until their depositions and their documents were not searched. (Day 5 (PM) at 15:5-16:14); (Day 11 (AM) at 48:6-49:9). At best MGA was willfully blind (which is sufficient for a willfulness verdict) but the more likely clear inference was MGA rushed to court to intimidate the OMG Girlz and to hide the facts.

Given the well-supported willfulness finding, enhancement is also appropriate to ensure MGA does not profit at all from its conduct and thus deter MGA from committing willful infringement in the future. MGA claims that it has ceased direct sales of the infringing dolls, therefore there is nothing to deter. (Dkt. 1062 at 21). But MGA's representation—which included no citation or support that sales actually ceased—was made only after it lost at trial. (*See* Dkt. 1046 at 14 n.5).  MGA thus wants credit for stopping sales only after making the OMG Girlz litigate this case for years and prove willful infringement. Furthermore, MGA says it has stopped "direct" sales but makes no representations about sales to retailers, nor does it represent to have stopped retailers like Amazon or Walmart from selling the infringing products. But most importantly, MGA's argument misses the mark because the deterrent effect is intended to prevent would-be bad actors from engaging in *future* unlawful conduct via future potential infringements by making it unprofitable, not just to "deter" the present bad actor from continuing sales of an infringing product in the present case after a finding of liability. *OmniGen Research, LLC v. Yongqiang Wang*, 2017 U.S. Dist. LEXIS 189543 (D. OR. 2017) (Courts may "consider that enhancing damages would advance the cause of deterring Defendants and others similarly situated from repeating the type of unfair and deceptive behavior." "); *Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software*, 880 F. Supp. 1005, 1025 (S.D.N.Y. 1994) (enhancing damages to compensate for harm "that is difficult to quantify" and "to provide some

steps to differentiate the OMG Dolls from the OMG Girlz. (Day 8 (AM) at 79:19-24).

deterrence for future violations by [defendant].").  MGA's argument is disingenuous; ceasing sales *after* MGA has already made millions in ill-gotten gains and is finally held accountable does not qualify as a sufficient "deterrent" obviating enhancement of profits.[3] To the contrary, it demonstrates that neither a cease and desist letter, nor years of litigation, were enough to stop MGA from continued to unlawfully profit from its infringement, and more is needed to deter MGA from similar future conduct by showing it that  infringement does not pay (without being punitive). *See Scott Collection, Inc. v. Trendily Furniture, Ltd. Liab. Co.*, 68 F.4th 1203, 1222 (9th Cir. 2023) (The district court has "discretion to fashion relief, including monetary relief, based on the totality of the circumstances, because it is essential that trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement."); *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 263 (2d Cir. 2014).

### C.     Enhancement is Warranted Based on the Harm MGA Caused the OMG Girlz

Throughout its brief, MGA tries to downplay or disregard the harm it caused, even going so far as to claim that its malicious and oppressive behavior caused *no* harm. These arguments are wrong as a matter of fact and law. The harm caused, including the additional profits gained, warrants enhancement. This is not a punitive measure. It is necessary so MGA does not profit from the misconduct it still pretends never happened.

The jury has already made the correct factual determination that the "OMG Girlz were harmed" by MGA's misappropriation and that "MGA's conduct was a substantial factor in causing the OMG Girlz Harm" (*See* Dkt. 1013 at Jury Instruction No. 18; Dkt. 1009 at 6)). The jury indeed heard evidence that MGA diverted financial

---

[3] MGA also puts great stock into findings from a prior trial. But, these findings are irrelevant and were based on bad law. Unsurprisingly, MGA cites zero case law that stands for the proposition that an overturned verdict from a superseded jury trial in which the jury received legally erroneous instructions should factor into the calculation for equitable relief. (*See* Dkt. 860 at 7 ("[T]he *Rogers* instruction was . . .a hurdle that the Harris Parties were required to overcome in order to prevail")).

opportunity from the OMG Girlz through use of their name, identity, and likeness, as well as their brand as a whole.

As a matter of law (and as stated in MGA's own cited authority): "A plaintiff may also (and simultaneously) seek a defendant's profits on the basis that the defendant should not be allowed to retain its ill-gotten gains, *regardless of the plaintiff's damages*." *Out of the Box Enterprises, LLC v. El Paseo Jewelry Exch., Inc.*, 2012 WL 12893524, at *5 (C.D. Cal. June 27, 2012) (emphasis added). "[T]he Ninth Circuit approved the award of a defendant's profits under an unjust enrichment theory, and would do so even without evidence of direct competition between the parties (for competition would counsel the use of the defendant's profits as a measure of the plaintiff's damages)." *Maier Brewing Co.*, 390 F.2d at 121–23. MGA's arguments that the OMG Girlz are not entitled to disgorgement because they do not have actual damages is contrary to the law.

The jury heard ample evidence demonstrating that MGA was unjustly enriched by deceiving consumers into believing MGA's dolls had an affiliation with the OMG Girlz and by exploiting the goodwill that the OMG Girlz worked so hard and sacrificed so much to build. The evidence demonstrated that consumers purchased OMG Dolls because they believed that they were supporting the OMG Girlz by doing so. *See n.1 supra.* The jury also heard evidence that Mrs. Harris and the OMG Girlz intended to make dolls (Day 2 (AM) at 48-50, 124), and at least at one point in time were approached by someone at a Bratz (MGA product) Giveaway event, and thus believed that MGA wanted to work with them to create dolls. MGA could have properly entered a licensed with the OMG Girlz, like it did with Paris Hilton or Kylie Jenner to create dolls, but instead MGA decided it was worth the risk to proceed with using the OMG Girlz' trade dress and profit off of their goodwill without paying them a cent. The jury heard that MGA got away with this for many years and made millions of dollars, while calling the OMG Girlz "extortionists" and "money grabbers" for trying to enforce their rights. The OMG Girlz are not seeking and did not ask for

"emotional damages" at trial. Rather, they are asking that MGA not be unjustly enriched by unauthorized and willful infringement of the OMG Girlz' trade dress, their brand, and their identities, and by creating market confusion as to OMG Girlz affiliation with MGA. *See Out of the Box Enters.*, 2012 WL 12893524, at *5. Disgorgement of MGA's profits, and enhancing the same, is the only way to compensate the OMG Girlz for these harms and deter future infringement and misconduct.

MGA's salacious tots constitute another source of uncompensated and immeasurable "harm" to the OMG Girlz. Although MGA continues to demean the OMG Girlz by discrediting the childhood sacrifices they made as children to build the brand goodwill that MGA exploited, and belittling the extra care required for coloring and un-coloring Black hair, MGA fails to address the harm caused by consumers' misimpression that the OMG Girlz are somehow associated with MGA's scandalous line of child inappropriate dolls. "Potential harm from lingering misimpressions [may be] unlikely to be fully captured by the lost profits" *Binder v. Disability Grp., Inc.*, 772 F. Supp. 2d 1172, 1183 (C.D. Cal. 2011) (enhancing damages); *see also Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 124 (9th Cir. 1968). Courts recognize that trademark owners may be injured because "confused buyers may be so unhappy with the infringer's product that they will never again buy plaintiff's product." 4 McCarthy on Trademarks and Unfair Competition § 30:64 (5th ed.). Consumer witness Maxine Wagner testified that although she felt the dolls were a little "older" due to the short skirts and make-up, she was willing to buy them for her nieces because she thought she was supporting the OMG Girlz. (Maxine Wagner TT at 72:10-73:16). In other words, MGA profited from the goodwill and reputation of the OMG Girlz—and it is not a stretch to believe that for the consumers who were aware of MGA's tot scandal, this connection went the other way, causing reputational damage for the OMG Girlz' brand. Indeed, MGA's documents show the negative

effect that what it internally deemed "lingerie-gate" had on parents. (Day 3 (AM) at 53:2-55:7 (discussing Tr. Exh. 500)).

As a last ditch effort, MGA claims that the OMG Girlz enhancement request is really based on "racial arguments" about "cultural appropriation" and "racism." (Dkt. 1062 at 18). The OMG Girlz brief says nothing of the sort and MGA notably does not identify the supposedly offending arguments. This unsupported argument, and MGA raising the mistrial, is wholly unproper and an obvious strawman to distract from the issues raised. Its inclusion by MGA demonstrates the weakness of its position on the merits.

**D.     MGA Failed to Prove Costs, And Now Offers an Unsupported and Too-Late Damages Theory**

While MGA's damages expert, Mangum, contended that "no portion" of MGA's profits are attributable to its infringement, four consumer witnesses testified that they purchased the dolls because of the mistaken belief that they were affiliated with the OMG Girlz.

Given the obvious flaws in Mangum's theory, the jury rightly found MGA failed to meet its burden on apportionment. Now, with its "zero attributable profits" strategy having failed, MGA asks the Court to adopt new theories that it never presented. As discussed in the OMG Girlz' briefing on the equitable issues, MGA waived its right to any such theory, this new theory is unsupported by the evidence, and is unpersuasive for several reasons.

At the outset, MGA cannot rely on a theory it never raised at trial. The "analysis" to arrive at the 10% allocation was never done by Mangum—it is being done by MGA's attorneys after the fact. Similarly, while the "15%" allocation was in earlier expert reports from Mangum, MGA chose not to present it at trial, instead swinging for the fences with a "zero attributable profits" argument:

Q You did several different analysis to try to allocate profits over the life of this case; correct?

SMRH:4924-0798-1573.8

-13-

A There was -- yes. Yes. It wasn't the life of the case. I guess you mean when the reports were given.

**Q During the pendency of this case, you've done multiple reports where you've given different ways to attempt to allocate profits; correct?**

**A Yes, that's true**. I think there was one. There was one report that I think we're talking about.

**Q And you didn't testify about that analysis today; right?**

A Correct.

(Day 11 (PM) at 113:24-114:9). Having made its strategic choice and lost, it cannot now argue for an allocation that it abandoned.

Furthermore, there was good reason MGA walked away from its flimsy "15% allocation" argument. First, the OMG Dolls use the entire OMG Girlz' brand—not just the "look." This means that the dolls improperly traded off of the goodwill associated with the OMG Girlz' reputation, as some consumers testified that they bought OMG Dolls because they wanted to support the OMG Girlz. Second, MGA's attorney argument in their post-trial brief directly contradicts the testimony of its own witnesses at trial. MGA spent hours with designer-witnesses on the stand testifying about how important the looks of these fashion dolls were to consumers and the amount of resources MGA put into sourcing the details of the dolls' clothing. MGA knows that the "look" of the dolls is attributable to more than 15% of the profit, or else these designers' testimony is untrue. This is just another example of MGA taking contradictory positions based on whatever suits its objective at the moment.

MGA contends that the OMG Girlz "conceded" that the upper most limit for compensatory damages is $25M, but the OMG Girlz made no such concession. The OMG Girlz discussed in opening and closing what it expected its expert to opine based on MGA's numbers. *See, e.g.*, (Day 12 (AM) at 142:10-14) ("For the damages, we're going to ask you to adopt the numbers of Mr. Tregillis. He explained carefully how he went through them all, and ask you to fill in for trade dress infringement and name, likeness, and identity $24,570,485."). Contrary to MGA's contention, OMG

SMRH:4924-0798-1573.8

-14-

Girlz did not "waive" any rights to additional compensation via disgorgement or enhancement by telling the jury what numbers they would hear from the experts, as both parties agree these are issues for the Court to decide.

**E.**   **The Lanham Act Gives This Court Discretion To Award Enhanced Damages, Whether Capped at "Trebled" Or Not**

MGA does not argue that there is any statutory or legal cap or prohibition on disgorged profits under Section 1117(a) (there is none). Instead, it argues that the *trebling* language only applies to *damages*. While this argument appears on its face to be an issue of first impression, courts have trebled disgorged profits as shown in the OMG Girlz' opening brief. Regardless the Court need not veer down that path. The statute expressly allows the Court to enhance a disgorgement award to compensate a plaintiff and there is ample precedent for the enhancement amount that OMG Girlz are requesting. An additional award of $35 million is within the Court's discretion under the Lanham Act.

Regardless of whether the "trebling" language in the statute applies to "profits" (as opposed to "actual damages"), the profits provision in section 1117(a) expressly allows for enhancement and does not include a monetary cap on that enhancement. 35 U.S.C. § 1117(a) ("If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case."). Thus, whether the additional $35 million requested by OMG amounts to a doubling, trebling or quadrupling of damages, the requested enhancement amount is not foreclosed by the statute.  *See, e.g.*, *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 109 (2d Cir. 1988) ("Unlimited enhancement or reduction of an award based on defendant's profits is permitted in order to correct inadequacy or excessiveness."); *Deering, Milliken & Co. v. Gilbert*, 269 F.2d 191, 194 (2d Cir. 1959) ("[I]t is apparent from the face of the statute that the court in formulating its award has as much discretion as to the defendant's profits as it has over the plaintiff's

damages. The only difference is that the statute places no precisely stated ceiling over the amount of the defendant's profits which may be included in the award.").

MGA's case law does not prevent the enhancement requested here. For example, in *Aoki*, the district court relied on a 1980 case from the Southern District of New York, *Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 F. Supp. 947, 961 (S.D.N.Y. 1980), for its statement that "[t]reble damages are not appropriate on Defendants' profits, as distinguished from Plaintiffs' damages." But the *Aoki* court did not engage in any discussion regarding whether any enhancement of profits was appropriate at all, since they plainly are under the statute.

Next, *Nutting*—a 2003, pre-*Romag* case from out of circuit—does not stand for the proposition that section 1117(a) prohibits enhancement; it is merely an example of when a court chose not to exercise its discretion to enhance damages. *Nutting v. RAM Sw., Inc.*, 69 F. App'x 454, 458 (Fed. Cir. 2003) (using pre-*Romag* case law, "the district court did not here find that recovery based on RAM's profits would be inadequate to compensate Nutting."). The *Out of the Box* decision that MGA relies on similarly does not preclude a trebling of profits in this case. The *Out of the Box* court acknowledged that the award of defendants profits is "subject to modification at the court's discretion." *Out of the Box Enters., LLC v. El Paseo Jewelry Exch., Inc.*, 2012 WL 12893524, at *5 (C.D. Cal. June 27, 2012).

MGA is quick to discredit the cases cited by the OMG Girlz because "none (of those decisions) analyzed the statutory text." (Dkt. 1062 at 12).[4]  MGA makes the conclusory assertion that these cases are distinguishable, but from the parentheticals MGA included in its brief, it is clear that where the infringer has acted willfully, as the jury found here, enhancement (by a multiple or some other amount) is permitted.

---

[4] MGA also makes the blanket assertion that "the facts of those cases are readily distinguishable from this one" but fails to explain how the facts are distinguishable in a way that would preclude this court from awarding an enhancement that trebles profits in this case. (Dkt. 1062 at 12).

In sum, there are at least two points of agreement between the parties: the Lanham Act makes enhancement "available to ensure that the plaintiff receives adequate compensation" and the Lanham Act does not include any monetary cap on the enhancement that the Court may award to achieve this goal. (*See* Dkt. 1062 at 12, n.6) (citing *Yuga Labs, Inc. v. Ripps*, 2023 WL 7089922, at *13 (C.D. Cal. Oct. 25, 2023)). The additional $35 million requested by the OMG Girlz is necessary and permissible here. (*See* Dkt. 1045 at 17-22).

**F.     The Requested Enhancement Is Not Punitive**

While the Lanham Act specifies that an enhancement shall not be a penalty, the Ninth Circuit is clear that proper purposes of enhancement include (1) deterring further infringement (2) increasing a conservative award (as here, where profits on many infringing dolls were not included and MGA's deductions from revenue were unsupported) and (3) when intangible harms were uncompensated.  *See, e.g.*, *Taylor Made Golf Co., Inc. v. Carsten Sports Ltd.*, 175 F.R.D. 658, 663 (S.D. Cal. 1997). All three bases were discussed and supported in the OMG Girlz opening brief.

As to deterrence, MGA's Response argues and cites cases for the proposition "deterrence alone is not sufficient reason for an enhancement" and then primarily argues that because the infringement was not willful, no deterrence is needed. (Dkt. 1062 at 19-22). As discussed above, MGA cannot sidestep the jury's willfulness verdict which rejected the same arguments MGA makes here in post-trial briefing. Further, MGA's argument that it stopped direct sales, while not mentioning its continued supply and sales through mass market sellers of the dolls MGA knows infringe, shows a strong need for deterrence.

As to enhancement on the basis of increasing a conservative award, here the profits figure was conservative, and MGA failed to prove deductible expenses. (*See* Dkt. 1045 at 18-20). In cases similar to this one in which the infringer produces only litigation-based summary documents without the underlying source documents, then

uses an expert to argue these as deductions, district courts have awarded total sales revenue as lost profits.

In the recent case *Paige LLC v. Shop Paige LLC*, 2024 WL 3594450, at *5 (C.D. Cal. July 10, 2024), Defendant claimed over $2 million in cost deductions but "produced essentially no concrete evidence to the Court to support the deductions alleged. Not a single invoice, receipt, or other original source document has been produced in support of Defendant's expenses." The court awarded as disgorgement of profits the entire $2,572,667 in total sales revenue. *Id.* The court noted other Ninth Circuit district courts had done similar, citing *Brighton Collectibles, LLC v. Believe Production, Inc.*, 2018 WL 1381894, at *7 (C.D. Cal. Mar. 15, 2018) (declining to deduct cost where only evidence in support of cost was witness testimony and spreadsheets produced by the witness) and *Brighton Collectibles, Inc. v. Marc Chantal USA, Inc.*, 2009 WL 10674076, at *10 (S.D. Cal. Aug. 12, 2009). The same was true here. Day 7 (AM) at 21:23-22:6 (Tregillis: MGA did not provide any underlying invoices or documents); Day 9(PM) at 121:13-122:7 (Mangum did not look at the general ledger listing "every cost that comes in for any purpose across the company"); Day 12 (AM) at 7:5-9:9 (Mangum cannot affirm the accuracy of any of the expense numbers, only Mr. Crisanti could, and he did not testify). MGA's revenue for the seven dolls the OMG Girlz sought damages for was more than $68.5M, according to MGA's summary document. (*See* Tr. Exh. 6057). Thus, the award could be enhanced higher than the trebled amount requested solely on this basis. And although the OMG Girlz did not seek damages on any of the other 25 dolls, and in fact sought to dismiss them from the case, they were kept in the case *solely at MGA's insistence*, resulting in a jury verdict that eight additional dolls infringed. Those eight dolls had total revenue over $76.7M. *Id.* The OMG Girlz did not and do not seek damages for these dolls, but note this only to counter MGA's refrain that the award is "all" of the profit for its infringement. The actual award was conservative, amounting

SMRH:4924-0798-1573.8

-18-

A175

to 12% of the infringing revenue. Enhancement is supported on the basis to increasing a conservative award.

As to enhancement on the basis of compensating intangible harms, MGA misunderstands the argument. MGA argues it is not responsible for the sacrifices the OMG Girlz made to build the brand (true) while ignoring the point—the OMG Girlz put years of sweat equity into building a trade dress and brand, then MGA willfully (per the jury) and with fraud and malice (per the jury) caused confusion about that brand and a loss of goodwill. That is intangible harm caused by MGA's willful infringement, not the childhood sacrifices.

## III.    CONCLUSION

For at least the reasons set forth above and in its opening brief, the OMG Girlz respectfully request that the Court exercise its discretion and treble the $17,872,253 profits award to $53,616,759.

Dated:  December 13, 2024

SHEPPARD MULLIN RICHTER & HAMPTON LLP

By: /s/ *John R. Keville*
    John R. Keville

*Attorney for Defendants*
*CLIFFORD "T.I." HARRIS, TAMEKA "TINY" HARRIS, OMG GIRLZ LLC, and Counter-Claimants GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC and OMG GIRLZ LLC*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the Defendant / Counter-Claimants, certifies that this brief contains 5,864 words, which complies with the word limit of L.R. 11-6.1.

By: /s/ *John R. Keville*
    John R. Keville
    *Attorney for Defendants*

    *CLIFFORD "T.I." HARRIS, TAMEKA "TINY" HARRIS, OMG GIRLZ LLC, and Counter-Claimants GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC and OMG GIRLZ LLC*

John R. Keville (*pro hac vice*)
jkeville@sheppardmullin.com
Robert L. Green (*pro hac vice)*
rgreen@sheppardmullin.com
Chante B. Westmoreland (*pro hac vice*)
cwestmoreland@sheppardmullin.com
SHEPPARD MULLIN RICHTER &
HAMPTON LLP
700 Louisiana Street, Suite 2750
Houston, TX 77002
Telephone: (713) 431-7100

Jiepu (Bobby) Li (SBN: 342224)
bli@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700

*Attorneys for Defendants*
CLIFFORD "T.I." HARRIS, TAMEKA
"TINY" HARRIS, OMG GIRLZ LLC, and
*Counter-Claimants* GRAND HUSTLE, LLC,
PRETTY HUSTLE, LLC and OMG GIRLZ LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MGA ENTERTAINMENT, INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CLIFFORD "T.I." HARRIS, an individual; TAMEKA "TINY" HARRIS, an individual; OMG GIRLZ LLC, a Delaware limited liability company; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 2:20-cv-11548-JVS-AGR<br><br>**DEFENDANTS' AND COUNTER-CLAIMANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC, and OMG GIRLZ LLC,<br><br>Counter-Claimants,<br><br>vs.<br><br>MGA ENTERTAINMENT, INC., ISAAC LARIAN, and DOES 1 – 10, inclusive,<br><br>Counter-Defendants. | Judge: Hon. James V. Selna<br><br>Complaint Filed:  December 20, 2020<br><br>Trial Date:  September 3, 2024 |

Pursuant to Federal Rules of Civil Procedure 52(a)(1) and Central District of California Local Rule 52-1, Defendants Clifford "T.I." Harris, Tameka "Tiny" Harris, OMG Girlz LLC and Counterclaimants Grand Hustle, LLC, Pretty Hustle, LLC and OMG Girlz LLC (collectively, "Defendants and Counterclaimants") respectfully submit their Proposed Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### I. JURY VERDICT AND ISSUES FOR THE COURT

1.     The Counterclaimants in this action are the OMG Girlz, Pretty Hustle LLC (owned by Tameka "Tiny" Harris, the founder of the OMG Girlz), and Grand Hustle LLC. The Counter-defendants are MGA Entertainment and Isaac Larian ("MGA").

2.     Following a trial on OMG Girlz counterclaims of trade dress infringement under the Lanham Act and misappropriation of the OMG Girlz name, likeness, and identity, the jury issued a verdict with the following factual findings:

(a)     that the OMG Girlz established by a preponderance of the evidence that MGA infringed the OMG Girlz' trade dress with respect to the following OMG Dolls:

(i)     Chillax

(ii)     Roller Chick

(iii)     Metal Chick

(iv)     Bhad Gurl

(v)     Prism

(vi)     Miss Divine

(vii)     Runway Diva

(b)     that the OMG Girlz established by the preponderance of the evidence that MGA's trade dress infringement was willful

(c)     that eight additional dolls included in MGA's declaratory judgment claims infringed the OMG Girlz' trade dress (Downtown BB, Punk

-1-

SMRH:4869-0194-8150.7

Case No. 2:20-cv-11548-JVS-AGR
DEFENDANTS' AND COUNTER-CLAIMANTS' PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

A180

Grrrl, Virtuelle, Honeylicious, Miss Independent, City Babe, and Shadow)

 (d) that the OMG Girlz established by a preponderance of the evidence that MGA has misappropriated the OMG Girlz name, likeness, and identity with respect to the following OMG Dolls:

  (i) Chillax

  (ii) Roller Chick

  (iii) Metal Chick

  (iv) Bhad Gurl

  (v) Prism

  (vi) Miss Divine

  (vii) Runway Diva

 (e) that eight additional dolls included in MGA's declaratory judgment claims misappropriated the OMG Girlz name, likeness, and identity (Downtown BB, Punk Grrrl, Virtuelle, Honeylicious, Miss Independent, City Babe, and Miss Glam)

 (f) that OMG Girlz established by clear and convincing evidence that MGA acted with oppression, fraud, or malice with regard to its misappropriation of the OMG Girlz' name, likeness, and identity.

 (g) that the OMG Girlz were entitled to disgorged profits of $17,872,253

 (h) that the OMG Girlz should receive $53,616,759 in punitive damages

3. As discussed in the conclusions of law below, although the jury heard and weighed all of the evidence and expert testimony before rendering an advisory verdict, issue (g) is an equitable issue and the final decision is for the Court. The remaining findings are factual issues for the jury. The Court must therefore find whether the OMG Girlz are entitled to the equitable remedy of disgorgement of profits under the Lanham Act, and if so, the amount of net profits to be awarded. Similarly, the Court must also find whether the OMG Girlz are entitled to disgorgement of

SMRH:4869-0194-8150.7

profits for MGA's common law misappropriation of their name, likeness, or identity, and if so, the amount of net profits to be awarded.

## II. MGA'S PROFITS FROM SEVEN OMG DOLLS FOUND TO INFRINGE AND MISAPPROPRIATE AMOUNT TO AT LEAST $17,872,253

### A. MGA's Gross Revenue

4. The OMG Girlz's expert Chris Tregillis testified that MGA's gross revenue for the 7 infringing dolls he included in his damages calculation (Chillax, Roller Chick, Metal Chick, Bhad Gurl, Prism, Miss Divine, and Runway Diva) were $68,529,557. (Day 6 (AM) at 102:4-8); (Day 7, 28:20-29:12).  Mr. Tregillis relied on MGA's revenue numbers to arrive at this amount. (*See* Tr. Exhs. 950, 6056, 6057).

5. MGA's expert did not dispute Mr. Tregillis' revenue calculations.  (Day 11 (PM) at 82:16-83:19).

6. MGA's revenues for the other 8 infringing dolls (Downtown BB, Punk Grrrl, Virtuelle, Honeylicious, Miss Independent, City Babe Shadow (trade dress infringement only), and Miss Glam (misappropriation of name identity and likeness only)) was $76.7M for these same time periods. (Dkt. 1013); (Tr. Exh. 6057).

### B. MGA's Margins

7. MGA's profit margins on the OMG Dolls were 35% in 2020; 21.5% in 2021; 9.4% in 2022; 10% in 2023; and 13.3% in the first quarter of 2024.  (*See* Tr. Exh. 950).

8. Mr. Tregillis calculated these profit margins using the expenses provided by MGA.  (Day 7 (AM) at 21:23-28:23).

### C. MGA's Profits

9. Mr. Tregillis calculated the profits for the seven dolls as $17,872,253, using the expense numbers that MGA represented it would prove in its case-in-chief. (Day 7 (AM) at 28:20-29:12); (Tr. Exhs. 950, 6057).

10. Specifically, Mr. Tregillis, applied all of MGA's stated expenses except overhead.   (Day 7 (AM) at 21:23-28:5).  Mr. Tregillis calculated total profits of

$17,872,253 based on the assumption that MGA would prove those remaining expenses. *Id.* at 29:2-21.

11.    MGA did not present any evidence supporting the expenses numbers in its summary documentation.

12.    MGA's expert Russell Mangum testified to MGA's general categories of expenses based on a summary document created by MGA for this litigation.  (Tr. Exh. 6057), MGA did not provide any underlying source documents, such as invoices or receipts, he did not review MGA's "general ledger," and he could not confirm the accuracy of any of the expense numbers on which he relied. (Day 7 (AM) at 21:23-22:6); (Day 9 (PM) at 121:13-122:7); (Day 12 (AM) at 7:5-9:9).  Mangum testified that only Pedro Crisanti, MGA's VP Controller, could confirm the accuracy; however, Mr. Crisanti did not testify. (Day 12 (AM) at 7:5-9:9).

### III.  MGA'S PROFITS FROM OTHER OMG DOLLS

13.    Because the OMG Girlz represented at trial that they would seek verdicts on only seven dolls, and profits for those seven plus two when sold in a package with dolls included in the seven, Mr. Tregillis did not testify about the profits for the additional dolls found to infringe the OMG Girlz trade dress and/or misappropriate their name, likeness, and identity.  The jury therefore did not provide profit numbers for those dolls. (Dkt. 1009).  However, Mangum calculated the profits for those dolls as $12,567,928, with total revenue of $75,589,982. (Tr. Exh. 6057).

14.    Consumer witnesses testified that they bought MGA OMG dolls beyond the seven subject to infringement and misappropriation damages based on the understanding that the entire doll line was connected to the OMG Girlz.  (Day 4 (PM) (TT M. Campbell) at 17:22-18:07).

15.    Online evidence showed that other doll consumers knowledgeable about the OMG Girlz bought OMG dolls beyond the seven subject to damages based on the understanding that the entire doll line was connected to the OMG Girlz. *See, e.g.,* (Tr. Exs. 311-CF; 341-CF); (Day 7 (PM) at 100:7-10).

SMRH:4869-0194-8150.7

Case No. 2:20-cv-11548-JVS-AGR
DEFENDANTS' AND COUNTER-CLAIMANTS' PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

16. Consumer witnesses and MGA witnesses testified the OMG dolls were collectible, meaning once someone buys a doll they are likely to build their collection by buying other dolls. (Day 5 (AM) at 34:14-35:12); *see also* (Day 4 (PM) (TT M. Campbell at 19:1-19); (TT W. Osborne at 148:12-149:22); (TT M. Wagner at 24:2-9; 55:1-17)).

## CONCLUSIONS OF LAW

### I. DISGORGEMENT IS APPROPRIATE

17. The Lanham Act provides that once trademark infringement has been established, a plaintiff is entitled, "subject to the principles of equity, to recover . . . defendant's profits." 15 U.S.C. § 1117. This statute affords district courts "broad discretion" in fashioning a remedy for trademark infringement. *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 124 (9th Cir. 1968). Disgorgement under the Lanham Act is designed to compensate the brand owner, prevent unjust enrichment, and deter future infringements by ensuring that violators do not profit from their unlawful actions, thereby stripping away financial benefits derived from infringement. *See Maier Brewing Co.*, 390 F.2d at 123; *see also Munhwa Broad. Corp. v. Create New Tech. Co.*, 2015 U.S. Dist. LEXIS 174796, at *18 (C.D. Cal. Sep. 2, 2015) ("The Ninth Circuit has stressed that 'the trial court's primary function should center on making any violations of the Lanham Act unprofitable to the infringing party.'").

18. A finding of willfulness is not a prerequisite to disgorgement of profits, however "a trademark defendant's mental state [remains] a highly important consideration in determining whether an award of profits is appropriate." *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020). District courts should therefore consider a defendant's mental state in determining what award of profits is appropriate. *Grasshopper House, LLC v. Clean & Sober Media, LLC*, 2021 WL 3702243, at *3 (9th Cir. Aug. 20, 2021).

19.     The Court finds disgorgement of profits for trade dress infringement is appropriate in this case as a proxy for the OMG Girlz' damages, to prevent unjust enrichment of MGA.

**A.     Willful Infringement Was a Factual Issue for the Jury But the Court Would Adopt the Jury's Findings Regardless**

20.     The parties dispute whether the jury's finding of willful infringement was binding or whether it was an advisory finding on an equitable issue for the Court. (Dkts. 1046, 1064, 1067).

21.     Willfulness is a factual determination for a jury, not an equitable issue for the Court.  *See, e.g.*, *Adidas Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1046 (D. Or. 2008); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 2016 U.S. Dist. LEXIS 82532, *42 (S.D. Cal. June 17, 2016).

22.     MGA suggests that the Court previously found no evidence of willfulness on summary judgment. (Dkt. 1062).  However, summary judgment was not granted on the willfulness claim.  Rather, MGA moved for summary judgment on disgorgement, which was denied. (Dkt. 326 at 31).

23.     Consistent with the above, willfulness was presented to the jury.  The jury heard evidence on willfulness and found MGA to be a willful infringer.  The jury's verdict on this issue was binding and will be reflected in the final judgment.

24.     Even if the jury's verdict was advisory on this point, the result would be the same.  The jury heard ample evidence to support a finding of willfulness and the Court would adopt the jury's verdict if this was an equitable issue.

25.     The evidence showed that:

- MGA is a sophisticated company who regularly copies from popular culture and does not appear to have an official intellectual property policy (Day 2 (PM) at 107:18-25); (Tr. Exh. 4936); (Day 10 (AM) at 32:5-34:14).  MGA does not train its designers on this topic. *See* (Day

8 (AM) at 65:24-66:11; 79:19-24); *see also* (Day 2 (PM) at 93:19-21).

- MGA did not obtain permission from OMG Girlz for using their brand, trade dress, and likeness.

- The OMG Dolls use the OMG Girlz trade dress and appear as animated or "toy" versions of the OMG Girlz. (Day 3 (PM) at 91:10-13).

- OMG Girlz put forth evidence of confused consumers, some of whom testified at trial (Day 5 (AM) at 34:14-35:12); *see also* (Day 4 (PM) (TT M. Campbell at 19:1-19); (TT W. Osborne at 148:12-149:22); (TT M. Wagner at 24:2-9; 55:1-17)) and some of whom demonstrated confusion via social media. *See* (Tr. Exs. 311-CF; 341-CF); (Day 7 (PM) at 100:7-10).  This confusion is unsurprising given the striking similarities between the dolls and the OMG Girlz.

- MGA had knowledge of the OMG Girlz and the overlap in the brands' target markets and consumer-base before creating the OMG Doll line.  *See, e.g.*, (Day 11 (AM) at 74:4-13); (Day 2 (PM) at 107:18-25); (Tr. Exh. 440).

- MGA designer Lora Stephens, one of the only MGA designers responsible for the OMG Dolls at issue, testified that she knew of the OMG Girlz, has watched the Harrises' reality shows—which she recalled featuring the OMG Girlz, recalled episodes about Zonnique's musical training, considered Tiny one of her Xscape-favorites, followed Tiny's 6-year-old daughter, Heiress, on Instagram, and knew the backstory behind Tiny's Instagram handle, "Major Girl."  (Day 11 (AM) at 74:4-13).

- In December 2020, the OMG Girlz' representatives sent MGA a cease and desist letter providing notice of their concerns of trade dress

-7-

and misappropriation of name, likeness, and identity. (Day 2 (AM) at 73-74). MGA did no investigation to determine whether its designers were aware of the OMG Girlz and had copied the OMG Girlz. (Day 2 (PM) at 107:18-25; 115:16-19; 111:15-17; 111:20-22). Further, MGA's designers testified that no one spoke to them about this lawsuit until their depositions, and their documents were not searched. (Day 5 (PM) at 15:5-16:14); (Day 11 (AM) at 48:6-49:9).

- MGA also did not put a legal document hold in place to preserve evidence, or take any action to try to mitigate consumer confusion. *Id.*; *see also* (Day 8 (AM) at 79:19-24); (Dkt. 478).

- MGA and its witnesses testified they did not "copy" the OMG Girlz, but their testimony revealed that MGA's policy on copying meant making two things that look exactly alike with no changes. Ms. Stephens conceded that there was no oversight or training to prevent intellectual property infringement. (Day 8 (AM) at 65:24-66:11); *see also* (Day 2 (PM) at 93:19-21).

- MGA's testimony on copying was also not credible given its witnesses testified that certain "tots" did not bear the likeness of celebrities. (Day 10 (AM) at 32:5-34:14); (Day 11 (AM) at 61:23-62:19). This testimony strained credulity and impacts the credibility of MGA's fact witnesses (both the designers and Mr. Larian), and thus undermines MGA's entire story of independent creation.

- MGA was also on notice of at least one instance of internal confusion as early as December 2019, but did nothing to differentiate itself form the OMG Girlz or to mitigate further consumer confusion. (Day 5 (PM) at 43:1-11); (Day 8 (AM) at 79:19-24).

- Despite this awareness and notice, MGA has never taken any steps to avoid confusion between the OMG Dolls and the OMG Girlz. (Day

SMRH:4869-0194-8150.7

Case No. 2:20-cv-11548-JVS-AGR
DEFENDANTS' AND COUNTER-CLAIMANTS' PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

8 (AM) at 79:19-24); (Day 5 (PM) at 49:9-24). To the contrary, MGA continued to release new OMG Dolls, each combining quintessential elements of the OMG Girlz' brand. These new, post-complaint, infringing dolls included—Miss Divine, Miss Prism, and Runway Diva—which match the OMG Girlz most publicized photo (a photo that appeared prominently in the OMG Girlz' cease and desist letter) and were released in the middle of discovery in this case. (Day 2 (AM) at 74:5-76:17).

26. Based on this and other evidence, and MGA credibility issues, the Court would adopt the jury's verdict even if it was advisory. MGA's continued sales despite its knowledge of consumer confusion with the OMG Girlz' nearly identical marks is indicative of an improper motive. *See Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th Cir. 1993) (internal quotation marks and citation omitted) ("Willfulness and bad faith require a connection between a defendant's awareness of its competitors and its actions at those competitors' expense."); *Monster Energy Co. v. Integrated Supply Network, LLC*, 533 F. Supp. 3d 928, 933 (C.D. Cal. 2021) (finding willfulness where "[d]efendant continued to sell the infringing product after it received [p]laintiff's cease and desist letters and after [p]laintiff filed the instant lawsuit"); *Color Me Mine Enters. Inc. v. S. States Mktg. Inc.*, No. CV 12-00860-RGK (JCx), 2013 WL 12119715, at *11 (C.D. Cal. Apr. 25, 2013) (finding a triable issue of fact as to willfulness where defendants continued to sell infringing products despite knowledge of plaintiff's mark and the likelihood of consumer confusion).

27. The Court therefore concludes MGA's infringement was willful.

**B. Disgorgement of $17,872,253 Profits for Trade Dress Infringement Is Proper**

28. In determining the profits to be disgorged, the OMG Girlz bore the burden to prove the MGA' gross sales from the infringing activity with reasonable certainty. 15 U.S.C. § 1117(a). *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778

F.3d 1059, 1076 (9th Cir. 2015) (Once this is established "the burden shifts to the defendant infringer to prove expenses that should be deducted from the gross revenue to arrive at the defendant infringer's lost profits." ). Once the OMG Girlz demonstrated gross sales, they are presumed to be the result of the infringing activity. *Id.* (citing *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993)) ("The trademark holder has the burden to prove the defendant infringer's gross revenue from the infringement."). The burden then shifts to MGA, the infringer, to prove which, if any, of its total sales are not attributable to the infringing activity and any permissible cost deductions. 15 U.S.C. § 1117(a).

29.     Based on MGA's failure to prove deductions from gross revenue with supporting evidence, the Court could award MGA's total revenue. *See Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 514 (1985) (citing *Russell v. Price*, 612 F.2d 1123, 1130-31 (9th Cir. 1979) ("If the infringing defendant does not meet its burden of proving costs, the gross figure stands as the defendant's profits."). The Court declines to do so here.  However, based on the testimony of the experts and the exhibits presented at trial, and taking into consideration as advisory the jury's verdict, the Court finds that an award of $17,872,253 in MGA profits is fair and well supported.

**II.     STATUTORY ENHANCEMENT UNDER THE LANHAM ACT IS APPROPRIATE**

30.     If a court finds that recovery based on profits is either inadequate or excessive, the court in its discretion may enter judgment in an amount it finds to be just. 15 U.S.C. § 1117(a). If the court exercises its discretion to adjust the award, the sum "shall constitute compensation and not a penalty." *Id.* Courts have enhanced disgorgement awards and damages "for deterrence" where infringers "in both their underlying conduct and their litigation conduct—have shown repeated disregard for Plaintiffs' rights, the law, and this Court's orders." *OmniGen Research*, 2017 U.S. Dist. LEXIS 189543, at *49 (tripling damages for Lanham Act violations under 15

SMRH:4869-0194-8150.7

Case No. 2:20-cv-11548-JVS-AGR
DEFENDANTS' AND COUNTER-CLAIMANTS' PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

U.S.C. § 1117 because "fully compensat[ing] Plaintiffs will have an important deterrent effect"); *Merck Eprova AG*, 760 F.3d at 263 (the enhancement provisions were intended to fully compensate "plaintiffs whose actual damages were difficult to prove," but "may also be awarded where deterrence of willful infringement is needed."); *Getty Petroleum Corp.*, 858 F.2d at 113 (same); *Mobius Mgmt. Sys*, 880 F. Supp. at 1025 (same).

### A. Deterrence Supports Enhancement

31. MGA is well-known in the artistic community for "referencing" pop culture, and with no clear internal policy outlining the appropriate or legal limits, these "references" often rise to the level of ripping off creatives without attribution. (Day 10 (AM) at 32:5-34:14); (Day 11 (AM) at 61:23-62:19).

32. MGA's employees waffled about how much MGA incorporates pop culture and celebrities into its doll designs (and their uncertainty about whether MGA has a policy on the same) but MGA's documents make clear that it routinely bases dolls on celebrities. *See id.* MGA's testimony to the contrary was not credible.

33. In addition, faced with a cease and desist letter and pictures showing similarities between the OMG Girlz and certain of the seven infringing OMG dolls, MGA did no investigation, it simply filed a lawsuit. (Day 2 (AM) at 73-74); (Day 2 (PM) at 107:18-25; 111:15-22; 115:16-19).

34. MGA did not put a legal document hold in place to preserve evidence, nor take any action to try to mitigate consumer confusion. *Id.*; *see also* (Day 8 (AM) at 79:19-24); (Dkt. 478).

35. MGA then not only continued to make the dolls, without discussing the letter or disclosing the lawsuit to the designers, MGA went on to create and sell during this litigation OMG dolls that looked remarkably similar to one of the pictures in the letter of the OMG Girlz on a red carpet. (Day 2 (AM) at 74:5-76:17).

36. MGA has never taken any steps to avoid confusion between the OMG Dolls and the OMG Girlz. (Day 8 (AM) at 79:19-24); (Day 5 (PM) at 49:9-24).

37. MGA alleges that after the lawsuit that it has ceased "direct" sales of the seven trade dress infringing dolls, but provides no evidence nor does it describe what that means. (Dkt. 1062 at 21). The OMG Girlz respond that the seven infringing dolls remain available through mass retail outlets such as Amazon and Walmart. (Dkt. 1067 at 9).

38. MGA's continued sales despite its knowledge of consumer confusion with the OMG Girlz' nearly identical marks is indicative of an improper motive. *See Lindy Pen Co.*, 982 F.2d at 1406; *Monster Energy*, 533 F. Supp. at 933 (finding willfulness where "[d]efendant continued to sell the infringing products after it received [p]laintiff's cease and desist letters and after [p]laintiff filed the instant lawsuit"); *Color Me Mine*, 2013 WL 12119715 at *11 (finding a triable issue of fact as to willfulness where Defendant continued to sell the infringing products despite knowledge of plaintiff's mark and the likelihood of consumer confusion).

39. For all these reasons, and supported by the jury's willfulness finding, the Court finds that enhancement is supported by the need for deterrence.

**B.      Uncompensated Harm Supports Enhancement**

40. "Potential harm from lingering misimpressions [may be] unlikely to be fully captured by the lost profits" *Binder v. Disability Grp., Inc.*, 772 F. Supp. 2d 1172, 1183 (C.D. Cal. 2011) (enhancing damages); *see also Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 124 (9th Cir. 1968). Courts recognize that trademark owners may be injured because "confused buyers may be so unhappy with the infringer's product that they will never again buy plaintiff's product." 4 McCarthy on Trademarks and Unfair Competition § 30:64 (5th ed.).

41. MGA did not obtain permission from OMG Girlz for using their brand, trade dress, and likeness. (Dkt. 1009).

42. At trial, the evidence showed that the OMG Girlz suffered reputational harm by being associated with MGA's OMG Dolls. This misimpression was caused by consumer belief that the OMG Girlz partnered with MGA, a company known for

its "tot scandal," in which its line of L.O.L. Surprise! Tot dolls (the "little sisters" of the bigger OMG Dolls) were found to have secret lingerie and bondage on the doll when it is dipped in cold water. (Day 3 (AM) at 49:11-55:12). MGA's documents show the negative effect that "lingerie-gate" had on parents. (Day 3 (AM) at 53:2-55:7 (discussing Tr. Exh. 500)). There was evidence that some consumers believed that the affiliation with the OMG Girlz made MGA's dolls more wholesome, for example Maxine Wagner testified that although she felt the dolls were a little "older" due to the short skirts and make-up, she was willing to buy them for her nieces because she thought she was supporting the OMG Girlz. (Maxine Wagner TT at 72:10-73:16). In other words, MGA profited from the goodwill and reputation of the OMG Girlz— and for consumers who were aware of MGA's tot scandal, this connection could go the other way, causing reputational damage for the OMG Girlz' brand.

43. The OMG Girlz also described their childhood sacrifices that they made to create a memorable brand  (Day 7 (AM) at 117:24-118:4); (Day 3 (PM) at 51:7-52:8; 55:20-56:19), and their desire to create a line of dolls—a market which is displaced by MGA's OMG Dolls (Day 2 (AM) at 48-50, 124).

44. At trial, MGA repeatedly called the OMG Girlz and their families "extortionists" and "money grabbers" for trying to protect their rights in this litigation *that MGA filed*, and also called them "liars."  (Day 2 (PM) at 105); (Day 11 (PM) at 51-52).

45. MGA also made such statements to the public following the second trial, telling reporters in 2023 that the OMG Girlz' counterclaims were "an extortion"  and misrepresenting to the public that the OMG Girlz had filed suit saying "[t]hey knew from the beginning they don't have a case, and they brought it anyways." *See* Daniel Kreps, Rolling Stone, May 27, 2023, T.I. and Tiny Lose Copyright Infringement Lawsuit Against Toy Maker; *https://www.legalaffairsandtrials.com/p/jury-finds-in-favor-of-toymaker-mga* (Meghann Cuniff, Legal Affairs and Trials).   This reputational harm is uncompensated by the disgorgement award.

SMRH:4869-0194-8150.7

46. Here, where there is ample evidence of uncompensated harm (and bad faith conduct) enhancement of MGA's profits is appropriate to compensate the OMG Girlz and to deter future violation by MGA. *See* (Day 2 (AM) at 73-74); *see also PepsiCo, Inc. v. Triunfo-Mex, Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999) (electing to treble defendant's profits "[g]iven the nature of defendant['s] [] infringing conduct" where defendant "willfully and intentionally infringed" plaintiff's mark).

47. Accordingly, as additional compensation and for deterrence, the Court trebles the award to $53,616,759.

## III. DISGORGEMENT OF PROFITS IS APPROPRIATE FOR THE MISAPPROPRIATION CLAIM

### A. Disgorgement of Profits Is an Available Remedy for Common Law Misappropriation of Name, Likeness, and Identity

48. The parties dispute whether disgorgement of profits is an available remedy for a misappropriation of name, likeness, and identity claim. (Dkts. 1046, 1064, 1067).

49. The Court finds that disgorgement is a proper and appropriate remedy for a common law misappropriation of name, likeness, or identity claim.

50. Section 3344 "is best understood as 'complementing,' rather than enacting, the common law cause of action, because the two are not identical." *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 414 (9th Cir. 1996); *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 692 ("Section 3344 neither replaces nor codifies the common law cause of action"). The statute is clear that its remedies are "cumulative" and "in addition to" any common law remedies. Thus, the inclusion or non-inclusion of a remedy has no bearing on whether it is available under common law, nor would the legislature decide such an issue.

51. MGA asserts that disgorgement is not available based on the legislative history of California Civil Code § 3344. (Dkt. 1046 at 21). However, nowhere does the legislative history affirmatively state that a common law misappropriation claim

Case No. 2:20-cv-11548-JVS-AGR
DEFENDANTS' AND COUNTER-CLAIMANTS' PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

does not allow for disgorgement of profits. MGA does not provide any legal authority that such a remedy is not available.

52. The available case law is also contrary to MGA's position. In *Newcombe*, the Ninth Circuit reversed the district court's summary judgment on plaintiff's common law misappropriation and §3344 claims, and then explained "[b]ecause we hold that Newcombe is entitled to proceed to trial on his common law claim against Coors and Belding, he is also entitled to proceed on his claim for equitable relief and constructive trust against these defendants." 157 F.3d at 694 (emphasis added). Thus, the Ninth Circuit has endorsed equitable remedies, like disgorgement, for a misappropriation claim.

53. Additionally, in *Batis v. Dun & Bradstreet Holdings, Inc.*, No. 22-cv-01924-MMC, 2023 WL 1870057 at *4 (N.D. Cal. Feb. 9, 2023), *aff'd*, 106 F.4th 932 (9th Cir. 2024) a court in the Northern District found disgorgement of "unjust profits from [defendant's] unauthorized use of [plaintiff's] persona" constituted sufficient injury in fact for a common law misappropriation claim. Similarly, in *Forrest v. Meta Platforms, Inc.*, No. 22-cv-03699-PCP, 2024 WL 3024642, at *6 (N.D. Cal. June 17, 2024) the district court denied a motion to dismiss a common law misappropriation claim, finding that the profits disgorgement claim was enough to adequately plead common law misappropriation. In *Vanvakaris v. Fashion Forms, Inc.*, No. CV 19-7765-DMG (JEMx), 2019 WL 6245546, at *2-3 and fn. 6 (C.D. Cal. Nov. 22, 2019) plaintiff sought disgorgement of profits, emotional distress damages, compensatory damages, and punitive damages for common law misappropriation, and the court relied solely on the disgorgement of profits to support removal. Each of these findings necessarily assumes the availability of disgorgement as a remedy for a misappropriation claim.

54. Disgorgement is also a widely used remedy in analogous situations and the prevailing view is that they are recoverable in right of publicity claims. Restatement (Third) of Unfair Competition § 49 comment d (1995) ("Although there

-15-

is little case law, it is widely assumed that the defendant's profits are an appropriate measure of relief in right of publicity cases under rules analogous to the recovery of profits in trademark, trade secret, and copyright cases.") (citing cases). This is because "monetary relief may be awarded for the pecuniary loss to the plaintiff or the pecuniary gain to the defendant resulting from the unauthorized use of the plaintiff's identity." *Id. See also*, 2 Rights of Publicity and Privacy § 11:35 (2d ed) (1995) (noting "in right of publicity cases, a recovery of the infringer's profits attributable to the infringement is an 'ordinarily available' remedy").

55.　Given the law above, and the dearth of support for MGA's position, the Court finds that disgorgement of profits is an available remedy for misappropriation of name, likeness, or identity.

56.　Disgorgement of $17,872,253 profits is proper for the OMG Girlz' claim for Common Law Misappropriation of name, likeness, and identity.

**B.　Disgorgement of $17,872,253 Profits is Proper for the OMG Girlz' Common Law Misappropriation of Name, Likeness, and Identity**

57.　There were multiple ways the jury properly reached the conclusion that the OMG Girlz were harmed by MGA's misappropriation of their name and likeness, including those cited in the section above regarding Disgorgement of Lanham Act Profits above.

58.　In addition, MGA testified that it has entered into licensing deals with other celebrities to use their likeness for dolls. (Day 3 (PM) at 42:2-6; 43:18-20; 42:14-18). The evidence showed that while MGA pays some celebrities for dolls in exchange for use of their name and identity, it paid the OMG Girlz nothing.

59.　The evidence showed that Mrs. Harris requested MGA enter a license agreement and account for profits before MGA sued the Harrises. (Tr. Exh. 19).

60.　The evidence also showed that some consumers purchased OMG Dolls with the understanding they were supporting the OMG Girlz, and accordingly, MGA diverted revenue from the OMG Girlz through use of their name and likeness. *See,*

*e.g.*, (Day 2 (AM) at 70; Tr. Exh. 323-B; 332-B; 320-C); (Day 5 (AM) at 34:14-35:12); *see also* (Day 4 (PM) (TT M. Campbell at 19:1-19); (TT W. Osborne at 148:12-149:22); (TT M. Wagner at 24:2-9; 55:1-17)).

61. As discussed in III.A. above, the OMG Girlz presented unrebutted evidence of the revenue at issue for the seven dolls that were found to have misappropriated the OMG Girlz' name, likeness, and identity and thus violated their common law rights, that MGA failed to properly support deductions from revenue, and that the OMG Girlz expert number for profits was accepted by the jury and is now accepted by this Court.

62. Also as discussed above eight dolls that were in the case only because MGA sought declaratory judgment and injunctive relief as to them were found to have also have appropriated the OMG Girlz' name, likeness, and identity and thus violated their common law rights. Although the OMG Girlz made the choice at trial to narrow the dolls at issue for damages, this supports the fact that the award of profits for only seven other dolls is not unjust.

63. Finally, the jury in an advisory capacity heard and weighed all the evidence and found that a disgorgement of profits award of $17,872,253 was proper. (Dkt. 1009).

64. The Court finds and concludes the OMG Girlz are entitled to $17,872,253 in disgorgement of profits as a remedy for common law misappropriation of name, likeness, and identity.

**IV. PUNITIVE DAMAGES ARE AVAILABLE AND APPROPRIATE**

65. Punitive damages are a legal remedy meant to punish the defendant for their wrongdoing. Punitive damages and actual damages serve distinct purposes and both remedies may be necessary to serve both remedial and deterrence functions. Punitive damages serve as a critical legal mechanism to punish egregious conduct and deter future misconduct.

66. The Court finds that punitive damages are available and that they are an issue for the jury. As such, the jury's verdict will be incorporated in the final judgment. However, even if punitive damages were an equitable issue for the Court, the Court fully adopts the jury's well-reasoned and supported findings.

**A.     Punitive Damages Are Available**

67. MGA argues that punitive damages are not available, relying on the same legislative history argument as it does for disgorgement of profits. (Dkt. 1046 at 23-24). As discussed for disgorgement, the statutory text and legislative history of § 3344 do not support MGA's position.

68. California statutes provide for punitive damages on common law claims. Specifically, Cal. Civ. Code § 3294 provides that in tort actions, "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." *See also Ross v. Pioneer Life Ins. Co.*, 545 F. Supp. 2d 1061, 1064 (C.D. Cal. 2008) ("California's civil statutory scheme permits a trier of fact to impose a penalty for such conduct, by virtue of California Civil Code § 3294, which permits a trier of fact to impose punitive damages for the purpose of deterrence.").

69. The Ninth Circuit has likewise explained that a plaintiff is "entitled to punitive damages if she proved 'by clear and convincing evidence that [Defendants] ha[ve] been guilty of oppression, fraud, or malice.'" *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998 (9th Cir. 2004). Neither the statute nor the Ninth Circuit limit or exclude punitive damages for the common law tort of misappropriation of name or likeness.

70. Additionally, in *Eastwood v. Sera Labs, Inc.*, the district court held that "[b]oth California Civil Code § 3344 and common law right of publicity allow for an award of punitive damages." No. 2:20-cv-06503-RJK (JDEx), 2021 WL 4439221, at *6 (C.D. Cal. June 23, 2021). MGA argues that this holding should be ignored as "a

-18-

single non-binding district court case." (Dkt. 1046 at 24). But this case is on point, from another court in this district, and MGA presents no contrary law in support of its position.

71. Furthermore, additional cases support the same proposition. In *Waits v. Frito-Lay, Inc.*, the Ninth Circuit upheld the punitive damages award for a misappropriation claim, noting their availability "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice," which tracks the statutory language. 978 F.2d 1093, 1098-1104 (9th Cir. 1992). In *Leavy v. Cooney*, the court found Levy's claim for unauthorized use of his name and image was not a contract claim but a claim for "a tortious invasion of Leavy's right of privacy" and thus entitled him to punitive damages. 214 Cal. App. 2d 496, 501 (Ct. App. 1963). The plaintiffs in *Vanvakaris v. Fashion Forms, Inc.* and *Olive v. Gen. Nutrition Ctrs., Inc.*, also sought disgorgement, actual damages, and punitive damages for common law misappropriation of name or likeness without court disapproval or dispute. *See Vanvakaris v. Fashion Forms, Inc.*, 2019 WL 6245546, at *2-3, n. 6 (C.D. Cal. Nov. 22, 2019); *Olive v. Gen. Nutrition Ctrs., Inc.*, 242 Cal. Rptr. 3d 15, 29 (Ct. App. 2d Dist. 2018).

72. MGA also argues that punitive damages are not available for a disgorgement remedy because there are no compensatory damages. However, the law relied on by MGA involved case where a jury returned a verdict of $0 compensatory damages. Here, the OMG Girlz were awarded damages in the form of disgorgement of profits. Furthermore, Ninth Circuit case law is contrary to MGA's position. *See In re Javahery*, No. 2:14-BK-33249-DS, 2017 WL 971780, at *8 (B.A.P. 9th Cir. Mar. 14, 2017), *aff'd*, 742 F. App'x 307 (9th Cir. 2018) ("Carefully parsed, California decisional law does not require that there be an express award of actual damages to support an award of punitive damages, but rather that the plaintiff has suffered injuries from a tortious act, even if compensatory damages were not awarded."); *MJT Sec., LLC v. Toronto-Dominion Bank*, No. 04-16362, 2006 WL 1236661, at *3 (9th Cir.

SMRH:4869-0194-8150.7

Case No. 2:20-cv-11548-JVS-AGR
DEFENDANTS' AND COUNTER-CLAIMANTS' PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

May 9, 2006) (holding plaintiff could seek punitive damages even though it did not seek actual damages).

73.     Given the cases above, and the lack of any case law to support MGA's position, the Court finds that punitive damages are available for the OMG Girlz' common law misappropriation of name, likeness, or identity claim.

**B.     Punitive Damages Were in the Discretion of the Jury, But the Court Would Adopt Their Finding**

74.     The parties dispute whether punitive damages are an equitable issue such that the jury's verdict was advisory.  (Dkts. 1046, 1064, 1067).  The Court finds they are not, but the result would be the same as the Court would adopt the jury's verdict.

75.     Punitive damages are an issue for the jury.  Per § 3294 discussed above, punitive damages are for the trier of fact.  *See also Stevens v. Owens-Corning Fiberglas Corp.*, 49 Cal. App. 4th 1645, 1660 (1996) ("Awarding punitive damages is first a function of the trier of fact.").

76.     Even when a district court sits in equity, punitive damages should be left to the jury.  For example, in *Rivero v. Thomas*, 86 Cal. App. 2d 225, 227 (1948) suit was brought for breach of fiduciary duty and to establish a trust. The court stated punitive damages are "entirely in the discretion of the jury, and they may be awarded only where there is some evidence of fraud, malice, express or implied, or oppression," (*id.* at 238-239) which corresponds to current Cal. Civ. Code §3294 and how the jury was instructed was in this case.  *See also Taylor v. Wright*, 69 Cal. App. 2d 371, 385 (1945) (referring to §3294 and stating that "[t]hose sections limit the right to recover exemplary damages [], in the discretion of the jury, to cases based on tort and exclude contract actions").

77.     The Court therefore finds that punitive damages were in the discretion of the jury.  The jury's verdict on punitive damages will be incorporated in the final judgment.

78.     Even if MGA were correct, however, the result would be the same as the Court would adopt the jury's punitive damages number.  The jury found that MGA's actions were malicious and oppressive, and the evidence supports this finding. *See* (Dkts. 1009, 1011); *see also* (Day 13 (AM) at 5:1-29:18).   The Court heard the evidence at trial and believes a finding of oppression, fraud, or malice is appropriate. The Court further finds the jury's punitive damages amount of $53,616,759 is appropriate as punitive damages.

79.     At trial, the evidence showed that:

- MGA's conduct was malicious and oppressive.  MGA ignored the cease and desist letter from the OMG Girlz, labeling their efforts to protect their rights as "extortion," failing to investigate these claims, and continuing to release new dolls that closely mirrored the OMG Girlz' brand. (Day 2 (PM) at 107:18-25 and 119:4-6); (Day 5 (PM) at 43:1-11); (Day 8 (AM) at 79:19-24).

- MGA repeatedly testified that the OMG Girlz were unsuccessful and therefore "unworthy" of being copied, claiming that this lawsuit was merely for "extortion" purposes. (Day 1 (PM) at 82); (Day 2 (PM) 119:4-6).

- MGA's disregard for its actions is shown in consumer testimony discussing MGA's marketing strategies designed to exploit the likeness and branding of the OMG Girlz. (Day 4 (PM) TT M. Campbell at 92:20-93:5); (Day 7 (AM) at 32:16-33:25).

80.     In addition, as previously discussed for trade dress infringement, there was ample evidence that MGA's conduct was willful.  The same evidence supports the jury's finding that MGA's conduct was oppressive, fraudulent, and/or malicious. *See Alberts v. Liberty Life Assurance Co. of Bos.*, 65 F. Supp. 3d 790, 796 (N.D. Cal. 2014) (stating that a level of malice adequate to justify an award of punitive damages

-21-

"may be established by a showing that the defendant's wrongful conduct was willful, intentional, and done in reckless disregard of its possible results").

**C. The Jury's Punitive Damages Award Is Appropriate and Comports with Due Process**

81. As discussed above, punitive damages are in the discretion of the jury, but this Court would adopt the same number if the issue was equitable. The amount of punitive damages is reasonable and supported based on the evidence presented.

82. The amount of punitive damages also comports with due process. "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." *Riley v. Volkswagen Grp. of Am., Inc.*, 51 F.4th 896, 902 (9th Cir. 2022); *see also Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 962 (9th Cir. 2005) ("In cases where there are significant economic damages and punitive damages are warranted but behavior is not particularly egregious, a ratio of up to 4 to 1 serves as a good proxy for the limits of constitutionality.").

83. The jury trebled the disgorgement award, a ratio that is less than the 4 to 1 limit for conduct that is not particularly egregious. There is no due process issue with the amount of punitive damages awarded.

## CONCLUSION

84. The OMG Girlz have protectible trade dress.

85. MGA's OMG dolls Chillax, Roller Chick, Metal Chick, Bhad Gurl, Prism, Miss Divine, and Runway Diva infringe the OMG Girlz' trade dress, and misappropriate the OMG Girlz' name, likeness, and identity.

86. MGA's trade dress infringement was willful.

87. The Court awards the OMG Girlz $17,872,253 in disgorged profits for MGA's trade dress infringement, and awards the OMG Girlz $17,872,253 in disgorged profits for MGA's common law misappropriation of name, likeness, and identity.

-22-

88. The Court enhances the trade dress infringement award pursuant to the Lanham Act, increasing the award for trade dress infringement to the total of $53,616,759.

89. MGA's OMG dolls Downtown BB, Punk Grrrl, Virtuelle, Honeylicious, Miss Independent, City Babe, and Shadow also infringe the OMG Girlz' trade dress, but are not subject to disgorgement of profits.

90. MGA's OMG dolls Downtown BB, Punk Grrrl, Virtuelle, Honeylicious, Miss Independent, City Babe, and Miss Glam also misappropriated the OMG Girlz name, likeness, and identity but are not subject to disgorgement of profits.

91. MGA acted with oppression, fraud, or malice with regard to its misappropriation of the OMG Girlz' name, likeness, or identity.

92. The OMG Girlz are awarded $53,616,759 in punitive damages.

Dated:  December 20, 2024

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By   /s/ John R. Keville
   JOHN R. KEVILLE

*Attorney for Defendants and Counterclaimants CLIFFORD "T.I." HARRIS, TAMEKA "TINY" HARRIS, OMG GIRLZ LLC, and Counter-Claimants GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC and OMG GIRLZ LLC*

-23-

Case 2:20-cv-11548-JVS-AGR   Document 1121   Filed 05/27/25   Page 1 of 5   Page ID #:52260

Mark A. Finkelstein (SBN 173851)
mfinkelstein@umbergzipser.com
Ellen S. Kim(SBN 329348)
ekim@umbergzipser.com
UMBERG ZIPSER LLP
1920 Main Street, Suite 750
Irvine, CA  92614
Telephone: (949) 679-0052

Paul J. Loh (Bar No. 160541)
ploh@willenken.com
Jason H. Wilson (Bar No. 140269)
jwilson@willenken.com
Kenneth M. Trujillo-Jamison
(Bar No. 280212)
ktrujillo-jamison@willenken.com
Breeanna N. Brewer (Bar No. 312269)
bbrewer@willenken.com
WILLENKEN LLP
707 Wilshire Blvd., Suite 3850
Los Angeles, California 90017
Telephone: (213) 955-9240

Attorneys for Plaintiff and Counter-Defendant MGA Entertainment, Inc., and Counter-Defendant Isaac Larian

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MGA ENTERTAINMENT, INC., a California corporation,<br><br>                    Plaintiff,<br><br>vs.<br><br>CLIFFORD "T.I." HARRIS, an individual; TAMEKA "TINY" HARRIS, an individual; OMG GIRLZ LLC, a Delaware limited liability company; and DOES 1 - 10 inclusive,<br><br>                    Defendants, | Case No. 2:20-cv-11548-JVS-AGR<br>ASSIGNED TO: Hon James V. Selna<br><br>**PLAINTIFF AND COUNTER-DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW (RULE 50(b)) OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL OR REMITTITUR**<br><br>Date:  June 30, 2025<br>Time:  1:30 p.m. |
| GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC and OMG GIRLZ LLC,<br><br>                    Counter-Claimants,<br><br>vs.<br><br>MGA ENTERTAINMENT, INC., ISAAC LARIAN and DOES 1 - 10, inclusive,<br>                    Counter-Defendants. | Complaint Filed:  December 20, 2020<br>Trial Date:   September 3, 2024 |

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{288764.2}

Case No. 2:20-cv-11548-JVS-AGR
MGA'S NOTICE OF MOT. FOR JMOL OR IN THE
ALTERNATIVE, MOT. FOR NEW TRIAL OR REMITTITUR

A203

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 30, 2025 at 1:30 p.m., or as soon thereafter as the matter may be heard before the Honorable James V. Selna, United States District Judge, in Courtroom 10C of the Ronald Reagan Federal Building and U.S. Courthouse, located at 411 West Fourth Street, Santa Ana, California 92701, Plaintiff and Counter-Defendant MGA Entertainment Inc. and Counter-Defendant Isaac Larian (collectively, "MGA") will, and hereby do, move the Court for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), a new trial under Rule 59(a), and/or an order for a remittitur or reduction of the monetary awards, on the Third Amended Counterclaims ("TACC") brought by Counterclaimants Grand Hustle, LLC, Pretty Hustle, LLC, and OMG Girlz LLC in this action (Dkt. 63), as follows:

1.      Judgment as a matter of law or, in the alternative, a new trial on Counterclaimants' First Counterclaim for Violation of the Lanham Act, 15 U.S.C. § 1125, because Counterclaimants have not set forth sufficient evidence to support that they have protectable trade dress;

2.      Judgment as a matter of law or, in the alternative, a new trial on Counterclaimants' First Counterclaim for Violation of the Lanham Act, 15 U.S.C. § 1125, because Counterclaimants have not set forth sufficient evidence to support that their claimed trade dress has secondary meaning;

3.      Judgment as a matter of law or, in the alternative, a new trial on Counterclaimants' First Counterclaim for Violation of the Lanham Act, 15 U.S.C. § 1125, because Counterclaimants have not set forth sufficient evidence to rebut a *prima facie* case of abandonment;

4.      Judgment as a matter of law or, in the alternative, a new trial on Counterclaimants' First Counterclaim for Violation of the Lanham Act, 15 U.S.C. § 1125, because Counterclaimants have not set forth sufficient evidence to support a finding of likelihood of confusion;

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{288764.2}                                      1                          Case No. 2:20-cv-11548-JVS-AGR

MGA'S NOTICE OF MOT. FOR JMOL OR IN THE
ALTERNATIVE, MOT. FOR NEW TRIAL OR REMITTITUR

A204

5.      Judgment as a matter of law or, in the alternative, a new trial on Counterclaimants' Third Counterclaim for Common Law Misappropriation of Name or Likeness, because Counterclaimants have not set forth sufficient evidence to establish that they have standing;

6.      Judgment as a matter of law or, in the alternative, a new trial on Counterclaimants' Third Counterclaim for Common Law Misappropriation of Name or Likeness, because Claimants have not set forth sufficient evidence to establish that there has been any misappropriation;

7.      Judgment as a matter of law or, in the alternative, a new trial on Counterclaimants' Third Counterclaim for Common Law Misappropriation of Name or Likeness, Counterclaimants have not set forth sufficient evidence to establish that they have been harmed by any misappropriation;

8.      Judgment as a matter of law or, in the alternative, a new trial on Counterclaimants' Third Counterclaim for Common Law Misappropriation of Name or Likeness, because the counterclaim is barred by the First Amendment;[1]

9.      Judgment as a matter of law or, in the alternative, a new trial on Counterclaimants' First Counterclaim for Violation of the Lanham Act, 15 U.S.C. § 1125, and Third Counterclaim for Common Law Misappropriation of Name or Likeness, because Counterclaimants failed to pursue, and therefore waived, any claims against Isaac Larian as an individual;

10.     Judgment as a matter of law or, in the alternative, a new trial on Counterclaimants' First Counterclaim for Violation of the Lanham Act, 15 U.S.C. § 1125, and Third Counterclaim for Common Law Misappropriation of

---

[1] MGA maintains that the First Amendment defense also applies to Counterclaimants' Lanham Act claim (*see* Dkt. 854), but is not raising that issue herein because the Court rejected MGA's argument in granting Counterclaimants' motion for a new trial (Dkt. 860).  However, MGA reserves its right to raise the issue on appeal.

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{288764.2}                                    2                        Case No. 2:20-cv-11548-JVS-AGR
                                                                      MGA'S NOTICE OF MOT. FOR JMOL OR IN THE
                                                                      ALTERNATIVE, MOT. FOR NEW TRIAL OR REMITTITUR

A205

Name or Likeness, because Counterclaimants failed to establish any claims against Isaac Larian as an individual;

11. A new trial on, a remittitur of, or a reduction of the disgorgement award under Counterclaimants' Third Counterclaim for Common Law Misappropriation of Name or Likeness, because Counterclaimants cannot recover disgorgement of profits without establishing that such profits are attributable to the unauthorized use the OMG Girlz's likeness;

12. A new trial on, a remittitur of, or a reduction of the disgorgement and punitive damages awarded under Counterclaimants' Third Counterclaim for Common Law Misappropriation of Name or Likeness because disgorgement and punitive damages are unavailable for common law misappropriation as a matter of law;

13. A new trial on, or remittitur of, or a reduction of the punitive damages awarded under Counterclaimants' Third Counterclaim for Common Law Misappropriation of Name or Likeness, because MGA did not act with the requisite oppression, malice, or fraud, as the Court already found MGA did not act willfully;

14. A new trial on, or remittitur of, or a reduction of the punitive damages awarded under Counterclaimants' Third Counterclaim for Common Law Misappropriation of Name or Likeness because the award does not comport with the Due Process Clause; and

15. A new trial on, or remittitur of, or a reduction of the punitive damages awarded under Counterclaimants' Third Counterclaim for Common Law Misappropriation of Name or Likeness because the amount of the punitive damages award was excessive.

Please take further notice that MGA will, and hereby does, move the Court pursuant to Rule 50(b) for a judgment as a matter of law or, in the alternative, a new trial on the First Cause of Action for Declaratory Judgment,

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{288764.2}   3   Case No. 2:20-cv-11548-JVS-AGR

MGA'S NOTICE OF MOT. FOR JMOL OR IN THE
ALTERNATIVE, MOT. FOR NEW TRIAL OR REMITTITUR

A206

28 U.S.C. § 2201(a), asserted in its First Amended Complaint (Dkt. 16) on the 15 Dolls for which the jury found infringement and/or misappropriation, as MGA has established that it does not infringe upon any intellectual property rights of Defendants. At minimum, the Court should enter judgment for MGA on the eight Dolls the jury found to be infringing and/or misappropriated the OMG Girlz' likeness, but for which Defendants did not seek liability and "abandoned." Specifically, these eight Dolls are Downtown B.B., Punk Grrrl, Virtuelle, Honeylicious, Miss Independent, City Babe, Shadow, and Miss Glam.

This Motion will be and is based on this Notice of Motion, the Memorandum of Points and Authorities filed concurrently herewith, and all of the trial evidence entered to date, and upon any such additional evidence entered at trial at or before the hearing on this Motion, as well as any argument regarding this Motion.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on April 21, 2025.

Dated: May 27, 2025

UMBERG ZIPSER LLP

Mark A. Finkelstein
Attorneys for Plaintiff and Counter-Defendant MGA Entertainment, Inc., and Counter-Defendant Isaac Larian

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{288764.2}

4

Case No. 2:20-cv-11548-JVS-AGR
MGA'S NOTICE OF MOT. FOR JMOL OR IN THE ALTERNATIVE, MOT. FOR NEW TRIAL OR REMITTITUR

A207

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-11548-JVS-AGR | Date | July 8, 2025 |
| Title | MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al. | | |

Present: The Honorable **James V. Selna, U.S. District Court Judge**

| Elsa Vargas | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

Proceedings:   **[IN CHAMBERS] Order Regarding Motion and Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for New Trial or Remittitur [1121]**

Plaintiffs and Counterdefendants MGA Entertainment, Inc. and Isaac Larian (collectively, "MGA") file a motion for judgment as a matter of law or, in the alternative, new trial or remittitur. (Mot., Dkt. No. 1121.) Defendants and Counterclaimaints Clifford "T.I." Harris, Tameka "Tiny" Harris, and OMG Girlz LLC (collectively, "Harrises" or "OMG Girlz") filed an opposition. (Opp'n, Dkt. No. 1124.) MGA filed a reply. (Reply, Dkt. No. 1125.)

For the following reasons, the Court **GRANTS in part** and **DENIES in part** the motion. With respect to punitive damages, the Court **GRANTS** the motion, on the condition that the Harrises do not accept a remittitur of $1. The Harrises shall lodge a filing of their decision with the Court within 14 days upon the issuance of this Order. If the Harrises reject remittitur, the Parties shall meet and confer and file a joint proposed briefing schedule for the structure of a new trial.

Regarding the Lanham Act counterclaim and common law misappropriation counterclaim, the Court **DENIES** the motion. The Court **DENIES** the motion with respect to both the request for declaratory judgment and for judgment as a matter of law for all claims against Mr. Larian individually.

**I. BACKGROUND**

*A.    The OMG Girlz and MGA Entertainment, Inc.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    2:20-cv-11548-JVS-AGR                    Date    July 8, 2025

Title    MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

This case arises from an alleged trade dress infringement and misappropriation of name, likeness, or identity of the OMG Girlz brand by the entertainment and toy company, MGA, over the L.O.L Surprise! O.M.G. dolls line. On December 22, 2020, MGA filed a complaint against the OMG Girlz seeking declaratory judgment whether the L.O.L. Surprise! O.M.G. dolls and associated lines of toy products infringed the intellectual property rights of the OMG Girlz' mark. (See Compl., Dkt. No. 1.)

MGA is a large toy company that designs, develops, and distributes children's toys. (See Summary Judgment Order, Dkt. No. 326 at 2.) In 2001, MGA released the enormously successful "Bratz" doll. (Id.) MGA CEO Isaac Larian ("Larian") credits MGA with having "invented diversity in dolls," starting with the Bratz doll. (Trial Tr. 9/19/24 AM 97:12–13.)

Tameka "Tiny" Harris is a famous singer-songwriter who formed a teenage female vocal group called the OMG Girlz. (Trial Tr. 9/4/24 AM 33:1–2.) The core members of the group are Zonnique Pullins, Breaunna Womack, and Bahja Rodriguez. (Id.) The individual members of the OMG Girlz are not parties to the instant action.

In 2016, MGA launched a collectible series of toys called L.O.L. Surprise!. (Trial Tr. 9/11/24 AM 41:18–42:20.) The collection was a big success for MGA, quickly becoming a top selling toy in the United States. (Id.) In 2019, MGA released a spin-off line of fashion dolls, called L.O.L. Surprise! O.M.G. Outrageous Millennial Girls. (Trial Tr. 9/13/24 AM 23:3–6, 25:2–26:1.)

B.    *The Lawsuit Commences*

On December 8, 2020, the Harris Parties sent a cease-and-desist letter to MGA claiming that MGA had copied the OMG Girlz' signature look and demanding that MGA stop distributing the L.O.L. Surprise! O.M.G. dolls. (Dkt. No. 13; Trial Tr. 9/4/24 AM 93:21–94:8.) Immediately thereafter, MGA filed suit against the OMG Girlz in an effort to clarify the rights of the parties. (Trial Tr. 9/19/24 PM 43:13–44:4.) On February 22, 2021, the OMG Girlz answered and filed a counterclaim alleging violations of the Lanham Act, statutory and common law misappropriation of name or likeness, and statutory and common law unfair competition claims. (Dkt. No. 13.)

In July 2022, the Court granted summary judgment in favor of MGA on more than

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:20-cv-11548-JVS-AGR                    Date   July 8, 2025

Title   MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

half of the dolls alleged to be infringing—40 dolls in total.  (Summary Judgment Order at 23, 33.)  Additionally, the Court granted summary judgment in favor of MGA on the statutory misappropriation claim, finding that the OMG Girlz did not have a claim under Cal. Civ. Code § 3344.  (Id.)  Finally, the Court granted summary judgment in favor of MGA on the unfair competition law claims.  (Id.)

On May 9, 2023, the remaining claims were tried before a jury.[1]  (Dkt. No. 777.)  On May 26, 2023, the jury returned a verdict in favor of MGA on both remaining causes of action.  (Id.)  The jury found that the OMG Girlz had not proven that the L.O.L. Surprise! O.M.G. doll line infringed the OMG Girlz' asserted trade dress or misappropriated the OMG Girlz' name, likeness, or identity.  (Id.)  The Court additionally found that MGA was entitled to declaratory relief.  (Id.)  On June 13, 2023, the Court issued its judgment.  (Id. at 2.)

However, following the conclusion of that trial, the Supreme Court issued its ruling in Jack Daniel's Props., Inc. v. VIP Prods. LLC, 599 U.S. 140 (2023).  Following the Jack Daniel's case, this Court held that one of the jury instructions related to the Harrises' trade dress claim was erroneous and granted a new trial on both of the Harrises' claims.  (Dkt. No. 860.)

*C.      The September 2024 Trial and Jury Verdicts*

In September 2024, the third trial in this lawsuit began.  (Dkt. No. 944; Trial. Tr. 9/3/24 AM.)  Prior to trial, the Court ruled that any verdicts on equitable issues were to be regarded as advisory verdicts.  (Final Pretrial Conference Order, Dkt. No. 924 at 2.)  At trial, the Harrises narrowed the scope of their claim and sought disgorgement for seven of the 32 remaining dolls.  (See Trial Tr. 9/18/24 AM 7:21–23.)

On September 23, 2024, the jury reached its verdict.  (Verdict, Dkt. No. 1010.)  With regard to the Lanham Act, the jury found that the Harrises had established by a preponderance of the evidence that MGA infringed on the OMG Girlz' trade dress with respect to all seven dolls: Chillax, Roller Chick, Metal Chick, Bhad Gurl, Prism, Miss Divine, and Runaway Diva.  (See id. at 2–4.)  The jury found that there was no First

---

[1] The first trial ended in a mistrial.  The second trial began in May 2023.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    2:20-cv-11548-JVS-AGR                    Date    July 8, 2025

Title    MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

Amendment defense and that MGA's trade dress infringement was willful. (Id. at 5.) The jury awarded $17,872,253 as an advisory figure for damages. (Id.)

With respect to common law misappropriation, the jury found that the OMG Girlz had proven by a preponderance of the evidence that the dolls misappropriated the OMG Girlz' name, likeness, or identity. (Id. at 2.) The jury found by clear and convincing evidence that MGA acted with oppression, fraud, or malice in this misappropriation. (Id. at 6.) The jury awarded $17,872,253 as an advisory figure. (Id.) The jury also awarded punitive damages of $53,616,759. (Punitive Damages Verdict, Dkt. No. 1012 at 1.)

In deciding on MGA's claim for declaratory relief, the jury also concluded that six additional dolls infringed on the OMG Girlz' trade dress and misappropriated their name, likeness, or identity: Downtown B.B., Punk Grrrl, Virtuelle, Honeylicious, Miss Independent, and City Babe. (Id. at 7–14.) The jury found that one doll, Shadow, infringed on the OMG Girlz' trade dress only, and another doll, Miss Glam, misappropriated the OMG Girlz' name, likeness, or identity. (Id.) The jury determined that the following 13 dolls did not infringe on the OMG Girlz' trade dress or misappropriate their name, image, or likeness: Ferocious, Fame Queen, Uptown Girl, Class Prez, Rocker Boi, Lady Diva, Sweets, Spicy Babe, Miss Royale, B-Gurl, Major Lady, Cosmic Nova, 24K D.J., Snowlicious, Candylicious, Moonlight B.B., and Gamma Babe. (Id.)

On April 15, 2025, the Court denied the Harrises motion for permanent injunction and prejudgment interest, but awarded post-judgment interest. (Permanent Injunction Order, Dkt. No. 1113.)

D.    *The Present Motion*

The Court entered its Final Judgment on April 29, 2025. (Final Judgment, Dkt. No. 1118.) On May 27, 2025, MGA filed the present motion requesting judgment as a matter of law or, in the alternative, new trial or remittitur.

**II. LEGAL STANDARD**

A.    *Renewed Judgment as a Matter of Law*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:20-cv-11548-JVS-AGR                     Date   July 8, 2025

Title   MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

Pursuant to Fed. R. Civ. P. 50(a), a motion for judgment as a matter of law must be made before the case is submitted to the jury and must specify the judgment sought and the law and facts that entitle the movant to the judgment. Fed. R. Civ. P. 50(a). If the Court does not grant the motion, then "the court is considered to have submitted the action to the jury subject to the court's later  deciding the legal questions raised by the motion." E.E.O.C. v. Go Daddy Software, Inc., 581 F.3d 951, 961 (9th Cir. 2009); Zion v. Cty. of Orange, No. 8:14-cv-01134, 2019 U.S. Dist. LEXIS 228259, at *15 (C.D. Cal. Apr. 17, 2019).

A party may move to renew its motion for judgment as a matter of law under Fed. R. Civ. P. 50(a) within twenty-eight days after the entry of judgment, or if the motion addresses a jury issue not decided by a verdict, no later than twenty-eight days after the jury was discharged. Fed. R. Civ. P. 50(b). It may also move in the alternative a request for a new trial under Fed. R. Civ. P. 59. Id.

A moving party is entitled to judgment as a matter of law if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion that is contrary to the jury's verdict. Go Daddy Software, 581 F.3d at 961. A jury's verdict "must be upheld" if it is supported by substantial evidence, even where it "is possible to draw a contrary conclusion." Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002). In ruling on a motion for judgment as a matter of law, the court may: "(a) allow the judgment to stand, (b) order a new trial, or (c) direct entry of judgment as a matter of law." White v. Ford Motor Co., 312 F.3d 998, 1010 (9th Cir. 2002). Judgment is appropriate "if there is no legally sufficient basis for a reasonable jury to find for that party on that issue." Costa v. Desert Palace, Inc., 299 F.3d 838, 859 (9th Cir. 2002). Additionally, when making its determination, the Court cannot "make credibility determinations" and "must disregard all evidence favorable to the moving party that the jury is not required to believe." Tan Lam v. City of Los Banos, 976 F.3d 986, 995 (9th Cir. 2020) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 159-51 (2000)).

*B.*   *New Trial*

Pursuant to Rule 59(a), in an action in which there has been a jury trial, a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Courts may grant new trials, "even though the verdict is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    2:20-cv-11548-JVS-AGR                           Date    July 8, 2025

Title    MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

supported by substantial evidence, if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." United States v. 4.0 Acres of Land, 175 F.3d 1133, 1139 (9th Cir. 1999) (internal quotations omitted). Authority to grant a new trial "is confided almost entirely to the exercise of discretion on the part of the trial court." Allied Chem. Corp. v. Daiflon, 449 U.S. 33, 36 (1980) (per curiam). However, a trial court may "not grant [a new trial] simply because the court would have arrived at a different verdict." Pavao, 307 F.3d at 918.

## III. DISCUSSION

### A.    Punitive Damages Award

MGA argues that the Court should vacate the punitive damages award or, in the alternative, order a remittitur or new trial. (Mot. at 10.) Specifically, MGA contends that: (1) it did not act willfully, and (2) the award is excessive and violates the Due Process Clause. (Id. at 10–14.) MGA also reiterates prior arguments that punitive damages are not available for a claim of common law misappropriation.[2]

#### 1.    Waiver of Punitive Damages Argument

As an initial matter, the Harrises argue that MGA has waived its punitive damages argument because it did not move for judgment as a matter of law on this issue before the jury's verdict. (Opp'n at 2.) MGA correctly notes that it is not moving for judgment as a matter of law on punitive damages and that it did not do so at trial under Federal Rule Civil Procedure 50(a). (Reply at 9.) Rather, MGA is requesting punitive damages relief under Rule 59 and the Due Process Clause. Accordingly, MGA's argument is not waived.

#### 2.    Willfulness of MGA's Conduct

---

[2] The Court will not address this argument. As MGA has respectfully noted, the Court has already ruled on this issue and found that punitive damages are available for a claim of common law misappropriation. (See Equitable Issues Order, Dkt. No. 1090 at 12–14.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    2:20-cv-11548-JVS-AGR                    Date    July 8, 2025

Title    MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

In California, punitive damages are available "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Waits v. Frito-Lay, Inc., 978 F.2d 1093, 1104 (9th Cir. 1992) (citing Cal. Civ. Code § 3294(a)).  Malice is defined as despicable conduct carried out with a "willful and conscious disregard of the rights or safety of others."  Id.  Likewise, fraud requires a finding of "intentional misrepresentation, deceit, or concealment . . . with the intention on the part of the defendant of thereby depriving a person of property or legal rights[.]"  Cal. Civ. Code § 3294(c)(3). Finally, oppression is defined as "despicable conduct" done with a "conscious disregard of that person's rights."  Id. § 3294(c)(2).  Thus, there must be a finding of intent, conscious disregard, or willfulness to support punitive damages in California.

The Harrises argue that the evidence at trial supports a finding of willfulness. (Opp'n at 3.)  The Harrises advance three reasons why the evidence supports a finding of willfulness: (1) lead designers' knowledge about the OMG Girlz, (2) overlapping markets, and (3) MGA's lack of credibility following brazen misappropriation of other celebrity identities.  (Opp'n at 4–5.)  At oral argument, the Harrises presented more argument for why the evidence supports a finding of willfulness.

### a.    Designers' Knowledge

The Harrises presented evidence at trial that lead designers, including Blanche Consorti, knew of the OMG Girlz in December 2019, prior to the creation of all of the infringing dolls.  (Trial Tr. 9/10/24 PM 47:5–11.)  Through Consorti, the Harrises presented evidence of an email exchange where MGA employees discuss the lyrics of a song, which they believed included a reference to the "OMG dolls."  (Id. 47:9–49:25.)  To the employees' dismay, however, a fellow coworker notes that the song was likely a reference to the "OMG Girlz" and not their OMG dolls.  (Id.)  Consorti appears to neither confirm nor deny any prior knowledge of the OMG Girlz.  (Id.)  Despite this confusion, the designers never reached out to the OMG Girlz to investigate.  (Id. at 85.)

As the Court previously found in its Equitable Issues Order:

The email exchange and testimony tend to support a finding that some employees and at least one designer, Consorti, were aware of the OMG Girlz existence in

CV-90 (06/04)                    **CIVIL MINUTES - GENERAL**                    Page 7 of 33

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:20-cv-11548-JVS-AGR                    Date   July 8, 2025

Title   MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

December 2019.  However, this evidence largely fails to show that there was a deliberate intent to copy their trade dress upon learning of their identity.

(Equitable Issues Order, Dkt. No. 1090 at 7.)

The Court once again agrees that this evidence is insufficient to show willfulness or intent.  At best, this evidence shows that the designers saw a passing reference to the OMG Girlz and were negligent in not following up with the OMG Girlz having, themselves, been momentarily confused.  Yet, nothing in the email thread provides clear and convincing evidence that Consorti or other designers knew of the OMG Girlz trade dress or willfully made use of that knowledge to create the infringing dolls.

### b.    Overlapping Markets

The Harrises also presented evidence at trial that MGA's target audience overlapped with the OMG Girlz' audience.  (Trial Tr. 9/13/24 AM 83:6–24.)  While overlapping markets can be indicative of intentional efforts to deceive, see Playboy Enters. v. Netscape Comms. Corp., 354 F.3d 1020, 1028 (9th Cir. 2004), it can equally be unexceptional.  In this case, the overlapping market was that of Black/African-American mothers and Hispanic mothers.  (Trial Tr. 9/13/24 AM 83:12–16.)

This overlapping market, however, was partially explained by Mr. Larian, who testified that he was proud that Bratz was founded with a diverse line of dolls and has continued to sell its diverse brand of dolls well before the 2019 line of L.O.L. Surprise! dolls.  (Trial Tr. 9/19/24 AM 125:16–20.)  Further, Mr. Larian explained that MGA sells to "every girl, every nationality, [and] every color," and that it was Bratz' business practice to study the reactions and preferences of different demographics for dolls.  (Id. 126:19–25.)  Thus, the mere coincidence that the infringing dolls appealed to some of the same consumers that followed the OMG Girlz does not support a finding of intent to deceive, nor a finding based on clear and convincing evidence.

### c.    MGA's Lack of Credibility

The Harrises argue that MGA's story of innocence is called into question by the lack of credibility of its doll designers.  (Opp'n at 4.)  The Court has previously described the credibility issue as follows:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:20-cv-11548-JVS-AGR                        Date   July 8, 2025

Title      MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

On numerous occasions, witnesses, particularly designers, were confronted with dolls that appeared to copy famous celebrities. Rather than concede copying, the designers attempted to explain away blatantly obvious design features copied from real individuals.[3] (See Trial Tr. 9/18/24 AM 32:5–34:14; Trial Tr. 9/19/24 AM 61:23–62:19.)

(Equitable Issues Order at 8.)

The Court agrees, as it now can on a motion for new trial,[4] that these witnesses lost credibility as a result of the testimony about copying other celebrities. However, the Court still finds that while this evidence is the strongest evidence of willfulness or intent advanced by the Harrises, it falls short of clear and convincing. Indeed, MGA conceded to using other celebrities as inspiration for their dolls and even discussed forming partnerships with celebrities. (See Trial Tr. 9/10/24 PM 34:21–35:4; Trial Tr. 9/18/24 PM 111:15–19; Trial Tr. 9/19/24 AM 62:11–14.) However, when it came to the OMG Girlz, there was no reliable evidence that MGA had any knowledge of the group's trade dress or desire to use their likeness to create the infringing dolls. The strong appearance that MGA copied other celebrities does not provide clear and convincing evidence that such was the case for the OMG Girlz.

Put together, the evidence falls short of showing willfulness, intent, or conscious disregard with respect to MGA's conduct. Where, as here, "the verdict is contrary to the clear weight of the evidence" or "would result in a miscarriage of justice," the Court has "the right, and indeed the duty, to weigh the evidence . . . and to set aside the verdict of

---

[3] For instance, during the cross of Consorti, she was asked whether a doll called "Piano King" (who clearly looks like Elton John), copied the famous singer Elton John. (Trial Tr. 9/18/24 AM 32:16–23.) Consorti maintained that it was not a copy of Elton John. (Id.) Consorti was shown an MGA doll called "Shimone Queen," with one white sparkly glove, glittery black costume, large glasses, and curly black hair (strongly resembling Michael Jackson). Yet, Consorti stated "[t]hat's a coincidence." (Id. 34:1–35:4.) The same pattern was repeated with other famous celebrities such as Lady Gaga and Audrey Hepburn. (Id.)

[4] Unlike a Rule 50 motion, under Rule 59, the Court "can weigh the evidence and assess the credibility of the witnesses." See Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd, 762 F.3d 829, 845 (9th Cir. 2014).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:20-cv-11548-JVS-AGR                     Date   July 8, 2025

Title     MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

the jury[.]"  See Fenner v. Dependable Trucking Co., Inc., 716 F.2d 598, 602 (9th Cir. 1983).  Therefore, the jury's verdict on punitive damages cannot be sustained.

### d.     Logo Change and Infringement During Trial

The Harrises argue that MGA's conduct after learning about the OMG Girlz further proves willfulness of conduct.  Specifically, after the 2019 email thread where Consorti and other designers discuss the OMG Girlz, MGA changes its logo from "L.O.L. Surprise! O.M.G." to include "Outrageous Millennial Girls" underneath the O.M.G.  The Harrises argue that "outrageous millennial girls" brought the infringing dolls closer to the OMG Girlz trade dress.  Further, the Harrises argue that MGA's continued release of infringing dolls demonstrates its intent to capitalize on the OMG Girlz likeness and identity.

The Court disagrees.  First, as noted, there is scarce evidence that MGA was aware of the OMG Girlz in 2019 such that they would act in a way to intentionally copy the trade dress.  Thus, it follows that the logo change in 2019 was not indicative of any intent to copy.  Second, even if there was sufficient knowledge in 2019 to show an intent to copy, the logo change to include "outrageous millennial girls" falls far short from demonstrating willfulness.  The change in logo can equally (if not more reasonably) be viewed as MGA distancing itself from the OMG Girlz.  MGA notably did not use "girlz"[5] in its logo rework nor do the OMG Girlz claim that the OMG in their name stands for "outrageous millennial girls."  Thus, this evidence does not support a clear and convincing finding of willfulness or intent.

Nor does the release of more infringing dolls support a finding of willfulness.  The Harrises argue that MGA's continued infringement after the beginning of trial should support a finding of willfulness.  However, the release of these dolls is equally explained by Larian and MGA's conviction that it was not infringing on the trade dress because of the reasonable dissimilarities in the dolls (such as skin color, clothing, style, and names).  See San Miguel Pure Foods Co., inc. v. Ramar Int'l Corp., 625 F. App'x 322, 325 (9th

---

[5] And even assuming MGA did use "Girlz," Larian testified that MGA has used the "z" in Girlz for products dating back as far as ten years before the OMG Girlz formed.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    2:20-cv-11548-JVS-AGR                      Date    July 8, 2025

Title    MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

Cir. 2015) ("Infringement is not willful if the party reasonably believes its usage of a trademark is not barred by law.")

### e.    Lora Stephens

The Harrises next argue that Lora Stephens' testimony demonstrates a willfulness or intent on the part of MGA and its designers. Stephens began working with MGA in 2017 and began working as a product designer around 2019. (Trial Tr. 9/18/24 PM 116:9–21.) Stephens was aware of the OMG Girlz before she joined MGA. (Trial Tr. 9/19/24 AM 74:1–3.) Stephens also followed Tiny Harris on Instagram. (Id. at 76:23–25.) Stephens also had an image of Breaunna Womack on her Pinterest board that she used for inspiration to design dolls. (Id. at 86:16–18.) Finally, during her cross examination, the Harrises were able to demonstrate that MGA had incorrectly responded to an interrogatory when asked whether any employees knew of the OMG Girlz before the lawsuit commenced. (Id. at 79:25–80:5.) Stephens conceded that MGA had not asked her whether she knew of the OMG Girlz. (Id. at 83:2–3.)

The Court finds that this evidence, too, fails to establish clear and convincing evidence of willfulness. Just as with the 2019 email thread, Stephens' knowledge of the OMG Girlz does not demonstrate an intent to copy. Rather, it shows that one designer had knowledge of the OMG Girlz while designing the infringing dolls. Further, the evidence that MGA falsely represented an interrogatory response may create an inference that MGA was hiding those with knowledge (as opposed to mere mistake), but it likewise fails to show an intent to copy the trade dress. The most persuasive evidence of an intent to copy coming from Stephens' testimony was the evidence regarding her Pinterest board, which had an image of Breaunna Womack on it. While the jury could certainly have placed strong weight on this fact, the board also contained approximately 1,200 images, most of whom were Black women with various hair colors including purple, (see id. 86:10–25.)

### f.    CEO Isaac Larian's Testimony and Demeanor

Finally, the Harrises argue that MGA's CEO Isaac Larian's malicious demeanor at trial demonstrated a lack of respect for the OMG Girlz trade dress. The Harrises are correct that, at times, Larian was blunt and dismissive towards the OMG Girlz. For instance, Larian accused them of being extortionists and hustlers (see Trial Tr. 9/19/24

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:20-cv-11548-JVS-AGR                      Date   July 8, 2025

Title        MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

PM 51:24–52:4) and when describing the group said that their brand "ha[d] no value and that "[t]hey are nowhere," (id. at 111:13–22). Larian also likely lost a modicum credibility with the jury in his steadfast conviction that MGA's dolls didn't share any similarities with the OMG Girlz—particularly when juxtaposed with the similarities he noted were obvious when it came to his company's lawsuits against competitors.

However, while Larian's vituperous attitude was, at times, belittling, this does not demonstrate that he or the designers at MGA willfully copied the trade dress or even acted with conscious disregard. The Harrises argue that his testimony creates an inference that his actions follow his attitude, but his testimony equally creates an inference that he reasonably believes his dolls did not infringe and sought to protect the reputation of his designers and company. Thus, at best, Larian's demeanor contributes only tepidly to the side of willfulness.

### g.    Summary of Willfulness Evidence

On balance, the jury's finding of willfulness remains unsupported by the clear weight of evidence. The 2019 email thread among the designers only tenuously demonstrates knowledge of the OMG Girlz and entirely fails to link any such knowledge with an intent. Further, while the Harrises established that designer Lora Stephens had knowledge of the OMG Girlz, they failed to show a meaningful connection between that knowledge and willful infringement. These pieces, when put together, establish just one passing reference to the OMG Girlz in MGA internal emails and one image of a single band member on one product designer's Pinterest board that also contained over 1,200 similar fashion-related images. This is not clear and convincing evidence of willful infringement or conscious disregard for the rights of others.

With respect credibility, the Harrises were successfully able to discredit product designer Blanche Consorti when it came to the similarities between certain dolls not at issue and real life celebrities. The Court has noted that this evidence was perhaps the most significant evidence of willfulness because it created an inference that if MGA was willing to so blatantly ignore obvious similarities to other celebrities, that it might be so inclined to do so with the OMG Girlz. However, the blatant copying of other celebrities does not demonstrate that such was the case at hand. In order for this inference to hold weight, it must be coupled with independently strong evidence of intent or willfulness.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:20-cv-11548-JVS-AGR                    Date   July 8, 2025

Title   MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

Finally, the remaining evidence supporting willfulness can be equally explained if not better explained by non-willful alternatives. For instance, Larian's notably belittling attitude towards the OMG Girlz does not provide clear and convincing evidence of willful intent where it can equally be explained by his reasonable belief of non-infringement and desire to product his designers reputations. (See Trial Tr. 9/19/24 AM 111:2–15.) Likewise, the overlapping markets between the OMG Girlz and the L.O.L. Surprise! O.M.G. Dolls is unexceptional and credibly explained by the ethos of MGA as a company founded by an Iranian immigrant seeking to develop a market for diverse dolls sold to "every girl, every nationality, [and] every color." (See Trial Tr. 9/19/24 AM 125:16–126:25.)

In sum, the clear weight of evidence does not support a clear and convincing finding of willfulness, intent, or conscious disregard of the OMG Girlz' trade dress.

### H.   Remedy

Having found that the jury's verdict on punitive damages cannot stand, an entry of judgment on the original award of $53,616,759 would constitute a reversible error. Id. at 603. Instead, "[w]hen the court . . . determines that the damages award is excessive, it has two alternatives. It may grant defendant's motion for new trial or deny the motion conditional upon the prevailing party accepting a remittitur. Id.

"A remittitur must reflect 'the maximum amount sustainable by the proof.'" Oracle Corp. v. SAP AG, 765 F.3d 1081, 1094 (9th Cir. 2014). In this case, the Court finds that the maximum punitive damages award sustainable by the proof is $1. In assessing the evidence of MGA's willfulness or intent, the Court finds that this amount reflects the fair value of a punitive award for MGA's conduct.

At oral argument, the Harrises noted that they plan to reject remittitur and request a new trial. The Harrises shall lodge a filing of their decision with the Court 14 days of the issuance of this Order. If the Harrises reject remittitur, the Parties shall meet and confer and file a joint proposed briefing schedule for the structure of a new trial.

### 3.   California Law and Due Process

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    2:20-cv-11548-JVS-AGR                    Date    July 8, 2025

Title    MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

In the alternative, MGA argues that even if punitive damages are available, the amount awarded was improper under Cal. Civ. Code § 3294 and violates the Due Process Clause.

### a.    California Requirement for Actual Damages

First, MGA argues that punitive damages are improper where there are no actual damages. "California courts have long interpreted Section 3294 to require an award of compensatory damages, even if nominal, to recover punitive damages." California v. Atlus Finance S.A., 540 F.3d 992, 1000 (9th Cir. 2008); accord Mother Cobb's Chicken Turnovers, Inc. v. Fox, 10 Cal. 2d 203, 205 (1937) ("Actual damages must be found as a predicate for exemplary damages.") However, "it is immaterial that plaintiff's recovery is in the form of specific restitution, rather than monetary damages." Horn v. Guaranty Chevrolet Motors, 270 Cal. App. 2d 477, 484 (1969); Millar v. James, 254 Cal. App. 2d 530, 533 ("[T]he fact that the plaintiff's recovery was in the form of specific restitution, rather than monetary damages, does not necessarily preclude an award of exemplary damages.")

In this case, the Court instructed the jury that "the specific items of damages claimed by the OMG Girlz" were "any profits that MGA received from the use of the OMG Girlz' name or identity or likeness. . . ." (Jury Instructions, Dkt. No. 1013 at 29.) The jury was then instructed that if "MGA's conduct caused the Harris Parties harm . . ., you must decide whether that conduct justifies an award of punitive damages." (Id. at 30.) The jury ultimately awarded $17,872,253 in damages with the understanding that these damages reflected the profits that MGA received from the use of the OMG Girlz' name, identity, or likeness. Therefore, punitive damages are not precluded under Cal. Civ. Code § 3294 simply on the basis that damages were provided by restitution.

### b.    Constitutional Limits

In BMW of N. Am., Inc. v. Gore, the Supreme Court provided three guideposts for determining whether a punitive damages award complies with due process: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties. 517 U.S. 559, 575 (1996).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

Case No.     2:20-cv-11548-JVS-AGR                    Date     July 8, 2025

Title     MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

### i.     Degree of Reprehensibility

"Reprehensibility of the alleged conduct is 'the most important indicium of the reasonableness' of punitive damages." Riley v. Volkswagen Grp. of Am., Inc., 51 F.4th 896, 902 (9th Cir. 2022) (citing State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003)).  In the Ninth Circuit, courts consider whether (1) the harm caused was physical as opposed to economic, (2) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others, (3) the target of the conduct had financial vulnerability, (4) the conduct involved repeated actions or was an isolated incident, and (5) the harm was the result of intentional malice, trickery, or deceit, or mere accident.  State Farm, 538 U.S. at 419.

The jury found that MGA's trade dress infringement was willful and found by clear and convincing evidence that MGA acted with fraud, oppression, or malice.  (Jury Verdict at 5–6.)  However, this Court has an independent obligation to consider the facts and apply the Gore factors.  See Mattel, Inc. v. MGA Enters., Inc., 801 F. Supp. 2d 950, 953 (C.D. Cal. 2011).  The Court will thus independently evaluate the degree of reprehensibility of MGA's conduct.

On the first factor, the Court finds that the harm was predominantly economic in nature, leaning against reprehensibility.  Indeed, there was little evidence of emotional harm because the Court specifically precluded evidence of emotional distress damages.  (Dkt. No. 521.)  Moreover, many of the "intangible harms" claimed by the Harrises—such as sacrificing life opportunities and bleaching their hair—demonstrate only the OMG Girlz' desire to cultivate their trade dress and *not* any reprehensible misconduct on the part of MGA.

The second and third factors likewise weigh against a finding of reprehensibility.  There is no evidence in the record to suggest that MGA acted with indifference or reckless disregard to the health or safety of others.  Further, despite the Harrises contention that MGA's "money grab" theory proves economic vulnerability, the trial record shows that the Harrises were not financially vulnerable.  (See e.g., Trial Tr. 9/4/24 AM 33:14–19 ("The OMG Girlz – they made quite a bit of money."); Trial Tr. 9/6/24 PM 67:6–16 (Mr. Harris stating "I already have money" and that he's not here for a "big money grab").)

A222

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    2:20-cv-11548-JVS-AGR                    Date    July 8, 2025

Title    MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

The fourth factor—repeated misconduct—favors reprehensibility. The jury found that MGA infringed the OMG Girlz' trade dress on several dolls over a period of years. This shows repeated misconduct. In coming to this conclusion, the Court does not find that the copying of other celebrities increases the reprehensibility of MGA's conduct nor does the Court find that MGA's "money grab" trial theory demonstrate repeated reprehensible conduct.

The final factor weighs against reprehensibility. As the Court discussed, the evidence does not support a finding of willfulness, intent, or conscious regard. Likewise, the evidence does not show that MGA acted with trickery, deceit, or malice when it infringed on the OMG Girlz' trade dress. The only evidence suggesting that MGA had knowledge of the OMG Girlz, as opposed to merely accidental infringement, is a single email thread where the doll designers confused OMG Dolls with OMG Girlz. At best, this conduct shows negligence.

On balance, the factors tend to show that MGA's conduct was not reprehensible.

>    ii.    *Disparity Between Actual Harm and Punitive Damages Awarded*

MGA argues that there are no actual damages and thus *any* punitive damages award is both disproportionate and unreasonable. (Reply at 17.) As discussed, the Court rejects this contention and finds that the $17,872,253 serves as a form of damages sufficient to support exemplary damages. (See Supra, Section A.3.a.)

The Harrises note that the punitive damages award of $53,616,759 is precisely a 3:1 ratio of the award for disgorgement of profits. (Opp'n at 12.) This ratio passes constitutional scrutiny, even for cases where "there are significant economic damages and punitive damages are warranted but behavior is not particularly egregious. . . ." See Planned Parenthood of Columbia/Willamette Inc. v. American Coalition of Life Activists, 422 F.3d 949, 962 (9th Cir. 2005) (affirming that a 4:1 ratio was a good proxy for the limits of constitutionality where the behavior was not particularly egregious); State Farm, 538 U.S. at 419 (holding that an award within a single-digit ratio is more likely to comport with due process).

A223

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:20-cv-11548-JVS-AGR                        Date   July 8, 2025

Title   MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

> *iii.    Differences Between Punitive Damages and Civil Penalties in Comparable Cases*

MGA argues that the most direct analogous statute is Cal. Civ. Code § 3344. (Reply at 17.)  Section 3344 is the statutory partner of California's common law misappropriation and provides a statutory minimum award of $750 to a meritorious litigant.  See Miller v. Collectors Universe, Inc., 159 Cal. App. 4th 988, 1002 (2008).

The Court finds that § 3344 is a comparable civil penalty and favors upholding the $53,616,759 verdict.  The $750 statutory minimum was meant to provide "a simple, civil remedy" to non-celebrities who prevailed at trial but often could not prove damages under the common law.  Id.  However, it was not meant to limit litigants to $750 nor was it meant to represent the average award for such claims.  Indeed, the statute itself provides for "the greater of [$750] . . . or the actual damages suffered by [the claimant] . . . *and any profits from the unauthorized use.* . . . Punitive damages may also be awarded to the injured party[.]"  Id. at 1000 (quoting Cal Civ. Code § 3344) (emphasis added).

Thus, under the analogous statutory regime, an award of disgorgement of profits and a punitive damages additive would be appropriate.  This Gore factor supports upholding the $53,616,759 verdict.

> *iv.    Remittitur*

On balance, the Court finds that while MGA's conduct was not reprehensible, the $53,616,759 verdict is within the reasonable and proportionate constitutional ratio for punitive damages and level with comparable civil penalties.  Thus, remittitur is not warranted under the Due Process Clause.

> B.    *Common Law Misappropriation*

MGA argues that the Court should grant judgment as a matter of law on the misappropriation counterclaim or, alternatively, grant a new trial.  (Mot. at 14.) Specifically, MGA contends that: (1) the Harrises do not have standing, (2) the First Amendment protects its dolls, (3) there is not substantial evidence of misappropriation, (4) there is no actual harm, and (5) any harm is not attributable to MGA's conduct.

A224

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-11548-JVS-AGR | Date | July 8, 2025 |

| | |
|---|---|
| Title | MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al. |

1.      Standing

"[S]tanding can be challenged 'at any stage' of the case, . . . 'even after trial and the entry of judgment.'"  United States v. $1,106,775.00 in United States Currency, 131 F.4th 710, 719 (9th Cir. 2025).  "The existence of standing turns on the facts as they existed at the time the plaintiff filed the complaint."  Skaff v. Meridien N. Am. Beverly Hills, LLC, 506 F.3d 832, 838 (9th Cir. 2007).  However, as the litigation proceeds, the "manner and degree of evidence required" to challenge standing will increase accordingly.  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).  "In response to a summary judgment motion . . . [a plaintiff] must 'set forth' by affidavit or other evidence 'specific facts' . . . which for purposes of the summary judgment motion will be taken to be true."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (internal quotations and citation omitted).  "[A]t the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'"  Id. (citation omitted).

This Court addressed standing in 2022 when it ruled on the first motion for summary judgment.  (Summary Judgment Order at 23–24.)  At the time, the Court found that the OMG Girlz had assigned their right of publicity to Grand Hustle and Pretty Hustle, both of which were parties to the action.  (Id. at 24.)  MGA now argues that that a 2012 contract between the Harrises and Interscope Records superseded the assignment to Grand Hustle and Pretty Hustle.  (Mot. at 15.)

The Court finds that the Harrises still have standing.  In its Summary Judgment Order, the Court unequivocally asserted that "[t]he Court agrees and finds that OMG Girlz assigned their right of publicity to Grand Hustle and Pretty Hustle, both of which are party to this action."  (Summary Judgment Order at 24.)  This conclusion was not merely a denial of MGA's motion for summary judgment on this issue, but instead a conclusive finding that the underlying contracts were uncontroverted and standing was

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:20-cv-11548-JVS-AGR                          Date   July 8, 2025

Title      MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

proven as a matter of law.[6]  Had the Court merely found that the OMG Girlz had come forward with controverted evidence, it would have said so.

In reviewing the plain terms of the agreements, the 2012 contract terminated at the expiration of the exclusive artist agreement.  (Dkt. No. 148-8 at 3.)  At such time, the status of the OMG Girlz' publicity rights reverted back to the 2011 contract between the OMG Girlz, Grand Hustle, LLC, and Pretty Hustle LLC.  (Id.; see also Dkt. No. 148-7.) Counter-Claimaints are not aware of any other written agreements assigning intellectual property rights.  (Decl. of Mark Finkelstein ("Finkelstein Decl."), Dkt. No. 148-3, Ex. I (Tameka Harris Dep.), at 98–99, 123:1–18.)  Accordingly, the Court finds that the Harrises still have standing.

### 2.   First Amendment Defense

The California Supreme Court has recognized the "tension between the right of publicity and the First Amendment."  Comedy III Prods., Inc. v. Gary Saderup, Inc., 25 Cal. 4th 387, 396 (2001).  California courts apply a test to determine "whether the new work merely supersede[s] the objects of the original creation . . . or instead adds something new, with a further purpose or different character."  Ross v. Roberts, 222 Cal. App. 4th 677, 685 (2013).  The central inquiry is whether the work is "transformative." Id. (citing Comedy III, 25 Cal. 4th at 396).  A work is transformative if the "product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness."  Comedy III, 25 Cal. 4th at 407.

At summary judgment, the Court concluded that it could not say "as a matter of law" that the Dolls were sufficiently transformed.  (Summary Judgment Order at 29.)

---

[6] The Court agrees, however, with MGA's position that had the Court relied on the summary judgment standard and merely denied MGA's motion on standing, that the Harrises would likely have needed to prove standing with evidence at trial.  See Bennett v. Spear, 520 U.S. 154, 168 (1997) (holding that a plaintiff "must ultimately support any contested facts with evidence adduced at trial"); Kumar v. Koester, 131 F.4th 746, 755 (9th Cir. 2025) ("In a case like this that proceeds to trial, the specific facts set forth by the plaintiff to support standing must be supported adequately by the evidence adduced at trial."); Diamond Resorts U.S. Collection Dev., LLC v. Pandora Marketing, LLC, 656 F. Supp. 3d 1073, 1083 (C.D. Cal. 2023) (same).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    2:20-cv-11548-JVS-AGR                      Date    July 8, 2025

Title    MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

Instead, the Court found that the question would be better presented to the trier of fact. (Id.)  At trial, the jury found that MGA had not proven by a preponderance of the evidence that its dolls were protected by the First Amendment.  (Jury Verdict, Dkt. No. 1010 at 5.)  The jury's finding was supported by ample trial evidence, including the exhibits of the dolls and testimony of Harrises regarding their trade dress.[7]  Further, while MGA provided witnesses to deny any similarity between the infringing dolls and the OMG Girlz, the jury was free to disregard these witnesses as not credible and thus reject the First Amendment defense.  Indeed, as the Court noted in its Equitable Issues Order, on numerous occasions, MGA's witnesses, "particularly designers," failed to concede to blatant copying of real life celebrities nor did these designers even attempt to argue for a transformative use of such dolls.  (See Equitable Issues Order, Dkt. No. 1090 at 8 (citing Trial Tr. 9/18/24 AM 32:5–34:14).)

On the basis of the trial record, the jury had substantial evidence to reject the First Amendment defense and the Court declines to exercise its discretion to grant a new trial on this issue.

> 3.    Evidence of Misappropriation

In California, a claim for common law misappropriation requires a plaintiff to prove: (1) the defendant's use of the plaintiff's name, likeness, or identity; (2) the misappropriation of plaintiff's name or likeness to the defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury.  See Newcombe v. Adolf Coors Co., 157 F.3d 686, 692 (9th Cir. 1998).  This is also known as the right of publicity.  Abdul-Jabbar v. Gen. Motors Corp., 85 F.3d 407, 413 (9th Cir. 1996).

MGA argues that there is not sufficient evidence to support the jury's finding that the second element is satisfied: misappropriation of plaintiff's identity.  First, MGA notes that the OMG Girlz inconsistently identified which dolls misappropriated their identity.  (Mot. at 19.)  MGA is correct that individual band members occasionally

---

[7] The Court does not agree with the Harrises that Mr. Larian "testified that MGA did **not** add something new to the OMG Girlz likeness."  (See Opp'n at 13.)  When asked whether MGA "started with the OMG Girlz likeness to make the O.M.G. dolls," Mr. Larian plainly testified "absolutely 1,000 percent no."  (Trial Tr. 9/19/24 PM 54:7–12.)  This was clearly not an admission to non-transformative use; but rather, a denial of copying at all.

A227

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:20-cv-11548-JVS-AGR | Date | July 8, 2025 |
|---|---|---|---|

| Title | MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al. |
|---|---|

contradicted themselves. (Compare Trial Tr. 9/12/24 PM 86:21–87:17 (Ms. Pullins stating that Ferocious and Fame Queen share her likeness) with Trial Tr. 9/12/24 AM 100:7–12 (Ms. Pullins stating that these dolls "are definitely Beyonce and Lady Gaga").) At times, the group contradicted one another. (Compare Trial Tr. 9/5/24 PM 103:1–104:2 (Ms. Womack stating that Roller Chick looked like Bahja Rodriguez) with Trial Tr. 9/12/24 PM 94:20–24 (Ms. Pullins stating that Roller Chick does not look like Ms. Rodriguez).)

Second, MGA claims that the differences in the dolls themselves contradicts a finding of misappropriation. Specifically, when comparing the dolls to one another, they each have different hair lengths and textures, styles, skin tones, eye colors, outfits, and accessories. (Mot. at 20.) As a matter of law, a plaintiff cannot continually move the target of their identity because a "lack of stasis is inconsistent with a claim of appropriation." Kirby v. Sega of America, Inc., 144 Cal. App. 4th 47, 56 (2006).

Neither of these rationales are persuasive. The jury was presented with trial exhibits of the relevant dolls and the relevant photographs of the OMG Girlz. While some of the infringing dolls may have had different styles and different looks, the jury was shown exhibits of the OMG Girlz in similar styles and looks. The jury also heard testimony from the OMG Girlz, T.I. Harris, Tiny Harris, and others, about the OMG Girlz' identity and likeness, including their race, the clothes they wore, the names of their group, and the colors of their clothing and brand. To be sure, the band members were not always consistent with their answers; but such inconsistency was a credibility determination properly placed with the jury. Ultimately, the jury had substantial evidence with which to find that MGA misappropriated the OMG Girlz' identity and thus satisfied the second element.

### 4.  Actual Harm and Resulting Injury

A claim for common law misappropriation requires "resulting injury." See Newcombe, 157 F.3d at 692. "Resulting injury is the *sine qua non* of a cause of action for misappropriation of name." Silvinsky v. Watkins-Johnson Co., 221 Cal. App. 3d 799, 807 (1990). The Court finds that, as a matter of law, this element has been satisfied and the jury's verdict is supported by the substantial weight of evidence.

A228

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:20-cv-11548-JVS-AGR                     Date   July 8, 2025

Title      MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

In California, disgorgement of unjustly earned profits is permitted "regardless of whether a defendant's actions caused a plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable." In re Facebook, Inc. Internet Tracking Litig., 956 F.3d 589, 600 (9th Cir. 2020). Indeed, "[t]he principle of unjust enrichment . . . is broader than mere 'restoration' of what the plaintiff lost." Cty. of San Bernardino v. Walsh, 158 Cal. App. 4th 533, 542 (2007). "Many instances of 'liability based on unjust enrichment . . . do not involve the restoration of anything the claimant previously possessed . . . includ[ing] cases involving the disgorgement of profits . . . wrongfully obtained. . . .'" Id. (alterations in original). Thus, unjust enrichment may form the basis of a resulting injury for California right of publicity claim.[8]

In this case, the jury heard evidence that MGA profited from the OMG Girlz' name and likeness. The jury could have reasonably come to this conclusion on the basis of several witnesses, including the OMG Girlz themselves, the designers at MGA, and the Harrises damages expert, Christian Tregillis, who testified to profits of $17,872,253, (see Trial Tr. 9/12/24 AM 29:20–23). Moreover, the jury heard evidence from Mr. Larian that MGA will enter into sponsorships with famous celebrities like Paris Hilton and Kylie Jenner. (Trial Tr. 9/5/24 PM 42:2–43:20.) Together, the jury could have properly concluded on the basis of the evidence that MGA used the OMG Girlz name and likeness to create infringing dolls without paying the OMG Girlz for this use. Therefore, the Court will not award a new trial or judgment as a matter of law for failure to show resulting damages.

5.   Attributable to MGA's Conduct

"[T]he plaintiff bears the burden of presenting proof of gross revenue attributable to the defendant's unauthorized use of the plaintiff's likeness, and the defendant must then prove its deductible expenses." Olive v. General Nutrition Centers, Inc., 30 Cal. App. 5th 804, 814 (2018); Lindy Pen Co. Inc. v. Bic Pen Corp, 725 F.2d 1240, 1243 (9th

---

[8] See also Camacho v. Control Grp. Media Co., LLC, 2022 WL 3093306, at *28 (S.D. Cal. July 18, 2022) (noting that derivation of economic value from Plaintiff was sufficient to prove resulting injury); Kellman v. Spokeo, Inc., 599 F. Supp. 3d 877, 889 (N.D. Cal. 2022) (same).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:20-cv-11548-JVS-AGR                          Date   July 8, 2025

Title        MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

Cir. 1984) (discussing the shifting burden standard for trademark infringement claims made under 15 U.S.C. § 1117(a)).[9]

In the Equitable Issues Order, the Court found that the Harrises had satisfied their burden of presenting proof of gross revenue. (Equitable Issues Order at 14–16.) Thus, the burden appropriately shifted to MGA to explain the lack of attributability. (Id. at 16.) The Court reviewed MGA's arguments for 10% and 15% attributability and ultimately found that "neither [percentage] merit[ed] an equitable reduction in disgorgement" because neither figure could reliably discount attributability. (Id. at 17.) While the Court noted its skepticism that MGA's profits were 100% attributable to its infringement, (see Equitable Issues order at 16; Permanent Injunction Order, Dkt. No. 1113 at 14 n.10), the Harrises have nevertheless satisfied their burden to show gross revenue. Ultimately, the Harrises established common law misappropriation, showed that many dolls were purchased because of the unauthorized use, and then satisfied their burden with respect to gross revenue from the dolls.

C.      Lanham Act

MGA argues that the Court should grant judgment as a matter of law or, in the alterative, new trial with respect to the trade dress claim. (Mot. at 23.) Specifically, MGA argues that: (1) The OMG Girlz do not have a protectable trade dress, (2) the Harrises did not establish secondary meaning, (3) the Harrises abandoned their trade dress, and (4) there is no likelihood of confusion. The Court takes each argument in turn.

1.      Protectable Trade Dress

Trade dress protects "a combination of any elements in which a product is presented to a buyer, including the shape and design of a product." Art Attacks Ink, LLC v. MGA Enter. Inc., 581 F.3d 1138, 1145 (9th Cir. 2009) (internal quotations and citation omitted). Courts are instructed to consider this combination of visual elements

---

[9] The Court notes that the decision in Olive is specific to claims under Cal. Civ. Code § 3344. However, as this Court previously determined, § 3344 "complement[s]" common law misappropriation in California. Thus, the Court finds it appropriate to adopt and implement the statutory burden shifting approach for the common law claim.

A230

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    2:20-cv-11548-JVS-AGR                    Date    July 8, 2025

Title    MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

when "taken together," even if some elements are separately unprotectable. Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1258–59 (9th Cir. 2001).

### a.    Defining Trade Dress with Specificity

"[A] vague, broad and non-specific definition of trade dress not only makes it impossible for a court to apply the test of distinctiveness, but also raises the danger of overprotection, with resulting anti-competitive injury to competitors[.]" 1 McCarthy on Trademarks and Unfair Competition § 8:3 (5th ed.). MGA argues that the OMG Girlz defined trade dress is vague and not specific to what they claimed at trial. For the following reasons, the Court disagrees.

The jury heard evidence that the OMG Girlz trade dress consists of three parts: the name (1) "OMG GIRLZ," (2) "combinations of vibrant hair color, primarily in bright pink, vivid purple, and shades of blue," and (3) "experimental, fun, urban, and edge wardrobes and makeup, layered clothing, voluminous skirts . . . and bold, over the top clothing and accessories." (See Mot. at 24 (citing TX 5521).) The jury also heard testimony that this trade dress was curated over a period of 13 years and recognizable to fans. (Trial Tr. 9/12/24 AM 93:2–95:11.)

At trial, MGA focused on specific components of the trade dress and the band's evolving style to attempt to discredit it. Despite these efforts, the jury ultimately concluded that the OMG Girlz had a protectable trade dress. (Jury Verdict at 2.) This finding is supported by the clear weight of evidence.

### b.    Functionality

MGA next argues that the OMG Girlz could not have a protectable trade dress as a matter of law where the aesthetic elements were functional. (Mot. at 24.) "Trade dress protection extends only to design features that are nonfunctional." Clicks Billiards, 251 F.3d at 1258. "[A]esthetic functionality has been limited to product features that serve an aesthetic purpose *wholly independent* of any source-identifying function." Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc., 457 F.3d 1062, 1073 (9th Cir. 2006) (emphasis added).

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-11548-JVS-AGR | Date | July 8, 2025 |
| Title | MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al. | | |

MGA argues that the OMG Girlz' "ever-changing image" demonstrates that its aesthetics were wholly independent of its source-identifying purpose. (Mot. at 25.) Yet, the trial record contains several examples of the OMG Girlz testifying that their specific colors and outfits were, in fact, source-identifying. (See e.g., Trial Tr. 9/4/24 AM 39:19–23; 65:16–20; 90:3–10; Trial Tr. 9/12/24 AM 93:2–10; 95:22–96:10.). The mere fact that the OMG Girlz continued to develop their look over time does not mean that these looks became wholly aesthetic or lost their source-identifying purpose. Accordingly, the evidence supports a finding of non-functionality.

### c.    Visual Use

As noted, trade dress protects "a combination of any elements in which a product is presented to a buyer, including the shape and design of a product." Art Attacks Ink, 581 F.3d at 1145 (internal quotations and citation omitted). This mandate requires examining the overall visual image of the trade dress. Id.; see also Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1044 (2d Cir. 1992).

MGA argues that the words "OMG Girlz" are not part of the overall visual impression of the group. (Mot. at 25.) Thus, because "OMG Girlz" was a requisite to the trade dress, the claim cannot stand. (Id.) Once again, the Court disagrees. The jury was presented with an abundance of evidence linking the words "OMG Girlz" to the color combinations and style of clothing. (See e.g., Trial Tr. 9/6/24 100:13–16; Trial Tr. 9/13/24 AM 93:9–24; Trial Tr. 9/18/24 AM 76:14–25.)

MGA further argues that the OMG Girlz changing appearances defeats their trade dress. (Mot. at 26.) At trial, the jury heard evidence that the OMG Girlz have used the same signature colors, name, and experimental clothing for the last 13 years, including their 2024 tour. (Trial Tr. 9/12/24 AM 93:2–12.) Thus, this argument is likewise unavailing.

Accordingly, the jury's finding of trade dress is supported by the clear weight of the evidence.

### 2.    Secondary Meaning

A232

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:20-cv-11548-JVS-AGR                Date   July 8, 2025

Title      MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

To prove trade dress infringement, the plaintiff "must show that her design has attained secondary meaning." Art Attacks Ink, 581 F.3d at 1145 (citing Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 214 (2000)). "Secondary meaning can be established in many ways, including (but not limited to) direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant." Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc., 198 F.3d 1143, 1151 (9th Cir. 1999). To establish secondary meaning, "a plaintiff must demonstrate 'a mental recognition in buyers' and potential buyers' minds that products connected with the [mark] are associated with the same source.'" Art Attacks Ink, 581 F.3d at 1145 (citing Japan Telecom v. Japan Telecom Am., 287 F.3d 866, 873 (9th Cir. 2002)).

MGA argues that the Harrises failed to provide survey evidence at trial, which is "the most persuasive evidence of secondary meaning." (See Mot. at 28 (citing Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1358 (9th Cir. 1985)).) The Harrises respond that there was ample evidence of secondary meaning without an expert survey. (Opp'n at 19–20.)

The Court agrees with the Harrises that the trial record contains sufficient evidence to show secondary meaning. The Harrises provided consumer witnesses to testify about their recognition of the OMG Girlz' brand. (See generally Trial Tr. 9/10/24 AM 16–19 (video depositions of M. Campbell and W. Wagner).) The Harrises also provided evidence of consumer-made videos, press and media reports, and consumer interviews to show secondary meaning, along with a social media survey. (See Trial Tr. 9/12/24 PM 96:16–99:23.) While this social media survey is not an expert survey, it nonetheless received 17,000 responses out of 48,000 views. (Id. 100:24–101:3.)

Thus, the evidence at trial is sufficient to concluded that the OMG Girlz' trade dress acquired secondary meaning.

3.      Abandonment

"Abandonment . . . requires an intent not to resume trademark use[.]" Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc., 458 F.3d 931, 937 (9th Cir. 2006). MGA briefly argues that the OMG Girlz abandoned their trade dress in 2015 when the

CV-90 (06/04)                    **CIVIL MINUTES - GENERAL**                    Page 26 of 33

**A233**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:20-cv-11548-JVS-AGR                     Date   July 8, 2025

Title      MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

group disbanded. (Mot. at 28.) The Harrises admit that the OMG Girlz band "took a pause" in 2015 after the band broke up. (Trial Tr. 9/6/24 117:23–118:20.) Nevertheless, the plain evidence provided at trial demonstrates that there was no intent to abandon the trade dress. (See Trial Tr. 9/6/24 AM 100:1–8; Trial Tr. 9/5/24 PM 81:1–82:12 (Ms. Womack testifying that the OMG Girlz maintained their social media presence, engaged with fans, and continued singing even after their break up in 2015).) Accordingly, the evidence does not support a finding that the OMG Girlz abandoned their trade dress in 2015.

### 4.      Likelihood of Confusion

The likelihood of confusion is governed by the Sleekcraft[10] factors: "(1) strength of the protected mark; (2) proximity and relatedness of the goods; (3) type of goods and the degree of consumer care; (4) similarity of the protected mark and the allegedly infringing mark, (5) marketing channel convergence; (6) evidence of actual consumer confusion; (7) defendant's intent in selecting the allegedly infringing mark; and (8) likelihood of product expansion." Pom Wonderful LLC v. Hubbard, 775 F.3d 1118, 1125 (9th Cir. 2014) (citation omitted).

#### a.      **Strength of the Mark**

A stronger mark receives more protection under the Lanham Act. Sleekcraft, 599 F.2d at 348. A mark has both conceptual and commercial strength. JL Beverage Co., LLC v. Jim Bean Brands Co., 828 F.3d 1098, 1106 (9th Cir. 2016). A mark's conceptual strength "depends largely on the obviousness of its connection to the good or service to which it refers." Id. By contrast, a mark's commercial strength is determined by its recognition in marketplace. Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1144 (9th Cir. 2002). Courts classify "a mark along a spectrum of five categories ranging from strongest to weakest: arbitrary, fanciful, suggestive, descriptive, and generic." JL Beverage, 828 F.3d at 1107 (citing Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1149 (9th Cir. 2011)).

---

[10] AMF Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979).

A234

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    2:20-cv-11548-JVS-AGR    Date    July 8, 2025

Title    MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

MGA argues that the OMG Girlz have a weak trade dress because there is no singular, distinctive look. As the Court explained, the OMG Girlz have a protectable trade dress based on a signature look. (See Supra, Section C.1.) The OMG Girlz trade dress is comprised of their name, combination of vibrant hair colors, and experimental, fun, urban, and edgy outfits. Thus, this factor leans in favor of the Harrises.

### b.    Proximity or Relatedness of Goods

Where the goods bearing the two marks are related, there is a concern that the customers may be confused as to the producer of the goods. Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1392 (9th Cir. 1993). Thus, where the goods are similar in use and function, less similarity between the marks may be required. Sleekcraft, 599 F.2d at 350. The proximity of the goods is measure by whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function. Id. A plaintiff "need not establish that the parties are direct competitors" in order to succeed on this factor. Rearden LLC v. Rearden Com., Inc., 683 F.3d 1190, 1212 (9th Cir. 2012). The primary question is whether the goods or services would be "reasonably thought by the buying public to come from the same source if sold under the same mark." Sleekcraft, 599 F.2d at 348 n. 10.

In this case, the Court already determined that the Harrises and MGA are not direct competitors. (See Preliminary Injunction Order at 11.) However, this finding was specific to damages. The Court was noting that because there was no direct competition, the Harrises had not missed any financial opportunities. With respect to a finding of likelihood of confusion, a consumer could reasonably believe that the infringing L.O.L. Surprise! O.M.G. dolls came from the OMG Girlz or, at least a sponsored partnership. Thus, this factor leans in favor of the Harrises.

### c.    Similarity of the Marks

The similarity of the marks "has always been considered a critical question in the likelihood-of-confusion analysis." GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1205 (9th Cir. 2000). The following axioms must guide the comparison: "first, the marks must be considered in their entirety as they appear in the marketplace; second, similarity is adjudged in terms of appearance, sound, and meaning; and third, similarities are weighted more heavily than differences." Id. at 1206 (citations omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-11548-JVS-AGR | Date | July 8, 2025 |
| Title | MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al. | | |

"Obviously, the greater the similarity between the two marks at issue, the greater the likelihood of confusion." Id.

MGA argues that the Dolls and the OMG Girlz are dissimilar such that this factor leans strongly against likelihood of confusion. The Court finds that the record strongly supports a similarity between the trade dress and the infringing dolls. The jury heard and saw evidence of the dolls with similar designs, hair color, and the "O.M.G." logo underneath. (Trial Tr. 9/13/24 AM 93:9–24; Trial Tr. 9/18/24 AM 76:14–25; Trial Tr. 9/19/24 AM 69:8–70:1.) Thus, the evidence shows that this factor leans in favor of finding likelihood of confusion.

### d.     Actual Confusion

Evidence of actual confusion is strong evidence that future confusion is likely. Thane Int'l Inc. v. Trek Bicycle Corp., 305 F.3d 894, 902 (9th Cir. 2002). However, a lack of such evidence is not dispositive. Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1178 (9th Cir. 1988).

At trial, the Harrises put forth substantial evidence of consumer confusion. This evidence included witness testimony from four consumers, (See e.g., Trial Tr. 9/10/24 AM 34:13–35:12; Trial Tr. 9/6/24 PM), testimony from the OMG Girlz about fan feedback, and a social media poll responded to by 17,000 people, (Trial Tr. 9/12/24 PM 100:24–101:3). Thus, the record supports a finding of actual confusion.

### e.     Marketing Channels and Types of Goods

"Where products bearing the marks are marketed through similar channels, there is a greater likelihood of confusion. Official Airline Guides, 6 F.3d at 1393. To assess coverage of marketing channels, "courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." Pom Wonderful, 775 F.3d at 1130. Courts also examine whether the types of goods overlap from the perspective of a typical buyer exercising ordinary caution." Sleekcraft, 599 F.2d at 353.

Here, MGA and the OMG Girlz used the same marketing channels, such as YouTube and social media, to promote their products and services. (Compare Trial Tr. 9/18/24 AM 44:25–45:2 (MGA promoting on YouTube) with Trial Tr. 9/5/24 PM

A236

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:20-cv-11548-JVS-AGR                   Date   July 8, 2025

Title   MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

81:19–86:25 (Ms. Womack discussing social media and YouTube outreach).)  Thus, this factor leans in favor of a finding of likelihood of confusion.

### f.    Types of Goods and the Degree of Care Used

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." Sleekcraft, 599 F.2d at 353 (citation omitted).  "When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely. Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely." Id. (citations omitted).  "Consumer care for inexpensive products is expected to be quite low." Playboy Enters., 354 F.3d at 1028.  Thus, "[l]ow consumer care . . . increases the likelihood of confusion." Network Automation, 638 F.3d at 1152 (citing Playboy Enters., 354 F.3d at 1028).

Neither party sufficiently describes the level of sophistication of the relevant purchasing population or the degree of care that would be exercised by such consumer.  Thus, this factor remains neutral or weighs slightly against a finding of confusion.

### g.    Intent

The intent factor generally carries minimal weight because "an intent to confuse customers is not required for a finding of trademark infringement." Brookfield Commc'ns, 174 F.3d 1036, 1059 (9th Cir. 1999).  However, if the defendant knowingly adopts an infringing mark to deceive the public, courts presume that such confusion will occur.  Sleekcraft, 559 F.2d at 354.  Thus, this factor favors the plaintiff "where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark." JL Beverage, 828 F.3d at 1111 (quoting Brookfield, 174 F.3d at 1059).

As the Court has discussed at length, the evidence of intent is minimal and tenuous in this case.  (See Supra, Section A.2.)  Thus, this factor weighs against finding a likelihood of confusion.

### h.    Likelihood of Expansion

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    2:20-cv-11548-JVS-AGR                    Date    July 8, 2025

Title       MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." Sleekcraft, 559 F.2d at 354. "When goods are closely related, any expansion is likely to result in direct competition." Id. (citation omitted). "Where two companies are direct competitors, this factor is unimportant." Network Automation, 638 F.3d at 1153 (citing Brookfield, 174 F.3d at 1060).

The Harrises provided little if any evidence that they were intending to expand into the doll making business. (See Trial Tr. 9/4/24 AM 48–50.) Accordingly, this factor weighs against a finding of likelihood of confusion.

### i.    Weighing the Factors

On balance, the Court finds that the Sleekcraft factors weigh strongly in favor of a finding of likelihood of confusion. The most critical factors, strength of mark, actual confusion, and similarity, all weigh in favor of the Harrises. Accordingly, the evidence presented at trial supports a finding that a reasonably prudent consumer is likely to be confused as to the origin of the infringing dolls.

### D.    Claims Against Mr. Larian

MGA argues that judgment should be entered in favor of Mr. Larian on all claims brought against him individually because the Harrises failed to include him in the Final Pretrial Conference Order. (Mot. at 31.) As a rule, MGA is correct that parties may not offer evidence or advance theories at the trial which are not included in the [pretrial order]." U.S. v. First Nat. Bank of Circle, 652 F.2d 882, 886 (9th Cir. 1981).

However, the Pretrial Order plainly states that the "issues the Parties *agree* are to be tried are . . . Counter-Claimants' Third Amended Counterclaims[.]" (Final Pretrial Conference Order at 1 (alterations in original).) In the Third Amended Counterclaim ("TACC"), the Harrises asserted claims against Mr. Larian on the basis that he was "principally responsible as the driving force for making the decisions to distribute OMG Dolls that infringe on the OMG Girlz brand." (TACC, Dkt. No. 63 ¶ 22.) Moreover, the Court defined "MGA" in the Final Pretrial Conference Order to include MGA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.  2:20-cv-11548-JVS-AGR                    Date   July 8, 2025

Title        MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

Entertainment, Inc. and Counter-Defendant Isaac Larian.  (Id.)  Thus, the Harrises claim was within the parameters of the Final Pretrial Conference Order.

MGA next argues that even if the claims were permissible, there was no evidence to support a claim against Mr. Larian individually.  (Mot. at 31.)  Once again, the Court disagrees.  In the jury instructions, the Court was careful to explain to the jury that MGA Entertainment and Isaac Larian are collectively referred to as "MGA."  (Jury Instructions, Dkt. No. 1013 at 2.)  At all times when explaining trade dress infringement and misappropriation, the Court uses references to "MGA" or "MGA Parties."  (Id. at 15–24.)  Finally, the jury's verdict expressly finds that "MGA" infringed on the OMG Girlz' trade dress, (Jury Verdict at 5), and that "MGA" misappropriated the OMG Girlz' name, likeness, or identity, (id. at 6).

Accordingly, the Court denies judgment as a matter of law with respect to all claims against Mr. Larian individually.

*E.    Declaratory Judgment*

MGA requests that the Court grant declaratory judgment in MGA's favor as to "the 15 Dolls for which the jury found infringement and/or misappropriation."  (Mot. at 31.)  In the alternative, MGA requests that, "at minimum, the Court should enter judgment for MGA on the eight Dolls that the jury found to infringe . . . and/or misappropriate . . ., but for which [the Harrises] ***did not*** seek liability and 'abandoned.'"  (Id. (alterations in original).)

The Court declines to grant judgment as a matter of law on any of the above mentioned dolls.  First, the Harrises counterclaims were supported by substantial evidence at trial.  As discussed in this Order, there is no reason to overturn the jury's well-supported finding of infringement or misappropriation by granting declaratory judgment for MGA. Thus, with respect to MGA's argument for declaratory judgment on the 15 infringing dolls, the Court denies the request.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:20-cv-11548-JVS-AGR                    Date   July 8, 2025

Title   MGA Entertainment Inc. et al. v. Clifford "T.I." Harris et al.

Second, with respect to MGA's request for declaratory judgment on the eight dolls[11] found to be infringing or misappropriating, but which the Harrises did not seek liability, the Court declines to grant declaratory relief for MGA. The jury's verdict regarding these dolls was supported by the clear weight of evidence at trial and the mere fact that the Harrises did not seek liability does not provide sufficient reason to disturb this verdict.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** the motion. With respect to punitive damages, the Court **GRANTS** the motion, on the condition that the Harrises do not accept a remittitur of $1. The Harrises shall lodge a filing of their decision with the Court within 14 days upon the issuance of this Order. If the Harrises reject remittitur, the Parties shall meet and confer and file a joint proposed briefing schedule for the structure of a new trial.

Regarding the Lanham Act counterclaim and common law misappropriation counterclaim, the Court **DENIES** the motion. The Court **DENIES** both the request for declaratory judgment and for judgment as a matter of law for all claims against Mr. Larian individually.

**IT IS SO ORDERED.**

---

[11] Downtown B.B., Punk Grrrl, Virtuelle, Honeylicious, Miss Independent, City Babe, Shadow, and Miss Glam.

A240

Mark A. Finkelstein (SBN 173851)
mfinkelstein@uzllp.com
Ellen S. Kim (SBN 329348)
ekim@uzllp.com
UMBERG ZIPSER LLP
1920 Main Street, Suite 750
Irvine, CA 92614
Telephone: (949) 679-0052

Paul J. Loh (Bar No. 160541)
ploh@willenken.com
Jason H. Wilson (Bar No. 140269)
jwilson@willenken.com
Kenneth M. Trujillo-Jamison (Bar No. 280212)
ktrujillo-jamison@willenken.com
Breeanna N. Brewer (Bar No. 312269)
bbrewer@willenken.com
WILLENKEN LLP
707 Wilshire Blvd., Suite 3850
Los Angeles, California 90017
Telephone: (213) 955-9240

Attorneys for Plaintiff and Counter-Defendant MGA Entertainment, Inc., and Counter-Defendant Isaac Larian

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MGA ENTERTAINMENT, INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CLIFFORD "T.I." HARRIS, an individual; TAMEKA "TINY" HARRIS, an individual; OMG GIRLZ LLC, a Delaware limited liability company; and DOES 1 - 10 inclusive,<br><br>Defendants, | Case No. 2:20-cv-11548-JVS-AGR<br>ASSIGNED TO: Hon James V. Selna<br><br>**PLAINTIFF AND COUNTER-DEFENDANTS' OPENING BRIEF REGARDING STRUCTURE OF NEW TRIAL ON PUNITIVE DAMAGES**<br><br>Hearing Date: September 22, 2025<br>Time: 1:30 p.m. |
| GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC and OMG GIRLZ LLC,<br><br>Counter-Claimants,<br><br>vs.<br><br>MGA ENTERTAINMENT, INC., ISAAC LARIAN and DOES 1 - 10, inclusive,<br>Counter-Defendants. | Complaint Filed: December 20, 2020<br>Trial Date: September 3, 2024 |

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{292253.7}

Case No. 2:20-cv-11548-JVS-AGR
MGA'S OPENING BRIEF REGARDING STRUCTURE OF NEW TRIAL

A241

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 4

II.   BACKGROUND ................................................................................................. 5

III.  ARGUMENT ...................................................................................................... 7

    A.    The New Trial On Punitive Damages Should Be Tried To The Court. 7

        1.    *Punitive Damages Are Equitable In This Case.* ......................... 7

        2.    *The Parties' Prior Consent To A Jury Under Rule 39(c) Does Not Apply To A New Trial.* ................................................ 9

    B.    The Court Should Conduct A Bench Trial Based On The Existing Record And Enter Findings of Fact And Conclusions Of Law Under Rule 52. ........................................................................10

    C.    Any New Jury Trial On The Issue Of Punitive Damages Would Require Retrial Of Willfulness. ............................................................11

IV.   CONCLUSION ................................................................................................ 12

Umberg Zipser llp
Attorneys At Law
Irvine

{292253.7}                               1                    Case No. 2:20-cv-11548-JVS-AGR

MGA'S OPENING BRIEF REGARDING
STRUCTURE OF NEW TRIAL

A242

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bereda v. Pickering Creek Indus. Park, Inc.*,
865 F.2d 49 (3d Cir. 1989) ................................................................. 9, 10

*ConsumerDirect, Inc. v. Pentius, LLC*,
No. 8:21-CV-01968-JVS, 2025 WL 817138
(C.D. Cal. Mar. 3, 2025) ........................................................................ 11

*Curtis v. Loether*,
415 U.S. 189 (1974) ................................................................................... 8

*Fenner v. Dependable Trucking Co.*,
716 F.2d 598 (9th Cir. 1983) .................................................................. 11

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*,
778 F.3d 1059 (9th Cir. 2015) .................................................................. 8

*Gasoline Prods. Co. v. Champlin Ref. Co.*,
283 U.S. 494 (1931) ................................................................................. 11

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*,
28 F.4th 35 (9th Cir. 2022) ........................................................... 4, 9, 10

*Kearney v. Standard Ins. Co.*,
175 F.3d 1084 (9th Cir. 1999) ................................................................ 10

*Kumar v. Koester*,
131 F.4th 746 (9th Cir. 2025) ................................................................. 10

*Liu v. SEC*,
591 U.S. 71 (2020) ................................................................................. 7, 8

*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996) ................................................................................... 8

*Porter v. Warner Holding Co.*,
328 U.S. 395 (1946) ................................................................................... 7

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{292253.7}                                  2                    Case No. 2:20-cv-11548-JVS-AGR

MGA'S OPENING BRIEF REGARDING
STRUCTURE OF NEW TRIAL

A243

*Proofpoint, Inc. v. Vade USA, Inc.*,
    Nos. 23-16085 and 23-16175, 2024 WL 4003096
    (9th Cir. Aug. 30, 2024) ................................................................................. 4, 7, 8

*SEC v. Jarkesy*,
    603 U.S. 109 (2024) ............................................................................................. 8

**Statutes**

Fed. R. Civ. P. 39 ........................................................................ 4, 5, 7, 9, 10

Fed. R. Civ. P. 50 ................................................................................... 12

Fed. R. Civ. P. 52 ........................................................................... 4, 10, 11

Fed. R. Civ. P. 59 .................................................................................. 11, 12

**Other Authority**

2 Callmann on Unfair Comp., Tr. & Mono. § 14:49 (4th ed.) ................................. 8

Umberg Zipser llp
Attorneys At Law
Irvine

{292253.7}                                    3                    Case No. 2:20-cv-11548-JVS-AGR

MGA'S OPENING BRIEF REGARDING
STRUCTURE OF NEW TRIAL

A244

## I.   **<u>INTRODUCTION</u>**

MGA Entertainment Inc. and Isaac Larian (collectively, "MGA") do not consent to a jury trial on punitive damages for the new trial.  Accordingly, the new trial on the equitable issue of punitive damages should be a bench trial.  Two Ninth Circuit decisions—*Proofpoint, Inc. v. Vade USA, Inc.*, Nos. 23-16085 and 23-16175, 2024 WL 4003096 (9th Cir. Aug. 30, 2024) and *Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, 28 F.4th 35 (9th Cir. 2022)—compel this result.  Under *Proofpoint*, Counterclaimants do *not* have a right to a jury trial on punitive damages where, as here, the underlying award is equitable disgorgement.  Under *Harbor Breeze*, any prior consent under Federal Rule of Civil Procedure 39(c) does *not* carry over to a new trial and, as stated above, MGA does not consent to a jury trial on punitive damages.

The Court thus should hold that the Court, not a jury, must decide the equitable issue of punitive damages.  Further, the Court should issue its ruling based on the existing evidentiary record.  There is no reason to believe Counterclaimants could present different evidence to support punitive damages in a new trial.  The Court has already overseen a lengthy trial and heard three post-trial arguments regarding willfulness and punitive damages.  Based on its own assessment of the witnesses and the trial evidence, the Court concluded MGA *did not act willfully* and has since reiterated this finding multiple times, including in its decision to grant a new trial on punitive damages.  Therefore, the Court should simply issue amended findings under Rule 52 based on the extensive trial record.  The parties can then submit an Amended Judgment for the Court's consideration.

If the Court were instead to conclude that punitive damages should be retried to a jury for a binding verdict (which it should not), MGA must be allowed to put on evidence before the new jury that it did not act willfully in misappropriating the

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{292253.7}                                    4                        Case No. 2:20-cv-11548-JVS-AGR

MGA'S OPENING BRIEF REGARDING
STRUCTURE OF NEW TRIAL

A245

likeness of the OMG Girlz.[1]

## II.    BACKGROUND

There have been three trials (including one mistrial) in this case, which now spans almost five years.  While the jury in the second trial swiftly awarded a verdict in favor of MGA (Dkt. 777), the jury in the third trial found that MGA willfully infringed Counterclaimants' trade dress and/or misappropriated the OMG Girlz' likeness as to 15 of MGA's L.O.L. Surprise! O.M.G. dolls, and that MGA acted with oppression, fraud, or malice (Dkt. 1009).  That third jury returned an advisory verdict on damages, awarding $17,872,253 in disgorged profits for both the trade dress and common law misappropriation claims, and $53,616,759 in punitive damages on the misappropriation claim.  Dkts. 1009, 1011.  Counterclaimants were not awarded any actual damages for their alleged harm and, in fact, were barred from seeking such damages at trial due to their failure to disclose any theory of recovery beyond equitable disgorgement.  See Dkt. 502, 521.

After the trial, the parties extensively briefed several equitable issues, including disgorgement under the Lanham Act and common law misappropriation, as well as punitive damages based on the common law claim.  See Dkts. 1045-46, 1061, 1064, 1067-68.  The Court issued a Tentative Order Regarding Post-Trial Equitable Issues in which it found that, among other things, (1) punitive damages are an equitable remedy when—like here—they are based on disgorgement, and (2) the Court could not accept the jury's advisory award of punitive damages because "the Court cannot reasonably conclude that MGA's conduct was done with willfulness."  Dkt. 1096-4 at 21-22 ("Tentative Equitable Issues Order").  In the final Order Regarding Post-Trial Equitable Issues, the Court ruled that the jury's punitive damages award was binding at that stage of the proceedings under Rule 39(c) (concluding that the parties had consented to a binding jury for the punitive

---

[1] MGA continues to disagree with the underlying finding of liability.

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{292253.7}                    5                    Case No. 2:20-cv-11548-JVS-AGR

MGA'S OPENING BRIEF REGARDING
STRUCTURE OF NEW TRIAL

A246

damages phase) and adopted the jury's advisory disgorgement award on the misappropriation claim. Dkt. 1090 at 19-20 ("Equitable Issues Order").[2] The Court, however, disagreed with other aspects of the jury's advisory verdict and found that "MGA did not act willfully," and awarded no disgorgement of profits under the Lanham Act as a matter of equity. *Id*. at 8, 10-11, 23.

On March 10, 2025, Counterclaimants moved for entry of judgment and requested a permanent injunction, in addition to prejudgment and post-judgment interest. Dkt. 1104. The Court granted Counterclaimants' motion for entry of judgment and post-judgment interest, but denied their motion for a permanent injunction and prejudgment interest. Dkt. 1113 at 1. In rejecting Counterclaimants' argument that prejudgment interest was required to fully compensate them, the Court reiterated its finding in the final Equitable Issues Order that "the evidence did not support a finding of willfulness" on MGA's part. *Id.* at 14.

After the Court entered Final Judgment on April 29, 2025 (Dkt. 1118), MGA timely moved for judgment as a matter of law ("JMOL") or, alternatively, a new trial or remittitur (Dkt. 1121). Among other things, MGA argued that the punitive damages award was irreconcilable with the Court's express finding that MGA did not act willfully. Dkt. 1121-1 at 11.

On July 8, 2025, the Court issued its Order on MGA's motion (Dkt. 1133, the "New Trial Order") which, in relevant part, granted a new trial on the issue of punitive damages on the condition that Counterclaimants do not accept a remittitur of $1. The Court undertook a meticulous review of the trial evidence, addressing each of Counterclaimants' bases for a finding of willfulness: (1) lead designers' knowledge about the OMG Girlz; (2) overlapping markets; (3) MGA's credibility; (4) change in logo and further release of allegedly infringing dolls; (5) testimony of Lora Stephens; and (6) Mr. Larian's testimony and demeanor. *See id.* at 7-13.

---

[2] MGA maintains that it did not consent to a binding jury trial for punitive damages in the third trial.

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{292253.7}                                  6                    Case No. 2:20-cv-11548-JVS-AGR

MGA'S OPENING BRIEF REGARDING
STRUCTURE OF NEW TRIAL

A247

None of these supported a finding of willfulness.

As the Court summarized, "the clear weight of evidence does not support a clear and convincing finding of willfulness, intent, or conscious disregard of the OMG Girlz' trade dress," and "punitive damages cannot stand." *Id.* at 13. The Court further found that MGA's conduct was not reprehensible. *Id.* at 16. The Court concluded that the maximum punitive damages sustainable by proof was $1, and that "this amount reflect[ed] the fair value of a punitive award for MGA's conduct." *Id.* at 13.

On July 10, 2025, Counterclaimants filed notice of their decision to reject the remittitur and thus to elect a new trial. Dkt. 1136.

## III.   ARGUMENT

### A.   The New Trial On Punitive Damages Should Be Tried To The Court.

#### 1.   *Punitive Damages Are Equitable In This Case.*

The availability of punitive damages based on an underlying award of equitable disgorgement (and, if available, the amount of punitive damages) is an equitable issue to be decided by the Court. As the Court explained in its Tentative Equitable Issues Order: "Punitive damages are a mainstay of equity when 'a remedy is tethered to a wrongdoer's net unlawful profits, whatever the name[.]'" Dkt. 1096-4 at 21-22 (citing *Liu v. SEC*, 591 U.S. 71, 80 (2020); *Porter v. Warner Holding Co.*, 328 U.S. 395 (1946); *Proofpoint, Inc. v. Vade USA, Inc.*, 2024 WL 4003096, at *1 (9th Cir. Aug. 30, 2024)). While the final Equitable Issues Order did not address the issue of whether punitive damages here are equitable because the Court separately ruled that the parties had consented to a jury trial on punitive damages under Rule 39 (Dkt. 1090 at 19), the Court correctly concluded in its Tentative Equitable Issues Order that punitive damages here are equitable.

That conclusion aligns with the *Proofpoint* decision, where the Ninth Circuit

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{292253.7}                                     7                         Case No. 2:20-cv-11548-JVS-AGR

affirmed the district court's denial of the plaintiffs' request for a jury trial on exemplary damages in a trade secret misappropriation case, concluding that the Seventh Amendment right to a jury trial did not extend to exemplary damages where the sole relief awarded was "disgorgement of the defendant's profits." 2024 WL 4003096, *1 (citing *Liu*, 591 U.S. at 80). The Ninth Circuit further explained: "[T]he Seventh Amendment embraces all suits that are <u>not</u> in equity or admiralty jurisdiction. Thus, the Seventh Amendment extends to a statutory claim only if that particular claim is legal in nature, which disgorgement is not." *Id.* (citing *SEC v. Jarkesy*, 603 U.S. 109, 122 (2024)) (emphasis in original and internal citations omitted). The Ninth Circuit concluded as follows: "***[w]here, as here, an award for unjust enrichment rests on disgorgement of the defendant's profits, [exemplary damages] is an equitable remedy***." *Id.* (emphasis added).

The *Proofpoint* opinion, though unpublished, was faithful to Supreme Court and Ninth Circuit precedent.[3] Not all punitive damages are legal remedies for the jury to decide just because they are a form of monetary relief. *See Curtis v. Loether*, 415 U.S. 189, 196 (1974) (refusing to hold "that any award of monetary relief must necessarily be 'legal' relief"). The Seventh Amendment preserves the right to jury trial if it "existed under the English common law when the [Seventh] Amendment was adopted." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 376 (1996) (citation omitted). And as the Ninth Circuit held, "actions for disgorgement of improper profits are equitable in nature" and were not "traditionally tried to a jury" in actions at law. *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015).

Here, the disgorgement award (under both the Lanham Act and common law

---

[3] *Proofpoint* is indicative of how the Ninth Circuit would almost certainly rule today. *See* 2 Callmann on Unfair Comp., Tr. & Mono. § 14:49 (4th ed.) ("The Ninth Circuit has held that because unjust enrichment is an equitable remedy, the Seventh Amendment does not require a jury trial on exemplary damages when disgorgement is awarded but actual damages are not.").

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{292253.7}                          8                    Case No. 2:20-cv-11548-JVS-AGR

MGA'S OPENING BRIEF REGARDING
STRUCTURE OF NEW TRIAL

A249

misappropriation) was equitable, and thus the jury's decision on that issue was advisory. Dkt. 1090 at 22. Counterclaimants agree: "The OMG Girlz do not dispute that disgorgement of profits under the Lanham Act and for Common Law Misappropriation are equitable issues." Dkt. 1064 at 2:11-12.

Accordingly, as the Court tentatively held before, any punitive award based on that equitable disgorgement award is also an equitable issue for the Court.

### 2. *The Parties' Prior Consent To A Jury Under Rule 39(c) Does Not Apply To A New Trial.*

While the Court previously ruled that the jury's award of punitive damages was binding due to the parties' consent under Rule 39(c), such consent does not extend to the new trial. The Ninth Circuit addressed this very issue in *Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, where the equitable issue of disgorgement of profits was submitted to the jury for a binding verdict and that verdict was subsequently set aside. 28 F.4th at 41. The Ninth Circuit concluded that "Rule 39(c) does ***not*** require that [a] retrial on remand be a jury trial," explaining there is no "free-floating right to a jury trial, as to a concededly equitable issue, that is untethered to [a] now-vacated verdict." *Id.* at 41 (emphasis added).

Here, the Court vacated the jury's punitive damages verdict because "the clear weight of evidence does not support a clear and convincing finding of willfulness, intent, or conscious disregard of the OMG Girlz' trade dress." Dkt. 1133 at 13. The Court went so far as to say that entering a judgment that included the jury's punitive damages award "would constitute reversible error." *Id.*

Thus, as was the case in *Harbor Breeze*, the jury's verdict on punitive damages was "entirely defective," such that "no valid portion of [the] prior jury verdict would be disrespected, implicitly or explicitly, by allowing a bench trial on remand." *See Harbor Breeze*, 28 F.4th at 41 (distinguishing the facts from the Third Circuit's decision in *Bereda v. Pickering Creek Indus. Park, Inc.*, 865 F.2d 49

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{292253.7}                    9                    Case No. 2:20-cv-11548-JVS-AGR

MGA'S OPENING BRIEF REGARDING
STRUCTURE OF NEW TRIAL

**A250**

(3d Cir. 1989)).[4]  As the Ninth Circuit explained, "[b]y its terms, Rule 39(c)(2) requires only that the actual 'verdict' that was rendered by the jury be given 'the same effect as if a jury trial had been a matter of right,' and that command **has no further force** when, as here, that verdict has been set aside as fundamentally flawed." *Id.* (citing Fed. R. Civ. P. 39(c)(2)) (emphasis added).

Thus, because the parties' prior consent under Rule 39(c) "has no further force," and because MGA does not consent to a binding jury retrial on any equitable issues, the new trial on punitive damages should be tried to the Court.

**B.** **The Court Should Conduct A Bench Trial Based On The Existing Record And Enter Findings of Fact And Conclusions Of Law Under Rule 52.**

The Ninth Circuit has consistently recognized that the court may conduct a bench trial on the existing record or the parties' briefs. *See, e.g., Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094-95 (9th Cir. 1999) ("In a bench trial on the record, the judge will have to make findings of fact under Federal Rule of Civil Procedure 52(a)."); *Kumar v. Koester*, 131 F.4th 746, 748 (9th Cir. 2025) (affirming the district court's decision following a bench trial on the briefs and record). Indeed, this exact practice was already done here.  Following the jury trial, the Court did not take any new evidence before issuing its equitable rulings.  Dkt. 1090.

For their part, Counterclaimants cannot identify any new evidence regarding willfulness that the Court has not already considered and rejected.  There is no need to expend the Court's time and resources merely to rehash what the Court heard at the third jury trial and in post-trial briefing.

Accordingly, the Court should enter findings of fact and conclusions of law

---

[4]  The defect in the jury verdict in *Bereda* (the court's failure to inform the jury that backpay was available only for certain years) was "partial and limited, and it involved a specific issue as to which there was no right to a jury trial." *Harbor Breeze*, 28 F.4th at 41.  Thus, the *Bereda* court could not determine "what portion of the monetary award was valid." *Id.*

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{292253.7}                                    10                    Case No. 2:20-cv-11548-JVS-AGR

MGA'S OPENING BRIEF REGARDING
STRUCTURE OF NEW TRIAL

under Rule 52(a) based on the existing record and consistent with its finding that punitive damages cannot stand because there was insufficient evidence of MGA's willfulness. The parties can then submit an Amended Judgment for the Court's consideration.

**C.  Any New Jury Trial On The Issue Of Punitive Damages Would Require Retrial Of Willfulness.**

If the Court determines that punitive damages should be retried to a jury for a binding verdict (which it should not), the jury would need to decide the factual question of willfulness, which is inextricably tied to the availability of punitive damages. *See Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500 (1931) ("Where the practice permits a partial new trial, it may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.").

Here, the Court found that the prior jury's willfulness finding was "***unsupported by the clear weight of evidence***." Dkt. 1133 at 12 (emphasis added). Accordingly, the Court must set aside that finding for purposes of a new trial on the punitive damages award. *See* Fed. R. Civ. P. 59(a); *Fenner v. Dependable Trucking Co.,* 716 F.2d 598, 602 (9th Cir. 1983) (trial court has "a duty" to set aside the verdict that is against the clear weight of the evidence). Indeed, it would be improper to instruct the new jury to accept the prior jury's finding of willfulness when the Court has already ruled that this finding is unsupported by the clear weight of the evidence. *Cf. ConsumerDirect, Inc. v. Pentius, LLC*, No. 8:21-CV-01968-JVS (ADSX), 2025 WL 817138, at *2 (C.D. Cal. Mar. 3, 2025) (Selna, J.) (ruling that punitive damages could be separately tried to a jury where new trial only went to the ***amount*** of punitive damages and where jury's finding of fraud oppression, or malice was "made without error").

Retrying the issue of willfulness to a new jury would, in turn, require a full

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{292253.7}                    11                    Case No. 2:20-cv-11548-JVS-AGR

MGA'S OPENING BRIEF REGARDING
STRUCTURE OF NEW TRIAL

retrial of the liability portion of the case. The fourth jury would need to hear all of the evidence regarding the (alleged) misappropriation, so it could determine if that was done willfully. In prior briefing and hearings, Counterclaimants argued that MGA's alleged willfulness encompassed things like the "knowledge," "lack of credibility," and "demeanor" of MGA's witnesses. *See* Dkt. 1133 at 7-13. Such factors cannot be evaluated without having all those witnesses testify once again, some for the fourth time.

Further, if the Court orders a new jury trial on punitive damages over MGA's objection, MGA anticipates moving for JMOL under Rule 50(a) on that issue. And if the Court denies or defers that motion and the jury rules against MGA, MGA expects to file a post-trial motion under Rules 50(b) and 59. In such a circumstance, to the extent the Court does not grant the Rule 50(b) motion, the Court presumably would—once again—grant another new trial because Counterclaimants' sparse evidence cannot support a finding of willfulness. This would place the parties back in the exact same position they are in today.

## IV.   CONCLUSION

For the foregoing reasons, MGA respectfully requests that the Court grant a new **bench** trial for punitive damages and issue findings of fact and conclusions of law under Rule 52 based on the existing record.

Dated: August 11, 2025                      UMBERG ZIPSER LLP

_____
Mark A. Finkelstein
Attorneys for Plaintiff and Counter-
Defendant MGA Entertainment, Inc., and
Counter-Defendant Isaac Larian

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{292253.7}                          12                  Case No. 2:20-cv-11548-JVS-AGR

MGA'S OPENING BRIEF REGARDING
STRUCTURE OF NEW TRIAL

A253

**CERTIFICATE OF COMPLIANCE—LOCAL RULE 11-6.2**

The undersigned, counsel of record for MGA, certifies that this brief complies with the page limit set by the Court Order dated July 29, 2025 (Dkt. 1138).

Dated: August 11, 2025

UMBERG ZIPSER LLP

_____

Mark A. Finkelstein
Attorneys for Plaintiff and Counter-Defendant MGA Entertainment, Inc., and Counter-Defendant Isaac Larian

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{292253.7}                    13                    Case No. 2:20-cv-11548-JVS-AGR
MGA'S OPENING BRIEF REGARDING
STRUCTURE OF NEW TRIAL

A254

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-11548-JVS-AGR | Date | November 20, 2025 |
| Title | MGA Entertainment Inc. v. Clifford T.I. Harris et al | | |

Present: The Honorable **James V. Selna, U.S. District Court Judge**

| Elsa Vargas | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:** **[IN CHAMBERS] Order Regarding Motion for Certification of Interlocutory Appeal [1150]**

Plaintiff and Counter-Defendant MGA Entertainment Inc. and Counter-Defendant Isaac Larian (together, "MGA") move to certify for appeal the Court's September 23, 2025, order regarding a new trial on punitive damages (Order ("New Trial Order"), Dkt. No. 1144), and the Court's July 8, 2025, order regarding available remedies (Order ("Available Remedies Order"), Dkt. No. 1133). (Mot., Dkt. No. 1150.) Defendants and Counterclaimants Clifford "T.I." Harris, Tameka "Tiny" Harris, and OMG Girlz LLC (collectively, "Harrises" or "OMG Girlz") opposed. (Opp'n Dkt. No. 1157.) MGA replied. (Reply, Dkt. No. 1161.)

For the following reasons, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the motion.

### I. BACKGROUND

The parties are familiar with the factual and procedural background of this case, so the Court recites it here only as necessary to resolve the motion.

Following the Court entering Final Judgment on April 29, 2025, (Final Judgment, Dkt. No. 1118), MGA filed a motion requesting judgment as a matter of law or, in the alternative, new trial or remittitur. (Order, Dkt. No. 1121.) On July 8, 2025, the Court ruled on MGA's motion, finding that the jury's verdict finding that MGA acted willfully

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    2:20-cv-11548-JVS-AGR                    Date    November 20, 2025

Title    MGA Entertainment Inc. v. Clifford T.I. Harris et al

was contrary to the clear weight of the evidence.[1]  (Order, Dkt. No. 1133 at 12–13.)  Therefore, the Court found that the jury's punitive damages award of $53,616,759 was excessive.  (Id. at 13.)  The Court granted a new trial on the issue of punitive damages on the condition that the Harrises did not accept a remittitur of $1, the maximum punitive damages award sustainable by the proof provided.  (Id. at 33.)  On July 10, 2025, the Harrises rejected the remittitur.  (Harrises' Denial of Remittitur, Dkt. No. 1136.)  Thus, the Court granted MGA's motion for a new trial and requested supplemental briefing on the structure of a new trial.  (Order, Dkt. No. 1138.)

On September 23, 2025, the Court ordered a partial new jury trial on the amount of punitive damages, finding that the OMG Girlz are entitled to a jury trial on the issue of punitive damages as a matter of right.  (Order, Dkt. No. 1144.)

## II. LEGAL STANDARD

Under 28 U.S.C. § 1292(b), the party seeking certification must establish that: (1) there is a controlling question of law, (2) as to which there are substantial grounds for difference of opinion, and (3) an immediate appeal from the order may materially advance the ultimate termination of litigation.  In re Cement Antitrust Litig., 673 F.2d 1020, 1026 (9th Cir. 1982).  Only if all three factors are met may the Court certify an order for appeal.  Id.; see also Couch v. Telescope Inc., 611 F.3d 629, 633 (9th Cir. 2010) ("Certification under § 1292(b) requires the district court to expressly find in writing that all three § 1292(b) requirements are met.").  "Section 1292(b) is a departure from the normal rule that only final judgments are appealable, and therefore must be construed narrowly."  James v. Price Stern Sloan, 283 F.3d 1064, 1067 n.6 (9th Cir. 2002).  Such a departure is "to be applied sparingly and only in exceptional cases."  United States v. Woodbury, 263 F.2d 784, 788 n.11 (9th Cir. 1959).  Thus, the party seeking certification "has the burden of showing that exceptional circumstances justify a departure from the 'basic policy of postponing appellate review until after the entry of a final judgment.'"  Fukuda v. Cnty. of L.A., 630 F. Supp. 228, 229 (C.D. Cal. 1986)

---

[1] The Court erred in stating its conclusion on the original motion that the evidence does not support a clear and convincing finding of willfulness, intent, or conscious disregard of the OMG Girlz' trade dress.  (Id. at 13).  Rather, under the Rule 59, the court may grant a new trial "if the *verdict* is contrary to the clear weight of the evidence."  United States v. 4.0 Acres of Land, 175 F.3d 1133, 1139 (9th Cir. 1999) (emphasis added).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-11548-JVS-AGR | Date | November 20, 2025 |

| | |
|---|---|
| Title | MGA Entertainment Inc. v. Clifford T.I. Harris et al |

(quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 475 (1978)).

### III. DISCUSSION

MGA seeks to appeal two of the Court's orders: (1) the September 23, 2025, New Trial Order, and (2) the July 8, 2025, Available Remedies Order. (Mot. at 1.) The Court evaluates the appeal of each order in turn.

### A. *Interlocutory Appeal of the New Trial Order*

In determining the nature of a new trial for punitive damages, the parties disputed whether a jury or bench trial was required. (See MGA's Brief on Structure of a New Trial ("MGA's New Trial Brief"), Dkt. No. 1139; Harrises' Brief on Structure of a New Trial ("Harrises' New Trial Brief"), Dkt. No. 1140) MGA argued that because the only other remedy awarded was disgorgement, itself an equitable remedy, punitive damages are also equitable and should be decided by the Court. (MGA's New Trial Brief, Dkt. No. 1139, at 7–1; Mot. at 3.) However, in its New Trial Order, the Court found that the availability and amount of punitive damages must be decided by a jury as a matter of right. (New Trial Order at 3–4.) MGA seeks interlocutory appeal on this issue. (See Mot., generally.)

#### 1. Controlling Question of Law

MGA argues there exists a controlling question of law: "must punitive damages in a disgorgement action be tried by a jury and not a court?" (Mot. at 4.) The Court agrees with MGA this question is one of pure law, rooted in whether the Seventh Amendment entitles a party to a jury trial. (Mot. at 5.) The OMG Girlz do not seem to dispute this characterization. (See Opp'n at 2–3; Reply at 2.)

The parties dispute whether this question is controlling. A controlling question is one in which its resolution on appeal could "materially affect the outcome of litigation in the district court." ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union, 22 F.4th

| | | |
|---|---|---|
| CV-90 (06/04) | **CIVIL MINUTES - GENERAL** | Page 3 of 11 |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:20-cv-11548-JVS-AGR                    Date   November 20, 2025

Title   MGA Entertainment Inc. v. Clifford T.I. Harris et al

1125, 1130 (9th Cir. 2022); see also In re Cement Antitrust Litig., 673 F.2d 1020, 1026 (9th Cir. 1981).

To argue that the question is controlling, MGA describes that the Ninth Circuit has twice accepted interlocutory appeals on the question of whether certain claims must be tried to a jury or the bench. (Mot. at 5 (citing Standard Oil Co. of Cal. v. Arizona, 738 F.2d 1021, 1022–23 (9th Cir. 1984); SEC v. Rind, 991 F.2d 1486, 1488 (9th Cir. 1993).) MGA also points out that other courts have found the question of whether a jury or a bench trial is required to be "controlling." (Id. (citing Hoescht Marion Roussel, Inc. v. Par Pharm, Inc., 95 F.3d 1165, 1165 (Fed. Cir. 1996); In re Baker & Getty Fin. Servs., Inc., 954 F.2d 1169, 1172 (6th Cir. 1992).) The OMG Girlz argue that this question is not controlling because regardless of an interlocutory appeal, the Court will still hold a fourth trial on punitive damages, and thus the appeal will not affect the outcome of litigation in the district court. (Opp'n at 2–3.)

The Court finds the OMG Girlz argument unavailing. The issue is not whether a trial is held at all, but whether it is a bench or a jury trial. As the Ninth Circuit and other courts have found, the nature of the trial will "materially affect the outcome of litigation in the district court." ICTSI Oregon, 22 F.4th at 1130; see Standard Oil Co. of Cal., 738 F.2d at 1022–23; Rind, 991 F.2d at 1488. Thus, the question of whether punitive damages in a disgorgement action be tried by a jury and not the court is a controlling question of law.

2.      Substantial Grounds for Difference of Opinion

A substantial ground for difference of opinion exists if the "appeal involves an issue over which reasonable judges might differ." Reese v. BP Expl. (Alaska) Inc., 643 F.3d 681, 688 (9th Cir. 2011).

MGA argues that the disputed issue, whether punitive damages in a disgorgement action are legal or equitable, and thus must be tried by a jury, meets this threshold. To demonstrate that it is an issue over which reasonable judges may differ, MGA points to

A258

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-11548-JVS-AGR | Date | November 20, 2025 |
| Title | MGA Entertainment Inc. v. Clifford T.I. Harris et al | | |

this Court's own rulings.  In its January 3, 2025, tentative on post-trial equitable issues, the Court looked to the unpublished Ninth Circuit opinion in Proofpoint, Inc. v. Vade USA, Inc., finding that "[p]unitive damages are a mainstay of equity when 'a remedy is tethered to a wrongdoer's net unlawful profits.'" (Mot. for Reconsideration, Dkt. No. 1096-4, Ex. B, at 21 (citing 2024 WL 4003096, at *1 (9th Cir. Aug. 30, 2024)).) Following the Court's tentative, the Ninth Circuit published the In re Tsay JBR LLC opinion, clarifying a framework for determining whether an award is legal or equitable. 136 F.4th 1176, 1180 (9th Cir. 2025); (see Opp'n at 3.)  In its September 23, 2025, New Trial Order, this Court analyzed punitive damages under the In re Tsay framework, finding that the punitive damages award is legal because it is "designed to punish or deter the wrongdoer" and not "solely to restore the status quo."  (New Trial Order at 3–4 (citing 136 F.4th 1176, 1180 (9th Cir. 2025)).)

The OMG Girlz argue that there is no grounds for difference of opinion.  (See Opp'n at 3.)  They claim that In re Tsay, a published Ninth Circuit opinion, overwrote Proofpoint, an earlier unpublished Ninth Circuit opinion, and established the framework for determining whether a remedy is legal or equitable.  (Id.)  The OMG Girlz also argue that there are "no circuit splits or inconsistent district holdings," suggesting no substantial ground for difference of opinion.  (Id. at 4.)

This Court finds that reasonable judges may differ over whether In re Tsay overwrote Proofpoint.  Proofpoint specifically addressed remedies tethered to disgorgement, while In re Tsay did not, but it established a general framework for analyzing remedies as legal or equitable.  Compare Proofpoint, 2024 WL 4003096, at *1 with In re Tsay, 136 F.4th at 1180–81.  Furthermore, In re Tsay draws on the same cases referenced by Proofpoint, including SEC v. Jarksey, 603 U.S. 109 (2024), but does not address Proofpoint.  Id.  Therefore, after Proofpoint and In re Tsay, it is not obvious whether courts should apply the general In re Tsay framework or the specific Proofpoint analysis for punitive damages in a disgorgement action.  Thus, reasonable judges may differ over whether a trial over punitive damages should be tried by a jury or the bench in this case.  And despite the OMG Girlz' claim, no law suggests that a circuit split is

**A259**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    2:20-cv-11548-JVS-AGR                    Date    November 20, 2025

Title       MGA Entertainment Inc. v. Clifford T.I. Harris et al

required to justify this uncertainty as a substantial ground for difference in opinion.
Therefore, the Court finds that substantial grounds for difference in opinion exist here.

### 3.    Advance Ultimate Termination of Litigation

An interlocutory appeal advances the ultimate termination of litigation "when
resolution of the question 'may appreciably shorten the time, effort, or expense' of the
district court proceedings." ICTSI Oregon, 22 F.4th at 1131.

MGA argues that if this Court declines to certify interlocutory appeal, it may
appeal after final judgment in the jury trial, potentially resulting in a fifth bench trial.
(Mot. at 8.)  The OMG Girlz respond that, if so, the Court could simply review the
punitive damages trial record and treat the jury's record as advisory in making its own
finding.  (Opp'n at 6.)

The Court finds that even if it may treat the fourth trial's record as advisory in a
fifth bench trial, this cannot justify the time, effort, and expense of a jury trial if it is not
necessary.  To avoid extending an already protracted litigation history, the Court finds
that interlocutory appeal on this issue would advance the ultimate termination of
litigation.

Finding that all three statutory requirements are met, the Court **GRANTS**
certification of the New Trial Order for interlocutory appeal.

### B.    *Interlocutory Appeal of the Available Remedies Order*

In post-trial briefings, the parties disputed the availability of punitive damages
given the absence of actual damages.  (See Mot. at 3; Dkt. 1046 at 24–25;  Dkt. 1121-1
at 11–12; Dkt. 1125 at 12–14.)  In its Available Remedies Order, the Court ruled that
punitive damages were available, but vacated the punitive damages award, finding that
the jury's verdict was contrary to the clear weight of the evidence that MGA acted
willfully.  (Available Remedies Order at 12–13.)  MGA seeks interlocutory appeal on the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-11548-JVS-AGR | Date | November 20, 2025 |
| Title | MGA Entertainment Inc. v. Clifford T.I. Harris et al | | |

issue of whether punitive damages are available in the absence of actual damages. (Mot. at 9.)

### 1. Procedural Arguments

The OMG Girlz object to the certification of interlocutory appeal of the Available Remedies Order on several procedural grounds. First, the OMG Girlz suggest that MGA waived its ability to challenge punitive damages because it failed to raise the argument under Rule 50(a) before trial. (Opp'n at 6.) But as MGA points out, this Court has already rejected that argument. (Order, Dkt. No. 1133, at 6.) Because MGA requested punitive damages relief under Rule 59, their argument was not waived. (Id.)

Second, the OMG Girlz also suggest that MGA's request for review on this issue is untimely because the Court ruled on the availability of damages months ago. (Opp'n at 6.) There is no specified time limit for seeking certification, unless the request is "inexcusably dilatory." Spears v. Washington Mut. Bank FA, 2010 WL 54755, at *1 (N.D. Cal. Jan. 8, 2010). The OMG Girlz have made no argument that the three months between the Available Remedies Order and the motion for certification is "inexcusably dilatory." Id. Thus, the Court does not entertain this argument.

Lastly, the OMG Girlz argue that the Available Remedies Order is inapt for certification because the question at issue, whether punitive damages are available without actual damages, is one of state law. (Opp'n at 7.) Federal courts are competent to apply state law, and only in exceptional circumstances is certification before a state supreme court advisable. See McKesson v. Doe, 592 U.S. 1, 5 (2020). Even if the Ninth Circuit was to certify the question to the California Supreme Court, causing some delay, this does not impact whether this Court should grant interlocutory appeal. The OMG Girlz fail to present any law that suggests the likelihood of state court certification impacts a court's ability to grant interlocutory appeal to an issue that is "material" to the order. See In re Cinematronics, 916 F.2d at 1449.

A261

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:20-cv-11548-JVS-AGR                    Date   November 20, 2025

Title      MGA Entertainment Inc. v. Clifford T.I. Harris et al

Finding none of the OMG Girlz' procedural arguments availing, the Court continues to the 1292(b) statutory factors to determine if certification is appropriate.

2.      Controlling Question of Law

MGA argues there exists a controlling question of law: "are punitive damages available at all without actual damages?" (Mot. at 4.) The OMG Girlz do not challenge whether this is a controlling question of law in their Opposition, seeming to concede the factor. (See Opp'n at 7.) The Court agrees with MGA that this question is purely legal and its resolution could eliminate the need for a fourth trial. Thus, the first factor is satisfied.

3.      Substantial Ground for Difference of Opinion

MGA argues that California law is clear that punitive damages are unavailable without actual damages. (Mot. at 10 (citing California v. Atlus Finance S.A._, 540 F.3d 992, 1000 (9th Cir. 2008); accord Mother Cobb's Chicken Turnovers, Inc. v. Fox_, 10 Cal. 2d 203, 205 (1937) ("Actual damages must be found as a predicate for exemplary damages.").)[2]

The OMG Girlz disagree, arguing that punitive damages are available if "a tortious act be proven." (Opp'n at 7 (citing Topanga Corp. v. Gentile, 249 Cal. App. 2d 681, 691 (Ct. App. 1967).) But the California Supreme Court has repeatedly held that proof of liability is not enough to render punitive damages available. See Mother Cobb's Chicken

---

[2]The Court finds that MGA oversimplifies the Ninth Circuit's opinion in Altus Fin on this issue. (Reply at 10 (citing Altus Fin., 540 F.3d at 996, 1001).) In Altus Fin., the Ninth Circuit stated that restitution is not a permissible predicate for punitive damages where the "defendant is not legally liable for fraud and a jury has expressly awarded '$0' in compensatory damages." Altus Fin., 540 F.3d at 1003. Here, the jury found MGA liable. (Final Judgment at 1.) And the jury never analyzed compensatory damages, as the OMG Girlz opted for the jury to only consider disgorgement. (Mot. in Limine No. 4, Dkt. No. 502, at 7–8; MGA's Proposed Findings of Fact and Conclusions of Law, Dkt. No. 1071, at 24–25.) Thus, nothing in Altus Fin. precludes a finding of punitive damages in this case.

A262

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    2:20-cv-11548-JVS-AGR                    Date    November 20, 2025

Title    MGA Entertainment Inc. v. Clifford T.I. Harris et al

Turnovers, 10 Cal. 2d 203 at 206 (1937) (finding punitive damages unavailable because, although the jury found the defendant liable, the plaintiff suffered no damages, and thus was awarded no compensatory damages); see also Kizer v. County of San Mateo 53 Cal.3d 139, 147 (1991) ("In California, as at common law, actual damages are an absolute predicate for an award of exemplary or punitive damages."); Cheung v. Daley, 35 Cal. App. 4th 1673, 1676 (1995) (summarizing decades of case law and concluding "our highest court requires that any award of exemplary damages be accompanied by an express award of compensatory damages.").

Neither party is correct.  California case law states that punitive damages are available when either actual damages or the "equivalent" of actual damages, such as restitution, is awarded.  See Cheung, 35 Cal. App. 4th at 1677 n.8.  Indeed, as this Court described in its Available Remedies Order, California courts have found that punitive damages are not precluded when the plaintiff's recovery is in the form of specific restitution, instead of monetary damages.  (See Available Remedies Order at 14); Millar v. James, 254 Cal. App. 2d 530, 533 (1967); see also Horn v. Guaranty Chevrolet Motors, 270 Cal. App. 2d 477, 484 (1969) ("[I]t is immaterial that plaintiff's recovery is in the form of specific restitution, rather than monetary damages.").  This Court found that the jury awarded damages to reflect "the profits that MGA received from the use of the OMG Girlz' name, identity, or likeness," a form of restitution.  (Available Remedies Order at 14.)

Yet MGA argues that the disgorgement award here is not equivalent to actual damages, and thus punitive damages are not available.  (See Opp'n at 16.)  It claims that because the disgorgement award was based on MGA's profits, not on the OMG Girlz' losses, there was no "financial harm."  (Id.)  But this Court noted that damages for common law misappropriation may extend beyond mere economic losses, and it found that disgorgement of profits was a proper remedy as a form of "additional resulting damages."  (See Order on Post-Trial Equitable Issues, Dkt. No. 1090, at 13–14.)  Thus, the Court finds that disgorgement was awarded as an "equivalent to actual damages." Cheung, 35 Cal. App. 4th at 1677 n.8.

A263

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    2:20-cv-11548-JVS-AGR                    Date    November 20, 2025

Title       MGA Entertainment Inc. v. Clifford T.I. Harris et al

Furthermore, punitive damages are appropriate in the absence of actual damages when the award of "restitution would have little or no deterrent effect." Ward v. Taggart, 51 Cal. 2d 736, 743 (1959). In Ward, the California Supreme Court awarded punitive damages predicated on restitution against a plaintiff who made an unlawful profit at the expense of the defendants. Id. The court found that in the absence of punitive damages, the plaintiff "would run no risk of liability to their victims beyond that of returning what they wrongfully obtained." Id. Similarly, disgorgement alone is not a deterrent to MGA; disgorgement simply requires MGA to return what was wrongfully obtained. Thus, punitive damages are necessary for deterrence and are appropriate in this case.

Thus, in this case, the Court finds that whether punitive damages are available in the absence of actual damages is not "an issue over which reasonable judges might differ." Reese, 643 F.3d at 688. Thus, the second 1292(b) factor fails, and the Court **DENIES** MGA's motion to certify for interlocutory appeal of the Available Remedies Order.[3]

## IV. CONCLUSION

For the foregoing reasons, this Court **GRANTS** interlocutory appeal of the New Trial Order and **DENIES** interlocutory appeal of the Available Remedies Order. The Court also hereby **STAYS** proceedings pending resolution of the appeal to the Ninth

---

[3] Although the statutory factors fail for certification of the Available Remedies Order, MGA argues that the Ninth Circuit may still consider the order because of the certification of the New Trial Order. (See Mot. at 9.) MGA points to the Ninth Circuit's holding that it may "address issues outside the four corners of the properly certified order" when the issue "provides grounds for reversal of the entire order." (Mot. at 9); In re Cinematronics, Inc., 916 F.2d 1444, 1449 (9th Cir. 1990). The Court agrees with MGA that the Ninth Circuit may analyze the New Trial Order on the basis that it is "inextricably tied" to the Available Remedies Order. Id.; (see Mot. at 9.) Whether punitive damages are available is a prerequisite question as to whether punitive damages must be determined by a jury. Thus, the Ninth Circuit can likely assess the Available Remedies Order on interlocutory appeal, even without independent statutory certification from this Court.

| CV-90 (06/04) | **CIVIL MINUTES - GENERAL** | Page 10 of 11 |

**A264**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:20-cv-11548-JVS-AGR                    Date   November 20, 2025

Title      MGA Entertainment Inc. v. Clifford T.I. Harris et al

Circuit. The parties shall file a status brief within ten (10) days of the resolution of appeal, or sooner if events warrant.

**IT IS SO ORDERED.**

A265

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

MGA ENTERTAINMENT, INC.,
a California corporation,

        Plaintiff,

    vs.

CLIFFORD "T.I." HARRIS, an individual; TAMEKA "TINY" HARRIS, an individual; OMG GIRLZ LLC, a Delaware limited liability company; and DOES 1-10, inclusive,

        Defendants.

GRAND HUSTLE, LLC, PRETTY HUSTLE, LLC, and OMG GIRLZ LLC,

        Counter-Claimants,

    vs.

MGA ENTERTAINMENT, INC., ISAAC LARIAN, and DOES 1 – 10, inclusive,

        Counter-Defendants.

**Case No. 2:20-cv-11548-JVS-AGR**

**FINAL JUDGMENT**

Judge: Hon. James V. Selna

Complaint Filed:  December 20, 2020

Trial Date:  September 3, 2024

A266

This action was tried before a jury and the Court, the Honorable James V. Selna presiding, between September 3, 2024 and September 23, 2024. On September 23, 2024, the jury returned a verdict in favor of Counter-Claimants Grand Hustle, LLC, Pretty Hustle, LLC, and OMG Girlz LLC (collectively, "OMG Girlz") on their claims against Plaintiff and Counter-Defendant MGA Entertainment, Inc. ("MGA Entertainment") and Counter-Defendant Isaac Larian (collectively, "MGA") for trade dress infringement under 15 U.S.C. § 1125 and on their claim for misappropriation of name, likeness, or identity with respect to the seven dolls at issue: Chillax, Roller Chick, Metal Chick, Bhad Gurl, Prism, Miss Divine, and Runaway Diva. (*See* Dkt. 1009). The jury further found that eight additional dolls subject only to MGA's declaratory judgment claims infringed the OMG Girlz' trade dress and/or name, likeness, or identity: Downtown B.B., Punk Grrrl, Virtuelle, Honeylicious, Miss Independent, City Babe, Shadow (trade dress infringement only), and Miss Glam (misappropriation of name, likeness, or identity only). (*See id.*). The Court previously disposed of the OMG Girlz' trade dress and misappropriation claims related to other dolls, as well as other claims asserted by the OMG Girlz, at summary judgment (*See* Dkt. 326). Accordingly, pursuant to Federal Rule of Civil Procedure 58, consistent with this Court's July 29, 2022 Order Regarding Motion for Summary Judgment (Dkt. 326), the jury's verdicts (Dkts. 1009 and 1011), this Court's February 3, 2025 Order Regarding Post-Trial Equitable Issues (Dkt. 1090), and this Court's April 15, 2025 Order Regarding Motion for Entry of Judgment and Request for Permanent Injunction (Dkt. 1113), the Court hereby ENTERS FINAL JUDGMENT as follows:

As to the OMG Girlz' Third Amended Counterclaims (Dkt. 63) for trade dress infringement (15 U.S.C. § 1125) and common law misappropriation of name, likeness, or identity, judgment is entered in favor of the OMG Girlz as to the following L.O.L. Surprise! O.M.G. dolls: Chillax, Roller Chick, Metal Chick, Bhad Gurl, Prism, Miss Divine, and Runway Diva.

As to the OMG Girlz' Third Amended Counterclaims (Dkt. 63) for (1) trademark infringement (15 U.S.C. § 1125), (2) statutory misappropriation of name or likeness (Cal. Civ. Code § 3344), (3) statutory unfair competition (Cal. Bus. & Prof. Code § 17200, et seq.), and (4) common law unfair competition, judgment is entered in favor of Counter-Defendants MGA Entertainment and Isaac Larian.

As to MGA's First Amended Complaint For Declaratory Judgment (Dkt. 16), judgment is entered in favor of MGA as to the following L.O.L. Surprise! O.M.G. dolls with respect to trade dress infringement and common law misappropriation of name, likeness, or identity: Ferocious, Fame Queen, Uptown Girl, Class Prez, Rocker Boi, Lady Diva, Sweets, Spicy Babe, Miss Royale, B-Gurl, Major Lady, Cosmic Nova, 24K D.J., Snowlicious, Candylicious, Gamma Babe, Moonlight B.B., NYE Queen, Splash Beauty, Sunshine Gurl, Sways, Crystal Star, Swag, Royal Bee, Neonlicious, Dollie, Busy B.B., Groovy Babe, Dazzle, Angles, Speedster, Da Boss, Missy Meow, Alt Grrrl, Big Wig, Camp Cutie, Icy Gurl, Pop B.B., Kitty K, Lonestar, Jukebox B.B., Cool Lev, Cheer Diva, Vault Queen, Coastal Q.T., Paradise V.I.P., Coral Waves, Spirit Queen, Ms. Direct, Magic Starlette, L.O.L. Surprise! O.M.G. Movie Magic Studios (Agent Glamour and Agent Soul), Tough Dude, Pink Chick, Fly Gurl, Sunset, Miss Celebrate, Skatepark Q.T., and Trendsetter.

As to MGA's First Amended Complaint For Declaratory Judgment, judgment is entered in favor of MGA as to the following L.O.L. Surprise! O.M.G. doll with respect to trade dress infringement only: Miss Glam.

As to MGA's First Amended Complaint For Declaratory Judgment, judgment is entered in favor of MGA as to the following L.O.L. Surprise! O.M.G. doll with respect to common law misappropriation of name, likeness, or identity only: Shadow.

As to MGA's First Amended Complaint For Declaratory Judgment, judgment is entered in favor of the OMG Girlz as to the following L.O.L. Surprise! O.M.G. dolls with respect to trade dress infringement: Chillax, Roller Chick, Metal Chick,

Case No. 2:20-cv-11548-JVS-AGR
FINAL JUDGMENT

Bhad Gurl, Prism, Miss Divine, Runway Diva, Downtown B.B., Punk Grrrl, Virtuelle, Honeylicious, Miss Independent, City Babe, and Shadow.

As to MGA's First Amended Complaint For Declaratory Judgment, judgment is entered in favor of the OMG Girlz as to the following L.O.L. Surprise! O.M.G. dolls with respect to common law misappropriation of name, likeness, or identity: Chillax, Roller Chick, Metal Chick, Bhad Gurl, Prism, Miss Divine, Runway Diva, Downtown B.B., Punk Grrrl, Virtuelle, Honeylicious, Miss Independent, City Babe, and Miss Glam.

In the Court's Order Regarding Post-Trial Equitable Issues (Dkt. 1090), the Court adopted the jury's disgorgement award of $17,872,253 for MGA's common law misappropriation of the OMG Girlz' name, likeness, or identity. The Court did not adopt the jury's disgorgement award under the Lanham Act, and instead awarded the OMG Girlz no disgorgement of MGA's profits under the Lanham Act. (*Id.* at 12).

As to the OMG Girlz' claim for punitive damages under common law misappropriation of the OMG Girlz' name, likeness, or identity the jury found MGA's misappropriation was conducted with oppression, fraud, or malice, (Dkt. No. 1009), and awarded $53,616,759 in punitive damages (Dkt. 1011). The Court found that the jury's punitive damages award was binding under Fed. R. Civ. P. 39(c). (Dkt. 1090 at 18–20).

The Court awards the OMG Girlz post-judgment interest on the $71,489,012 judgment at a rate of 3.972% from April 15, 2025, until the date of payment, compounded annually. (*See* Dkt. 1113).

Case No. 2:20-cv-11548-JVS-AGR
FINAL JUDGMENT

The Court leaves for further later determination of the prevailing party for purposes of costs, attorney's fee, and all other post judgment relief.

FINAL JUDGMENT IS SO ENTERED.

Dated:  April 29, 2025

_____
The Honorable James V. Selna
United States District Judge

A270